RECEIVED IN CHAMBERS   DJF

JUN 5 2002

RECEIVED
U.S DISTRICT COURT E.D.N Y
IN CLERK'S OFFICE
LONG ISLAND OFFICE

★   JUN 05 2002   ★

ENTERED
★ 6/12/02 ★

**Pomerantz Haudek Block Grossman & Gross LLP**
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
100 Park Avenue
New York, New York 10017
212-661-1100

Counsel for Plaintiff and the Putative Class

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| |
|---|
| STEPHEN R. STEINBERG, on his own behalf and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NATIONWIDE MUTUAL INSURANCE COMPANY, <br><br> Defendant. |

99-CV-7725

**AFFIDAVIT OF D. BRIAN HUFFORD IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF NEW YORK   )

D. BRIAN HUFFORD, being duly sworn, deposes and says:

1.    I am an attorney admitted to practice in the State of New York and am a member of the firm of Pomerantz Haudek Block Grossman & Gross LLP, plaintiff's counsel in the above-captioned litigation. I submit this affidavit in support of plaintiff's Motion for Class Certification.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the Affidavit of Thomas C. Meloy, Esq. ("Meloy Aff."), the Chief Claims Counsel for defendant Nationwide Mutual Insurance Company ("Nationwide"), dated February 4, 2000, which was filed by the defendant in

178

this action. Attached at Tab 1 to the Meloy Affidavit a true and correct copy of the Nationwide automobile insurance policy for plaintiff Stephen R. Steinberg. Meloy Aff., ¶ 16.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Thomas O. Rau on Behalf of Nationwide Mutual Insurance Company, dated October 17, 2001, which was filed by the defendant in this action. Mr. Rau is Pricing/Actuarial Senior Consultant for Nationwide.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Robert W. Basehore, Jr. on Behalf of Nationwide Mutual Insurance Company, dated December 17, 2001, which was filed by the defendant in this action. Mr. Basehore is Manager - Product Compliance for Nationwide. Attached at Tab A to the Basehore Affidvit is a document entitled "Nationwide Mutual Insurance Policies and Amendatory Endorsements Produced on 11/21/01 in *Steinberg v. Nationwide Mut. Ins. Co.*," which, according to Mr. Basehore, "identifies the effective/approval date and the state to which each listed form type and form number applies." Basehore Aff., ¶ 3.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a Nationwide automobile insurance policy issued for the State of Michigan, as of January 1, 1998 (bates number 001694-1720), as specified in the chart attached to the Basehore Affidavit at Tab A (Exh. 3 hereto).

6.      Attached hereto as Exhibit 5 is a true and correct copy of a chart identifying the language used in the automobile insurance policies issued by Nationwide in various states for "Actual Cash Value" and related terms, based on the policies produced by Nationwide and identified in the chart attached to the Basehore Affidavit at Tab A (Exh. 3 hereto).

7.      Attached hereto as Exhibit 6 is a true and correct copy of the transcript of the deposition of Terry Michael Forkner taken in this action on August 17, 2001. Mr. Forkner is a Material Damage Claims Technical Officer for Nationwide.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a memorandum dated December 14, 1998 from Terry Forkner to Material Damage Claims Directors, produced by Nationwide in this action and with bates number 00472-473. This document was marked as Exhibit 1 in the Forkner Deposition.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a firm resume for Pomerantz Haudek Block Grossman & Gross LLP.

10.     Attached hereto as Exhibit 9 is a true and correct copy of a summary of the laws of the 50 states which demonstrates that there are no material differences for their common law breach of contract claims.

11.     Attached hereto as Exhibit 10 is a true and correct copy of *Gilman v. Independence Blue Cross and Medical Service Ass'n of Penn.*, 1997 U.S. Dist. LEXIS 15481 (E.D. Pa. Oct. 6, 1997).

12.     Attached hereto as Exhibit 11 is a true and correct copy of *Sutton v. Medical Service Ass'n of Penn.*, 1993 U.S. Dist. LEXIS 3049 (E.D. Pa. Mar. 5, 1993).

13.     Attached hereto as Exhibit 12 is a true and correct copy of *Snider v. State Farm Mutual Automobile Insurance Co.*, No. 97-L-114, *slip op.* (Ill. Cir. Ct. Dec. 5, 1997).

14.     Attached hereto as Exhibit 13 is a true and correct copy of *Avery v. State Farm Mut. Auto. Ins. Co.*, No. 97-L-114, *slip op.* (Ill. Cir. Ct., Oct. 8, 1999).

15.    Attached hereto as Exhibit 14 is a true and correct copy of *Avery v. State Farm Mut. Auto. Ins. Co.*, No. 97-L-114, *slip op.* (Ill.App.Ct., 5th Dist., Apr. 5, 2001).

16.    Attached hereto as Exhibit 15 is a true and correct copy of In *Peterson v. State Farm Mut. Auto. Ins. Co.*, No. 99-L-394A, *slip op.* (Ill. Cir. Ct., Dec. 21, 2000).

17.    Attached hereto as Exhibit 16 is a true and correct copy of *Kaiser v. CIGNA Corp.*, No. 00-L-480, *slip op.* (Ill. Cir. Ct., Apr. 20, 2001).

18.    Attached hereto as Exhibit 17 is a true and correct copy of *Sims v. Allstate Insurance Company*, No. 99-L-393A, *slip op.* (Ill. Cir. Ct. Dec. 21, 2000).

Dated:  New York, New York
        June 4, 2002

_____
D. Brian Hufford

Sworn to before me this
4th day of June, 2002

_____
Notary Public

CAROLYN S. MOSKOWITZ
Notary Public, State of New York
No. 01MO6017657
Qualified in Kings County
Commission Expires 12/14/20_02_

Exhibit 1

**Swartz, Campbell & Detweiler**
**BY:** Curtis P. Cheyney, III, Esquire
Identification No. 03827
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316
(215)564-5190

**Attorney for Defendant,** Nationwide Mutual Insurance Company

2-4-00

---

| | |
|---|---|
| STEPHEN R. STEINBERG,<br><br>Plaintiff,<br><br>v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>Defendant. | UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br><br>99-CV-7725 |

# AFFIDAVIT

Before me, the undersigned authority, personally appeared Thomas C. Meloy, Esquire, who by me, being duly sworn, deposes and says under oath as follows:

1.       My name is Thomas C. Meloy. I am a resident of Mt. Vernon, Ohio; and I am an attorney, licensed to practice law by the Supreme Court of the State of Ohio. I am over 21 years of age; and I have personal knowledge of the facts and matters set forth in this affidavit, or where indicated, I have acquired knowledge from the personal investigation that is disclosed.

2.       I am employed by Nationwide Mutual Insurance Company (an Ohio corporation with its principal place of business in Ohio) as Chief Claims Counsel, and in the course of my duties, I have access to the claims information concerning the number of first-party insured physical damage automobile comprehensive loss claims under personal automobile policies issued by Nationwide Mutual Insurance Company.

3. I have reviewed the Complaint filed by the plaintiff, Stephen R. Steinberg and the claims made therein.

4. The claim referenced to in the Complaint would be classified as a first-party physical damage comprehensive coverage claim regarding the repair or replacement of a damaged part (damaged other than by collision or upset), and wherein the damaged part was replaced with a part supplied from the manufacturer with less wear and tear than the part which was damaged or destroyed, and replaced.

5. From January 1, 1992 through October 1, 1999, I have caused an investigation, and learned that there have been 3,849,503 first-party physical damage claims to automobiles or their parts made by policyholders of Nationwide Mutual Insurance Company throughout the nation. Approximately 50% of said claims represent comprehensive coverage claims for replacement or repair of the insured's automobile or parts thereof (wherein the damage was caused other than by collision or upset). In New York, there were approximately 20,970 first-party collision coverage claims and approximately 28,374 comprehensive claims during 1998 with similar number of claims for each preceding year.

6. The New York policy of the plaintiff is subject to a state-specific endorsement 1891(a), which in addition to the policy's exclusions for "wear and tear" indicates that the insurer's obligation can be satisfied by a payment of the actual cash value of the damaged part by the following state-approved language:

> "The limit of our coverage is the cash value of your auto or its damaged parts at the time of loss. We will consider fair market value, age and condition of the property at the time of loss to determine the cash value. . . ."

7. If the Court determines the policy exclusion for wear and tear is not valid (and precludes Nationwide's calculation of value of the damaged part to exclude wear and tear, and henceforth precludes

fair market value calculation to consider the age or condition of the used part), it will have economic losses for Nationwide Mutual Insurance Company's claims practices not only in New York but in other states. In New York, the calculation for "betterment" in 1998 for both collision and comprehensive coverages was approximately $280,000.00.

8. All such damaged vehicles that received a replacement part from the manufacturer or other sources are "used" vehicles owned by insureds, where the damaged part or parts has experienced wear and tear, to some calculable degrees, usually based on mileage for the entire vehicle.

9. The part or parts that are replaced are either parts supplied from the manufacturer and/or are supplied by an after-market part manufacturer. The parts, in their supplied condition, have not been previously used or installed on a vehicle, even if it is a reconditioned part from the manufacturer or by the repair shop. In all such cases, the parts, in their supplied and installed condition, is a part not previously subject to the effects of wear and tear, as was the part that was replaced.

10. The Nationwide Mutual Insurance Company policy for both collision and comprehensive coverage excludes coverage for wear and tear to the parts damaged.

11. The standard procedure for adjusting wear and tear values, when parts with less wear and tear are replaced or installed is to assess the effect of wear and tear to the damaged part in comparison with the replacement part, and to describe the difference as "betterment". "Betterment" is deducted from the policy benefit – the full cost of the replacement part.

12. The total of betterment charges for 1998 for automobile repair or replacement parts for 1998 was in excess of $75,000.00, and it is so for each preceding year in New York.

13. There is no reason to believe that 1998 is not a typical year for the "betterment" calculation of parts installed on insured vehicles under the comprehensive coverage.

-3-

14.     Plaintiff's claims for this suit involve a claims practice for Nationwide in all states where betterment deductions have been negotiated over a course of 5 years.

15.     Plaintiff's claims for injunctive relief demand that this Court require Nationwide to both discontinue its recognition of betterment in its claims practice, and absorb the cost for pre-damage wear and tear in a damaged part. Plaintiff's claims for injunctive relief demand that this Court require Nationwide to do so even though the replaced part has a greater value than the pre-damage value of the damaged part, and even though the replacement part improves the condition and/or the value of the vehicle and/or a damaged part. Such a result would render null and void Nationwide's contract agreement with its insureds to exclude coverage for wear and tear. At issue under plaintiff's proposed demand that the Court void Nationwide's contract agreement, is the value (viz., the single dollar figure which represents the value) of the betterment, and which Nationwide would have to absorb/pay for prospectively, ad infinitum. Further, Nationwide would have to absorb this cost for not only the proposed class members, but ad infinitum for all Nationwide insureds, in each of the fifty United States of America.

16.     A true and correct copy of the plaintiff's policy is attached hereto.

17.     This affidavit is offered for purpose of describing the economic impact, and the monies at issue in the litigation as described by plaintiff in the Complaint; the cost thereof to Nationwide from the Complaint is claims for contract damages, injunctive and diminutive claims as demanded by plaintiff exceeds the sum of $75,000.00.

THOMAS C. MELOY, ESQUIRE

SWORN TO AND SUBSCRIBED
before me this 9th day FEB
of          2000

Notary Public

My term expires:
NO EXPIRATION DATE

1



**NATIONWIDE INSURANCE**
Nationwide is on your side

# Nationwide's Century II Auto Policy

## Now — auto insurance protection you can count on in a policy you can understand

You now have a different kind of insurance policy. One that's readable, understandable, straightforward. We believe you have purchased the best in auto insurance protection—backed by the best in policyholder service. We intend to keep it that way.

Please take a few minutes to read and see what's inside your new Century II policy.

Should you have an accident or loss—and we hope you don't—just call us at once. Our claims service starts then. The telephone number to call is listed on your Nationwide identification card, or you may get in touch with any local claims office.

If you have any questions about this policy, or any part of your insurance program, your sales representative will welcome your call anytime.

Thank you for relying on Nationwide.

## YOUR GUIDE TO PROTECTION

**DEFINITIONS**
Key Policy Words ........................................................................ 2

**TERRITORY**
Where Your Protection Applies ........................................................ 3

**COVERAGES**
Comprehensive ........................................................................... 3
Collision .................................................................................... 3
Towing and Labor ....................................................................... 3
Property Damage and Bodily Injury Liability ...................................... 5
Comprehensive Family Liability ...................................................... 8

**GENERAL CONDITIONS**
Your Duties After an Accident or Loss ............................................. 10
How Your Policy May be Changed ................................................... 11
Our Right to Recover from Others (Subrogation) ................................. 11
Policy Renewal .......................................................................... 11
Your Right and Our Right to Cancel ................................................ 11
Our Installment Premium Plan ....................................................... 12

**MUTUAL POLICY CONDITIONS**
Your Membership in This Company ................................................. 12

**MANDATORY ENDORSEMENT**
Mandatory Personal Injury Protection (New York) .............................. 13

Nationwide Mutual Insurance Company • Nationwide Mutual Fire Insurance Company / Home Office: Columbus. Ohio 43215-2220

# ntionwide's
# entury II
# to Policy

## INSURING AGREEMENT

For **your** payment of premiums in amounts we require and subject to all of the terms and conditions of this policy, we agree to provide the coverages **you** have selected. **Your** selections are shown in the attached Declarations, which are a part of this policy contract. Subsequent premiums for renewal terms of six months each must be paid in advance.

## DEFINITIONS

The language of this insurance policy includes certain common words for easy understanding. They have exactly defined meanings. In this policy:

1. the words **"YOU"** and **"YOUR"** mean the policyholder first named in the attached Declarations. They include that policyholder's spouse if living in the same household.

2. the words **"WE"**, **"US"**, **"OUR"** and **"THE COMPANY"** mean the Nationwide Mutual Insurance Company.

3. the words **"THE INSURED"**, **"AN INSURED"**, and **"ANY INSURED"** mean or refer to the persons and organizations specifically indicated as entitled to protection under the coverage being described.

4. the words **"YOUR AUTO"** mean the vehicle or vehicles described in the attached Declarations.

5. the word **"DEDUCTIBLE"** means the amount of loss to be paid by **the insured** when a loss occurs. We pay for covered **loss** above the **deductible** amount.

6. the words **"MOTOR VEHICLE"** mean a land **motor vehicle** designed to be driven on public roads. This does not include vehicles operated on rails or crawler treads. Other **motor vehicles** designed for use mainly off public roads are covered when used on public roads.

7. the words **"PRIVATE PASSENGER AUTO"** mean a four-wheel:
   a) private passenger auto;
   b) station wagon;
   c) van;
   d) jeep; or
   e) pickup truck.

8. the word **"OCCUPYING"** means in or upon or entering into or alighting from.

9. the word **"RELATIVE"** means a person who regularly resides in your household and is related to you by blood, marriage or adoption (including a ward or foster child). A **relative** may be living temporarily outside **your** household.

10. the words **"BODILY INJURY"** mean:
    a) bodily injury;
    b) sickness;
    c) disease; or
    d) death of any person.

11. the words **"PROPERTY DAMAGE"** mean:
    a) destruction of property;
    b) damage or injury to it; or
    c) loss of its use.

Other words are also defined. All defined words are boldfaced when used.

*(Attach Declarations and Endorsements Here)*

## TERRITORY

All coverages in this policy apply only to occurrences while the policy is in force. All coverages apply in Canada, the United States of America and its territories or possessions, or between their ports. All coverages except Uninsured Motorists coverage apply to occurrences in Mexico, if within 50 miles of the United States boundary. We will base the amount of any Comprehensive or Collision loss in Mexico on cost at the nearest United States point. Comprehensive Family Liability coverage has no territorial limitations.

**NOTE:** **You** will need to buy auto insurance from a Mexican insurance company—regardless of coverage provided by this policy—before driving in Mexico. Otherwise, **you** may be subject to jail detention, auto impoundment, and other legal complications in case of an accident.

## physical damage coverages
(damage to your auto)



**Additional Definitions Applicable to These Coverages**

1. The word "loss" means direct and accidental loss or damage to **your auto** including its equipment.

2. The word "equipment" means anything usual and incidental to the use of a **motor vehicle** as a motor vehicle. A trailer is not **equipment**.

## COVERAGES

**COMPREHENSIVE COVERAGE**   We will pay for loss to **your auto** not caused by collision or upset. We will pay for the loss less your declared **deductible**. Loss from contact with animals or falling or flying objects is covered. Broken glass is covered—even if caused by collision or upset—if **you** do not have Collision coverage. If **your** Comprehensive and Collision coverages have different **deductibles**, the smaller **deductible** will apply to broken glass.

Also, if **your auto** has a loss under this coverage we will:

1. pay for resulting loss of your clothing and luggage or that of any **relatives**. Maximum payment is $200. We will pay for stolen clothing or luggage only if **your auto** is stolen.

2. repay **your** travel costs after **your auto** is stolen. Maximum payment is $10 per day—not to exceed $300. These costs must be incurred within a certain time. It begins 48 hours after **you** report the theft to us and the police. It ends when **your auto** is returned to **you** or we pay for its **loss**.

3. repay **you** for the cost of travel from where **your auto** was disabled to where **you** were going. Maximum payment is $10.

**COLLISION COVERAGE**   We will pay for loss to **your auto** caused by collision or upset. This includes broken glass. We will pay for the loss less your declared **deductible**. However, we will not subtract the **deductible** amount:

1. if **your auto** collides with another **motor vehicle** insured by us, or

2. for broken glass if **you** have full (no **deductible**) Comprehensive coverage in force.

Also if **your auto** has a loss under this coverage, we will:

1. pay for a resulting loss of your clothing and luggage or that of any **relatives**. Maximum payment is $200.

2. repay **you** for the travel cost to where **you** were going. Maximum payment is $10.

**TOWING AND LABOR COSTS COVERAGE**   We will pay towing and labor costs if **your auto** is disabled. We will pay only for labor costs at the place where **your auto** is disabled.

## COVERAGE EXTENSIONS

**USE OF TRAILERS**   **Your auto's** insurance covers a trailer used by **you** or a member of **your** household. The trailer must not be otherwise insured. The trailer must not be owned by **you** or anyone in **your** household. It must be designed for use with a **private passenger auto**. The maximum

**physical damage**
(continued)

amount payable for such loss is $500. **We** will not pay when the trailer is used:

1. for business purposes with a vehicle that's not a **private passenger auto**.

2. with a vehicle that's not insured under these coverages.

**USE OF OTHER MOTOR VEHICLES**   Subject to Special Coverage Condition—Auto Inspection, **your auto's** insurance also will cover other **motor vehicles** as follows:

1. a **motor vehicle you** do not own, while it is used in place of **your auto** for a short time. **Your auto** must be out of use because of:

   a) breakdown;               c) servicing; or

   b) repair;                    d) **loss**.

2. a four-wheel **motor vehicle** newly acquired by **you**. The coverage applies only during the first 30 days **you** own the vehicle, unless it replaces **your auto**. **We** provide this coverage only if **you** do not have other collectible insurance. **You** must pay any additional premium resulting from this coverage extension.

3. a **private passenger auto** owned by a non-member of **your** household. This applies only while such auto is used by **you** or a **relative**. It applies only to policies issued to persons. **We** will not pay for **loss**:

   a) that results from the operation of:

      (1) an auto repair shop;           (3) sales agency; or

      (2) public garage or parking place;    (4) service station.

   b) while **you** or a member of **your** household have the car for regular use.

## COVERAGE EXCLUSIONS

**We** will not pay for **loss**:

1. to more than one:

   a) stereo tape;

   b) cassette; or

   c) cartridge.

2. to a container to be used for storing or carrying:

   a) stereo tapes;

   b) cassettes; or

   c) cartridges.

3. to any:

   a) citizens band radio;

   b) two-way mobile radio;

   c) telephone; or

   d) other equipment which receives and transmits sound.

This exclusion does not apply if the equipment is a permanent part of **your auto**. Permanent part means installed in a location planned by the auto maker for a radio. If this equipment is not covered, its antenna and other parts are not covered.

4. to a camper or living quarters unit which can be mounted on or attached to a vehicle. **We** will pay the **loss** if the unit is reported to **us** and the required premium is paid before the **loss**.

5. due to:

   a) wear and tear;

   b) freezing; .

   c) mechanical or electrical breakdown or failure.

This exclusion does not apply to damage which is the result of other **loss** covered by this policy. This exclusion does not apply to Towing and Labor coverage.

6. while any **motor vehicle** is under hire. **Motor vehicles** used in shared-expense car pools are **not motor vehicles** under hire.

7. to any auto due to an act of war.

**physical damage**
(continued)

## LIMITS OF PAYMENT

**ACTUAL CASH VALUE**   The limit of **our** coverage is the cash value of **your auto** or its damaged parts at the time of **loss**. We will consider fair market value, age, and condition of the property at the time of **loss** to determine cash value. We may pay you directly for a **loss**. We may repair or replace **your auto** or its damaged parts. We may return stolen property at **our** expense and pay for any damage.

**OTHER INSURANCE**   If **you** have other insurance that covers any **loss**, we will pay only **our** share of the **loss**. **Our** share is **our** proportion of the total insurance collectible for the **loss**. For **loss** to **motor vehicles** other than **your auto**, **we will** pay only the insured **loss** not covered by other insurance.

## ASSIGNABILITY

No interest in these coverages can be transferred without **our** written consent. However, if **you** die, they will stay in force for the rest of the policy period. They will apply for anyone having proper temporary custody of **your auto**.

## SPECIAL COVERAGE CONDITIONS

**AUTO INSPECTION**   We have the right to inspect any **private passenger auto** before insuring it for these coverages. This must be done as prescribed by the New York State Insurance Department. We will not cover any additional or replacement **private passenger auto** until **you** request coverage for it.

**AUTO REPAIR**   Repair of the auto shall not be required to pay a **loss**. We may require the following:



1. a completed "Certification of Auto Repairs" as prescribed by the New York State Insurance Department;

2. an itemized repair bill;

3. an inspection of the auto.

**AUTO RECOVERY**   When an insured auto which has been stolen or abandoned is located, **we** have the right to take it into **our** care to keep it safe.

---

## auto liability

(for damage or injury to others caused by your auto)

## COVERAGE

**PROPERTY DAMAGE AND BODILY INJURY LIABILITY COVERAGE**   We will pay for damages that **you** are legally obligated to pay as a result of an accident arising out of the:

1. ownership;

2. maintenance or use; or

3. loading or unloading

of **your auto**. Persons who live in **your** home also have this protection. So does any person or organization who is liable for the use of **your auto**. It must be used with **your** permission. Damages must involve **property damage** or **bodily injury**. We will pay such liability losses up to the limits stated in the attached Declarations.

In addition to these limits and as to any covered damages, we will:

1.   defend at **our** expense, with attorneys of **our** choice, any suit against **the insured**. Jurisdiction of the court must have been obtained without reference to **our** obligation in this policy. **We** may settle or defend any claim or suit as we think proper.

2.   pay all expense incurred by **us**, and all costs levied against **the insured** in any such suit.

3.   pay all premiums on appeal bonds in defended suits. **We** also will pay a premium of not more than $250 for bail bond required because of an accident or traffic violation. Although paying such premiums, **we** are not required to apply for or furnish such bonds.

4.   pay all premiums on bonds to release attached property.

**auto liability**
(continued)

5. pay interest on all damages awarded. **We** will not pay interest that accrues after such time as **we** have:

    a) paid;

    b) formally offered; or

    c) deposited in court

the amount for which **we** are liable under this policy.

6. pay expenses incurred by **an insured** for emergency medical aid to others at the time of accident.

7. pay all reasonable expenses incurred by **an insured** at **our** request, but not more than $25 per day for loss of earnings.

After the limits of this coverage have been paid, **we** will not defend any suit or pay any claim or judgment.

## COVERAGE EXTENSIONS



**USE OF TRAILERS**   This insurance covers the use of a trailer by **you** or someone else with **your** permission. The trailer must be used with a **private passenger auto**.

This coverage does not apply when the trailer is used:

1. for business purposes with a vehicle that's not a **private passenger auto**.

2. with a vehicle that's not insured under this coverage.

**USE OF OTHER MOTOR VEHICLES**   This insurance also applies to certain other **motor vehicles** as follows:

1. a **motor vehicle you** do not own, while it is used in place of **your auto** for a short time. **Your auto** must be out of use because of:

    a) breakdown;           c) servicing; or

    b) repair;               d) loss.

2. a four-wheel **motor vehicle** newly acquired by **you**. It applies only during the first 30 days **you** own the vehicle unless it replaces **your auto**. It applies only if **you** do not have other insurance. **You** must pay any premiums resulting from this coverage.

3. to a **motor vehicle** owned by a non-member of **your** household. This applies only when the **vehicle** is being used by **you** or a **relative**. It applies only in policies issued to persons (not organizations). It protects the user and any person or organization who does not own the vehicle but is legally responsible for its use. This insurance does not extend to losses that:

    a) involve the business use of a vehicle by **you** or a **relative**. It applies to a **private passenger auto** used by **you**, **your** chauffeur or employee in **your** home.

    b) occur while **you** or a member of **your** household have the car for regular use.

**FINANCIAL RESPONSIBILITY**   If the financial responsibility law of any state or province requires higher limits than those provided by this policy, we will adjust this policy to comply. **We** will also adjust this policy to comply with the kinds and limits of coverage required of non-residents by any compulsory **motor vehicle** insurance law, or similar law. However, any loss payment under this coverage will be made only over and above any other collectible **motor vehicle** insurance. In no case will anyone be entitled to duplicate payments for the same loss.

## COVERAGE EXCLUSIONS

This coverage does not apply to:

1. **property damage** or **bodily injury** caused intentionally by or at the direction of **an insured**.

2. any **motor vehicle** under hire. **Motor vehicles** used in shared-expense car pools are not **motor vehicles** under hire.

3. any occurrence arising out of the operation of:

    a) an auto repair shop;          c) a sales agency; or

    b) a public garage or parking place;    d) a service station.

**auto liability**
(continued)

However, it does cover the use of **your auto** by **you**, a member of **your** household and **your** associate or employee in such a business.

4. damage to any property **you** own or have in **your** care; except a rented home or rented private garage. The same applies to **any insured**.

5. **bodily injury** to others for which **any insured** may be liable under a workers' compensation, unemployment compensation, disability benefits, or similar law.

6. **bodily injury** to an employee of **any insured**, while engaged in his employment.
However, it does cover an employee at **your** home who is not covered or is not required to be covered by any workers' compensation law.

7. any obligation for which the government may be held liable under the Federal Tort Claims Act.

## LIMITS OF PAYMENT

**AMOUNTS PAYABLE FOR LIABILITY LOSSES**   **Our** obligation to pay Property Damage or Bodily Injury Liability losses is limited to the amounts per person and per occurrence stated in the Declarations. The following conditions apply to these limits:

1. For Property Damage Liability, limits shown are for all damages in one occurrence.

2. For Bodily Injury Liability, limits shown for any one person are for all damages claimed for **bodily injury** or loss of services of one person as a result of one occurrence. The total limit shown for each occurrence is for all damages sustained by two or more persons.

3. Insuring more than one person or vehicle under this policy does not increase **our** limits. Limits apply to each insured vehicle as stated in the Declarations.

4. In any **loss** covered under "USE OF OTHER MOTOR VEHICLES" the highest limits for any one vehicle apply.

5. A **motor vehicle** and attached trailer are considered one vehicle for Auto Liability coverage.

**SUPPLEMENTAL LIMITS OF LIABILITY**  If the **bodily injury** results in death, **we** will provide Supplemental Limits of Liability of:

1. $50,000 for such **bodily injury** resulting in death of one person as the result of one occurrence; and

2. subject to the above limit for one person, $100,000 for such **bodily injury** resulting in death of two or more persons as the result of each occurrence.

These Supplemental Limits of Liability shall be reduced as follows:

1. In the event of the death of one person, the $50,000 limit shall be reduced by any amounts paid to or on behalf of that person as outlined under the Amounts Payable For Liability Losses.

2. In the event of the death of two or more persons and subject to the limitation in item 1 above, the $100,000 limit shall be reduced by any amounts paid to or on behalf of those persons under the Amounts Payable For Liability Losses.

**OTHER INSURANCE**  If any **loss** involving the use of **your auto**, **we** will be liable for only **our** share of the **loss** if there is other collectible liability insurance. **Our**  share is **our** proportion of the total insurance limits for the loss. For losses involving the use of other **motor vehicles, we** will pay the insured loss not covered by other insurance.

## ASSIGNABILITY

No interest in this coverage can be transferred without **our** written consent. However, if **you** die, it will stay in force for the rest of the policy period. It will apply for anyone having proper temporary custody of **your auto**.

# compre-
# hensive
# family
# liability
# overages

r damage or injury to others
from non-vehicular causes)



## ADDITIONAL DEFINITIONS APPLICABLE TO THIS COVERAGE

"Premises" means:

1. your residence, even if rented on occasion to others.

2. other premises and grounds you use with your residence. This does not include any farm or business property.

3. a two-, three-, or four-family dwelling. You must, however, live in one unit. Its garage is included.

4. premises not owned by an insured, but in which any insured lives temporarily.

5. vacant land other than farmland, owned by or rented to an insured. This includes land on which a one- or two-family dwelling is being built for use by the insured.

6. any one- or two-family rental dwelling you own. This must be shown in the Declarations.

7. cemetery plots or burial vaults of any insured.

"Insured" means:

1. you or any relative.

2. any other persons under age 21. They must be in the care of you or a relative.

3. with respect to a covered animal or watercraft, a person or entity legally responsible for them.

They must be owned by you or an insured defined above. A person or entity using or having custody of this animal or watercraft:

   a) in the course of any business; or

   b) without the permission of the owner

is not an insured.

"Residence employee" means an employee of an insured whose duties relate to the maintenance or use of the premises.



# COVERAGES

## LIABILITY OTHER THAN AUTO

We will pay for damages an insured is legally obligated to pay because of bodily injury or property damage.

In addition to our limit of liability, we will:

1. defend at our expense any suit against an insured. This defense will be with counsel of our choice. We may settle or defend any claim or suit as we think proper. Our duty to settle or defend ends when we have paid our limits of coverage.

2. pay all expenses incurred by us. We will also pay all costs levied against an insured in any such suit.

3. pay premium on appeal bonds and bonds to release attached property. We will also pay up to $250 for the cost of bail bonds required due to an accident or traffic violation. We will not apply for or furnish such bonds.

4. pay interest on all damages awarded. We will not pay interest that accrues after such time as we have:

   a) paid;

   b) formally offered; or

   c) deposited in court

the amount for which we are liable under this policy.

5. pay expenses incurred by an insured for emergency medical aid to others at time of accident.

6. pay all reasonable expense incurred by the insured at our request. We will not pay more than $25 per day for loss of earnings.

**comprehensive family liability**
(continued)

**MEDICAL PAYMENTS OTHER THAN AUTO**  We will pay reasonable expenses incurred for necessary medical and funeral services because of **bodily injury** caused by accident. These expenses must be incurred within one year after the accident. This coverage does not apply to **an insured** or regular resident of **the insured's** premises. It does apply to a **residence employee**. This coverage applies to others as follows:

1. to a person on the **premises** with the consent of **an insured**.

2. to a person off the **premises** if the **bodily injury** is caused by:
   a) a condition of the **premises**.
   b) the activities of **an insured**.
   c) an animal **the insured** owns or is caring for.
   d) a **residence employee** of **an insured**.

**LIABILITY AND MEDICAL PAYMENTS EXCLUSIONS**  These coverages do not apply to **bodily injury** or **property damage**:

1. intentionally caused or directed by **the insured**. This exclusion does not apply to corporal punishment of pupils.

2. that arises out of the ownership, maintenance, or use of:
   a) any aircraft;
   b) a **motor vehicle** away from **premises**;
   c) a watercraft away from the **premises**:
      (1) if it has inboard or inboard-outdrive motor power of more than 50 horsepower; or
      (2) if it is a sailing vessel, with or without auxiliary power, 26 feet or more in overall length.
   d) any recreational vehicle away from the **premises**.

Employment-related injury of a **residence employee** is covered, except with respect to aircraft.

3. arising out of business pursuits of **an insured** from a business solely owned by him or in which he is a partner. This exclusion does not apply to any one- or two-family rental dwelling **you** own and which is shown in the Declarations. It does not apply to non-business activities relative to the operation of an:
   a) office;
   b) school;
   c) studio;
   d) barbershop; or
   e) beautyshop
on insured **premises**.

4. arising out of any professional services, except teaching.

5. if benefits are payable or required under any:
   a) workers' compensation;
   b) non-occupational disability; or
   c) occupational disease
law.

6. to property:
   a) rented to;
   b) occupied by;
   c) used by; or
   d) in charge of
**an insured**.

This exclusion does not apply to internal home furnishings or **premises** rented to or in charge of such insured.

**PHYSICAL DAMAGE TO PROPERTY**  We will pay for **property damage** to the property of others caused by direct physical acts of **an insured**. We will pay up to $250 per occurrence.

9

**comprehensive family liability**

(continued)

**PHYSICAL DAMAGE TO PROPERTY EXCLUSIONS**   We will not pay for property damage:

1. arising out of the ownership, maintenance, or use of:
   a) a **motor vehicle**;
   b) a watercraft;
   c) an aircraft; or
   d) any recreational vehicle away from the **premises**.

2. to property owned by **an insured**.

3. to property rented to **an insured** or resident of any insured **premises**.

4. intentionally caused by anyone age 13 or older.

5. arising out of business pursuits of an **insured** from a business solely owned by him or in which he is a partner. This exclusion does not apply to any one- or two-family rental dwelling you own and which is shown in the Declarations. It does not apply to non-business activities relative to the operation of an:
   a) office;
   b) school;
   c) studio;
   d) barbershop; or
   e) beautyshop

on insured **premises**.

6. arising out of any professional services, except teaching.

## LIMITS OF LIABILITY

The most **we** will pay as a result of any one occurrence is shown on the Declarations page. This applies regardless of the number of insureds or claims made.

**MEDICAL PAYMENTS OTHER THAN AUTO**   The most we will pay for any one person as a result of any one accident is shown on the Declarations page. This applies regardless of the number of insureds or claims made.

**OTHER INSURANCE**   We will be liable for only **our** proportional share of any loss if there is other collectible liability insurance. That share is determined by **our** proportion of the total insurance collectible for the loss. An exception is that this insurance is excess over any collectible insurance for **bodily injury** or **property damage** that arises out of the ownership, maintenance or use of:

1. a **motor vehicle** on the **premises**; and

2. watercraft or any land public conveyance.

## ASSIGNABILITY

No interest in this coverage can be transferred without **our** written consent. However, if **you** die, this coverage will stay in force for the rest of the policy period. It will insure other persons who had coverage at the time of **your** death. This includes **your** legal representative.

**general policy conditions**

We, **you**, and anyone insured by this policy must do certain things for the policy to apply. The following are policy conditions:

### 1. INSURED PERSONS' DUTIES

**The insured** or someone on his behalf will:
   a) give **us** or **our** agent prompt notice of all losses and proof of claim if required.
   b) notify the police of all theft losses.
   c) promptly deliver to **us** all papers dealing with any claims or suits.
   d) assist **us** with any claim or suit. Injured persons must submit to examinations by company-selected physicians as often as **the company** reasonably requires. The injured person must grant **us** authority, at **our** request, to obtain copies of wage and medical records. We also require

## general policy conditions
### (continued)



that damaged property insured under this policy be protected and made available to **us** for examination.

### 2. STOLEN MOTOR VEHICLES

Protection in this policy does not apply to any **motor vehicle any insured** has stolen, or to any **motor vehicle** that is known by **the insured** to be stolen.

### 3. HOW YOUR POLICY MAY BE CHANGED

a) Any terms of this policy which may be in conflict with statutes of the state in which the policy is issued are hereby amended to conform.

b) **Any insured** will automatically have the benefit of any extension or broadening of coverage in this policy, as of the effective date of the change, provided it does not require more premium.

c) No other changes may be made in the terms of this policy except by policy endorsement.

d) The premium for each coverage is based on information in **our** possession. Any change(s) in this information will allow **us** to make an adjustment of the premium on a pro rata basis.

### 4. IF YOU BECOME BANKRUPT

Bankruptcy or insolvency of **any insured** will not relieve **us** of any obligation under the terms of this policy.

### 5. SUBROGATION

We have the right of subrogation under the Physical Damage, Auto Liability, and Comprehensive Family Liability coverages in this policy. This means that after paying a **loss** to **you** or others under this policy, we will have **the insured's** right to sue for or otherwise recover such **loss** from anyone else who may be held responsible.

### 6. RENEWAL

**Your** policy is written for a six-month policy period. **We** will renew it for successive policy periods, subject to the following conditions:

a) Renewal will be in accordance with policy forms, rules, rates and rating plans in use by **us** at the time.

b) All premiums or premium installment payments must be paid when due. This applies whether they are payable directly to **us** or through any premium finance plan.

c) At any annual anniversary of the original effective date, **we** have the right to refuse to renew any coverage or the entire policy.

If **we** elect not to renew, **we** will mail or deliver written notice to **you** 45 days in advance of the date **our** action will take effect. Mailing of notice to **your** last known address or delivery of it to **you** will be considered proof of notice.

### 7. CANCELLATION DURING POLICY PERIOD

**You** may cancel this policy or any of its coverages by mailing notice to **us** of the future date of cancellation **you** desire. Premium refund, if any due, will be made as soon as practicable after the date of cancellation. Based on **our** "short-rate table," **we** will retain premium for the days **you** were covered plus a percentage-figured charge for cancelling at **your** request during the policy period. Up to the time this policy or any coverage has been in effect 60 days, **we** have unlimited right of cancellation. **We** may cancel by mailing or delivering notice to **you** 15 days in advance of termination of coverage if cancellation is for nonpayment of premium, or 20 days in advance of termination otherwise. While the date **we** mail this notice must be within the 60 days, the date of termination need not be.

After any coverage of this policy has been in force 60 days, **our** right to cancel such coverage during the policy period is limited. **We** may cancel for either of the following reasons:

a) if premiums or premium installment payments are not paid when due, whether payable directly to **us** or through any premium finance plan.

b) if **you** or anyone who lives in **your** household or who customarily operates a **motor vehicle** covered by **your** policy has his driver's license suspended or revoked during the policy period.

**We** must mail or deliver notice to **you** 20 days in advance of the date coverage is to be terminated, unless **we** are cancelling for nonpayment of premium. To cancel for nonpayment **we** will mail or deliver notice to **you** 15 days in advance of termination of coverage.

**general policy conditions**
(continued)

In any case of cancellation by **us**, **our** mailing of notice to **your** last known address or delivery of it to **you** will be considered proof of notice. **We** will retain premium for days **you** were covered during the policy period. Premium refund, if any due, will be made as soon as practicable. Mailing or delivery of **our** check will constitute tender of refund.

### 8. LEGAL ACTION LIMITATIONS

No legal action may be brought against **us** concerning this policy until **you** have fully complied with all its terms.

**We** have no obligation to pay to or for **any insured**, or to defend **any insured**, when such obligations or this policy provide the sole basis for jurisdiction of the court over such insured, such obligations, or this policy.

Under the liability coverages of this policy, no legal action may be brought against **us** until judgment against **the insured** has been finally determined after trial. This policy does not give anyone the right to make **us** a party to any action to determine the liability of **an insured**.

### 9. OPTIONAL PAYMENT OF PREMIUM IN INSTALLMENTS

**You** may, if **you** wish, pay the premium for this policy in installments, under terms and conditions approved where required by the Department of Insurance. For each separate installment payment there is an installment service charge. **Your** agent can provide additional information about installment payment.

## POLICYHOLDER MEMBERSHIP IN THE COMPANY

Because this policy is issued by a mutual insurance company, **you** are a member of **the company** while this or any other policy is in force. While a member **you** are entitled to one vote only—either in person or by proxy—at meetings of members of **the company**. **You** are entitled to any dividends which are declared by the Board of Directors and are applicable to coverages in **your** policy.

The annual meeting of members of **the company** will be held at the Home Office at Columbus, Ohio, at 10 a.m. on the first Thursday of April. If the Board of Directors should elect to change the time or place of meeting, **we** will mail notice of the change to **you** at **your** address last known to **us**. **We** will mail this notice at least 10 days in advance of the meeting date.

Prior to the expiration of a policy term for which premium has been paid, **we** will mail a notice to **you** for the premium required to renew or maintain the policy in effect. **We** will mail this notice to **your** address last known to **us**.

This policy is non-assessable, meaning that **you** are not subject to any assessment beyond the premiums **we** require for each policy term.

**IN WITNESS WHEREOF:** Nationwide Mutual Insurance Company or Nationwide Mutual Fire Insurance Company, whichever is the issuing company as shown in the Declarations, has caused this policy to be signed by its President and Secretary at Columbus, Ohio, and countersigned by a duly authorized representative of **the company**.

*Secretary*                    *President*



**NATIONWIDE INSURANCE**    Nationwide Mutual Insurance Company • Nationwide Mutual Fire Insurance Company
Home Office: Columbus, Ohio 43215-2220

# endorse-ment 1750C

Mandatory personal injury protection
(New York)

The company agrees with the named insured, as follows:

## SECTION I

### Mandatory Personal Injury Protection

The company will pay first-party benefits to reimburse for basic economic loss sustained by an eligible injured person on account of personal injuries caused by an accident arising out of the use or opera-tion of a motor vehicle or a motorcycle during the policy period and within the United States of America, its territories or possessions, or Canada.

### First-Party Benefits

First-party benefits, other than death benefits, are payments equal to basic economic loss, reduced by the following:

(a) 20 percent of the eligible injured person's loss of earnings from work to the extent that an eligible injured person's basic economic loss consists of such loss of earnings;

(b) amounts recovered or recoverable on account of personal injury to an eligible injured person under state or federal laws providing social security disability or workers' compensation benefits, or disability benefits under Article Nine of the New York Workers' Compensation Law;

(c) the amount of any applicable deductible, provided that such deductible shall apply to each accident, but only to the total of first-party benefits otherwise payable to the named insured and any relative as a result of that accident.

### Basic Economic Loss

Basic economic loss shall consist of medical expense, work loss, other expense and, when death occurs, a death benefit as herein provided. Except for such death benefit, basic economic loss shall not include any loss sustained on account of death. Basic economic loss of each eligible injured person on account of any single accident shall not exceed $50,000, except that any death benefit hereunder shall be in addition thereto.

### Medical Expense

Medical expense shall consist of necessary expenses for:

(a) medical, hospital (including services rendered in compliance with Article 41 of the Public Health Law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services;

(b) psychiatric, physical and occupational therapy and rehabilitation;

(c) any nonmedical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of New York; and

(d) any other professional health services.

These medical expenses will not be subject to a time limitation, provided that within one year after the date of the accident, it is ascertainable that further medical expenses may be sustained as a result of the injury. Payments hereunder for necessary medical expenses shall be subject to the limitations and requirements of Section 5108 of the New York Insurance Law.

### Work Loss

Work loss shall consist of the sum of the following losses and expenses, up to a maximum payment of $2,000 per month for a maximum period of three years from the date of the accident:

(a) loss of earnings from work which the eligible injured person would have performed had such person not been injured, except that an employee who is entitled to receive monetary pay-ments, pursuant to statute or contract with the employer, or who receives voluntary monetary benefits paid for by the employer, by reason of such employee's inability to work because of personal injury arising out of the use or operation of a motor vehicle or a motorcycle, shall not be entitled to receive first-party benefits for loss of earnings from work to the extent that such monetary payments or benefits from the employer do not result in the employee suffering a reduction in income or a reduction in such employee's level of future benefits arising from a subsequent illness or injury; and

**sement 1750C**
(continued)

(b) reasonable and necessary expenses sustained by the eligible injured person in obtaining services in lieu of those which such person would have performed for income.

## Other Expenses

Other expenses shall consist of all reasonable and necessary expenses, other than medical expense and work loss, up to $25 per day for a period of one year from the date of the accident causing injury.

## Death Benefit

Upon the death of any eligible injured person, caused by an accident to which this coverage applies, the company will pay to the estate of such person a death benefit of $2,000.

## Eligible Injured Person

Subject to the exclusions and conditions set forth below, an eligible injured person is:

(a) the named insured and any relative who sustains personal injury arising out of the use or operation of any motor vehicle;

(b) the named insured and any relative who sustains personal injury arising out of the use or operation of any motorcycle, while not occupying a motorcycle;

(c) any other person who sustains personal injury arising out of the use or operation of the insured motor vehicle in the State of New York while not occupying another motor vehicle; or

(d) any New York State resident who sustains personal injury arising out of the use or operation of the insured motor vehicle outside of New York while not occupying another motor vehicle.

## Exclusions

This coverage does not apply to personal injury sustained by:

(a) the named insured while occupying, or while a pedestrian through being struck by, any motor vehicle owned by the named insured with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect;

(b) any relative while occupying, or while a pedestrian through being struck by, any motor vehicle owned by the relative with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect;

(c) the named insured or relative while occupying, or while a pedestrian through being struck by, a motor vehicle in New York State, other than the insured motor vehicle, with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is in effect; however, this exclusion does not apply to personal injury sustained in New York State by the named insured or relative while occupying a bus or school bus, as defined in Sections 104 and 142 of the New York Vehicle and Traffic Law, unless that person is the operator, an owner, or an employee of the owner or operator, of such bus or school bus;

(d) any person in New York State while occupying the insured motor vehicle which is a bus or school bus, as defined in Sections 104 and 142 of the New York Vehicle and Traffic Law, but only if such person is a named insured or relative under any other policy providing the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act; however, this exclusion does not apply to the operator, an owner, or an employee of the owner or operator, of such bus or school bus;

(e) any person while occupying a motorcycle;

(f) any person who intentionally causes his or her own personal injury;

(g) any person as a result of operating a motor vehicle while in an intoxicated condition or while his ability to operate such vehicle is impaired by the use of a drug (within the meaning of Section 1192 of the New York Vehicle and Traffic Law); or

(h) any person while:

(i) committing an act which would constitute a felony, or seeking to avoid lawful apprehension or arrest by a law enforcement officer;

(ii) operating a motor vehicle in a race or speed test;

**endorsement 1750C**

(continued)

(iii) operating or occupying a motor vehicle known to that person to be stolen: or

(iv) repairing, servicing or otherwise maintaining a motor vehicle if such conduct is within the course of a business of repairing, servicing or otherwise maintaining a motor vehicle and the injury occurs on the business premises;

(i) the named insured or relative while not occupying a motor vehicle or a motorcycle when struck by a motorcycle in New York State with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is in effect;

(j) any New York State resident other than the named insured or relative injured through the use or operation of the insured motor vehicle outside of New York State if such resident is the owner or a relative of the owner of a motor vehicle insured under another policy providing the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act;

(k) any New York State resident other than the named insured or relative injured through the use or operation of the insured motor vehicle outside of New York State if such resident is the owner of a motor vehicle for which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect.

**Other Definitions**

When used in reference to this coverage:

(a) the "insured motor vehicle" means a motor vehicle owned by the named insured and to which the bodily injury liability insurance of this policy applies and for which a specific premium is charged;

(b) "motorcycle" means a vehicle as defined in Section 123 of the New York Vehicle and Traffic Law and which is required to carry financial security pursuant to Article 6, 8 or 48-A of the Vehicle and Traffic Law;

(c) "motor vehicle" means a motor vehicle, as defined in Section 311 of the New York Vehicle and Traffic Law, and also includes fire and police vehicles, but shall not include any motor vehicle not required to carry financial security pursuant to Article 6, 8 or 48-A of the Vehicle and Traffic Law, or a motorcycle as defined above;

(d) "named insured" means the person or organization named in the Declarations;

(e) "occupying" means in or upon or entering into or alighting from;

(f) "personal injury" means bodily injury, sickness or disease;

(g) "relative" means a spouse, child, or other person related to the named insured by blood, marriage, or adoption (including a ward or foster child), who regularly resides in the insured's household, including any such person who regularly resides in the household, but is temporarily living elsewhere; and

(h) "use or operation" of a motor vehicle or a motorcycle includes the loading or unloading of such vehicle.

**Conditions**

**Action Against Company.** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.

**Notice.** In the event of an accident, written notice setting forth details sufficient to identify the eligible injured person, along with reasonably obtainable information regarding the time, place and circumstances of the accident, shall be given by, or on behalf of, each eligible injured person, to the company, or any of the company's authorized agents, as soon as reasonably practicable, but in no event more than 90 days after the date of the accident, unless the eligible injured person submits written proof that it was impossible to comply with such time limitation due to specific circumstances beyond such person's control. If an eligible injured person or that person's legal representative institutes a proceeding to recover damages for personal injury under Section 5104(b) of the New York Insurance Law, a copy of the summons and complaint or other process served in connection with such action shall be forwarded as soon as practicable to the company or any of the company's authorized agents by such eligible injured person or that person's legal representative.

15

**dorsement 1750C**
(continued)

**Proof of Claim; Medical, Work Loss, and Other Necessary Expenses.** In the case of a claim for health service expenses, the eligible injured person or that person's representative shall submit written proof of claim to the company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable, but in no event later than 180 days after the date services are rendered or 180 days after the date written notice was given to the company, whichever is later. The eligible injured person or that person's representative shall submit written proof of claim for work loss benefits to the company as soon as reasonably practicable. Written proof of claim for other necessary expenses shall be submitted by the eligible injured person or that person's representative to the company as soon as reasonably practicable, but in no event later than 90 days after the services are rendered. The foregoing time limitations for the submission of proof of claim shall apply unless the eligible injured person or that person's representative submits written proof that it was impossible to comply with such time limitation due to specific circumstances beyond such person's control. Upon request by the company, the eligible injured person or that person's representative shall:

(a) execute a written proof of claim under oath;

(b) provide authorization that will enable the company to obtain medical records; and

(c) provide any other pertinent information that may assist the company in determining the amount due and payable.

The eligible injured person shall submit to medical examination by physicians selected by, or acceptable to, the company, when, and as often as, the company may reasonably require.

**Arbitration.** In the event any person making a claim for first-party benefits and the company do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration pursuant to procedures promulgated or approved by the Superintendent of Insurance.

**Reimbursement and Trust Agreement.** To the extent that the company pays first-party benefits, the company is entitled to the proceeds of any settlement or judgment resulting from the exercise of any right of recovery for damages for personal injury under Section 5104(b) of the New York Insurance Law. The company shall have a lien upon any such settlement or judgment to the extent that the company has paid first-party benefits. An eligible injured person shall:

(a) hold in trust, for the benefit of the company, all rights of recovery which that person shall have for personal injury under Section 5104(b) of the New York Insurance Law;

(b) do whatever is proper to secure, and shall do nothing to prejudice, such rights; and

(c) execute, and deliver to the company, instruments and papers as may be appropriate to secure the rights and obligations of such person and the company established by this provision.

An eligible injured person shall not compromise an action to recover damages brought under Section 5104(b) of the New York Insurance Law, except:

(a) with the written consent of the company;

(b) with approval of the court; or

(c) where the amount of the settlement exceeds $50,000.

**Other Coverage.** Where more than one source of first-party benefits required by Article 51 of the New York Insurance Law and Article VI or VIII of the New York Vehicle and Traffic Law is available and applicable to an eligible injured person in any one accident, this company is liable to an eligible injured person only for an amount equal to the maximum amount that the eligible injured person is entitled to recover under this coverage, divided by the number of available and applicable sources of required first-party benefits. An eligible injured person shall not recover duplicate benefits for the same elements of loss under this coverage or any other mandatory first-party motor vehicle or no-fault motor vehicle insurance coverage issued in compliance with the laws of another state.

If the eligible injured person is entitled to benefits under any such mandatory first-party motor vehicle or no-fault motor vehicle insurance for the same elements of loss under this coverage, this company shall be liable only for an amount equal to the proportion that the total amount available under this coverage bears to the sum of the amount available under this coverage and the amount available under

**.endorsement 1750C**

such other mandatory insurance for the common elements of loss. However, where another state's mandatory first-party or no-fault motor vehicle insurance law provides unlimited coverage available to an eligible injured person for an element of loss under this coverage, the obligation of this company is to share equally for that element of loss with such other mandatory insurance until the $50,000, or $75,000 if Optional Basic Economic Loss (OBEL) coverage is purchased, limit of this coverage is exhausted by the payment of that element of loss and any other elements of loss.

## SECTION II

**Excess Coverage**

If motor vehicle Medical Payments Coverage or any disability coverages or Uninsured Motorists Coverage are afforded under this policy, such coverage shall be excess insurance over any Mandatory PIP, OBEL, or Additional PIP benefits paid or payable, or which would be paid or payable but for the application of a deductible, under this or any other motor vehicle No-Fault insurance policy.

## SECTION III

**Constitutionality**

If it is conclusively determined by a court of competent jurisdiction that the New York Comprehensive Motor Vehicle Insurance Reparations Act, or any amendment thereto, is invalid or unenforceable in whole or in part, then, subject to the approval of the Superintendent of Insurance, the company may amend this policy and may also recompute the premium for the existing or amended policy.

These amendments and recomputations will be effective retroactively to the date that such Act or any amendment is deemed to be invalid or unenforceable in whole or in part.

This endorsement applies as stated in the policy Declarations.

This endorsement is issued by the company shown in the Declarations as the issuing company.

**This endorsement supersedes any prior endorsement numbered 1750B.**

### NATIONWIDE INSURANCE COMPANIES
### Home Office: Columbus, Ohio 43215-2220

17

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 29 of 260 PageID #: 254



## Endorsement 1901

# amendatory endorsement
# seat belt extended coverage
# personal injury protection coverage

**Please attach this important endorsement to your auto policy.**

Your Personal Injury Protection Coverage is amended as follows:

**ADDED DEATH BENEFIT (Seat Belt)**

We will pay a death benefit of $10,000 for any insured using an approved motor vehicle seat belt or child restraint system at the time of the accident. Death must occur within one year and as a direct result of the accident. This benefit is in addition to any other benefit provided by this coverage for funeral costs, survivors loss or death.

The endorsement is issued by Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, or Nationwide Property and Casualty Insurance Company, whichever is the issuing company as shown in the Declarations.

**NATIONWIDE MUTUAL INSURANCE COMPANY**
**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY**
**NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY**
**Columbus, Ohio**

*Secretary*                                          *President*

**Attention New York Policyholders. . .**

The Rental Vehicle Coverage endorsement to this policy provides protection in the event of damage to, or loss of, a rental vehicle, including loss of use, as described in the endorsement.

Rental Vehicle Coverage has been mandated by New York State law, as part of overall legislation to redress problems that confronted consumers and left them vulnerable to major unanticipated costs when dealing with rental vehicle companies.

Effective April 1, 1989, another part of this legislation prohibits rental vehicle companies in New York State from holding their customers liable for damage to, or loss of, rental vehicles, including loss of use, and limits the maximum charge by the rental vehicle company to $100 for such damage or loss, subject to stated exceptions for certain behavior on the part of the renter.

This Rental Vehicle Coverage protects you whenever rental vehicles are rented and operated anywhere within the United States, its territories or possessions, and Canada.

Please review the Rental Vehicle Coverage endorsement itself. If you have any questions, please contact your Nationwide agent.



# Endorsement 2205
# rental vehicle coverage endorsement
# (New York)

**Please attach this important addition to your auto policy.**

This **Rental Vehicle** Coverage endorsement applies only to, and is part of, every motor vehicle liability insurance policy that covers less than five private passenger motor vehicles.

For each such policy, this endorsement provides coverage for the **insured's** obligations in the event of actual damage to, or loss of, any **rental vehicle**, including loss of use, rented by the **insured** anywhere in the United States, its territories or possessions, and Canada under a rental agreement with a term no longer than thirty consecutive days, regardless of where such **rental vehicle** may be registered, rented or operated.

**Rental Vehicle** Coverage shall provide protection regardless of: (a) fault; and (b) whether the **rental vehicle** is rented or operated for business or pleasure, unless used for transporting persons or property for hire.

**ADDITIONAL DEFINITIONS APPLICABLE TO THIS COVERAGE ENDORSEMENT**

(a) "**Insured**" means named **insured** or any **relative**;

(b) "**Relative**" means a spouse, child or other person related to the named **insured** by blood, marriage or adoption (including a ward or foster child), who regularly resides in the named **insured's** household, including any such person who regularly resides in the household, but who is temporarily living elsewhere;

(c) "**Private passenger motor vehicle**" means:

(1) a motor vehicle of the private passenger or station wagon type that is owned or hired under a long-term contract by an individual or by husband and wife, and is neither used as a public or livery conveyance for passengers nor rented to others without a driver; or

(2) a motor vehicle with a pick-up body, a delivery sedan, panel truck or van, owned by an individual or by husband and wife who are residents of the same household, or by a family farm co-partnership or a family farm corporation, and not customarily used in the occupation, profession or business of the **insured** other than farming or ranching, whether or not used in the course of driving to or from work.

19

02/04/00  FRI 07:47 FAX

(d) "**Long-term contract**" means a contract with a term of six months or longer.

(e) "**Rental vehicle**" means a vehicle of the type described in (c) above, if:

    (1) not used for transporting persons or property for hire; and

    (2) owned by a person engaged in the business of renting or leasing vehicles rented or leased without a driver to persons other than the owner and is registered in the name of such owner.

## PRIORITY OF PAYMENT

(a) In no event shall payment be made under this endorsement duplicating payment made by this policy, another policy or another insurer for the same claim.

(b) If more than one policy could cover the claim, payment on the claim shall be made in the following order of priority:

    (1) the policy with respect to which the person is a named **insured**;

    (2) if the person is not a named **insured** on any policy, the policy with respect to which the person is an **insured**; and

    (3) where two or more policies provide coverage of equal priority, the policy or insurer with respect to which the claim is first submitted.

(c) An inquiry about coverage or notification of damage to, or loss of, a **rental vehicle** shall constitute submission of a claim.

## EXCLUSIONS

No **Rental Vehicle** Coverage shall be provided:

(a) arising beyond the geographic limitations of the policy to which **Rental Vehicle** Coverage is endorsed;

(b) to an **insured** who has committed fraud in connection with damage to, or loss of, a **rental vehicle**, including loss of use; or

(c) for damage to, or loss of, a **rental vehicle**, including loss of use, which the **rental vehicle** company is precluded from recovering from the **insured**:

    (1) pursuant to the terms of the rental agreement; or

    (2) due to the prohibitions of section 396-z of the General Business Law or similar statutory provisions of other jurisdictions.

## SUBROGATION

(a) In the event of any payment under this endorsement, the insurer is subrogated to the extent of such payments to the rights of the person to whom, or for whose benefit, such payments were made.

(b) Such person shall execute and deliver instruments and papers and do whatever else is necessary to secure such subrogation rights, and shall not act in a manner that may prejudice such rights.

(c) Subrogation shall not be pursued against any person who operated the **rental vehicle** with the **insured's** permission.

This endorsement applies as stated in the Declarations attached to **your** policy.

This endorsement is issued by Nationwide Mutual Insurance Company or Nationwide Mutual Fire Insurance Company, whichever has issued the policy to which it is attached.

**NATIONWIDE MUTUAL INSURANCE COMPANY**
**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY**
**Columbus, Ohio**

*John C. M. Cittin*

*Secretary*

*Richard D. Crabtree*

*President*

20



## Endorsement 1738

# amendatory endorsement
# comprehensive coverage—glass breakage
## (New York)

**Please attach this important addition to your auto policy.**

It is agreed that any deductible amount shown on the Declarations as applicable to the Comprehensive coverage does not apply to glass breakage.

This endorsement applies as stated in the Declarations attached to your policy.

This endorsement is issued by the Nationwide Mutual Insurance Company or Nationwide Mutual Fire Insurance Company, whichever has issued the policy to which it is attached.

### NATIONWIDE MUTUAL INSURANCE COMPANY
### NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
#### Columbus, Ohio

*Secretary*                     *President*

Auto 7418-66   (2-90)



# Endorsement 1901

# amendatory endorsement
# seat belt extended coverage
# personal injury protection coverage

Please attach this important endorsement to your auto policy.

Your Personal Injury Protection Coverage is amended as follows:

**ADDED DEATH BENEFIT (Seat Belt)**

We will pay a death benefit of $10,000 for any insured using an approved motor vehicle seat belt or child restraint system at the time of the accident. Death must occur within one year and as a direct result of the accident. This benefit is in addition to any other benefit provided by this coverage for funeral costs, survivors loss or death.

The endorsement is issued by Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, or Nationwide Property and Casualty Insurance Company, whichever is the issuing company as shown in the Declarations.

### NATIONWIDE MUTUAL INSURANCE COMPANY
### NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
### NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY
#### Columbus, Ohio

*Secretary*                    *President*

Auto 8110—11-89

## Endorsement 2364A



## supplementary uninsured motorists
## (New York)

**Please attach this important addition to your auto policy.**

We, the company, agree with you, as the named insured, in return for payment of the premium for this coverage, to provide Supplementary Uninsured Motorists (SUM) coverage, subject to the following terms and conditions:

## INSURING AGREEMENTS

I.  **Definitions:** For purposes of this SUM endorsement, the following terms have the following meanings:

(a)  **Insured.** The unqualified term "insured" means:

(1)  you, as the named insured and, while residents of the same household, your spouse and the relatives of either you or your spouse;

(2)  any other person while occupying:

(i)  a motor vehicle insured for SUM under this policy; or

(ii)  any other motor vehicle while being operated by you or your spouse; and

(3)  any person, with respect to damages such person is entitled to recover, because of **bodily injury** to which this coverage applies sustained by an **insured** under paragraph (1) or (2) above.

(b)  **Bodily Injury.** The term "bodily injury" means bodily harm, including sickness, disease or death resulting therefrom.

(c)  **Uninsured Motor Vehicle.** The term "uninsured motor vehicle" means a motor vehicle that, through its ownership, maintenance or use, results in **bodily injury** to an **insured**, and for which:

(1)  no bodily injury liability insurance policy or bond applies to such vehicle (including a vehicle that was stolen, operated without the owner's permission, or unregistered) at the time of the accident; or

(2)  neither owner nor driver can be identified (including a hit-and-run vehicle), and which causes **bodily injury** to an **insured** by physical contact with the **insured** or with a motor vehicle occupied by the **insured** at the time of the accident, provided that:

(i)  the **insured** or someone on the **insured's** behalf shall have reported the accident within 24 hours or as soon as reasonably possible to a police, peace or judicial officer or to the Commissioner of Motor Vehicles and shall have filed with the company a statement under oath that the **insured** or the **insured's** legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof; and

(ii)  at the request of the company, the **insured** or the **insured's** legal representative makes available for inspection the automobile the **insured** was occupying at the time of the accident; or

(3)  there is a bodily injury liability insurance coverage or bond applicable to such motor vehicle at the time of the accident, but:

(i)  the amount of such insurance coverage or bond is less than the third-party bodily injury liability limit of this policy; or

(ii)  the amount of such insurance coverage or bond has been reduced, by payments to other persons injured in the accident, to an amount less than the third-party bodily injury liability limit of this policy; or

(iii)  the insurer writing such insurance coverage or bond denies coverage, or such insurer is or becomes insolvent.

The term "uninsured motor vehicle" does not include a motor vehicle that is:

(1)  insured under the liability coverage of this policy; or

(2)  owned by you, as the named insured, or your spouse residing in your household; or

Case 9:99-cv-07725-ADS-ARL Document 178 Filed 06/05/02 Page 35 of 260 PageID #: 260

(3) self-insured within the meaning of the financial responsibility law of the state in which the motor vehicle is registered, or any similar state or federal law, to the extent that the required amount of such coverage is equal to, or greater than, the third-party bodily injury liability limits of this policy; or

(4) owned by the United States of America, Canada, a state, a political subdivision of any such government, or an agency of any of the foregoing; or

(5) a land motor vehicle or trailer, while located for use as a residence or premises and not as a vehicle, or while operated on rails or crawler treads; or

(6) a farm type vehicle or equipment designed for use principally off public roads, except while actually upon public roads.

(d) **Occupying.** The term "occupying" means in, upon, entering into, or exiting from a motor vehicle.

(e) **State.** The term "state" includes the District of Columbia, a territory or possession of the United States, and a province of Canada.

**II. Damages for Bodily Injury Caused by Uninsured Motor Vehicles:**

We will pay all sums that the **insured** or the **insured's** legal representative shall be legally entitled to recover as damages from the owner or operator of an **uninsured motor vehicle** because of bodily injury sustained by the **insured,** caused by an accident arising out of such **uninsured motor vehicle's** ownership, maintenance or use, subject to the Exclusions, Conditions, Limits and other provisions of this SUM endorsement.

**III. SUM Coverage Period and Territory:**

This SUM coverage applies only to accidents that occur:

1. During the policy period shown in the Declarations; and

2. In the United States, its territories or possessions, or Canada.

## EXCLUSIONS

This SUM coverage does not apply:

1. To bodily injury to an insured, including care or loss of services recoverable by an insured, if such insured, such insured's legal representatives, or any person entitled to payment under this coverage, without our written consent, settles any lawsuit against any person or organization that may be legally liable for such injury, care or loss of services, but this provision shall be subject to Condition 10.

2. To bodily injury to an insured incurred while occupying a motor vehicle owned by that insured, if such motor vehicle is not insured for SUM coverage by the policy under which a claim is made, or is not a newly acquired or replacement motor vehicle covered under the terms of this policy.

3. For non-economic loss, resulting from bodily injury to an insured and arising from an accident in New York State, unless the insured has sustained serious injury as defined in Section 5102(d) of the New York Insurance Law.

## CONDITIONS

1. **Policy Provisions:** None of the Insuring Agreements, Exclusions or Conditions of the policy shall apply to this SUM coverage except: "Insured Persons' Duties," "Fraud," "Renewal" and "Cancellation During Policy Period" if applicable.

2. **Notice and Proof of Claim:** As soon as practicable, the insured or other person making claim shall give us written notice of claim under this SUM coverage.

   As soon as practicable after our written request, the insured or other person making claim shall give us written proof of claim, under oath if required, including full particulars of the nature and extent of the injuries, treatment, and other details we need to determine the SUM amount payable.

   The insured and every other person making claim hereunder shall, as may reasonably be required, submit to examinations under oath by any person we name and subscribe the same. Proof of claim shall be made upon forms we furnish unless we fail to furnish such forms within 15 days after receiving notice of claim.

3. **Medical Reports:** The insured shall submit to physical examinations by physicians we select when and as often as we may reasonably require. The insured, or in the event of the insured's incapacity, such insured's legal representative (or in the event of such insured's death, the insured's legal representative or the person or persons entitled to sue therefor), shall upon each request from us authorize us to obtain relevant medical reports and copies of relevant records.

4. **Notice of Legal Action:** If the **insured** or such **insured's** legal representative brings any lawsuit against any person or organization legally responsible for the use of a **motor vehicle** involved in the accident, a copy of the summons and complaint or other process served in connection with the lawsuit shall be forwarded immediately to **us** by the **insured** or the **insured's** legal representative.

5. **SUM Limits:** The SUM limits payable under this SUM endorsement shall be:

   (a) the SUM limits stated in the Declarations; or

   (b) if the **bodily injury** results in death, **we** will provide SUM limits of the higher of the SUM limits stated in the Declarations, or $50,000 for such **bodily injury** resulting in death sustained by one person as the result of any one accident and, subject to this per-person limit, $100,000 for such **bodily injury** resulting in death sustained by two or more persons as the result of any one accident.

6. **Maximum SUM Payments:** Regardless of the number of **insureds, our** maximum payment under this SUM endorsement shall be the difference between:

   (a) the SUM limits; and

   (b) the **motor vehicle** bodily injury liability insurance or bond payments received by the **insured** or the **insured's** legal representative, from or on behalf of all persons that may be legally liable for the **bodily injury** sustained by the **insured**.

   The SUM limit shown on the Declarations for "Each Person" is the amount of coverage for all damages due to **bodily injury** to one person. The SUM limit shown under "Each Accident" is, subject to the limit for each person, the total amount of coverage for all damages due to **bodily injury** to two or more persons in the same accident.

7. **Non-Stacking:** Regardless of the number of vehicles involved, persons covered, claims made, vehicles or premiums shown in this policy, or premium paid, the limits, whether for uninsured motorists coverage or supplementary uninsured motorists coverage, shall never be added together or combined for two or more vehicles to determine the extent of insurance coverage available to an **insured** injured in the same accident.

8. **Priority of Coverage:** If an **insured** is entitled to uninsured motorists coverage or supplementary uninsured motorists coverage under more than one policy, the maximum amount such **insured** may recover shall not exceed the highest limit of such coverage for any one vehicle under any one policy, and the following order of priority shall apply:

   (a) a policy covering a **motor vehicle** occupied by the injured person at the time of the accident;

   (b) a policy covering a **motor vehicle** not involved in the accident under which the injured person is a named insured; and

   (c) a policy covering a **motor vehicle** not involved in the accident under which the injured person is an insured other than a named insured.

   Coverage available under a lower priority policy applies only to the extent that it exceeds the coverage of a higher priority policy.

9. **Exhaustion Required:** Except as provided in Condition 10, **we** will pay under this SUM coverage only after the limits of liability have been used up under all motor vehicle bodily injury liability insurance policies or bonds applicable at the time of the accident in regard to any one person who may be legally liable for the **bodily injury** sustained by the **insured**.

10. **Release or Advance:** In accidents involving the **insured** and one or more negligent parties, if such **insured** settles with any such party for the available limit of the motor vehicle bodily injury liability coverage of such party, release may be executed with such party after thirty calendar days actual written notice to **us**, unless within this time period **we** agree to advance such settlement amounts to the **insured** in return for the cooperation of the **insured** in **our** lawsuit on behalf of the **insured**.

    **We** shall have a right to the proceeds of any such lawsuit equal to the amount advanced to the **insured** and any additional amounts paid under this SUM coverage. Any excess above those amounts shall be paid to the **insured**.

    An **insured** shall not otherwise settle with any negligent party, without **our** written consent, such that **our** rights would be impaired.

11. **Non-Duplication.** This SUM coverage shall not duplicate any of the following:

    (a) benefits payable under workers' compensation or other similar laws;

(b) non-occupational disability benefits under article nine of the Workers' Compensation Law or other similar law;

(c) any amounts recovered or recoverable pursuant to article fifty-one of the New York Insurance Law or any similar motor vehicle insurance payable without regard to fault;

(d) any valid or collectible motor vehicle medical payments insurance; or

(e) any amounts recovered as bodily injury damages from sources other than motor vehicle bodily injury liability insurance policies or bonds.

12. **Arbitration:** If any insured making claim under this SUM coverage and we do not agree that such insured is legally entitled to recover damages from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by the insured, or do not agree as to the amount of payment that may be owing under this SUM coverage, then, at the option and upon written demand of such insured, the matter or matters upon which such insured and we do not agree shall be settled by arbitration, administered by the American Arbitration Association, pursuant to procedures prescribed or approved by the Superintendent of Insurance for this purpose.

If, however, the maximum amount of SUM coverage provided by this endorsement equals the amount of coverage required to be provided by Section 3420(f)(1) of the New York Insurance Law and Article 6 or 8 of the New York Vehicle and Traffic Law, then such disagreement shall be settled by such arbitration procedures upon written demand of either the insured or us.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, and any such insured and we each agree to be bound by any award made by the arbitrator as to this SUM coverage. For purposes of this Condition, the term "insured" includes any person authorized to act on behalf of the insured.

13. **Subrogation:** If we make a payment under this SUM coverage, we have the right to recover the amount of this payment from any person legally responsible for the bodily injury or loss of the person to whom, or for whose benefit, such payment was made to the extent of the payment. The insured or any person acting on behalf of the insured must do whatever is necessary to transfer this right of recovery to us. Except as permitted by Condition 10, such person shall do nothing to prejudice this right.

14. **Payment of Loss by Company:** We shall pay any amount due under this SUM coverage to the insured or, at our option, to a person authorized by law to receive such payment or to a person legally entitled to recover the damages which the payment represents.

15. **Action Against Company:** No lawsuit shall lie against us unless the insured or the insured's legal representative has first fully complied with all the terms of this SUM coverage.

16. **Survivor Rights:** If you or your spouse, if a resident of the same household, dies, this SUM coverage shall cover:

(a) the survivor as named insured;

(b) the decedent's legal representative as named insured, but only while acting within the scope of such representative's duties as such; and

(c) any relative who was an insured at the time of such death.

This endorsement applies as stated in the policy Declarations.

This endorsement is issued by the company shown in the Declarations as the issuing company.

**This endorsement supersedes any prior endorsement numbered 2364.**

## NATIONWIDE INSURANCE COMPANIES
### Home Office: Columbus, Ohio 43215-2220

# endorse- ment 1750C

**Mandatory personal injury protection (New York)**

The company agrees with the named insured, as follows:

## SECTION I

### Mandatory Personal Injury Protection

The company will pay first-party benefits to reimburse for basic economic loss sustained by an eligible injured person on account of personal injuries caused by an accident arising out of the use or operation of a motor vehicle or a motorcycle during the policy period and within the United States of America, its territories or possessions, or Canada.

### First-Party Benefits

First-party benefits, other than death benefits, are payments equal to basic economic loss, reduced by the following:

(a) 20 percent of the eligible injured person's loss of earnings from work to the extent that an eligible injured person's basic economic loss consists of such loss of earnings;

(b) amounts recovered or recoverable on account of personal injury to an eligible injured person under state or federal laws providing social security disability or workers' compensation benefits, or disability benefits under Article Nine of the New York Workers' Compensation Law;

(c) the amount of any applicable deductible, provided that such deductible shall apply to each accident, but only to the total of first-party benefits otherwise payable to the named insured and any relative as a result of that accident.

### Basic Economic Loss

Basic economic loss shall consist of medical expense, work loss, other expense and, when death occurs, a death benefit as herein provided. Except for such death benefit, basic economic loss shall not include any loss sustained on account of death. Basic economic loss of each eligible injured person on account of any single accident shall not exceed $50,000, except that any death benefit hereunder shall be in addition thereto.

### Medical Expense

Medical expense shall consist of necessary expenses for:

(a) medical, hospital (including services rendered in compliance with Article 41 of the Public Health Law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services;

(b) psychiatric, physical and occupational therapy and rehabilitation;

(c) any nonmedical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of New York; and

(d) any other professional health services.

These medical expenses will not be subject to a time limitation, provided that within one year after the date of the accident, it is ascertainable that further medical expenses may be sustained as a result of the injury. Payments hereunder for necessary medical expenses shall be subject to the limitations and requirements of Section 5108 of the New York Insurance Law.

### Work Loss

Work loss shall consist of the sum of the following losses and expenses, up to a maximum payment of $2,000 per month for a maximum period of three years from the date of the accident:

(a) loss of earnings from work which the eligible injured person would have performed had such person not been injured, except that an employee who is entitled to receive monetary payments, pursuant to statute or contract with the employer, or who receives voluntary monetary benefits paid for by the employer, by reason of such employee's inability to work because of personal injury arising out of the use or operation of a motor vehicle or a motorcycle, shall not be entitled to receive first-party benefits for loss of earnings from work to the extent that such monetary payments or benefits from the employer do not result in the employee suffering a reduction in income or a reduction in such employee's level of future benefits arising from

**ement 1750C**
(continued)

(b) reasonable and necessary expenses sustained by the eligible injured person in obtaining services in lieu of those which such person would have performed for income.

## Other Expenses

Other expenses shall consist of all reasonable and necessary expenses, other than medical expense and work loss, up to $25 per day for a period of one year from the date of the accident causing injury.

## Death Benefit

Upon the death of any eligible injured person, caused by an accident to which this coverage applies, the company will pay to the estate of such person a death benefit of $2,000.

## Eligible Injured Person

Subject to the exclusions and conditions set forth below, an eligible injured person is:

(a) the named insured and any relative who sustains personal injury arising out of the use or operation of any motor vehicle;

(b) the named insured and any relative who sustains personal injury arising out of the use or operation of any motorcycle, while not occupying a motorcycle;

(c) any other person who sustains personal injury arising out of the use or operation of the insured motor vehicle in the State of New York while not occupying another motor vehicle; or

(d) any New York State resident who sustains personal injury arising out of the use or operation of the insured motor vehicle outside of New York while not occupying another motor vehicle.

## Exclusions

This coverage does not apply to personal injury sustained by:

(a) the named insured while occupying, or while a pedestrian through being struck by, any motor vehicle owned by the named insured with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect;

(b) any relative while occupying, or while a pedestrian through being struck by, any motor vehicle owned by the relative with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect;

(c) the named insured or relative while occupying, or while a pedestrian through being struck by, a motor vehicle in New York State, other than the insured motor vehicle, with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is in effect; however, this exclusion does not apply to personal injury sustained in New York State by the named insured or relative while occupying a bus or school bus, as defined in Sections 104 and 142 of the New York Vehicle and Traffic Law, unless that person is the operator, an owner, or an employee of the owner or operator, of such bus or school bus;

(d) any person in New York State while occupying the insured motor vehicle which is a bus or school bus, as defined in Sections 104 and 142 of the New York Vehicle and Traffic Law, but only if such person is a named insured or relative under any other policy providing the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act; however, this exclusion does not apply to the operator, an owner, or an employee of the owner or operator, of such bus or school bus;

(e) any person while occupying a motorcycle;

(f) any person who intentionally causes his or her own personal injury;

(g) any person as a result of operating a motor vehicle while in an intoxicated condition or while his ability to operate such vehicle is impaired by the use of a drug (within the meaning of Section 1192 of the New York Vehicle and Traffic Law); or

(h) any person while:

(i) committing an act which would constitute a felony, or seeking to avoid lawful apprehension or arrest by a law enforcement officer;

(ii) operating a motor vehicle in a race or speed test;

14

**dorsement 1750C**
**(continued)**

(iii) operating or occupying a motor vehicle known to that person to be stolen; or

(iv) repairing, servicing or otherwise maintaining a motor vehicle if such conduct is within the course of a business of repairing, servicing or otherwise maintaining a motor vehicle and the injury occurs on the business premises;

(i) the named Insured or relative while not occupying a motor vehicle or a motorcycle when struck by a motorcycle in New York State with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is in effect;

(j) any New York State resident other than the named Insured or relative injured through the use or operation of the insured motor vehicle outside of New York State if such resident is the owner or a relative of the owner of a motor vehicle insured under another policy providing the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act;

(k) any New York State resident other than the named Insured or relative injured through the use or operation of the insured motor vehicle outside of New York State if such resident is the owner of a motor vehicle for which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect.

**Other Definitions**

When used in reference to this coverage:

(a) the "Insured motor vehicle" means a motor vehicle owned by the named Insured and to which the bodily injury liability insurance of this policy applies and for which a specific premium is charged;

(b) "motorcycle" means a vehicle as defined in Section 123 of the New York Vehicle and Traffic Law and which is required to carry financial security pursuant to Article 6, 8 or 48-A of the Vehicle and Traffic Law;

(c) "motor vehicle" means a motor vehicle, as defined in Section 311 of the New York Vehicle and Traffic Law, and also includes fire and police vehicles, but shall not include any motor vehicle not required to carry financial security pursuant to Article 6, 8 or 48-A of the Vehicle and Traffic Law, or a motorcycle as defined above;

(d) "named insured" means the person or organization named in the Declarations;

(e) "occupying" means in or upon or entering into or alighting from;

(f) "personal injury" means bodily injury, sickness or disease;

(g) "relative" means a spouse, child, or other person related to the named insured by blood, marriage, or adoption (including a ward or foster child), who regularly resides in the insured's household, including any such person who regularly resides in the household, but is temporarily living elsewhere; and

(h) "use or operation" of a motor vehicle or a motorcycle includes the loading or unloading of such vehicle.

**Conditions**

**Action Against Company.** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.

**Notice.** In the event of an accident, written notice setting forth details sufficient to identify the eligible injured person, along with reasonably obtainable information regarding the time, place and circumstances of the accident, shall be given by, or on behalf of, each eligible injured person, to the company, or any of the company's authorized agents, as soon as reasonably practicable, but in no event more than 90 days after the date of the accident, unless the eligible injured person submits written proof that it was impossible to comply with such time limitation due to specific circumstances beyond such person's control. If an eligible injured person or that person's legal representative institutes a proceeding to recover damages for personal injury under Section 5104(b) of the New York Insurance Law, a copy of the summons and complaint or other process served in connection with such action shall be forwarded as soon as practicable to the company or any of the company's authorized agents by such

**rsement 1750C**
(continued)

Proof of Claim; Medical, Work Loss, and Other Necessary Expenses. In the case of a claim for health service expenses, the eligible injured person or that person's representative shall submit written proof of claim to the company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable, but in no event later than 180 days after the date services are rendered or 180 days after the date written notice was given to the company, whichever is later. The eligible injured person or that person's representative shall submit written proof of claim for work loss benefits to the company as soon as reasonably practicable. Written proof of claim for other necessary expenses shall be submitted by the eligible injured person or that person's representative to the company as soon as reasonably practicable, but in no event later than 90 days after the services are rendered. The foregoing time limitations for the submission of proof of claim shall apply unless the eligible injured person or that person's representative submits written proof that it was impossible to comply with such time limitation due to specific circumstances beyond such person's control. Upon request by the company, the eligible injured person or that person's representative shall:

    (a) execute a written proof of claim under oath;

    (b) provide authorization that will enable the company to obtain medical records; and

    (c) provide any other pertinent information that may assist the company in determining the amount due and payable.

The eligible injured person shall submit to medical examination by physicians selected by, or acceptable to, the company, when, and as often as, the company may reasonably require.

Arbitration. In the event any person making a claim for first-party benefits and the company do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration pursuant to procedures promulgated or approved by the Superintendent of Insurance.

Reimbursement and Trust Agreement. To the extent that the company pays first-party benefits, the company is entitled to the proceeds of any settlement or judgment resulting from the exercise of any right of recovery for damages for personal injury under Section 5104(b) of the New York Insurance Law. The company shall have a lien upon any such settlement or judgment to the extent that the company has paid first-party benefits. An eligible injured person shall:

    (a) hold in trust, for the benefit of the company, all rights of recovery which that person shall have for personal injury under Section 5104(b) of the New York Insurance Law;

    (b) do whatever is proper to secure, and shall do nothing to prejudice, such rights; and

    (c) execute, and deliver to the company, instruments and papers as may be appropriate to secure the rights and obligations of such person and the company established by this provision.

An eligible injured person shall not compromise an action to recover damages brought under Section 5104(b) of the New York Insurance Law, except:

    (a) with the written consent of the company;

    (b) with approval of the court; or

    (c) where the amount of the settlement exceeds $50,000.

Other Coverage. Where more than one source of first-party benefits required by Article 51 of the New York Insurance Law and Article VI or VIII of the New York Vehicle and Traffic Law is available and applicable to an eligible injured person in any one accident, this company is liable to an eligible injured person only for an amount equal to the maximum amount that the eligible injured person is entitled to recover under this coverage, divided by the number of available and applicable sources of required first-party benefits. An eligible injured person shall not recover duplicate benefits for the same elements of loss under this coverage or any other mandatory first-party motor vehicle or no-fault motor vehicle insurance coverage issued in compliance with the laws of another state.

If the eligible injured person is entitled to benefits under any such mandatory first-party motor vehicle or no-fault motor vehicle insurance for the same elements of loss under this coverage, this company shall be liable only for an amount equal to the proportion that the total amount available under this coverage bears to the sum of the amount available under this coverage and the amount available under

**endorsement 1750C**
(continued)

such other mandatory insurance for the common elements of loss. However, where another state's mandatory first-party or no-fault motor vehicle insurance law provides unlimited coverage available to an eligible injured person for an element of loss under this coverage, the obligation of this company is to share equally for that element of loss with such other mandatory insurance until the $50,000, or $75,000 if Optional Basic Economic Loss (OBEL) coverage is purchased, limit of this coverage is exhausted by the payment of that element of loss and any other elements of loss.

## SECTION II

### Excess Coverage

If motor vehicle Medical Payments Coverage or any disability coverages or Uninsured Motorists Coverage are afforded under this policy, such coverage shall be excess insurance over any Mandatory PIP, OBEL, or Additional PIP benefits paid or payable, or which would be paid or payable but for the application of a deductible, under this or any other motor vehicle No-Fault insurance policy.

## SECTION III

### Constitutionality

If it is conclusively determined by a court of competent jurisdiction that the New York Comprehensive Motor Vehicle Insurance Reparations Act, or any amendment thereto, is invalid or unenforceable in whole or in part, then, subject to the approval of the Superintendent of Insurance, the company may amend this policy and may also recompute the premium for the existing or amended policy.

These amendments and recomputations will be effective retroactively to the date that such Act or any amendment is deemed to be invalid or unenforceable in whole or in part.

This endorsement applies as stated in the policy Declarations.

This endorsement is issued by the company shown in the Declarations as the issuing company.

This endorsement supersedes any prior endorsement numbered 1750B.

**NATIONWIDE INSURANCE COMPANIES**
**Home Office: Columbus, Ohio 43215-2220**



**Endorsement 1734D**

# additional personal injury protection
(New York)

Please attach this important addition to your auto policy.

The company agrees with the **named insured** subject to all of the provisions, exclusions and conditions of the Mandatory Personal Injury Protection (New York) endorsement, not expressly modified in this endorsement, as follows:

**Additional Personal Injury Protection**

**The company** will pay additional first-party benefits to reimburse for extended economic loss on account of **personal injuries** sustained by an **eligible injured person** and caused by an accident arising out of the **use or operation** of a motor vehicle or a motorcycle during the policy period. This coverage applies only to motor vehicle accidents which occur on or after January 1, 1982, and motorcycle accidents which occur on or after July 22, 1982, and within the United States of America, its territories or possessions, or Canada.

**Eligible Injured Person**

Subject to the exclusions and conditions set forth below, an **eligible injured person** is:

(a) the **named insured** and any **relative** who sustains **personal injury** arising out of the **use or operation** of any **motor vehicle**;

(b) the **named insured** and any **relative** who sustains **personal injury** arising out of the **use or operation** of any motorcycle, while not **occupying a motorcycle**;

(c) any other person who sustains **personal injury** arising out of the **use or operation** of the **insured motor vehicle** while **occupying** the **insured motor vehicle**; or

(d) any other person who sustains **personal injury** arising out of the **use or operation** of any other **motor vehicle** (other than a public or livery conveyance) while **occupying** such other **motor vehicle**, if such other **motor vehicle** is being operated by the **named insured** or any **relative**.

**Exclusions**

This coverage does not apply to **personal injury** sustained by:

(a) any person while **occupying** a motor vehicle owned by such person with respect to which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect;

(b) any person while **occupying**, or while a pedestrian through being struck by, a **motor vehicle** owned by the **named insured** with respect to which additional personal injury protection coverage is not provided under this policy;

(c) any **relative** while **occupying**, or while a pedestrian through being struck by, a **motor vehicle** owned by such **relative** with respect to which additional personal injury protection coverage is not provided under this policy;

(d) any New York State resident other than the **named insured** or **relative** injured through the **use or operation** of a **motor vehicle** outside of New York State if such resident is the owner of a **motor vehicle** for which the coverage required by the New York Comprehensive Motor Vehicle Insurance Reparations Act is not in effect;

(e) any person while **occupying** a motorcycle;

(f) any person who intentionally causes his own **personal injury**;

(g) any person as a result of operating a **motor vehicle** while in an intoxicated condition or while his ability to operate such vehicle is impaired by the use of a drug (within the meaning of Section 1192 of the New York Vehicle and Traffic Law); or

(b) any person while:

    (i) committing an act which would constitute a felony, or seeking to avoid lawful apprehension or arrest by a law enforcement officer;

    (ii) operating a **motor vehicle** in a race or speed test;

    (iii) operating or **occupying** a motor vehicle known to him to be stolen; or

    (iv) repairing, servicing or otherwise maintaining a motor vehicle if such conduct is within the course of a business of repairing, servicing or otherwise maintaining a **motor vehicle** and the injury occurs on the business premises.

## Additional First-Party Benefits

Additional first-party benefits are payments equal to extended economic loss reduced by:

(a) 20 percent of the **eligible injured person's** loss of earnings from work to the extent that the extended economic loss covered by this endorsement includes such loss of earnings;

(b) amounts recovered or recoverable on account of **personal injury** to an **eligible injured person** under state or federal laws providing social security disability or workers' compensation benefits or disability benefits under Article Nine of the New York Workers' Compensation Law, which amounts have not been applied to reduce first-party benefits recovered or recoverable under basic economic loss;

(c) amounts recovered or recoverable by the **eligible injured person** for any element of extended economic loss covered by this endorsement under any mandatory source of first-party **motor vehicle** no-fault benefits required by the laws of any state (other than the state of New York) of the United States of America, its possessions or territories, or by the laws of any province of Canada.

## Extended Economic Loss

Extended economic loss shall consist of the following:

(a) basic economic loss sustained on account of an accident occurring within the United States of America, its possessions or territories, or Canada, which is not recovered or recoverable under a policy issued in satisfaction of the requirements of Article VI or VIII of the New York Vehicle and Traffic Law and Article 51 of the New York Insurance Law;

(b) the difference between:

    (i) basic economic loss; and

    (ii) basic economic loss recomputed in accordance with the time and dollar limits as respects the option indicated in the Schedule below or, if not so designated, in accordance with the option indicated on the Declarations.

## Two or More Motor Vehicles Insured Under This Policy

The limit of liability under this endorsement applicable to injuries sustained by an **eligible injured person** while occupying, or while a pedestrian through being struck by, the **insured motor vehicle** shall be stated as respects the option indicated in the Schedule below or, if not so designated, in accordance with the option indicated on the Declarations for that **insured motor vehicle**. The limit of liability for injuries covered by this endorsement and sustained by an **eligible injured person** while occupying, or while a pedestrian through being struck by, a **motor vehicle** other than the **insured motor vehicle**, shall be the highest limit stated for this coverage in the Declarations for any **insured motor vehicle** under this policy.

## Arbitration

In the event any person making a claim for additional first-party benefits and **the company** do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration pursuant to procedures promulgated or approved by the Superintendent of Insurance.

## Subrogation

In the event of any payment for extended economic loss, **the company** is subrogated to the extent of such payments to the right of the person to whom, or for whose benefit, such payments were made. Such person must execute and deliver instruments and papers and do whatever else is necessary to secure such rights. Such person shall do noting to prejudice such rights.

**Other Coverage; Non-Duplication**

The **eligible injured person** shall not recover duplicate benefits for the same elements of loss covered under this endorsement or any other optional first-party automobile or no-fault automobile insurance coverage.

If an **eligible injured person** is entitled to New York mandatory and additional personal injury protection benefits under any other policy and if such **eligible injured person** is not entitled to New York mandatory personal injury protection benefits under this policy, then the coverage provided under this Additional Personal Injury Protection (New York) endorsement shall be excess over such other New York mandatory and additional personal injury protection benefits.

When coverage provided under this endorsement applies on an excess basis, it shall apply only in the amount by which the total limit of liability of New York mandatory and additional personal injury protection coverage available under this policy exceeds the total limit of liability for any other applicable New York mandatory and additional personal injury protection coverage.

Subject to the provisions of the preceding three paragraphs, if the **eligible injured person** is entitled to benefits under any other optional first-party automobile or no-fault automobile insurance for the same elements of loss covered by this endorsement, this company shall be liable only for an amount equal to the proportion that the total amount available under this endorsement bears to the sum of the amounts available under this endorsement and such other optional insurance for the same elements of loss.

### SCHEDULE

| Option No. | Economic Loss each person; each accident |
|---|---|
| ☐ 1 | Out of State Coverage (refer to Basic Coverage, and OBEL Coverage if applicable, for limits) |
| ☐ 2 | $50,000 Additional PIP Limit* <br><br> Also: <br> - Work loss limit increased from $2,000 per month to $3,000 per month <br> - Other Expenses limit increased from $25 per day to $50 per day |
| ☐ 3 | $100,000 Additional PIP Limit* <br><br> Also: <br> - Work loss limit increased from $2,000 per month to $4,000 per month <br> - Other Expenses limit increased from $25 per day to $50 per day |
| ☐ 4 | |
| *Additional economic loss coverage above Basic limit of $50,000 (or above $75,000 if OBEL applies) | |
| Applicable option indicated as marked ☒ or, if not so designated, as shown on the Declarations. | |

This endorsement applies as stated in the policy Declarations.

This endorsement is issued by the company shown in the Declarations as the issuing company.

**This endorsement supersedes any prior endorsement numbered 1734C.**

**NATIONWIDE INSURANCE COMPANIES**
**Home Office: Columbus, Ohio 43215-2220**



### Endorsement 1891C

### amendatory endorsement
### (New York)

**Please attach this important addition to your auto policy.**

With this endorsement, the policy is amended as follows:

## DEFINITIONS

Definitions 6 and 7 are replaced to read:

6. "MOTOR VEHICLE" means a land motor vehicle designed primarily to be driven on public roads. This does not include vehicles operated on rails or crawler-treads. Other motor vehicles designed for use mainly off public roads shall be included within the definition of motor vehicle when used on public roads.

7. "PRIVATE PASSENGER AUTO" means a four-wheel:
   a) private passenger auto;
   b) van; or
   c) pickup truck.

# PHYSICAL DAMAGE

## COVERAGES

### COMPREHENSIVE COVERAGE

The second sentence of item 2 is replaced to read:

Maximum payment is $25 per day — not to exceed $750 per occurrence.

## COVERAGE EXTENSIONS

### USE OF OTHER MOTOR VEHICLES

Item 3 is replaced to read:

3. A **private passenger auto** owned by a non-member of your household and not covered in item 1 of this section.
   a) This applies only:
      (1) to policies issued to persons (not organizations).
      (2) while such auto is being used by you or a **relative**.
   b) We will not pay for loss:
      (1) that results from the operation of an auto:
         (a) repair shop;                          (c) sales agency; or
         (b) public garage or parking place;       (d) service or maintenance facility.
      (2) involving a **private passenger auto** owned by an employer of **an insured**.
      (3) involving a **private passenger auto** furnished to you or a **relative** for regular use.
      (4) to any rented **motor vehicle**.

## COVERAGE EXCLUSIONS

Exclusion 3 is replaced and Exclusions 8 and 9 are added to read:

3. to any device which is a:
   a) tape player;
   b) compact disc player;
   c) citizens band radio;

d) two-way mobile radio;

e) telephone; or

f) any other device which records, emits, receives and/or transmits sound.

This exclusion (3.) does not apply if the device is a permanent part of your auto. Permanent part means installed in a location used by the auto maker for such a device. If the device is not covered, its antenna and other parts are not covered.

8. to cover scanning monitor receivers used for radar detection. This exclusion does not apply if the receiver is a permanent part of your auto. Permanent part means installed in a location planned by the auto maker.

9. to your auto which occurs:

a) while your auto is being used in any illegal trade or transportation by:

(1) you;

(2) a relative; or

(3) anyone else with your knowledge or permission; or

b) due to confiscation of your auto by any law enforcement agency because of your auto's use in such activities.

## LIMITS OF PAYMENT

The ACTUAL CASH VALUE section is replaced to read:

The limit of our coverage is the cash value of your auto or its damaged parts at the time of loss. We will consider fair market value, age, and condition of the property at the time of loss to determine cash value. We may pay you directly for a loss. We may, at our option, replace your auto. We may return stolen property at our expense and pay for any damage.

# AUTO LIABILITY

## COVERAGE

The last paragraph is replaced to read:

We will have no duty to defend or indemnify claims which are made after the policy limits of liability are exhausted on other claims previously made arising out of the same loss.

## COVERAGE EXTENSIONS

### USE OF TRAILERS

The second sentence is replaced to read:

The trailer must be designed for use with a private passenger auto.

### USE OF OTHER MOTOR VEHICLES

Item 3 is replaced to read:

3. A motor vehicle owned by a non-member of your household and not covered in item 1 of this section.

a) This applies only to policies issued to individual persons (not organizations) and while the vehicle is being used by you or a relative. It protects the user, and any person or organization, except as noted below in b), who does not own the vehicle but is legally responsible for its use.

b) This does not apply to liability losses involving a motor vehicle:

(1) used in the business or occupation of you or a relative except a private passenger auto used by you, your chauffeur, or your household employee;

(2) owned, rented or leased by an employer of an insured;

(3) rented or leased by anyone for or on behalf of an employer of an insured; or

(4) furnished to you or a relative for regular use. Furnished for regular use does not include a motor vehicle rented from a rental company for 30 or less consecutive days.

02/04/00  FRI 07:53 FAX                                                              ☑040

## COVERAGE EXCLUSIONS

Exclusions 3 and 4 are replaced to read:

3.  Any person for any occurrence arising out of the operation of an auto:

    a)  repair shop;                          c)  sales agency; or
    b)  public garage or parking place;       d)  service or maintenance facility.

    However, this exclusion does not apply to:

    a)  you;
    b)  a relative; or
    c)  a partner, employee or agent of you or a relative;

    with regard to the use of your auto.

4.  **Property damage** caused by any **insured** to any property, including a **motor vehicle**, that is owned by or in the custody of that **insured**, except a rented home or rented private garage.

## LIMITS OF PAYMENT
### AMOUNTS PAYABLE FOR LIABILITY LOSSES

Items 1, 2 and 3 are replaced to read:

1.  Property Damage Liability limits shown are for all **property damage in one occurrence.**

2.  Bodily Injury limits shown for any one person are for all legal damages, including all derivative claims, claimed by anyone arising out of and due to **bodily injury** to one person as a result of one occurrence.

    The per-person limit is the total amount available when one person sustains **bodily injury,** including death, as a result of one occurrence. No separate limits are available to anyone for derivative claims, statutory claims or any other claims made by anyone arising out of **bodily injury,** including death, to one person as a result of one occurrence.

    Subject to this per-person limit, the total limit of **our** liability shown for each occurrence is the total amount available when two or more persons sustain **bodily injury,** including death, as a result of one occurrence. No separate limits are available to anyone for derivative claims, statutory claims or any other claims arising out of **bodily injury,** including death, to two or more persons as a result of one occurrence.

3.  Liability limits apply as stated in the Declarations. The insuring of more than one person or vehicle under this policy does not increase our liability limits.

## SUPPLEMENTAL LIMITS OF LIABILITY

The following paragraph is added:

No separate limits are available to anyone for derivative claims, statutory claims or any other claims arising out of **bodily injury,** including death, to one or more persons as a result of one occurrence.

# COMPREHENSIVE FAMILY LIABILITY COVERAGES
## COVERAGES
### LIABILITY OTHER THAN AUTO

Item 1 is replaced to read:

1.  Defend at **our** expense any suit against an **insured.** This defense will be with counsel of **our** choice. **We** may settle or defend any suit as **we** think proper. **We** will have no duty to defend or indemnify claims which are made after the policy limits of liability are exhausted on other claims previously made arising out of the same loss.

### LIABILITY AND MEDICAL PAYMENTS EXCLUSIONS

The following exclusions are added:

Liability and Medical Payments insurance under the Comprehensive Family Liability coverage does not apply to injury:

1.  resulting from an **insured** transmitting a communicable disease;

2. arising out of or relating to the exposure to lead or any claims from lead from any premises which are rented or held for rental. It includes, but is not limited to the ingestion, inhalation or absorption of lead in any form. Lead means lead and lead compounds in any form. This exclusion does not apply to that portion of the premises occupied by you.

These exclusions do not apply to any auto liability coverage provided by this policy.

## GENERAL POLICY CONDITIONS

General Policy Conditions 1, 2 and 7 are replaced to read:

### 1. INSURED PERSONS' DUTIES

**The Insured** will:

a) give **us** or **our** agent prompt notice of all losses and provide written proof of claim if required.

b) notify the police of all theft losses as soon as practicable.

c) promptly deliver to **us** all papers dealing with any claims or suits.

d) submit to examinations under oath as often as reasonably requested by **us**.

e) assist **us** with any claim or suit.

f) if injured, submit to examinations by company-selected physicians as often as the company reasonably requires. The injured person must grant **us** authority, at **our** request, to obtain copies of wage and medical records.

g) protect damaged property insured under this policy and make it available to **us** for inspection before its repair or disposal.

h) provide all records and documents **we** reasonably request and permit **us** to make copies.

### 2. UNAUTHORIZED USE OF OTHER MOTOR VEHICLES

Protection in this policy does not apply to other motor vehicles which any **insured**:

a) uses without a reasonable belief that **the insured** is entitled to do so.

b) has stolen.

c) knows to have been stolen.

### 7. CANCELLATION DURING POLICY PERIOD

**You** may cancel this policy or any of its coverages by mailing notice to **us** of the future date of cancellation desired. Premium refund, if any due, will be made as soon as practicable after the date of cancellation. Based on **our** "short-rate table," **we** will retain premium for the days covered plus a percentage-figured charge for cancelling at **your** request during the policy period.

Up to the time this policy or any coverage has been in effect 60 days, **we** have unlimited right of cancellation. **We** may cancel by mailing or delivering notice to **you** 15 days in advance of termination of coverage if cancellation is for nonpayment of premium, or 20 days in advance of termination otherwise. While the date **we** mail this notice must be within the 60 days, the date of termination need not be.

After any coverage of this policy has been in force 60 days, **our** right to cancel such coverage during the policy period is limited. **We** may cancel for any of the following reasons:

a) nonpayment of premium or premium installment payments when due, whether payable directly to **us** or through any premium finance program;

b) if **you** or anyone who lives in **your** household or who customarily operates a motor vehicle covered by **your** policy has their driver's license suspended or revoked during the policy period, other than a suspension issued pursuant to Section 510-b (1) of the Vehicle and Traffic Law or one or more administrative suspensions arising from the same incident which has or have been terminated prior to the effective date of cancellation; or

c) discovery of fraud or material misrepresentation in obtaining the policy or in the presentation of a claim.

**We** must mail or deliver notice to **you** 20 days in advance of the date coverage is to be terminated, unless **we** are cancelling for nonpayment of premium. To cancel for nonpayment **we** will mail or deliver notice to **you** 15 days in advance of termination of coverage.

In any case of cancellation by us, our mailing of notice to your last known address or delivery of it to you will be considered proof of notice. We will retain premium for days covered during the policy period. Premium refund,if any due, will be made as soon as practicable. Mailing or delivery of our check will constitute tender of refund.

This endorsement applies as stated in the policy Declarations.

This endorsement is issued by the company shown in the Declarations as the issuing company.

**This endorsement supersedes any prior endorsement numbered 1891B.**

**NATIONWIDE INSURANCE COMPANIES**
**Home Office: Columbus, Ohio 43215-2220**

---

**Attention New York Policyholders. . .**

The Rental Vehicle Coverage endorsement to this policy provides protection in the event of damage to, or loss of, a rental vehicle, including loss of use, as described in the endorsement.

Rental Vehicle Coverage has been mandated by New York State law, as part of overall legislation to redress problems that confronted consumers and left them vulnerable to major unanticipated costs when dealing with rental vehicle companies.

Effective April 1, 1989, another part of this legislation prohibits rental vehicle companies in New York State from holding their customers liable for damage to, or loss of, rental vehicles, including loss of use, and limits the maximum charge by the rental vehicle company to $100 for such damage or loss, subject to stated exceptions for certain behavior on the part of the renter.

This Rental Vehicle Coverage protects you whenever rental vehicles are rented and operated anywhere within the United States, its territories or possessions, and Canada.

Please review the Rental Vehicle Coverage endorsement itself. If you have any questions, please contact your Nationwide agent.

---



**Endorsement 2205**
# rental vehicle coverage endorsement
**(New York)**

**Please attach this important addition to your auto policy.**

This **Rental Vehicle** Coverage endorsement applies only to, and is part of, every motor vehicle liability insurance policy that covers less than five private passenger motor vehicles.

For each such policy, this endorsement provides coverage for the **insured's** obligations in the event of actual damage to, or loss of, any **rental vehicle**, including loss of use, rented by the **insured** anywhere in the United States, its territories or possessions, and Canada under a rental agreement with a term no longer than thirty consecutive days, regardless of where such **rental vehicle** may be registered, rented or operated.

**Rental Vehicle** Coverage shall provide protection regardless of: (a) fault; and (b) whether the **rental vehicle** is rented or operated for business or pleasure, unless used for transporting persons or property for hire.

**ADDITIONAL DEFINITIONS APPLICABLE TO THIS COVERAGE ENDORSEMENT**

(a) **"Insured"** means named **insured** or any **relative**;

(b) **"Relative"** means a spouse, child or other person related to the named **insured** by blood, marriage or adoption (including a ward or foster child), who regularly resides in the named **insured's** household, including any such person who regularly resides in the household, but who is temporarily living elsewhere;

(c) **"Private passenger motor vehicle"** means:

(1) a **motor vehicle** of the **private passenger** or station wagon type that is owned or hired under a **long-term contract** by an individual or by husband and **wife**, and is neither used as a public or livery conveyance for passengers nor rented to others without a driver; or

(2) a **motor vehicle** with a pick-up body, a delivery sedan, panel truck or van, owned by an individual or by husband and wife who are residents of the same household, or by a family farm co-partnership or a family farm corporation, and not customarily used in the occupation, profession or business of the **insured** other than farming or ranching, whether or not used in the course of driving to or from work.

(d) **"Long-term contract"** means a contract with a term of six months or longer.

☑044



# Endorsement 1891A
# amendatory endorsement
## (New York)

**Please attach this important addition to your auto policy.**

Your auto policy is amended as follows.

## DEFINITIONS

Definition 6 is replaced to read:

6. "MOTOR VEHICLE" means a land motor vehicle designed for use primarily on public roads. This does not include **motor vehicles** operated on rails or crawler treads. Other **motor vehicles** designed for use mainly off public roads are covered when used on public roads.

## PHYSICAL DAMAGE
### COMPREHENSIVE COVERAGE

The second sentence of item 2 is replaced to read:

Maximum payment is $15 per day—not to exceed $450 per occurrence.

## COVERAGE EXCLUSIONS

The following exclusion is added to read:

Comprehensive and Collision coverages do not cover scanning monitor receivers used for radar detection. This exclusion does not apply if the receiver is a permanent part of **your auto**. Permanent part means installed in a location planned by the auto maker.

## LIMITS OF PAYMENT

The ACTUAL CASH VALUE section is replaced to read:

**ACTUAL CASH VALUE**   The limit of **our** coverage is the cash value of **your auto** or its damaged parts at the time of loss. **We** will consider fair market value, age, and condition of the property at the time of loss to determine cash value. **We** may pay **you** directly for a loss. **We** may, at **our** option, replace **your auto**. **We** may return stolen property at **our** expense and pay for any damage.

## AUTO LIABILITY
## COVERAGE EXCLUSIONS

Exclusion 3 is replaced to read:

3. It does not cover any person for any occurrence arising out of the operation of an auto:

    a) repair shop;
    b) public garage or parking place;
    c) sales agency; or
    d) service station.

However, this exclusion does not apply to:

    a) **you**;
    b) a member of **your** household; or
    c) a partner, employee or agent of **you** or a member of **your** household;

with regard to the use of **your auto**.

Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

STEPHEN R. STEINBERG, individually
and on behalf of a class of policy-holders
of Nationwide Mutual Insurance Company,

Civil No.: 99 Civil 7725 (*ADS)

Plaintiff,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY

Defendant

---

## DECLARATION OF THOMAS O. RAU
### ON BEHALF OF
### NATIONWIDE MUTUAL INSURANCE COMPANY

THOMAS O. RAU, under penalty of perjury pursuant to 28 U.S.C. δ1746, declares:

1.    I work for the Nationwide Mutual Insurance Company ("Nationwide Mutual") in the Office of Personal Lines Pricing.  My current title is Pricing/Actuarial Senior Consultant.  I have worked for Nationwide Mutual for 17 years, and have maintained my current duties and responsibilities over the last seven years.  My current responsibilities at Nationwide Mutual include, among other things, developing and managing its country-wide pricing recommendations as they pertain to various classifications within Nationwide Mutual's auto rating plan.  In my position with Nationwide Mutual, I have access to, and I am generally familiar with, information concerning the individual states within which Nationwide Mutual has sold personal lines automobile insurance for collision and comprehensive coverage.

1

2.     I have conducted research into the direct written premium charged by Nationwide Mutual for collision and comprehensive automobile coverage throughout the country from January 1, 1993 through June 30, 2001. I performed this research to determine the states in which Nationwide Mutual sold personal lines automobile insurance for collision and comprehensive coverage over any portion of time within that period.

3.     As a result of my research, I have determined that within the period from January 1, 1993 to June 30, 2001, Nationwide Mutual has sold personal lines automobile insurance for collision and comprehensive coverage in 45 of the 50 states as well as the District of Columbia and Territory of Puerto Rico. Nationwide Mutual has not sold personal lines automobile insurance for collision and comprehensive coverage in Florida, Hawaii, Louisiana, New Jersey and New Mexico during any time from January 1, 1993 to June 30, 2001. In Massachusetts and Michigan, Nationwide Mutual has sold such insurance at times, but not the entire time, from January 1, 1993 to June 30, 2001. For all other states, Nationwide has sold such insurance throughout the entire period from January 1, 1993 to June 30, 2001.

**THOMAS O. RAU**

Executed on _10/17/2001_

2

Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

STEPHEN R. STEINBERG, individually
and on behalf of a class of policy-holders
of Nationwide Mutual Insurance Company,

Civil No.: 99 Civil 7725 (*ADS)

Plaintiff,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY

Defendant

---

## DECLARATION OF ROBERT W. BASEHORE, JR.
## ON BEHALF OF
## NATIONWIDE MUTUAL INSURANCE COMPANY

ROBERT W. BASEHORE, JR., under penalty of perjury and pursuant to 28 U.S.C. section 1746, declares:

1.      I work for the Nationwide Mutual Insurance Company ("Nationwide Mutual") in the Office of Personal Lines Auto Product. My title is Manager - Product Compliance. I have worked for Nationwide Mutual for over 30 years, and have maintained my current duties and responsibilities over the last eight years. My current duties and responsibilities include reviewing legislative and regulatory changes and judicial decisions for their impact on the contract language in our personal line products. My duties and responsibilities also include drafting changes to these products and filing them with state insurance departments.

2.    In my position with Nationwide Mutual, I have developed a familiarity with and knowledge of Nationwide Mutual's personal lines automobile insurance policies and the periodic endorsements that amend them.

3.    I have reviewed the attached document (Exhibit "A") titled Nationwide Mutual Insurance Policies and Amendatory Endorsements Produced on 11/21/01 in Steinberg v. Nationwide Mut. Ins. Co.  To the best of my knowledge, information and belief, the attached document, Exhibit "A," truly and correctly identifies the effective/approval date and the state to which each listed form type and form number applies.

I declare under penalty of perjury that the foregoing is true and correct.

ROBERT W. BASEHORE, JR.

Executed on 12/17/01

2

A

**NATIONWIDE MUTUAL INSURANCE POLICIES AND AMENDATORY ENDORSEMENTS PRODUCED ON 11/21/01 IN *STEINBERG V. NATIONWIDE MUT. INS. CO.***

| Beginning Bates # | Ending Bates # | State | Form Type | Form # | Effective Date |
|---|---|---|---|---|---|
| 579 | 603 | Alabama | Policy | V-001 | 10/31/01 |
| 604 | 611 | Alabama | Endorsement | V-2276-A | 4/30/1998 |
| 610 | 611 | Alabama | Endorsement | V-2276 | 5/15/1991 |
| 612 | 625 | Alabama | Policy | Auto 4806-A | 1/1/1970 |
| 626 | 634 | Alaska | Endorsement | V-2282-B | 9/30/1999 |
| 635 | 639 | Alaska | Endorsement | V-2282-A | 6/1/1993 |
| 640 | 643 | Alaska | Endorsement | V-2282 | 12/26/1991 |
| 644 | 662 | Alaska | Policy | Auto 6173 | 1/1/1979 |
| 663 | 667 | Arizona | Endorsement | V-2448-A | 1/1/1999 |
| 668 | 670 | Arizona | Endorsement | V-2448 | 11/1/1996 |
| 671 | 690 | Arizona | Policy | V-1003 | 9/1/1993 |
| 691 | 692 | Arizona | Endorsement | 1513-A (Auto 6821-A) | 3/1/1981 |
| 693 | 707 | Arizona | Policy | Auto 6173 | 1/1/1979 |
| 708 | 736 | Arkansas | Policy | V-003-A | 9/1/1998 |
| 737 | 762 | Arkansas | Policy | V-003 | 3/1/1994 |
| 763 | 770 | Arkansas | Endorsement | 1636-C (Auto 7125-C) | 1/1/1991 |
| 771 | 786 | Arkansas | Policy | 6160-A | 3/3/1980 |
| 787 | 813 | California | Policy | V-004-B | 9/18/2000 |
| 814 | 840 | California | Policy | V-004-A | 10/1/1998 |
| 841 | 867 | California | Policy | V-004 | 12/1/1995 |
| 868 | 882 | California | Policy | Auto 6173 | 1/1/1979 |
| 883 | 908 | Colorado | Policy | V-005-D | 5/15/2000 |
| 909 | 934 | Colorado | Policy | V-005-C | 5/1/1999 |
| 935 | 959 | Colorado | Policy | V-005-B | 4/1/1996 |
| 960 | 985 | Colorado | Policy | V-005-A | 4/1/1995 |
| 986 | 1012 | Colorado | Policy | V-005 | 4/1/1994 |
| 1013 | 1019 | Colorado | Endorsement | 1922-B (Auto 8175-B) | 6/1/1992 |
| 1020 | 1034 | Colorado | Policy | Auto 6173 | 1/1/1980 |
| 1035 | 1058 | Connecticut | Policy | V-006-A | 5/30/1998 |
| 1059 | 1084 | Connecticut | Policy | V-006 | 1/1/1994 |
| 1085 | 1089 | Connecticut | Endorsement | 1907-B (Auto 7722-B) | 9/1/1990 |
| *** | *** | Connecticut | Policy | Auto 6166-A | 10/3/1977 |
| 1090 | 1117 | District of Columbia | Policy | V-008-B | 3/21/1999 |
| 1118 | 1144 | District of Columbia | Policy | V-008-A | 3/1/1997 |
| 1145 | 1171 | District of Columbia | Policy | V-008 | 12/15/1994 |
| 1172 | 1176 | District of Columbia | Endorsement | 1448-D (Auto 6576-D) | 3/15/1993 |
| 1177 | 1192 | District of Columbia | Policy | Auto 6160-A | 10/1/1977 |
| 1193 | 1220 | Delaware | Policy | V-007-C | 10/28/1998 |
| 1221 | 1247 | Delaware | Policy | V-007-A | 1/15/1995 |
| 1248 | 1274 | Delaware | Policy | V-007 | 8/1/1993 |
| 1275 | 1282 | Delaware | Endorsement | 1887-C (Auto 7970-C) | 6/1/1991 |
| 1283 | 1298 | Delaware | Policy | Auto 6168-A | 7/1/1978 |
| 1299 | 1304 | Georgia | Endorsement | V-2363-C | 12/1/1998 |
| 1305 | 1307 | Georgia | Endorsement | V-2363-B | 7/15/1995 |
| 1308 | 1326 | Georgia | Policy | Auto 6170-A | 10/1/1991 |
| 1327 | 1332 | Idaho | Endorsement | 1559-A (Auto 6910-A) | 10/1/1993 |
| 1333 | 1347 | Idaho | Policy | Auto 6173 | 1/1/1979 |
| 1348 | 1353 | Illinois | Endorsement | V-2449-A | 11/14/1997 |
| 1354 | 1359 | Illinois | Endorsement | V-2449 | 1/15/1997 |

*EXHIBIT  "A"*

002888

| 1360 | 1383 | Illinois | Policy | Auto 6164-C | 1/1/1992 |
|---|---|---|---|---|---|
| 1384 | 1408 | Indiana | Policy | V-013 | 3/6/1999 |
| 1409 | 1416 | Indiana | Endorsement | 1867-D (Auto 7875-D) | 12/15/1994 |
| 1417 | 1424 | Indiana | Endorsement | 1867-C (Auto 7875-C) | 12/15/1990 |
| 1425 | 1440 | Indiana | Policy | Auto 6160-A | 10/1/1977 |
| 1441 | 1446 | Iowa | Endorsement | 1709-B (Auto 7351-B) | 7/1/1993 |
| 1447 | 1450 | Iowa | Endorsement | 1709-A (Auto 7351-A) | 11/1/1985 |
| 1451 | 1465 | Iowa | Policy | Auto 6173 | 1/1/1979 |
| 1466 | 1467 | Kansas | Endorsement | 1835-B (Auto 7695-B) | 2/1/1985 |
| 1468 | 1482 | Kansas | Policy | Auto 6173 | 1/1/1980 |
| 1483 | 1488 | Kentucky | Endorsement | V-2288-C | 4/1/1998 |
| 1489 | 1492 | Kentucky | Endorsement | V-2288-B | 12/1/1995 |
| 1493 | 1494 | Kentucky | Endorsement | V-2288-A | 6/15/1994 |
| 1495 | 1517 | Kentucky | Policy | Auto 6177 | 11/4/1990 |
| 1518 | 1526 | Maine | Endorsement | 1705-C (Auto 7344-C) | 7/1/1999 |
| 1527 | 1531 | Maine | Endorsement | 1705-B (Auto 7344-B) | 2/1/1992 |
| 1532 | 1536 | Maine | Endorsement | 1705-A (Auto 7344-A) | 11/15/1990 |
| 1537 | 1555 | Maine | Policy | Auto 6176 | 6/1/1984 |
| 1556 | 1581 | Maryland | Policy | V-019-B | 2/20/1998 |
| 1582 | 1606 | Maryland | Policy | V-019 | 12/15/1993 |
| 1607 | 1610 | Maryland | Endorsement | 1952-C (Auto 8280-C) | 9/15/1991 |
| 1611 | 1626 | Maryland | Policy | Auto 6171-A | 8/6/1982 |
| 1627 | 1630 | Massachusetts | Endorsement | M-0099-S | Obsolete 1/7/1994 |
| 1631 | 1666 | Massachusetts | Policy | Auto 6515-E | Obsolete 1/7/1994 |
| 1667 | 1693 | Michigan | Policy | V-021-B**** | 8/24/2001 |
| 1694 | 1720 | Michigan | Policy | V-021-A**** | 1/1/1998 |
| 1721 | 1748 | Michigan | Policy | V-021**** | 1/1/1996 |
| 1749 | 1770 | Michigan | Policy | V-1002 | 8/15/1992 |
| 1771 | 1771 | Michigan | Endorsement | 2154-A (Auto 8963-A) | 4/18/1989 |
| 1772 | 1795 | Michigan | Policy | Auto 4808-B | 2/10/1987 |
| 1796 | 1802 | Minnesota | Endorsement | 1972-E (Auto 8342-E) | 12/1/1995 |
| 1803 | 1807 | Minnesota | Endorsement | 1972-C (Auto 8342-C) | 8/1/1988 |
| 1808 | 1822 | Minnesota | Policy | Auto 6175 | 1/25/1985 |
| 1823 | 1848 | Mississippi | Policy | V-023 | 1/30/1999 |
| 1849 | 1851 | Mississippi | Endorsement | V-2287-A | 4/1/1995 |
| 1852 | 1853 | Mississippi | Endorsement | V-2287 | 8/1/1991 |
| 1854 | 1869 | Mississippi | Policy | Auto 4806-A | 1/1/1970 |
| 1870 | 1873 | Missouri | Endorsement | 1528-C (Auto 6849-C) | 2/1/1993 |
| 1874 | 1892 | Missouri | Policy | V-1001 | 2/1/1993 |
| 1893 | 1896 | Missouri | Endorsement | 1528-B (Auto 6849-B) | 12/1/1985 |
| 1897 | 1911 | Missouri | Policy | Auto 6173 | 1/1/1979 |
| 1912 | 1916 | Montana | Endorsement | 1999-C (Auto 8461-C) | 9/1/1992 |
| 1917 | 1920 | Montana | Endorsement | 1999-B (Auto 8461-B) | 1/1/1988 |
| 1921 | 1935 | Montana | Policy | Auto 6173 | 1/1/1979 |
| 1936 | 1943 | Nebraska | Endorsement | V-2402 | 1/1/1995 |
| 1944 | 1958 | Nebraska | Policy | Auto 6173 | 1/1/1979 |
| 1959 | 1983 | Nevada | Policy | V-027-A | 2/1/1999 |
| 1984 | 2009 | Nevada | Policy | V-027 | 7/1/1996 |
| 2010 | 2016 | Nevada | Endorsement | 1627-C (Auto 7097-C) | 11/1/1988 |
| 2017 | 2031 | Nevada | Policy | Auto 6173 | 1/1/1980 |
| 2032 | 2057 | New Hampshire | Policy | V-028 | 8/16/1999 |
| 2058 | 2064 | New Hampshire | Endorsement | 1759-B (Auto 7496-B) | 11/1/1990 |
| 2065 | 2080 | New Hampshire | Policy | Auto 6165 | 8/1/1976 |
| 2081 | 2085 | New York | Endorsement | 1891-C (Auto 7988-C) | 2/23/1996 |
| 2086 | 2089 | New York | Endorsement | 1891-B (Auto 7988-B) | 9/1/1993 |
| 2090 | 2091 | New York | Endorsement | 1891-A (Auto 7988-A) | 1/1/1986 |
| 2092 | 2092 | New York | Endorsement | 1891 (Auto 7988) | 5/8/1983 |
| 2093 | 2104 | New York | Policy | Auto 6174 | 7/1/1981 |

002889

| 2105 | 2133 | North Carolina | Policy | V-032-B | 7/1/2000 |
|---|---|---|---|---|---|
| 2134 | 2162 | North Carolina | Policy | V-032-A | 1/15/1999 |
| 2163 | 2187 | North Carolina | Policy | V-032 | 7/25/1997 |
| 2188 | 2190 | North Carolina | Endorsement | V-2400-A | 8/9/1995 |
| 2191 | 2192 | North Carolina | Endorsement | V-2400 | 5/15/1994 |
| 2193 | 2207 | North Carolina | Policy | Auto 7300-D | 8/1/1990 |
| 2208 | 2212 | North Dakota | Endorsement | V-2218 | 11/15/1989 |
| 2213 | 2227 | North Dakota | Policy | Auto 6173 | 1/1/1980 |
| 2228 | 2254 | Ohio | Policy | V-034 | 12/1/2001 |
| 2255 | 2263 | Ohio | Endorsement | V-2251-B | 8/1/1997 |
| 2264 | 2268 | Ohio | Endorsement | V-2251-A | 6/15/1992 |
| 2269 | 2273 | Ohio | Endorsement | V-2251 | 10/15/1990 |
| 2274 | 2293 | Ohio | Policy | Auto 6161-C | 4/15/1989 |
| 2294 | 2301 | Oklahoma | Endorsement | 1665-C (Auto 7222-C) | 5/1/1995 |
| 2302 | 2308 | Oklahoma | Endorsement | 1665-B (Auto 7222-B) | 3/1/1992 |
| 2309 | 2323 | Oklahoma | Policy | Auto 6173 | 10/1/1982 |
| 2324 | 2349 | Oregon | Policy | V-036-A | 1/1/1999 |
| 2350 | 2375 | Oregon | Policy | V-036 | 10/15/1993 |
| 2376 | 2379 | Oregon | Endorsement | 1547-A (Auto 6880-A) | 11/1/1985 |
| 2380 | 2394 | Oregon | Policy | Auto 6173 | 1/1/1979 |
| 2395 | 2400 | Pennsylvania | Endorsement | V-2264-A | 11/1/1997 |
| 2401 | 2402 | Pennsylvania | Endorsement | V-2264 | 8/15/1992 |
| 2403 | 2425 | Pennsylvania | Policy | Auto 6000-D | 7/1/1990 |
| 2426 | 2448 | Rhode Island | Policy | V-038 | 12/20/1998 |
| 2449 | 2455 | Rhode Island | Endorsement | 1315-A (Auto 6216-A) | 7/15/1991 |
| 2456 | 2470 | Rhode Island | Policy | Auto 6173 ** | 10/1/1977 |
| 2471 | 2490 | South Carolina | Policy | V-039 | 3/1/1999 |
| 2491 | 2496 | South Carolina | Endorsement | 1958-B (Auto 8308-B) | 5/17/1994* |
| 2497 | 2499 | South Carolina | Endorsement | 1958-A (Auto 8308-A) | 10/1/1989 |
| 2500 | 2515 | South Carolina | Policy | Auto 6167-A | 2/1/1979 |
| 2516 | 2521 | South Dakota | Endorsement | 1974-B (Auto 8344-B) | 4/1/1994 |
| 2522 | 2525 | South Dakota | Endorsement | 1974-A (Auto 8344-A) | 6/1/1986 |
| 2526 | 2540 | South Dakota | Policy | Auto 6175 | 1/1/1985 |
| 2541 | 2546 | Tennessee | Endorsement | V-2273-A | 3/30/1998 |
| 2547 | 2548 | Tennessee | Endorsement | V-2273 | 12/15/1990 |
| 2549 | 2564 | Tennessee | Policy | Auto 4806-A | 1/1/1970 |
| 2565 | 2583 | Texas | Policy | V-1004 | 10/15/1992 |
| 2584 | 2599 | Texas | Policy | Auto 7394-C | 9/1/1989 |
| 2600 | 2607 | Utah | Endorsement | 2042-D (Auto 8641-D) | 2/1/1999 |
| 2608 | 2613 | Utah | Endorsement | 2042-C (Auto 8641-C) | 4/1/1995 |
| 2614 | 2621 | Utah | Endorsement | 2042-B (Auto 8641-B) | 1/1/1993 |
| 2622 | 2627 | Utah | Endorsement | 2042-A (Auto 8641-A) | 3/1/1992 |
| 2628 | 2631 | Utah | Endorsement | 2042 (Auto 8641) | 9/15/1986 |
| 2632 | 2646 | Utah | Policy | Auto 6173 | 1/1/1980 |
| 2647 | 2654 | Vermont | Endorsement | 1523-C (Auto 6844-C) | 6/26/1998 |
| 2655 | 2658 | Vermont | Endorsement | 1523-B (Auto 6844-B) | 3/15/1987 |
| 2859 | 2674 | Vermont | Policy | Auto 6160-A | 10/1/1977 |
| 2675 | 2676 | Virginia | Endorsement | 2001-E (Auto 8471-E) | 10/15/1997 |
| 2677 | 2678 | Virginia | Endorsement | 2001-D (Auto 8471-D) | 7/1/1993 |
| 2679 | 2680 | Virginia | Endorsement | 2001-C (Auto 8471-C) | 8/1/1991 |
| 2681 | 2696 | Virginia | Policy | Auto 4817-E | 1/31/1976 |
| 2697 | 2720 | Washington | Policy | V-046-B | 1/1/2001 |
| 2721 | 2744 | Washington | Policy | V-046-A | 2/1/2000 |
| 2745 | 2770 | Washington | Policy | V-046 | 9/1/1994 |
| 2771 | 2772 | Washington | Endorsement | 1832-B (Auto 7720-B) | 11/1/1985 |
| 2773 | 2787 | Washington | Policy | Auto 6175 | 12/1/1981 |
| 2788 | 2793 | West Virginia | Endorsement | V-2256-C | 7/8/2000 |
| 2794 | 2799 | West Virginia | Endorsement | V-2256-A | 9/1/1998 |

3

002890

| 2800 | 2822 | West Virginia | Policy | Auto 6163-B | 6/1/1989 |
|---|---|---|---|---|---|
| 2823 | 2830 | Wisconsin | Endorsement | 1973-A (Auto 8343-A) | 8/1/1994 |
| 2831 | 2833 | Wisconsin | Endorsement | 1973 (Auto 8343) | 1/1/1985 |
| 2834 | 2848 | Wisconsin | Policy | Auto 6175 | 1/1/1985 |
| 2849 | 2854 | Wyoming | Endorsement | 1852-B (Auto 7795-B) | 5/1/1994 |
| 2855 | 2856 | Wyoming | Endorsement | 1852-A (Auto 7795-A) | 2/15/1986 |
| 2857 | 2871 | Wyoming | Policy | Auto 6173 | 1/1/1979 |
| 2872*** | 2887*** | Connecticut | Policy | Auto 6166-A | 10/3/1977 |

\*    Dates marked with an asterisk are approval dates. No effective date was available.

\*\*    Rhode Island did not use base policy Auto 6173. The base policy should have been Auto 6160-A, which is the base policy provided under Arkansas, District of Columbia, Indiana, and Vermont. The effective date for Rhode Island base policy Auto 6160-A is 10/1/1977, as listed above.

\*\*\* Connecticut Base Policy Auto 6166-A was accidentally omitted from the original production. It is now being produced with this list as Bates numbers 2872 through 2887.

\*\*\*\* Michigan Base Policies V-021, V-021-A, and V-021-B were not issued by, and do not pertain to, Nationwide Mutual Insurance Company. These policies were mistakenly included in the documents produced.

Please note that Endorsements affect (i.e. endorse) the first Policy under the Endorsement within a given state. A new Endorsement affecting the same Policy as an older Endorsement supersedes the older Endorsement (i.e. the older Endorsement no longer applies). A newer Policy within a given state supersedes all older Policies and Endorsements in that state.

4

002891

Exhibit 4

# *Table Of Contents*

Page

**INSURING AGREEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D1

**DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D1

**INSURED PERSONS' DUTIES AFTER AN ACCIDENT OR LOSS** . . . . . . . . . . D2

**TERRITORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D2

**COVERAGES:**

**Physical Damage** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P1–P5
(damage to your auto)

    Comprehensive
    Collision
    Towing and Labor

**Auto Liability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . L1–L5
(for damage or injury to others caused by your auto)

    Property Damage and Bodily Injury

**Michigan No-Fault Coverages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . N1–N6

    Personal Injury Protection Insurance Coverage
    Property Protection Insurance Coverage

**Uninsured Motorists** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . U1–U5
(for bodily injury caused by uninsured and underinsured motorists)

**GENERAL POLICY CONDITIONS**

How Your Policy May Be Changed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G1
Optional Payment of Premium In Installments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G1
Renewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G1
Non-Renewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G1
Cancellation During Policy Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G1
Dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G2
If You Become Bankrupt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G2
Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G2
Legal Action Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G2
Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G2

**MUTUAL POLICY CONDITIONS**

Nationwide Mutual Insurance Company
Nationwide Mutual Fire Insurance Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G3

V-021-A

001694

_____*Nationwide Auto Policy*

# *Insuring Agreement*

For the **policyholder's** payment of premiums in amounts **we** require and subject to all of the terms and conditions of this policy, **we** agree to provide the coverages the **policyholder** has selected. These selections are shown in the enclosed Declarations, which are a part of this policy contract. The selected coverages in this policy apply only to occurrences while the policy is in force. Renewal premiums for terms of six months each must be paid in advance.

# *Definitions*

This policy uses certain common words for easy reading. They are defined as follows:

1. "POLICYHOLDER" means the first person named in the Declarations. The **policyholder** is the named insured under this policy but does not include the **policyholder's spouse**. If the first named insured is an organization, that organization is the **policyholder**.

2. "YOU" and "YOUR" mean the **policyholder**. They include the **policyholder's spouse** except in No-Fault coverage.

3. "SPOUSE" means the **policyholder's** husband or wife if a resident in the same household.

4. "RELATIVE" means one who regularly lives in **your** household and who is related to **you** by blood, marriage or adoption (including a ward or foster child). A **relative** may live temporarily outside **your** household. In the No-Fault coverage, **relative** includes **spouse**.

5. "INSURED" means one who is described as entitled to protection under each coverage.

6. "WE," "US," "OUR," and "THE COMPANY" mean or refer to the **company** issuing the policy—Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Property and Casualty Insurance Company, or Nationwide General Insurance Company.

7. "YOUR AUTO" means the vehicle(s) described in the Declarations.

8. "MOTOR VEHICLE" means a land **motor vehicle** designed primarily to be driven on public roads. This does not include vehicles operated on rails or crawler treads. Other motorized vehicles designed for use mainly off public roads shall be included within the definition of **motor vehicle** when used on public roads. See No-Fault coverages for the definition that applies to those coverages.

9. "PRIVATE PASSENGER AUTO" means a four-wheel:
   a) **private passenger auto**;
   b) van; or
   c) pickup truck.

10. "DEDUCTIBLE" means the amount of loss to be paid by the **insured**. **We** pay for covered loss above the **deductible** amount shown in the Declarations.

11. "OCCUPYING" means in, upon, entering, or alighting from.

12. "BODILY INJURY" means:
   a) **bodily injury**;
   b) sickness;
   c) disease; or
   d) death;
   of any person.

13. "PROPERTY DAMAGE" means:
   a) destruction of property;
   b) damage or injury to it; and
   c) loss of its use.

D1

001695

*Nationwide Auto Policy* ——————————————————————————————

14. "CODE" means Chapter 31 of the Michigan Insurance **Code**, the Michigan No-Fault Law.

Other words are also defined. All defined words are in bold print.

# Insured Persons' Duties After an Accident or Loss

The **insured** will:

1. give **us** or **our** agent prompt notice of all losses and provide written proof of claim if required.

2. notify the police of all theft losses as soon as practicable.

3. promptly deliver to **us** all papers dealing with any claims or suits.

4. submit to examinations under oath as often as reasonably requested by **us**.

5. assist **us** with any claim or suit.

6. If injured, submit to examinations by company-selected physicians as often as **the company** reasonably requires. The injured person must grant **us** authority, at **our** request, to obtain copies of wage and medical records.

7. protect damaged property insured under this policy and make it available to **us** for inspection before its repair or disposal.

8. provide all records and documents **we** reasonably request and permit **us** to make copies.

# Territory

All coverages except Property Protection Insurance apply in Canada, the United States of America and its territories or possessions, or between their ports. Property Protection Insurance applies only in the state of Michigan. All coverages except Uninsured Motorists and Property Protection Insurance apply to occurrences in Mexico, if within 50 miles of the United States boundary. **We** will base the amount of any Comprehensive or Collision loss in Mexico on cost at the nearest United States point.

NOTE: **You** will need to buy auto insurance from a Mexican insurance company — regardless of coverage provided by this policy — before driving in Mexico. Otherwise, **you** may be subject to jail detention, auto impoundment, and other legal complications in case of an accident.

001696



# *Physical Damage*

(damage to your auto)

## ADDITIONAL DEFINITIONS APPLICABLE TO THESE COVERAGES

For purposes of these coverages only:

1.  "LOSS" means direct and accidental **loss** or damage to **your auto**. **Your auto** includes its **equipment**.

2.  "EQUIPMENT" means anything usual and incidental to the use of a **motor vehicle** as a **motor vehicle**. Any type of trailer is not **equipment**.

3.  "SUBSTANTIALLY AT FAULT" means a person's action or inaction was more than 50% of the cause of the **loss**. **We** and **you** must agree that the driver of **your auto** was **substantially at fault**. If agreement cannot be reached, upon written demand of either party, the matter will go to arbitration.

# *Coverage Agreements*

## COMPREHENSIVE COVERAGE

1.  **We** will pay for **loss** to **your auto** not caused by collision or upset. **We** will pay for the **loss** less **your deductible**. Coverage is included for:

    a)  damage from contact with:

        (1)  animals; or

        (2)  falling or flying objects.

    b)  broken glass:

        (1)  even if caused by collision or upset; and

        (2)  if **you** do not have Collision coverage.

        If **your** Comprehensive and Collision coverages have different **deductibles**, the smaller **deductible** will apply to broken glass.

2.  Also, if **your auto** has a **loss** under this coverage **we** will:

    a)  pay for resulting damage to **your** clothing and luggage or that of any **relative**. Maximum payment is $200 per occurrence. **We** will pay for stolen clothing or luggage only if **your auto** is stolen.

    b)  repay **your** travel costs after **your auto** is stolen. Maximum payment is $15 per day - not to exceed $450 per occurrence. These costs must be incurred within a certain time. It starts 48 hours after **you** report the theft to **us** and the police. It ends when **your auto** is returned to **you** or **we** pay for its **loss**.

    c)  repay **you** for the cost of travel from where **your auto** was disabled to where **you** were going. Maximum payment is $10 per occurrence.

## COLLISION COVERAGE

1.  **We** will pay for **loss** to **your auto** caused by collision or upset. **We** will pay for the **loss** less **your deductible**. However, **we** will not subtract the **deductible** amount:

    a)  if **your auto** collides with another **motor vehicle** insured by **us**;

    b)  for broken glass if **you** have full (no **deductible**) Comprehensive coverage in force.

2.  Also if **your auto** has a **loss** under this coverage **we** will:

    a)  pay for resulting damage to **your** clothing and luggage or that of any **relative**. Maximum payment is $200 per occurrence.

    b)  repay **you** for the travel cost to where **you** were going. Maximum payment is $10 per occurrence.

P1

001697

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 69 of 260 PageID #: 294

*Physical Damage*

## BROADENED COLLISION

This added provision applies only if the Declarations show "BROADENED COLLISION."

**We** will not subtract the **deductible** amount:

1. When the driver of **your auto** was not **substantially at fault**; or

2. While **your auto** was parked in such a way as not to have caused an unreasonable risk of the **loss**.

## LIMITED COLLISION

This added provision applies only if the Declarations show "LIMITED COLLISION."

The Collision coverage only applies to a covered **loss**:

1. When the driver of **your auto** was not **substantially at fault**; or

2. While **your auto** was parked in such a way as not to have caused an unreasonable risk of the **loss**.

## TOWING AND LABOR COSTS COVERAGE

**We** will pay towing and labor costs if **your auto** is disabled. **We** will pay only for labor costs at the place where **your auto** is disabled. **Our** maximum payment per disablement is shown in the Declarations.

# *Coverage Extensions*

## USE OF TRAILERS

The insurance on **your auto** covers a trailer used by **you** or a **relative**.

1. The trailer must be:
   a) designed for use with a **private passenger auto**; and
   b) used with a vehicle that is insured under these coverages.

2. The trailer must not be:
   a) otherwise insured;
   b) owned by **you** or a **relative**; or
   c) used for business purposes with a vehicle that's not a **private passenger auto**.

3. The maximum amount payable is $500 per occurrence.

## USE OF OTHER MOTOR VEHICLES

The insurance on **your auto** also covers other **motor vehicles** as follows:

1. A **motor vehicle you** do not own, while it is used in place of **your auto** for a short time. **Your auto** must be out of use because of:
   a) breakdown;
   b) repair;
   c) servicing; or
   d) **loss**.

2. A four-wheel **motor vehicle** newly acquired by **you**. The coverage applies only during the first 30 days **you** own the vehicle, unless it replaces **your auto**. **We** provide this coverage only if **you** do not have other collectible insurance. **You** must pay any added premium resulting from this coverage extension.

P2

001698

*Physical Damage*

3.  A **private passenger auto** owned by a non-member of **your** household and not covered in item 1. of this section.

    a)  This applies only:

        (1)  to policies issued to persons (not organizations).

        (2)  while such auto is used by **you** or a **relative**.

    b)  **We** will not pay for **loss**:

        (1)  that results from the operation of an auto:

            (a)  wash facility;

            (b)  repair shop;

            (c)  public garage or parking place;

            (d)  sales agency; or

            (e)  service or maintenance facility.

        (2)  involving a **private passenger auto** owned by an employer of an **insured**.

        (3)  involving a **private passenger auto** furnished **to you** or a **relative** for regular use.

        (4)  to any rented **motor vehicle**.

4.  A rented **private passenger auto**, including its loss of income.

    a)  This applies only:

        (1)  while such auto is rented by **you** or a **relative**;

        (2)  to policies issued to persons (not organizations);

        (3)  if such auto is rented from a rental company for less than 30 days; and

        (4)  for loss of income that is:

            (a)  verifiable by **us**; and

            (b)  owed to a rental company because:

                (1)  the rental company had a customer willing to rent a **private passenger auto**; and

                (2)  there was no other vehicle available for rental in place of the damaged rented auto.

    b)  **We** will not pay for **loss** involving a **private passenger auto** rented or leased by anyone for or on behalf of the employer of an **insured**.

## *Coverage Exclusions*

**We** will not pay for **loss**:

1.  To more than one:

    a)  recording tape;

    b)  compact disc; or

    c)  other recording media.

2.  To a container to be used for storing or carrying:

    a)  recording tapes;

    b)  compact discs; or

    c)  other recording media.

3.  To any device which is a:

    a)  tape player;

    b)  compact disc player;

    c)  citizens band radio;

001699

*Physical Damage* —————————————————————————

d) two-way mobile radio;

e) telephone; or

f) any other device which records, emits, receives and/or transmits sound.

This exclusion (3) does not apply if the device is a permanent part of **your auto**. Permanent part means installed in a location used by an auto maker for such a device. If the device is not covered, its antenna and other parts are not covered.

4. To scanning monitor receivers used for radar detection or any other device designed to detect the monitoring of speed.

5. To a camper or living quarters unit which can be mounted on or attached to a vehicle. **We** will pay the **loss** if:

a) the unit is reported to **us**; and

b) the required premium is paid;

before the **loss**.

6. Caused by and limited to:

a) wear and tear;

b) freezing;

c) mechanical or electrical breakdown or failure.

This exclusion (6) does not apply to Towing and Labor coverage.

7. To any **motor vehicle** while used to carry persons or property for a fee. **Motor vehicles** used in shared-expense car pools are not considered as carrying persons for a fee.

8. To any **motor vehicle** due to acts of war, riot or civil unrest.

9. To **your auto** which occurs:

a) while **your auto** is being used in any illegal trade or transportation by:

(1) **you**;

(2) a **relative**; or

(3) anyone else with **your** knowledge or permission; or

b) due to confiscation of **your auto** by any law enforcement agency because of **your auto's** use in such activities.

10. Which is recoverable under Property Protection Insurance under Section 3121 of the **Code**.

11. To other **motor vehicles** which any **insured**:

a) uses without a reasonable belief that the **insured** is entitled to do so.

b) has stolen.

c) knows to have been stolen.

# *Limits and Conditions of Payment*

## ACTUAL CASH VALUE

The limit of **our** coverage is the cash value of **your auto** or its damaged parts at the time of **loss**. To determine cash value, **we** will consider:

1. fair market value;

2. age; and

3. condition of the property;

at the time of **loss**. In addition to **our** payment of the **loss**, necessary and reasonable towing and storage will be paid to protect the auto from further damage.

P4

001700

*Physical Damage*

## LOSS SETTLEMENT

At our option, we may:

1.  pay you directly for a loss;

2.  repair or replace your auto or its damaged parts;

3.  return stolen property at our expense and pay for any damage.

## AMOUNTS PAYABLE FOR TOWING AND LABOR COSTS

The limit of our coverage for a loss is limited to the amount shown in the Declarations. Limits apply as stated in the Declarations. Insuring more than one person or vehicle under this policy does not increase our limits.

## OTHER INSURANCE

If you have other insurance that covers any loss, we will pay only our share of the loss. Our share is our proportion of the total insurance collectible for the loss. For loss to motor vehicles other than your auto, we will pay only the insured loss not covered by other insurance or self-insurance.

# Coverage Conditions

## AUTO RECOVERY

When an insured auto which has been stolen or abandoned is located, we have the right to take it into our care to keep it safe.

# Loss Payable Clause

This clause applies to the Comprehensive and Collision coverages provided by this policy. It protects the lienholder named in the policy Declarations.

Payment for loss will be made according to the interest of the policyholder and lienholder. Payment may be made to both jointly, or to either separately. Either way, the company will protect the interests of both.

Protection of the lienholder's financial interest will not be affected by any change in ownership of the vehicle insured, nor by any act or omission by any person entitled to coverage under this policy. However, protection under this clause does not apply in any case of conversion, embezzlement, secretion, or willful or damaging destruction of the vehicle committed by or at the direction of an insured.

If the company cancels or refuses to renew the policy, the lienholder will receive notice at least 10 days before protection of its interest will end. The company will also notify the lienholder if coverage under the policy is excluded for any named driver.

The lienholder shall notify the company upon learning of any change in ownership of the vehicle.

To the extent of payment to the lienholder, the company will be entitled to the lienholder's rights of recovery. The company will do nothing to impair the right of the lienholder to recover the full amount of its claim.

# Assignability

No interest in these coverages can be transferred without our written consent. However, if the policyholder dies, they will stay in force for the rest of the policy period. They will apply for anyone having proper temporary custody of your auto.

P5

001701



# *Auto Liability*

(for damage or injury to others caused by your auto)

## *Coverage Agreement*

### PROPERTY DAMAGE AND BODILY INJURY LIABILITY COVERAGE

1. **We** will pay for damages for which **you** are legally liable as a result of an accident arising out of the:

   a) ownership;

   b) maintenance or use; or

   c) loading or unloading;

   of **your auto**. A **relative** also has this protection. So does any person or organization who is liable for the use of **your auto** while used with **your** permission. Except for damage to a **motor vehicle**, we will pay such liability losses up to the limits stated in the Declarations. **We** will pay for damage to a **motor vehicle** as required and limited by Section 3135(3)(d) of the **Code** if the words "LIMITED PROPERTY DAMAGE LIABILITY" are shown in the Declarations. The accident causing damage to a **motor vehicle** must happen in the state of Michigan.

2. Damages must involve:

   a) **property damage**; or

   b) **bodily injury.**

3. **We** will pay such liability losses, including any pre-judgment interest required by law, up to the limits stated in the Declarations. In addition to these limits and as to any covered damages, **we** will:

   a) defend at **our** expense, with attorneys of **our** choice, any suit against the **insured**. **We** may settle or defend any claim or suit as **we** think proper.

   b) pay:

      (1) all expense incurred by **us**; and

      (2) all costs levied against the **insured**;

      in any such suit.

   c) pay premiums:

      (1) of not more than $250 per **insured** for bail bonds required because of an accident or traffic violation.

      (2) for appeal bonds in defended suits and for bonds to release attached property. The amount of such bonds shall not be more than the limits of liability shown in the Declarations.

      Although paying such premiums, **we** are not required to apply for or furnish any bonds.

   d) pay post-judgment interest on all damages awarded. **We** will not pay interest that accrues after such time as **we** have:

      (1) paid;

      (2) formally offered; or

      (3) deposited in court;

      the amount for which **we** are liable under this policy.

L1

001702

*Auto Liability* ————————————————————————————————

    e)  pay expenses incurred by an **insured** for emergency medical aid to others at the time of accident.

    f)  pay all reasonable expenses incurred by an **insured** at **our** request, but not more than $50 per day for loss of earnings.

4.  After the limits of this coverage have been paid, we will not defend any suit or pay any claim or judgment.

# Coverage Extensions

## USE OF TRAILERS

1.  This coverage applies to the use of a trailer by:

    a)  **you**;

    b)  a **relative**; or

    c)  someone else with **your** permission.

2.  The trailer must be:

    a)  designed for use with a **private passenger auto**; and

    b)  used with a vehicle that is insured under this coverage.

3.  The trailer must not be used for business purposes with a vehicle that's not a **private passenger auto**.

## USE OF OTHER MOTOR VEHICLES

This coverage also applies to certain other **motor vehicles** as follows:

1.  A **motor vehicle you** do not own, while it is used in place of **your auto** for a short time. **Your auto** must be out of use because of:

    a)  breakdown;

    b)  repair;

    c)  servicing; or

    d)  loss.

2.  A four-wheel **motor vehicle** newly acquired by **you**. It applies only:

    a)  during the first 30 days **you** own the vehicle unless it replaces **your auto**; and

    b)  if **you** do not have other insurance. **You** must pay any premiums resulting from this coverage.

3.  A **motor vehicle** owned by a non-member of **your** household and not covered in item 1. of this section.

    a)  This applies only to policies issued to persons (not organizations) and while the vehicle is being used by **you** or a **relative**. It protects the user, and any person or organization, except as noted below in b), who does not own the vehicle but is legally responsible for its use.

    b)  This does not apply to losses involving a **motor vehicle**:

        (1)  used in the business or occupation of **you** or a **relative** except a **private passenger auto** used by **you**, **your** chauffeur, or **your** household employee;

        (2)  owned, rented or leased by an employer of an **insured**;

        (3)  rented or leased by anyone for or on behalf of an employer of an **insured**; or

        (4)  furnished to **you** or a **relative** for regular use. Furnished for regular use does not include a **motor vehicle** rented from a rental company for less than 30 days.

L2

001703

*Auto Liability*

## FINANCIAL RESPONSIBILITY

**We** will adjust this policy to comply:

1. With the financial responsibility law of any **state** or province which requires higher liability limits than those provided by this policy.

2. With the kinds and limits of coverage required of non-residents by any compulsory **motor vehicle** insurance law, or similar law.

However, any loss payment under this coverage will be made only over and above any other collectible **motor vehicle** insurance. In no case will anyone be entitled to duplicate payments for the same loss.

# *Coverage Exclusions*

This coverage does not apply to:

1. To an **insured** for **property damage** or **bodily injury** caused intentionally by or at the direction of such **insured**, including willful acts the result of which the **insured** knows or ought to know will follow from the **insured's** conduct.

2. Use of any **motor vehicle** to carry persons or property for a fee. **Motor vehicles** used in shared-expense car pools are not considered as carrying persons for a fee.

3. a) Any person for any occurrence arising out of the operation of an auto:

    (1) wash facility;

    (2) repair shop;

    (3) public garage or parking place;

    (4) sales agency; or

    (5) service or maintenance facility.

   b) However, this exclusion does not apply to:

    (1) **you**;

    (2) a **relative**; or

    (3) a partner, employee, or agent of **you** or a **relative**;
    with regard to the use of **your auto**.

4. **Property damage** caused by any **insured**:

   a) to a **motor vehicle** that is owned or operated by, or in the custody of, that **insured**; or

   b) to any other property that is owned by or in the custody of any **insured** or anyone occupying **your auto**. This exclusion does not apply to a:

    (1) rented home; or

    (2) rented private garage.

5. **Bodily injury** to any person eligible to receive any benefits required to be provided or voluntarily provided by any **insured** under a:

   a) worker's compensation;

   b) unemployment compensation;

   c) non-occupational or occupational disease;

   d) disability benefits;

   or any similar law.

6. **Bodily injury** to an employee of any **insured** while engaged in employment. However, it does cover an employee at **your** home who is not, or is not required to be, covered by any worker's compensation law.

L3

001704

*Auto Liability* ——————————————————————————————————————

7. Any person protected under nuclear energy liability insurance. This exclusion applies even if that insurance has been exhausted.

8. The United States of America or any of its agencies. It also does not apply to any employee of the United States of America or any of its agencies while such person is acting within the scope of his or her office or employment and the provisions of the Federal Tort Claims Act.

9. **Bodily injury** in excess of the Financial Responsibility Law of Michigan to any **insured** or any member of an **insured's** family residing in the **insured's** household.

10. Other **motor vehicles** which any **insured**:

   a) uses without a reasonable belief that the **insured** is entitled to do so.

   b) has stolen.

   c) knows to have been stolen.

# *Limits and Conditions of Payment*

## AMOUNTS PAYABLE FOR LIABILITY LOSSES

**Our** obligation to pay Property Damage or Bodily Injury Liability losses is limited to the amounts per person and per occurrence stated in the Declarations. The following conditions apply to these limits:

1. The limit shown:

   a) for Property Damage Liability is for all **property damage** in one occurrence.

   b) for Bodily Injury Liability for any one person is for all legal damages, including all derivative claims, claimed by anyone arising out of and due to **bodily injury** to one person as a result of one occurrence.

   The per-person limit is the total amount available when one person sustains **bodily injury**, including death, as a result of one occurrence. No separate limits are available to anyone for derivative claims, statutory claims, or any other claims made by anyone arising out of **bodily injury**, including death, to one person as a result of one occurrence.

   c) for Bodily Injury Liability for each occurrence is the total limit of **our** liability for all legal damages when two or more persons sustain **bodily injury**, including death, as a result of one occurrence. No separate limits are available to anyone for derivative claims, statutory claims, or any other claims arising out of **bodily injury**, including death, to two or more persons as a result of one occurrence. This total limit is subject to the limit for any one person.

2. Liability limits apply as stated in the Declarations. The insuring of more than one person or vehicle under this policy does not increase **our** liability limits.

3. In any loss covered under items 2. and 3. of "USE OF OTHER MOTOR VEHICLES," the highest liability limit applicable to any one vehicle on this policy will apply.

4. A **motor vehicle** and attached trailer are considered one vehicle for Auto Liability coverage.

## OTHER INSURANCE

1. In any loss involving the use of **your auto**, **we** will be liable for only **our** share of the loss if there is other collectible liability insurance. **Our** share is **our** proportion of the total insurance limits for the loss.

2. For losses covered under "USE OF OTHER MOTOR VEHICLES," **our** coverage is excess over any other collectible:

   a) insurance;

   b) self insurance;

L4

001705

*Auto Liability*

   c)  proceeds from a governmental entity; or

   d)  sources of recovery.

If more than one policy issued by **us** or an affiliated company applies on an excess basis to the same loss, **we** will pay only up to the highest limit of any one of them.

# *Assignability*

No interest in this coverage can be transferred without **our** written consent. However, if the **policyholder** dies, the Liability coverage will stay in force for the rest of the policy period for:

1.  Anyone having proper temporary custody of **your auto** until a legal representative is appointed; and

2.  The appointed legal representative.

001706

 *Michigan No-Fault Coverages*

## ADDITIONAL DEFINITIONS APPLICABLE TO THIS COVERAGE

1. "MOTOR VEHICLE" means a vehicle, including a trailer, with more than two wheels required to be registered for use on a public highway in Michigan. The **motor vehicle** must be operated, or designed for operation, upon a public highway by power other than muscular power. Motor vehicle does not include: (a) a farm tractor or other implement of husbandry not subject to registration requirements of the Michigan vehicle code; or (b) a **motorcycle**, moped, or an off-road recreational vehicle as defined by Michigan law.

2. "MOTORCYCLE" means a vehicle required to be registered for use on a public highway in Michigan having a saddle or seat for use of the rider, designed for operation upon a public highway to travel on not more than three wheels in contact with the ground and with a motor that exceeds 50 cubic centimeters piston displacement. **Motorcycle** does not include a moped or an off-road recreational vehicle as defined by Michigan law.

3. "INSURED MOTOR VEHICLE" means:
   a) a **motor vehicle** described in the Declarations for which:
      (1) the Auto Liability Insurance of this policy applies; and
      (2) the **policyholder** is required to maintain security under the provisions of the **Code**; or
   b) a **motor vehicle** to which the Auto Liability Insurance of this policy applies, if it:
      (1) does not have the security required by the **Code**; and
      (2) is operated, but not owned, by **you** or a **relative**;
   c) a trailer with more than two wheels designed for use with a **private passenger auto** that is owned or used by **you** or any **relative** if it does not have the security required by the **Code**.

4. "INSURED PERSON(S)" means:
   a) **you**, if an individual, and a **relative**;
   b) any other person:
      (1) **occupying** the **insured motor vehicle**; or
      (2) injured as a result of an accident involving the **insured motor vehicle** while not **occupying** any **motor vehicle**.

5. "DEPENDENT SURVIVOR(S)" means:
   a) the surviving **spouse**, if residing in the same household at the time of death, or if dependent upon the deceased at the time of death. Dependency ends upon death or remarriage of the surviving **spouse**.
   b) any person who was dependent upon the deceased at the time of death and is:
      (1) under the age of 18 years; or
      (2) physically or mentally incapacitated from earnings; or
      (3) engaged full-time in a formal program of academic or vocational training.
   Dependency ends upon death of the **dependent survivor**.

6. "CAR" means a vehicle of the same type as the one described on the Declarations. For the purposes of this definition, **private passenger auto** and **utility car** are considered the same type of vehicle.

7. "STATE(S)" includes the District of Columbia, and any state, territory or possession of the United States, and any province of Canada.

N1

001707

*No-Fault* _____

# Coverage Agreements

## PERSONAL INJURY PROTECTION INSURANCE COVERAGE

**We** agree to pay in accordance with the **Code** the following benefits to or for an **insured person** who suffers accidental **bodily injury** arising out of the ownership, operation, maintenance or use of a **motor vehicle as a motor vehicle.**

In the event of the **insured person's** death from such accidental **bodily injury, we** will pay the following benefits to or for the **insured person's dependent survivor(s).**

### 1. MEDICAL BENEFITS (ALLOWABLE EXPENSES)

All reasonable charges incurred for reasonably necessary products, services and accommodations for an **insured person's** care, recovery or rehabilitation. Payments are subject to the Limits and Conditions of Payment provisions.

### 2. WORK LOSS BENEFITS

Loss of income from work an **insured person** would have performed if that person had not been injured. Payments are subject to the Limits and Conditions of Payment provisions.

### 3. LOSS OF SERVICES EXPENSES

Expenses reasonably incurred in obtaining ordinary and necessary services an **insured person** would have performed not for income but for the benefit of that person or dependents. Payments are subject to the Limits and Conditions of Payment provisions.

### 4. SURVIVORS' LOSS BENEFITS

Contributions of tangible things of economic value that the **dependent survivor(s)** of the deceased at the time of death would have received for support. **We** will also pay expenses reasonably incurred by these **dependent survivors** in obtaining ordinary and necessary services the deceased would have performed for their benefit. Payments are subject to the Limits and Conditions of Payment provisions.

## PROPERTY PROTECTION INSURANCE COVERAGE

**We** agree to pay in accordance with the **Code** for **property damage** caused by accident and arising out of the ownership, operation, maintenance or use of a **motor vehicle as a motor vehicle.** The accident must happen in the state of Michigan. Payments are subject to the Limits and Conditions of Payment provisions.

# Coverage Exclusions

A. This insurance does not apply to **bodily injury** to:
1. Any person using a **motor vehicle** or **motorcycle** taken unlawfully unless that person had reason to believe that there was permission to take and use that vehicle;
2. Any person, other than **you** or any **relative,** not **occupying a motor vehicle** if the accident occurs outside the state of Michigan;
3. **You** while **occupying,** or through being struck by while not **occupying,** a **motor vehicle** owned or registered by **you** and which is not an **insured motor vehicle;**
4. A **relative** while **occupying,** or through being struck by while not **occupying,** a **motor vehicle,** if the **relative** is the owner or registrant of such vehicle and has failed to maintain security required by the **Code** on that vehicle;
5. The owner or registrant of a **motor vehicle** or **motorcycle** involved in the accident who has failed to maintain security on such vehicle as required by the **Code.**
6. Any person arising out of the ownership, operation, maintenance or use, including loading or unloading, of a parked **motor vehicle,** unless:
   a) the **motor vehicle** was parked in such a way as to cause unreasonable risk of the **bodily injury** which occurred; or

N2

001708

b) **bodily injury** was a direct result of physical contact with:

(1) equipment permanently mounted on the **motor vehicle** while the equipment was being operated or used; or

(2) property being lifted onto or lowered from the **motor vehicle** in the loading or unloading process; or

c) the person was **occupying** the **motor vehicle;**

7. Any person while **occupying** a **motor vehicle** located for use as a residence or premises;

8. Any person while **occupying** a **motor vehicle** operated in the business of transporting passengers for which security is maintained as required by the **Code**, unless the **motor vehicle** is an **insured motor vehicle** or the person is a passenger in a:

a) school bus;

b) bus operated as a common carrier;

c) bus operated under a government sponsored transportation program;

d) bus operated by or providing service to a non-profit organization; or

e) taxicab;

9. **You** or any **relative** while **occupying** a **motor vehicle** owned, furnished, or registered by **your** or their employer for which security is maintained as required under the provisions of the **Code;**

10. Any **relative** entitled to Personal Injury Protection Insurance Benefits as a person named under the terms of any other policy;

11. Any person, other than **you** or any **relative**, entitled to Personal Injury Protection Insurance Benefits under the terms of any other policy;

B. This insurance does not apply to **bodily injury** or **property damage:**

1. suffered intentionally; or

2. caused intentionally by any person claiming benefits.

C. This insurance does not apply to **property damage:**

1. To any vehicle and its contents, including trailers, designed for operation upon a public highway by power, other than muscular power, unless the vehicle is parked so as not to cause unreasonable risk of the **property damage** which occurred;

2. To any property owned by **you** or a **relative;**

3. To any utility transmission lines, wires or cables arising from the failure of a municipality, utility company, or cable television company to comply with the requirements of Michigan law;

4. To any property that occurs within the course of a business of repairing, servicing, or otherwise maintaining **motor vehicles.** However this exclusion (4) does not apply to **property damage** to **your auto** that is not covered by any other insurance, including Physical Damage coverages under this or any other policy.

# *Limits and Conditions of Payment*

## PERSONAL INJURY PROTECTION INSURANCE

**Our** obligation to pay Personal Injury Protection Insurance Benefits to or on behalf of any one person who sustains **bodily injury** in any one **motor vehicle** accident is subject to the conditions and limits as set out below.

**We** will subtract benefits provided or required to be provided under the laws of any **state** or federal government, including a Worker's Compensation law or disability law of a similar nature, from the benefits otherwise payable under this coverage even though the **insured person** has failed to apply for them. It is the obligation of the **insured person** to apply for any benefits

001709

*No-Fault* _____

provided or required to be provided under the laws of any **state** or federal government. It is also the obligation of the **insured person** to reapply, appeal or file suit for these governmental benefits if the initial application is rejected.

1. **MEDICAL BENEFITS (ALLOWABLE EXPENSES)** include reasonable and customary charges for semi-private hospital accommodations except when the **insured person's** injuries require special or intensive care. Allowable expenses also include $1,750 payable for funeral and burial expenses.

   Allowable expenses are limited to reasonable charges as provided by the **Code.**

   If the Declarations show "COORDINATED MEDICAL BENEFITS," sums paid or payable to or for **you** or any **relative** shall be reduced by any amount paid or payable under any valid and collectible: individual, blanket or group disability or hospitalization insurance; medical, surgical or hospital direct pay or reimbursement health care plan; or **car** or premises insurance affording medical expense benefits. Such other insurance, plan or benefits are agreed to be primary protection for **you** or a **relative. We** will pay, except to the extent that: (a) benefits are paid or payable under the primary protection; or (b) a provider within the primary protection is qualified and competent to render the products, services or accommodations.

   If medical expenses are identified as coordinated on the Declarations page, the **insured person** must seek treatment afforded for, or payable by any other coverage before **we** will be liable for any benefits, including any excess not paid for by such other coverage. The **insured person** has a duty to mitigate their damages.

2. **WORK LOSS BENEFITS** shall include payment for loss of income from work incurred within three years from the date of the accident. Work loss benefits cease after the date the **insured person** dies.

   Benefits payable for loss of income from work shall be reduced by 15%. If the **insured person's** income tax advantage is less than 15%, the actual percentage shall apply.

   After the application of the above percentage, the combined total amount payable for Work Loss and any income earned shall not exceed the maximum amount established under the **Code** in any 30-day period. The combined total limit shall be reduced pro rata for any period of less than 30 days.

   If the Declarations show "COORDINATED WORK LOSS BENEFITS," sums paid or payable to **you** or any **relative** for loss of income from work shall be reduced by any amount paid or payable under any valid and collectible: individual, blanket, group accident or disability insurance; salary or wage continuation plan. This reduction applies even if the **insured person** fails to apply for them.

   The **insured person** has a duty to mitigate damages by seeking alternative employment or, if available, by pursuing other governmental benefits, such as worker's compensation, or similar disability benefits under any **state** or federal government laws, except social security retirement benefits.

   If the Declarations show "WAIVER OF WORK LOSS BENEFITS," no benefits for loss of income will be payable to any person who has signed the waiver form which **we** have provided at the **policyholder's** request.

3. **LOSS OF SERVICES EXPENSES** are payment of such expenses, not to exceed $20 per day, incurred within three years from the date of the accident. Loss of Services Expenses cease after the date the **insured person** dies.

4. **SURVIVORS' LOSS BENEFITS** shall include payment for:

   a) loss of contributions of tangible things of economic value as provided by the **Code;** and

   b) loss of services expenses, not to exceed $20 per day;

   incurred after the death of the **insured person** and within three years of the date of the accident.

001710

*No-Fault*

After the application of the above limits, the combined total amount payable in any 30-day period for Survivors' Loss Benefits shall not exceed the maximum amount established under the **Code**.

5. **DEDUCTIBLES.** A **deductible** will apply as follows:

a) any amounts payable under Personal Injury Protection Insurance shall be reduced by any **deductible** stated on the Declarations.

b) If the Declarations show that COORDINATED MEDICAL BENEFITS have been selected and there is no other medical insurance applicable to **bodily injury** suffered by **you** or a **relative** at the time of the accident, **we** will not pay the first $300 of allowable expenses incurred by **you** or each **relative**.

c) If the Declarations show that COORDINATED WORK LOSS BENEFITS have been selected and there is no other disability insurance applicable to **bodily injury** suffered by **you** or a **relative** at the time of the accident, **we** will not pay the first $300 of work loss incurred by **you** or each **relative**.

## PROPERTY PROTECTION INSURANCE

Regardless of the number of vehicles insured or policies held, the limit of **our** liability under this coverage for all **property damage** from one accident is $1,000,000. Payment is limited to the lesser of reasonable repair costs or replacement costs less depreciation and, where applicable, the value of loss of use.

## OTHER INSURANCE

1. **PERSONAL INJURY PROTECTION INSURANCE**

An **insured person** shall recover under all applicable policies no more than the amount payable under the policy providing the highest dollar limit.

If the accident causing injury occurs outside Michigan, this insurance shall be excess over that provided under No-Fault Automobile Insurance Laws of any other **state**.

Under no circumstances may an **insured person** recover:

a) duplicate similar benefits required by any law for the same expenses or loss; or

b) more than the monthly benefits payable under the **Code**, except for any Additional Work Loss amount to which an **insured person** is otherwise entitled under this policy.

An **insured person**, occupying a motorcycle, who sustains **bodily injury** in an accident involving a **motor vehicle** shall claim Personal Injury Protection Insurance Benefits from insurers in the following order of priority:

a) the insurer of the owner or registrant of the **motor vehicle** involved in the accident;

b) the insurer of the operator of the **motor vehicle** involved in the accident;

c) the **motor vehicle** insurer of the operator of the **motorcycle** involved in the accident;

d) the **motor vehicle** insurer of the owner or registrant of the **motorcycle** involved in the accident.

2. **PERSONAL INJURY PROTECTION INSURANCE AND PROPERTY PROTECTION INSURANCE**

When two or more insurers are in the same order of priority, an insurer paying benefits is entitled to partial payment from the other insurer(s) including a reasonable amount of expenses.

When **we** are in the same order of priority with other insurer(s), **our** obligation to:

a) pay benefits; or

b) make reimbursement to other insurer(s);

shall be prorated on the basis of the number of policies in the same order of priority.

N5

001711

*No-Fault* _____

# Reimbursement and Trust Agreement

## PERSONAL INJURY PROTECTION INSURANCE AND PROPERTY PROTECTION INSURANCE

In the event of payment to any person under this Insurance:

a) **we** shall be entitled (to the extent of that payment) to the proceeds of any settlement or judgment from the exercise of any right of recovery of that person against any person or organization legally responsible for the **bodily injury** or **property damage**. **We** shall have a lien to the extent of **our** payment.

b) that person shall:

    (1) hold in trust for our benefit all rights of recovery;

    (2) do nothing after loss to prejudice any rights of recovery;

    (3) execute and deliver to **us** any papers necessary to secure the rights and obligations as established by this provision.

**Our** rights under this provision are subject to any applicable limitations of the **Code**.

# Arbitration

If **we** and the **insured person** do not agree about the right to receive benefits, or the amount of such benefits, the parties may agree in writing to settle the dispute by arbitration, as follows:

1. Each will select a competent arbitrator. The two so selected will select a third.

2. If the third arbitrator is not agreed upon within 30 days, the **insured person** or **we** may request a judge of a court of record to name one. The court must be in the county in which arbitration is pending.

3. Each party will pay its chosen arbitrator. Each will pay half of all other expenses of arbitration. Fees to lawyers and expert witnesses are to be paid by the party hiring them.

4. Unless the **insured person** and **we** agree otherwise, arbitration will take place in the county in which the **insured person** lives at the time of the accident. Arbitration will be subject to the usual rules of procedure and evidence in such county. The arbitrators will resolve the issues. Questions in dispute will be decided when two arbitrators agree.

5. Arbitrators may not award future benefits.

6. If all three arbitrators agree on the award, **we** will be bound by their decision, unless there is a clear error of law which materially affected the outcome.

7. If an award is not the unanimous decision of all three arbitrators, **we** may reject it and demand a trial. This right must be used within 30 days after the award.

8. All rights, remedies, obligations and limitations of the **Code** apply.

001712

 # *Uninsured Motorists*

(for bodily injury caused by uninsured and underinsured motorists)

## ADDITIONAL DEFINITION APPLICABLE TO THIS COVERAGE

An "**uninsured motor vehicle**" is:

1. One for which there is no bodily injury liability bond or insurance in effect, applicable to the vehicle owner, operator, or any other liable person or organization, at the time of the accident.

2. One which is underinsured. This is a **motor vehicle** for which bodily injury liability coverage or bonds are in effect; however, their total amount is less than the limits of this coverage. See the Declarations for those limits.

3. One for which the insuring company denies coverage or becomes insolvent.

4. A "hit-and-run" motor vehicle which causes **bodily injury** to an **insured** by physical contact with:

   a) such person; or

   b) a vehicle the **insured** is **occupying**.

   The driver and the owner of the "hit-and-run" vehicle must be unknown. A report must be made to the police within 24 hours. **We** must have a sworn statement within 30 days. It must state that the **insured** has a legal action due to the accident. It must include facts to support the action. **We** may inspect any vehicle the **insured** was **occupying**.

**We** will not consider as an **uninsured motor vehicle**:

1. Any **motor vehicle** that is "self-insured" under any law;

2. Any **motor vehicle** owned by a government unit or agency;

3. Any vehicle in use as a residence or premises;

4. Any equipment or vehicle designed for use mainly off public roads except while on public roads;

5. Any **motor vehicle** insured under the liability coverage of this policy; nor

6. Any vehicle owned by or furnished for the regular use of **you** or a **relative**.

## *Coverage Agreement*

### YOU AND A RELATIVE

**We** will pay compensatory damages, including derivative claims, which are due by law to **you** or a **relative** from the owner or driver of an **uninsured motor vehicle** because of **bodily injury** suffered by **you** or a **relative**. Damages must result from an accident arising out of the:

1. ownership;

2. maintenance; or

3. use;

of the **uninsured motor vehicle**.

### OTHER PERSONS

**We** will also pay compensatory damages, including derivative claims, which are due by law to other persons who:

1. Are not a named insured or an insured household member for similar coverage under another policy; and

U1

001713

*Uninsured Motorists*

2. **Suffer bodily injury while occupying**:
   a) **your auto**.
   b) a **motor vehicle you** do not own, while it is used in place of **your auto** for a short time. **Your auto** must be out of use because of:
      (1) breakdown;
      (2) repair;
      (3) servicing; or
      (4) loss.
   c) a four-wheel **motor vehicle** newly acquired by **you**. This applies only during the first 30 days you own the vehicle, unless it replaces **your auto**.
   d) any other **motor vehicle** while it is being driven by **you** or a **relative**. This extension applies only in policies issued to persons (not organizations). However, the vehicle must not be:
      (1) owned by **you** or a **relative**; or
      (2) furnished to **you** or a **relative** for regular use.

## RECOVERY

1. Before recovery, **we** and the **insured** must agree on two points:
   a) whether there is a legal right to recover damages from the owner or driver of an **uninsured motor vehicle**; and if so,
   b) the amount of such damages.
   If agreement can't be reached, the matter may go to arbitration.
2. Questions between the injured party and **us** regarding such person's entitlement to Uninsured Motorists coverage, or the limits of such coverage, are not subject to arbitration and shall be decided by a court of law.
3. Any judgment against the uninsured will be binding on **us** only if it has **our** written consent.

# Coverage Exclusions

This coverage does not apply to:

1. Use of any **motor vehicle** by an **insured** to carry persons or property for a fee. **Motor vehicles** used in shared-expense car pools are not considered as carrying persons for a fee.
2. Use of any **motor vehicle** by an **insured** without the owner's permission.
3. **Bodily injury** of any **insured** if the insured settles, without **our** written consent, with a liable party.
4. Punitive or exemplary damages.
5. Directly or indirectly benefit any workers' compensation or disability benefits carrier, or any person or organization qualifying as a "self-insurer" under a workers' compensation, disability benefits, or similar law.
6. **Bodily injury** suffered while **occupying** or struck by a **motor vehicle** owned by **you** or a **relative**, but such **motor vehicle** is not insured for Auto Liability coverage under this policy.

# Insured Persons' Duties

1. The **insured** must:
   a) submit written proof of the claim to **us** as soon as practicable. It must be under oath, if required. It must include details of:
      (1) the nature and extent of injuries;

U2

001714

(2) treatment; and

(3) any other facts which could affect the amount of payment.

b) provide all facts of the accident and the name of all witnesses.

c) answer questions under oath as often as we require.

d) be examined by doctors chosen by us as often as we require with good reason. At our request, the injured person must promptly authorize us to:

(1) speak with any doctor who has treated him;

(2) read all medical history and reports of the injury;

(3) obtain copies of wage and medical reports and records; and

(4) obtain copies of all medical bills as they are incurred.

2. After notice of claim, we may require the insured to take legal action against any liable party.

3. An insured may bring legal action against the other party for bodily injury. A copy of any paper served in this action must be sent to us at once.

4. The insured must:

a) obtain our written consent to:

(1) settle any legal action brought against any liable party; or

(2) release any liable party.

b) preserve and protect our right to subrogate against any liable party.

## *Arbitration*

If we and the insured do not agree about the right to recover damages, or the amount of such damages and upon written demand of either party, the dispute will be settled by arbitration, as follows:

1. Each will select a competent arbitrator. The two so selected will select a third.

2. If the third arbitrator is not agreed upon within 30 days, the insured or we may request a judge of a court of record to name one. The court must be in the county and state in which arbitration is pending.

3. Each party will pay its chosen arbitrator. Each will pay half of all other expenses of arbitration. Fees to lawyers and expert witnesses are to be paid by the party hiring them.

4. Unless the insured and we agree otherwise, arbitration will take place in the county and state in which the insured lives at the time of the accident. Arbitration will be subject to the usual rules of procedure and evidence in such county and state. The arbitrators will resolve the issues. Questions in dispute will be decided when two arbitrators agree.

5. Any arbitration against the company must begin within the time limits outlined under the Legal Action Limitations provision of this coverage.

6. When used, arbitration of uninsured motorists claims is binding on the insured and the company only if the award is within the limits of state financial responsibility laws where your auto is principally garaged. If the award exceeds these limits, the company or the insured may demand a trial. This right must be used within 21 days after the award. Trial will be in a court of competent jurisdiction. Trial will be on all issues of the award including the amount within the financial responsibility limits.

7. Judgment upon award may be entered in any proper court after such award is final and is not appealed as provided herein.

8. As an alternative, if the insured and we agree, arbitration will be by rules of the American Arbitration Association.

U3

001715

*Uninsured Motorists*

# *Legal Action Limitations*

No legal action may be brought against **the company** concerning this coverage until the **insured** has fully complied with all terms of the policy.

Under this Uninsured Motorists coverage, arbitration or any tort action against **the company** must begin within a certain time period. The proper papers must be filed within the time limit allowed by law:

a)   for death actions if the claim involves death of an **insured**; or

b)   for bodily injury actions if the claim involves injury to an **insured** but not death.

The laws of the state in which the accident occurred will determine these time limits.

# *Trust Agreement*

1.   This applies to the extent of any payment **we** make under this coverage. **We** will have first right to any amount the **insured** receives from any liable party. The **insured** must:

   a)   hold in trust for **us** his right to recover against any such party; and

   b)   furnish **us** all papers in any suit the **insured** files.

2.   **Our** payment of a claim may result from the insolvency of an insurer. If so, **we** have the right to recover from the insurer, but not its insured.

# *Limits of Payment*

## AMOUNTS PAYABLE FOR UNINSURED MOTORISTS LOSSES

**We** agree to pay losses up to the limit stated in the attached Declarations. The following apply:

1.   The limit shown:

   a)   for Bodily Injury for any one person is for all covered damages, including all derivative claims, claimed by anyone arising out of and due to **bodily injury** to one person as a result of one occurrence.

   The per-person limit is the total amount available when one person sustains **bodily injury**, including death, as a result of one occurrence. No separate limits are available to anyone for derivative claims, statutory claims, or any other claims made by anyone arising out of **bodily injury**, including death, to one person as a result of one occurrence.

   b)   for Bodily Injury for each occurrence is the total limit of **our** liability for all covered damages when two or more persons sustain **bodily injury**, including death, as a result of one occurrence. No separate limits are available to anyone for derivative claims, statutory claims, or any other claims arising out of **bodily injury**, including death, to two or more persons as a result of one occurrence. This total limit is subject to the limit for any one person.

2.   Coverage applies as stated in the Declarations. The insuring of more than one person or vehicle under this policy does not increase **our** payment limits. In no event will any **insured** be entitled to more than the highest limit applicable under any policy issued by **us** or an affiliated company.

3.   The limits of this coverage and/or any amounts payable under this coverage, whichever are less, will be reduced by:

   a)   any amount paid by or for any liable parties.

   b)   any sums paid or payable under any workers' compensation, disability benefits, or similar laws.

   c)   any sums paid or payble under any Personal Injury Protection (No-Fault) of any policy. This includes any benefits that would have been paid or payable except for a **deductible.**

U4

001716

*Uninsured Motorists*

    d)  any amount paid or payble under Medical Payments coverage endorsed to this policy.

4.  Any payment under this coverage to or for an **insured** will reduce the amount of damages the **insured** may be entitled to recover under the Bodily Injury Liability coverage of this policy.

5.  No payment will be made until the limits of all other liability insurance and bonds that apply have been exhausted by payments.

## OTHER INSURANCE

If there is other insurance:

1.  For **bodily injury** suffered by an **insured** while **occupying a motor vehicle** other than **your auto**, **we** will pay the insured loss not paid or payble by:

    a)  other similar insurance;

    b)  self insurance;

    c)  proceeds collectible from a governmental entity; or

    d)  any other sources of recovery.

However, this insurance will apply only in the amount by which the limit of coverage under this policy exceeds the applicable limit of liability of all the above noted recovery sources.

2.  Except as stated above, if there is other insurance similar to this coverage for **bodily injury** under any other policy, **we** will be liable for only **our** share of the loss. **Our** share is **our** proportion of the total insurance limits for the loss.

3.  In any event, if more than one recovery source provides proceeds for the loss, total recovery will be considered not to exceed the highest amount paid or payable from any one of all applicable recovery sources.

## DUPLICATE PAYMENT

**We** will make no duplicate payment to or for any **insured** for the same element of loss.

# *Assignability*

No interest in this coverage can be transferred without **our** written consent. However, if the **policyholder** dies, this coverage will stay in force for the rest of the policy period. It will apply to anyone having proper custody of **your auto**.

001717

 # *General Policy Conditions*

We, you, and anyone insured by this policy must do certain things in order for the provisions of the policy to apply. The following are policy conditions:

## 1. HOW YOUR POLICY MAY BE CHANGED

a) Any terms of this policy which may be in conflict with statutes of the state in which the policy is issued are hereby amended to conform.

b) Any **insured** will automatically have the benefit of any extension or broadening of coverage in this policy, as of the effective date of the change, provided it does not require more premium.

c) No other changes may be made in the terms of this policy except by policy endorsement or policy revision.

d) The premium for each coverage is based on information in **our** possession. Any change or correction in this information will allow **us** to make an adjustment of the premium during the policy period.

e) The **policyholder** has a duty to notify **us** as soon as possible of any change which may affect the premium or the risk under this policy. This includes, but is not limited to, changes in:

(1) the principal garaging address of the insured vehicle(s), which must be reported to **us** within 30 days of the date the address change becomes effective;

(2) drivers;

(3) vehicles;

(4) use of the insured vehicle(s); or

(5) desired coverages, **deductibles**, or limits.

## 2. OPTIONAL PAYMENT OF PREMIUM IN INSTALLMENTS

The **policyholder** may pay the premium for this policy in installments, under terms and conditions approved where required by the Department of Insurance. For each separate installment payment there is an installment service charge. **Your** agent can provide additional information about installment payment.

## 3. RENEWAL

This policy is written for a six-month policy period. **We** will renew it for successive policy periods, subject to the following conditions:

a) Renewal will be in accordance with policy forms, rules, rates and rating plans in use by **us** at the time.

b) All premiums or premium installment payments must be paid when due, whether payable directly to **us** or through any premium finance plan.

c) Prior to the expiration of a policy term for which premium has been paid, **we** will mail a notice to the **policyholder** for the premium required to renew or maintain the policy in effect. **We** will mail this notice to the address last known to **us**.

## 4. NON-RENEWAL

a) At the end of each six-month period after the effective date of this policy, **we** will have the right to refuse to renew the entire policy or any of its coverages.

b) If **we** elect not to renew, **we** will mail or deliver written notice to the **policyholder** 30 days in advance of the date **our** action will take effect. Mailing of this notice to the **policyholder's** last known address will be considered proof of notice.

c) For nonpayment of renewal premium, coverage will terminate without notice at the end of the last policy period for which premium was paid.

G1

001718

*General Policy Conditions*

### 5. CANCELLATION DURING POLICY PERIOD

a) The **policyholder** may cancel this policy or any of its coverages by mailing notice to **us** of the future date of cancellation desired. **We** will retain premium for the days covered subject to any minimum earned premium or short-rate premium filed with and approved by the Commissioner of Insurance.

b) Up to the time this policy or any coverage has been in effect 55 days, **we** may terminate in accordance with applicable law. **We** may cancel by mailing or delivering notice to the **policyholder** 20 days in advance of termination of coverage. While the date **we** mail this notice must be within the 55 days, the date of termination need not be.

c) After any coverage of this policy has been in effect 30 days, **our** right to cancel such coverage during the policy period is limited.

   (1) **We** may cancel:

      (a) If premiums or premium installment payments are not paid when due, whether payable directly to **us** or through any premium finance plan.

      (b) If any of these persons has his driver's license suspended or revoked during the policy period and the suspension or revocation has become final:

         (1) **you**;

         (2) one who lives in **your** household; or

         (3) one who frequently drives **your motor vehicle**.

      (c) for any reasons in accordance with applicable law.

   (2) **We** must mail or deliver notice to the **policyholder** 20 days prior to the effective date of cancellation, unless **we** are cancelling for nonpayment of premium. To cancel for nonpayment, **we** will mail notice to the **policyholder** 10 days prior to the termination of coverage.

d) In any case of termination or cancellation by **us** under items b) or c) above, **our** mailing or delivery of notice to the **policyholder's** last known address will constitute proof of notice. **We** will retain premium for days covered during the policy period subject to any minimum earned premium or short-rate premium filed with and approved by the Commissioner of Insurance.

e) Premium refund, if any due, will be made as soon as practicable. Mailing or delivery of **our** check will constitute tender of refund.

### 6. DIVIDENDS

The **policyholder** is entitled to any dividends which are declared by the Board of Directors and are applicable to coverages in this policy.

### 7. IF YOU BECOME BANKRUPT

Bankruptcy or insolvency of any **insured** will not relieve **us** of any obligation under the terms of this policy.

### 8. FRAUD

This policy does not cover any loss to or by any **insured** if any element of fraud or fraudulent action is engaged in by that **insured** in connection with the loss.

### 9. LEGAL ACTION LIMITATIONS

No legal action may be brought against **us** concerning this policy until the **insured** has fully complied with all its terms.

Under the Auto Liability coverages of this policy, no legal action may be brought against **us** until judgment against the **insured** has been finally determined after trial. This policy does not give anyone the right to make **us** a party to any action to determine the liability of an **insured**.

### 10. SUBROGATION

**We** have the right of subrogation under the:

a) Physical Damage;

G2

001719

*General Policy Conditions*

b) Auto Liability;

c) Michigan No-Fault; and

d) Uninsured Motorists;

coverages in or endorsed to this policy. This means that after paying a loss to you or others under this policy, we will have the **insured's** right to sue for or otherwise recover such loss from anyone else who may be held liable. Also, we may require reimbursement from the **insured** out of any settlement or judgment that duplicates our payments. These provisions will be applied in accordance with state law. Any **insured** will sign such papers, and do whatever else is necessary to transfer these rights to **us**, and will do nothing to prejudice them.

## MUTUAL POLICY CONDITIONS

(Applicable only to policies issued by Nationwide Mutual Insurance Company—Nationwide Mutual Fire Insurance Company.)

If this policy is issued by Nationwide Mutual Insurance Company or Nationwide Mutual Fire Insurance Company, the **policyholder** is a member of **the company** issuing the policy while this or any other policy issued by one of these two companies is in force. While a member, the **policyholder** is entitled to one vote only—regardless of the number of policies issued to the **policyholder**—either in person or by proxy at meetings of members of said company.

The annual meeting of members of the Nationwide Mutual Insurance Company will be held at the Home Office at Columbus, Ohio, at 10 a.m. on the first Thursday of April. The annual meeting of members of the Nationwide Mutual Fire Insurance Company will be held at the Home Office at Columbus, Ohio, at 9:30 a.m. on the first Thursday of April. If the Board of Directors of either of the above companies should elect to change the time or place of meeting, that company will mail notice of the change to the **policyholder** at the address last known to it. **The company** will mail this notice at least 10 days in advance of the meeting date.

This policy is non-assessable, meaning that the **policyholder** is not subject to any assessment beyond the premiums the above companies require for each policy term.

**IN WITNESS WHEREOF:** Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Property and Casualty Insurance Company, or Nationwide General Insurance Company, whichever is the issuing company as shown in the Declarations, has caused this policy to be signed by its President and Secretary at Columbus, Ohio, and countersigned as may be required by a duly authorized representative of **the company**.

*Patricia R. Hatter*
**Secretary**

*Galen Barnes*
**President**

Nationwide Mutual Insurance Company • Nationwide Mutual Fire Insurance Company
Nationwide Property and Casualty Insurance Company • Nationwide General Insurance Company
Home Office: Columbus, Ohio 43215-2220

001720

Exhibit 5

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 92 of 260 PageID #: 317

**FORM 1:**

**Limits and Conditions of Payment**
**ACTUAL CASH VALUE**
The limit of our coverage is the cash value of your auto or its damages parts at the time of loss. To determine case value, we will consider:

1.  fair market value;
2.  age; and
3.  condition of the property; at the time of loss. [Some policies add a clause to also cover reasonable towing and storage expenses.]

**LOSS SETTLEMENT**
At our option, we may:

1.  pay you directly for a loss;
2.  repair or replace your auto or its damaged parts [with certain policies adding that such parts may be "furnished either by original equipment manufacturers or non-original equipment manufacturers," or similar language];
3.  return stolen property at our expense and pay for any damage.

| States in which Nationwide policies include this language: | Bates Number of Nationwide documents: |
|---|---|
| Alabama | 00579-603 |
| Alaska | 00626-634 |
| Arizona | 00671-690 |
| Arkansas | 00708-736 |
| California | 00841-867 |
| Colorado | 00935-959 |
| Connecticut | 01035-1058 |
| District of Columbia | 01090-1117 |
| Delaware | 01221-1247 |
| Georgia | 01308-1326 |
| Illinois | 01360-1382 |
| Indiana | 01384-1408 |
| Kentucky | 01495-1517 |
| Maine | 01537-1555 |
| Maryland | 01556-1581 |
| Michigan | 01721-1748 |
| Mississippi | 01694-1720 |
| Missouri | 01874-1892 |
| Montana | 01921-1935 |
| Nevada | 01984-2009 |
| New Hampshire | 02032-2057 |
| Ohio | 02228-2254 |
| Oregon | 02324-2349 |

| | |
|---|---|
| Pennsylvania | 02395-2400 |
| Rhode Island | 02426-2448 |
| South Carolina | 02471-2490 |
| Washington | 02745-2770 |
| West Virginia | 02800-2822 |

**FORM 2:**

**ACTUAL CASH VALUE.** Our obligation to pay for Comprehensive or Collision loss is limited to the case value of the auto or its damaged parts at the time of loss. The determination of cash value will include consideration of fair market value, age and condition of the property in question at the time of loss.

We may pay you directly for a loss, or may repair of replace your auto or its damaged parts. At any time before loss settlement, we may return stolen property at our expense with payment for any damage done to the property.

| States in which Nationwide policies include this language: | Bates Number of Nationwide documents: |
|---|---|
| Idaho | 01336-1347 |
| Iowa | 01451-1465 |
| Kansas | 01468-1482[1] |
| Minnesota | 01808-1822 |
| Montana | 01921-1935 |
| Nebraska | 01944-1958 |
| North Dakota | 02213-2227 |
| Oklahoma | 02309-2323 |
| South Dakota | 02526-2540 |
| Utah | 02632-2646 |
| Vermont | 02659-2674 |
| Wisconsin | 02834-2848 |
| Wyoming | 02857-2871 |

---

[1] In a subsequent endorsement to the Kansas policy, the first paragraph of the Actual Cash Value provision is deleted and replaced with the following: "Our obligation to pay for Comprehensive or Collision loss is limited to the actual cash value of the auto or its damaged parts at the time of loss. Actual cash value means the amount it would cost to repair or replace damaged property with property of like kind and quality, less allowance for physical deterioration and depreciation." 01466-1467.

**FORM 3:**

**LIMIT OF LIABILITY**
Our limit of liability will be the lesser of the:
1.   Actual cash value of the stolen or damaged property; or
2.   Amount necessary to repair or replace the property with other property of like kind and quality.

However, our limit of liability for loss to:
1.   Personal effects is $100; and
2.   A trailer not owned by you is $500.

An adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss.

With respect to the Stated Amount Coverage(s) shown as applicable to a vehicle described in the Declarations, our limit of liability for loss will be the lesser of the:
1.   Amount shown in the Declarations;
2.   Actual cash value of the stolen or damaged property; or
3.   Amount necessary to repair or replace the property with other property of like kind and quality.

Our payment for loss will be reduced by any applicable deductible shown in the Declarations. The maximum amount payable is the Limit of Liability less the applicable deductible. An adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss.

**Payment of Loss**
We may pay for the loss in money or repair or replace the damaged or stolen property. We may, at our expense, return any stolen property to: (a) you; or (b) the address shown in this policy.

If we return stolen property we will pay for any damage resulting from the theft. We may keep all or part of the property at an agreed or appraised value.

In the repair of your covered auto under the physical damage coverage provisions of this policy, we may require or specify the use of automobile parts not made by the original manufacturer. These parts are required to be at least equal in terms of fit, quality, performance and warranty to the original manufacturer parts they replace.

| States in which Nationwide policies include this language: | Bates Number of Nationwide documents: |
|---|---|
| North Carolina | 002163-2187 |

-3-

Exhibit 6

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 96 of 260 PageID #: 321

**FORM 4:**

**Limit of Liability**

Our liability for loss will be the lesser of the:

1.    Actual cash value of the stolen or damaged property;
2.    Amount necessary to repair or replace the property with other of like kind and quality; or
3.    Amount stated in the Declarations of this policy.

****

**Payment of Loss**

We may pay for loss in money or repair or replace the damaged or stolen property. We may, at our expense, return any stolen property to: 1. You; or 2. The address shown in this policy. If we return the stolen property, we will pay for any damage resulting from the theft. We may keep all or part of the property at an agreed or appraised value.

States in which Nationwide policies
include this language:

Bates Number of
Nationwide documents

Texas

02563-2583

-4-

FILED UNDER SEAL

Exhibit 7

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 99 of 260 PageID #: 324

**FILED UNDER SEAL**

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 101 of 260 PageID #: 326

Exhibit 8

## POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP

Pomerantz Haudek Block Grossman & Gross LLP ("PHBG&G") is one of the nation's foremost specialists in corporate, securities, antitrust and ERISA class litigation. The firm was founded by the late Abraham L. Pomerantz, one of the "pioneers who developed the class action/derivative action field." New York Law Journal (August 1, 1983). Mr. Pomerantz rose to national prominence as a "champion of the small investor" and a "battler against corporate skullduggery." Robert J. Cole, *Class Action Dean*, The National Law Journal, Vol. 1 No. 2 at 1 (Sept. 25, 1978).

For more than 50 years, the firm has specialized in representing victims of securities frauds, breaches of fiduciary duty, corporate mismanagement, and price fixing conspiracies, as it continues the proud tradition established by Mr. Pomerantz. PHBG&G is led by senior partner Stanley M. Grossman, a nationally prominent litigation practitioner.

Courts have consistently acknowledged the ability of PHBG&G to vigorously pursue the claims of class members. In granting the fee request in *In re Salomon Brothers Treasury Litigation*, 91 Civ. 5471 (RPP) (S.D.N.Y. 1994), where the Pomerantz firm successfully negotiated a $100 million settlement for the class in a complex antitrust and securities case, Judge Patterson stated:

> I am going to approve the settlement, and I am going to approve the attorneys fees that you have requested with cost.

> As I am doing it so summarily, does not mean I have not considered it at length. But it does not need that much consideration because I've observed the conduct of the attorneys involved here. They get the work done, and it was a tough one.

> I think that there were a lot of people who thought there was going to be no recovery at all in this case.

In approving the $100 million settlement in *Snyder v. Nationwide Insurance Co.*, Index No. 97/0633 (N.Y. Supreme Court, Onondaga County), a case where the Pomerantz firm served as co-lead counsel, Judge Tormey stated, "It was a pleasure to work with you. This is a good result. You've got some great attorneys working on it. Everybody, everybody made out fine." (Tr. at 22-23, 12/17/98.)

Recently, in *Sherleigh Associates Inc. Profit Sharing Plan v. COHR, Inc.,* No. 98-3028-JSL (BQRx) (C.D. Cal.), where as co-lead, the Pomerantz firm helped obtained a substantial settlement, the court stated: "This is a good job. I don't always think all jobs are good. This one is a good job." (Tr. of June 12, 2000 settlement hearing at p. 6.12.). And in *In re Wiring Devices Antitrust Litigation*, MDL Docket No. 331 (E.D.N.Y. Sept. 9, 1980) ($12 million recovery), where the Pomerantz firm was again lead counsel, Chief Judge Jack B. Weinstein stated:

> Counsel for the plaintiffs I think did an excellent job . . . . They are outstanding and skillful. The litigation was and is extremely complex. They assumed a great deal of responsibility. They recovered a very large amount given the possibility of no recovery here which was in my opinion substantial.

*See also: Mercury Savings and Loan*, CV 90-87 LHM (C.D. Cal. 1995) (Judge McLaughlin commended the firm for the "absolutely extraordinary job in this litigation."); *Boardwalk Marketplace Securities Litigation*, MDL No. 712 (D. Conn.) (Judge Eginton described the firm's services as "exemplary," commended it for its "usual fine job of lawyering...[in] an extremely complex matter," and concluded that the case was "very well-handled and managed." Tr. at 6, 5/20/92; Tr. at 10, 10/10/92); *Nodar v. Weksel*, 84 Civ. 3870 (S.D.N.Y.) (Judge Broderick observed "that the services rendered [by the Pomerantz firm] were excellent

services from the point of view of the class represented, [and] the result was an excellent result . . . ." Tr. at 21-22, 12/27/90); *Klein v. A.G. Becker Paribas, Inc.*, 83 Civ. 6456 (S.D.N.Y. 1987) (Judge Goettel praised the firm for providing "excellent . . . absolutely top-drawer representation for the class, particularly in light of the vigorous defense offered by the defense firm." (Tr. at 22, 3/6/87)); *Digital Securities Litigation*, 83-3255Y (D. Mass.) (Judge Young complimented the firm for its "[v]ery fine lawyering" (Tr. at 13, 9/18/86); *Shelter Realty Corp. v. Allied Main-tenance Corp.*, 75 F.R.D. 34, 40 (S.D.N.Y. 1977), *appeal dismissed*, 574 F.2d 656 (2d Cir. 1978) (where the Pomerantz firm served as lead counsel, Judge Frankel, referring to class counsel, said: "Their experience in handling class actions of this nature is known to the court and certainly puts to rest any doubt that the absent class members will receive the quality of representation to which they are entitled."); *Rauch v. Bilzerian,* 88 Civ. 15624 (Sup. Ct. N.J. 1991) (the Court referred to the partners from the Pomerantz firm who had tried the case as "exceptionally competent counsel," and as having provided "top drawer, topflight [representation], certainly as good as I've seen in my stay on this court".)

Among the many important reported decisions obtained on behalf of the Pomerantz firm's clients are: *Kronfeld v. TWA*, 832 F.2d 726 (2d Cir. 1987); *Wool v. Tandem, Inc.*, 818 F.2d 1433 (9th Cir. 1987), *cert. denied*, 108 S.Ct. 1470 (1988); *Ross v. Bernhard*, 397 U.S. 531 (1970); *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir. 1971); *Moses v. Burgin*, 445 F.2d 369 (1st Cir. 1971); *Pearlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955); *Drolet v. Healthsource, Inc.*, 968 F. Supp. 757 (D.N.H. 1997); *In re Texas International Company*, [1988-89 Decisions] Fed. Sec. L. Rep. (CCH) ¶ 94,125 (W.D. Okla. 1988); *Fisher v. Kletz*, 266 F. Supp. 180 (S.D.N.Y. 1967); and *Heit v. Bixby*, 276 F. Supp. 217 (E.D. Mo. 1967).

3

Moreover, among the class and shareholder derivative actions in which the
Pomerantz firm was lead or co-lead counsel are the following:

*In re Sorbates Direct Purchaser Antitrust Litigation*, C98-4886 Cal
(N.D. Cal. 2000) (over $82 million recovery);

*Snyder v. Nationwide Insurance Co.*, Index No. 97/0633 (Supreme
Court, N.Y., Onondaga County 1998) ($100 million recovery);

*In re First Executive Corporation Securities Litigation*, CV-89-7135
DT (Kx) (C.D. Cal. 1994) ($102 million partial recovery);

*In re Salomon Brothers Treasury Litigation*, 91 Civ. 5471 (RPP)
(S.D.N.Y. 1994) ($100 million recovery);

*Mardean Duckworth v. Country Life Insurance Co.*, No. 98 CH
01046 (C.D. Ill. 2000) ($45 million recovery);

*In re National Health Laboratories, Inc. Securities*, CV-92-1949-H
(CM) (S.D. Cal. 1995) ($64 million recovery);

*In re Boardwalk Marketplace Securities Litigation*, M.D.L. Docket
No. 712 (D. Conn. 1994) (over $66 million benefit);

*In re Woolworth Corporation Securities Class Action Litigation*, 94
Civ. 2217 (RO) (S.D.N.Y. 1997) (recovery of $20 million);

*Frank v. Paul* (CenTrust Savings Bank Securities Litigation), 90-
0084-CIV (S.D. Fla. 1996) ($20 million recovery);

*Gelfer v. Pegasystems, Inc.*, No 98-CV-12527-JT (D. Mass. 2000)
($12.5 million recovery);

*Sherleigh Associates Inc. Profit Sharing Plan v. COHR, Inc.*, No. 98-
3028 JSL(BQRx) (C.D. Cal. 2000) ($12 million recovery);

*Wallace v. Fox* Docket No. 3:96 - CV - 00772 (PCD) (D. Conn.
1977) (Northeast Utilities Shareholder Derivative Action) ($25
million recovery)

4

*In re Digital Microwave Securities Litigation*, (N.D. Ca. 1994) ($19,200,000 recovery);

*In re Porta Systems Corp. Securities Litigation*, 93 Civ. 1453 (TCP) (E.D.N.Y. 1996) (recovery of $3,250,000 cash plus 1,100,000 shares of Porta Systems stock);

*In re Copley Pharmaceutical, Inc. Securities Litigation*, CV-94-11897 (WGY) (S.D. Mass. 1995) ($6.3 million recovery);

*Goldsmith v. Technology Solutions Company Securities Litigation*, 92 C 4374 (N.D. Ill. 1995) ($4,600,000 recovery);

*In re National Data Shareholder Litigation*, 1:90-CV-1037 JEC (N.D. Ga. 1994) ($6.95 million recovery);

*In re Zenith Laboratories Securities Litigation*, Master File No. 86-3241A (DRD) (D.N.J. 1993) ($12 million recovery);

*In re FHP Securities Litigation*, Master File No. SACV 91-580 (RWRx) (C.D. Cal. 1993) ($8.25 million recovery);

*Davis v. Cullinet Software, Inc.*, Civil Action No. 85-3204-WF (D. Mass. 1993) ($3 million recovery);

*Hurley v. FDIC*, Civil Action No. 88-1940-T (D. Mass. 1992) ($29 million judgment after trial against two former officers of First Service Bank for Savings);

*In re Intermec Corp. Securities Litigation*, Civ. No. C90-783Z (W.D. Wa. 1992) ($5.9 million recovery);

*In re Ocean Drilling & Exploration Company Shareholders Litigation*, Civ. No. 11898 (Del. Ch. 1991) ($38 million cash benefit);

*Rauch v. Bilzerian*, 88 Civ. 15624 (Sup. Ct. N.J. 1991) ($3 million recovery);

*Candela Laser Corporation Securities Litigation*, Case Nos. 88-2441, 88-2461 and 88-2460 (D. Mass. 1991) ($1 million cash and warrants having an estimated value of $4.9 million at time of settlement hearing);

5

*Nodar v. Weksel*, 84 Civ. 3870, (S.D.N.Y. 1990) ($5.1 million recovery);

*In re Freeport-McMoRan Inc. Shareholders Litigation*, Civil Action No. 11667 (Del. Ch. 1990) ($15.4 million recovery);

*In re Flight International Securities Litigation*, Master File No. 1:89-CV-2211-JTC (N.D. Ga. 1990) ($5.25 million recovery);

*In re Telerate, Inc. Shareholders Litigation*, Civ. 1115 (Del. Ch. 1989) ($95 million benefit).

*Kronfeld v. TWA*, 83 Civ. 8641 (KMW) (S.D.N.Y. 1989) ($3.4 million recovery);

*In re Texas International Securities Litigation*, Civ. No. 84-366-R (W.D. Okla. 1989) ($9.5 million recovery);

*Wool v. Tandem Inc.*, Civ. No. C 85134 (JPV) (N.D. Cal. 1988) ($16 million recovery);

*In re AM International, Inc. Securities Litigation*, M-21-31, MDL Docket No. 494 (S.D.N.Y. 1987) ($23 million recovery);

*Klein v. A.G. Becker Paribas, Inc.*, 83 Civ. 6456 (S.D.N.Y. 1987) ($3 million recovery);

*In re Data Point Securities Litigation*, SA-82-CA-338 (W.D. Tex. 1987) ($28.4 million recovery);

*In re Digital Securities Litigation*, 83-3255Y (D. Mass. 1986) ($9 million recovery);

*Kaplan v. General Motors Corporation*, 81 Civ. 1252 (E.D.N.Y. 1984) ($22.5 million recovery);

*In re New York City Municipal Securities Litigation*, MDL Docket No. 314 (S.D.N.Y. 1984) ($13.5 million recovery);

*In re Alcoholic Beverages Antitrust Litigation*, 9183-1 Trade Cases (CCH) ¶ 65,342 (E.D.N.Y. 1983) ($6 million recovery);

6

*In re National Student Marketing Securities Litigation*, MDL Docket No. 105 (D.D.C. 1983) ($35 million recovery);

*In re Sterling Homex Securities Litigation*, MDL Docket No. 126 (S.D.N.Y. 1983) ($10.5 million recovery);

*J.N. Futia Co. v. Phelps Dodge, Inc.*, 1982-2 Trade Cases (CCH) ¶ 64,978 (S.D.N.Y. 1982) ($6.4 million recovery); and

*In re Westinghouse Securities Litigation*, MDL Docket No. 295 (E.D.N.Y. 1981) ($12 million recovery).

Brief biographies of the firm's lawyers are provided below:

## STANLEY M. GROSSMAN

Stanley M. Grossman, the senior partner of the Pomerantz firm, was featured in an article entitled *"Top Litigators in Securities Field -- A Who's Who of City's Leading Courtroom Combatants," New York Law Journal*, August 1, 1983. He has been with the Pomerantz firm since February 1969, and has been a member of the firm since 1976. Throughout this period he has principally represented plaintiffs in securities and antitrust class actions, including many of those listed in the firm biography. For example, he was the lead lawyer for plaintiffs and the class *In re Salomon Brothers Treasury Litigation*, 91 Civ. 5471 (RPP)(S.D.N.Y. 1994), where he obtained a $100 million cash recovery for the class. He was also the attorney in charge of the *In re First Executive Corporation Securities Litigation*, CV-89-7135 DT (Kx)(C.D. Cal. 1994), another case where he negotiated a $100 million settlement for the class. Similarly, in *In re Sorbates Direct Purchaser Antitrust Litigation*, C98-4886 CAL (N.D. Cal. 2000), his efforts with his co-counsel resulted in an over $80 million settlement for the class.

7

Senior Judge Milton Pollack of the Southern District of New York appointed Mr. Grossman to the Executive Committee of counsel charged with allocating to claimants hundreds of millions of dollars obtained in settlements with Drexel Burnham & Co. and Michael Milken.

Many courts have acknowledged on the record the high quality of the legal representation provided by Mr. Grossman to classes of investors. For example, in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 79 Civ. 3123 (S.D.N.Y.), where Mr. Grossman was lead trial counsel for plaintiff, Judge Pollack noted at the completion of the trial (Tr. 507):

> *[I] can fairly say, having remained abreast of the law on the factual and legal matters that have been presented, that I know of no case that has been better presented so as to give the Court an opportunity to reach a determination, for which the court thanks you.*

Mr. Grossman has tried other complex litigations involving the securities and other federal and corporate laws.

He has lectured to the profession on various occasions under the auspices of the Southern Federal Securities Institute, Columbia University School of Law, Duke University Law School, University of Arizona Law School, Brooklyn Law School, ALI-ABA, PLI, the New York State Bar Association, and the Association of the Bar of the City of New York. Mr. Grossman is the author of "Commentary: The Social Meaning of Shareholder Suits," 65 BROOKLYN LAW REV. (1999), among other articles.

Mr. Grossman has been active in numerous professional organizations. He is the former president of the National Association of Securities Attorneys ("NASCAT") -- an organization of attorneys specializing in securities class action litigation. During his tenure, he

8

represented NASCAT in meetings with the Chairman of the Securities and Exchange Commission, members of Congress and of the Executive Branch in furnishing input and commentary on legislation which became the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In the summer of 1998, at the invitation of Chairman of the Judiciary Committee Henry Hyde, Mr. Grossman testified before Congress on proposed legislation dealing with "federalization of state class actions." Subsequent to the hearings, Mr. Grossman was requested to participate with Congressional counsel in drafting proposed legislation.

Mr. Grossman presently serves as a vice president and adviser of the Institute for Law and Economic Policy ("ILEP"). ILEP is a public policy research and educational foundation -- established to preserve, study and enhance access to the civil justice system by all consumers. He is also a member of the Advisory Board of the Institute for Consumer Antitrust Studies at Loyola University Chicago. Additionally, he is on the Advisory Committee for the Abraham L. Pomerantz Lectures at the Brooklyn Law School.

He is currently a member of the Judiciary Committee of the Association of the Bar of the City of New York. Previously he served on the Association's Committee on Professional and Judicial Ethics; State Courts of Superior Jurisdiction; and Trade and Antitrust. He is also a member of the Litigation Section dealing with class actions at the American Bar Association.

Mr. Grossman is actively involved in local and national civic affairs. In June, 1999, he was appointed by the Association of the Bar of the City of New York to chair a special Blue Ribbon Commission on the future of the City University of New York. Upon the publication of the Commission's Report, the President of the Association described it as "insightful,

measured and persuasive . . . a striking example of the very best of what this Association can do."

He is a director of the Lincoln Center Institute for the Arts in Education, as well as a member of the Appleseed Foundation, a national public interest advocacy group. Locally, he is a trustee and secretary of the University Settlement Society of New York, which serves the community in a broad spectrum of social services.

### MARC I. GROSS

Marc I. Gross has been associated with the firm since 1976 and became a partner in 1984. He has worked almost exclusively on class actions since his graduation from New York University Law School in 1976. He received his undergraduate degree from Columbia University in 1973.

Mr. Gross has been a member of the New York City Bar Association's Federal Courts Committee, an early neutral evaluator for the Eastern District of New York, and a mediator for the Commercial Division of the New York Supreme Court. He is the Treasurer of the National Association of Securities and Commercial Law Trial Attorneys. He was a guest panelist for a Spring 1998 conference on "Courts on Trial" sponsored by the Institute of Law and Economics held at the University of Arizona Law School.

Mr. Gross was co-lead counsel in *Snyder v. Nationwide Insurance Co.*, Index No. 97/0633 (N.Y. Supreme Court, Onondaga County) which resulted in a settlement valued at $100 million for defrauded life insurance policy customers. In approving the settlement, Judge Tormey stated:

The Court approves the settlement in all respects. It is so ordered, and I compliment you all, not only the manner in which you arrived at this result today, but the time that you -- in which it was done. And I think you all did a very, very good job for all the people. You made attorneys look good. I thank you very much. It was nice working with you all.

Mr. Gross was also co-lead counsel in *In re National Health Laboratories, Inc. Securities*, CV-92-1949-H (CM) (S.D.Cal. 1995) ($64 million recovery), *Mardean Duckworth v. Country Life Insurance Co*, No. 98 CH 01046 (C.D.Ill. 2000) ($45 million settlement), and in *Frank v. Paul (Centrust Savings Bank Securities Litigation)*, 93 Civ. 1453 (TCP) (E.D.N.Y. 1996) (over $20 million recovery).

In addition, Mr. Gross was the attorney in charge of *Texas International Securities Litigation*, where in granting class certification the Court stated:

> The performance of plaintiffs' counsel thus far leaves the Court with no doubt that plaintiffs' claims will be vigorously and satisfactorily prosecuted throughout the course of this litigation.

In the course of approving the subsequent settlement of the case, the Court added:

> I would like to compliment all the parties and attorneys in this case. ... You have all worked together better than I think any case I've had that involved these extensive issues and parties and potential problems. And I for one appreciate it. And I think it shows certainly a great deal of professionalism on all your part.

Mr. Gross also serves as Chairman of Neighbors Helping Neighbors, a not-for-profit housing group based in Brooklyn, New York that is affiliated with the Neighborhood Reinvestment Corporation.

11

## SHAHEEN RUSHD

Shaheen Rushd graduated *summa cum laude* from New York Law School in 1981. Following her graduation, Ms. Rushd worked for the New York Regional Office of the Federal Trade Commission and served as Law Clerk to the Honorable Leonard I. Garth, United States Court of Appeals for the Third Circuit. She joined the firm as an associate in January 1983 and became a partner in July 1991. Ms. Rushd also served as an Adjunct Instructor at New York Law School during the 1989 academic year, is a trustee of Kalamazoo College, and is a member of the Association of the Bar of the City of New York's Antitrust and Trade Regulation Committee.

## D. BRIAN HUFFORD

D. Brian Hufford joined the Pomerantz firm in April 1993 and became a partner in July 1995. After obtaining a Masters of Urban Affairs from Wichita State University in 1982, Mr. Hufford attended the Yale Law School, where he was Notes and Topics Editor for the *Yale Law and Policy Review* and was awarded the Thomas I. Emerson Prize for the Outstanding Legislative Services Project. Graduating from Yale in 1985, Mr. Hufford subsequently spent two years in Washington, D.C. as an Honors Attorney in the United States Department of the Treasury's Honors Law Program. From 1987 until he joined the firm in 1993, he was a litigation associate at Davis Polk & Wardwell, where he worked primarily on securities and class actions. His article: "Deterring Fraud vs. Avoiding the Strike Suit: Reaching An Appropriate Balance," was published in 61 *Brooklyn Law Review* 593 (Summer 1995).

At Pomerantz, Mr. Hufford has not only prosecuted a number of securities and antitrust cases, but he is also the attorney in charge of the firm's healthcare and consumer practice. Mr. Hufford successfully argued our case before the New York appellate court in *Batas v. Prudential*R, 281 A.D.2d, 724 N.Y.S.2d 3 (1st Dep't 2001), in which the court -- in a 5-0 vote -- upheld our claims that Prudential relied on improper procedures for the determination of medical necessity in its health insurance contracts. That decision was featured in an article in *Medical Economics* (Aug. 6, 2001), which cited it as a "potential landmark decision." Mr. Hufford also successfully argued *Drolet v. Healthsource, Inc.*, 968 F. Supp. 757 (D.N.H. 1997), in which the court upheld our complaint alleging the defendant's breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA") for misrepresenting the financial incentives it paid to physicians to reduce medical expenditures, establishing an important precedent for the rights of health care subscribers to ERISA plans.

Mr. Hufford has also written and lectured in the area of healthcare litigation. Recently, the court in *Orthopaedic Surgery Associates of San Antonio v. Prudential Health Care Plan, Inc.*, 147 F. Supp.2d 595 (W.D. Tex. 2001), quoted extensively from Mr. Hufford's article, entitled "*Managed Care Litigation: The Role of Providers,*" 1216 PLI/Corp. 487 (Nov. 2000), citing it as "instructive." In addition, Mr. Hufford was featured in the book *Net Law: How Lawyers Use the Internet*, by Paul Jacobsen (Jan. 1997), which discusses how he has used the Internet to investigate some of the firm's pending class actions.

13

## PATRICK V. DAHLSTROM

Mr. Dahlstrom is a 1987 graduate of the Washington College of Law at American University in Washington, D.C., where he was a Dean's Fellow, Editor-in-Chief of the *Administrative Law Journal*, and member of the Moot Court Board representing Washington College of Law in the New York County Bar Association's Antitrust Moot Court Competition. Upon graduating, Mr. Dahlstrom served as the Pro Se Staff Attorney for the United States District Court for the Eastern District of New York and clerked for the Honorable Joan M. Azrack, United States Magistrate Judge. He joined the Pomerantz firm as an associate in the Fall of 1991 and became a partner in January 1996.

Mr. Dahlstrom was a member of the trial team in *In re ICN/Viratek Securities Litigation*, 87 Civ. 4296 (KMW) (S.D.N.Y. 1996). The trial in *ICN* was litigated for two months before the Honorable Kimba Wood and ultimately settled for $14.5 million. After the close of the trial, the Court commented that "plaintiffs' counsel did a superb job here on behalf of the class . . . . This was a very hard fought case. You had very able, superb opponents, and they put you to your task . . . . The trial was beautifully done and I believe very efficiently done . . . ." Mr. Dahlstrom also was co-lead counsel in *In re Woolworth Corporation Securities Class Action Litigation*, 94 Civ. 2217 (RO) (S.D.N.Y. 1997), which was recently settled for $20 million.

## H. ADAM PRUSSIN

H. Adam Prussin graduated cum laude from Yale in 1969, and after obtaining a Masters degree from the University of Michigan in 1971, he received his J.D. degree from Harvard in 1974. He has published several articles on the subject of the standards and pro-

14

cedures for obtaining dismissal of shareholder derivative actions, including "Termination of Derivative Suits Against Directors on Business Judgement Grounds: From *Zapata* to *Aronson*" published in 39 The Business Lawyer 1503, 1984; "Dismissal of Derivative Actions Under the Business Judgement Rule: *Zapata* One Year Later," published in 38 *The Business Lawyer* 401, 1983; and "The Business Judgement Rule and Shareholder Derivative Actions: Viva *Zapata*?," published in 37 *The Business Lawyer* 27, 1981.

Mr. Prussin joined the firm as Of Counsel in June, 2000, and became a partner in January 2002. Before joining the firm, Mr. Prussin was a named partner in the firm of Silverman, Harnes, Harnes, Prussin & Keller, which specializes in representing plaintiffs in shareholder derivative and class action litigation, particularly those involving self-dealing by corporate officers, directors and controlling shareholders. Mr. Prussin played a key role in several landmark derivative cases in the Delaware courts, and has appeared repeatedly before the Delaware Supreme Court.

Prior to joining Silverman, Harnes in 1994, Mr. Prussin was of counsel to Weil, Gotshal & Manges. While there, he represented numerous corporate defendants in shareholder derivative actions and class actions, and also in general commercial, bankruptcy and antitrust disputes.

### DONALD G. DAVIS

Donald G. Davis joined the firm as Of Counsel in June 2001. Mr. Davis graduated from Cornell Law School in 1981, where he was an Articles Editor on the Cornell Law Review. Mr. Davis spent the next six years at Chadbourne & Parke and Spengler Carlson Gubar

15

Brodsky & Frischling, where he specialized in complex commercial litigation, working on such matters as the OPM fraud case and the *USFL v. NFL* antitrust case.

Mr. Davis then spent the next thirteen years at Murray & Hollander, where he became a partner, and continued to handle a broad variety of complex commercial litigation matters.

Mr. Davis is a member of the Association of the Bar of the City of New York and a member of its Sports Law Committee.

### ROBERT J. AXELROD

Robert J. Axelrod joined the firm as an associate upon his graduation from Brooklyn Law School in 1995, where he received an American Jurisprudence Award for Excellence in Legal Writing. While in law school, Mr. Axelrod interned with the Honorable Magistrate Judge Steven M. Gold, United States District Court, Eastern District of New York; and with the Office of Assistant Chief Counsel, Federal Aviation Administration. Mr. Axelrod also served as Executive Notes and Comments Editor of the *Brooklyn Law Review*, where he authored a Note entitled "The Politics of Nonacquiescence." This Note was subsequently republished by West Publishing Company. Mr. Axelrod specializes in securities, corporate, and ERISA litigation.

### PAUL T. CURLEY

Paul T. Curley graduated from Brooklyn Law School in 1997. While in law school, he interned at the New York State Attorney General, Investor Protection and Securities

16

Bureau. He is a member of the Association of the Bar of the City of New York and the American Bar Association Business Law Section.

## LEIGH R. HANDELMAN

Leigh R. Handelman became associated with the firm in January, 2002, and is practicing in the Chicago office. She graduated from Chicago-Kent College of Law in 1996. Upon her graduation, Ms. Handelman spent the next 5 years specializing in complex litigation, handling a broad variety of matters. She is a member of the Illinois State Bar Association.

## GREGORY LINKH

Gregory Linkh graduated from the University of Michigan Law School in 1999. While in law school, he clerked for the Honorable Gerald E. Rosen, United States District Judge, Eastern District of Michigan. He is a member of the American Bar Association and New York State Bar Association.

## RONEN SARRAF

Ronen Sarraf graduated from Brooklyn Law School in 2000, where he was Managing Editor of the Brooklyn Journal of International Law and a member of the Moot Court Honor Society. He is the author of a Note entitled "The Value of Borrowed Art," published in the Brooklyn Journal of International Law and "Authors' Lawsuit Takes Giant Leap Forward," published in the Authors Guild Bulletin.

## MURIELLE STEVEN WALSH

Murielle Steven Walsh graduated *cum laude* from New York Law School in 1996, where she received the Irving Mariash Scholarship. While in law school, she interned at the Kings County District Attorney's Office. She is a member of the New York State Bar Association Committee on Media Law.

## ANDREW G. TOLAN

Andrew G. Tolan received his Juris Doctor degree from Brooklyn Law School in 1990, where he was a member of the Moot Court Honor Society. While in law school, Mr. Tolan interned with the United States Attorney's Office, Southern District of New York. Mr. Tolan is a member of the Association of the Bar of the City of New York and the New York State Bar Association. In 1997, Mr. Tolan received his MBA degree from New York University's Stern School of Business.

Exhibit 9

## BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
| ALABAMA | YES[4] | YES[4] | YES[4] | YES[5] |
| ALASKA | YES[6] | YES[6] | YES[6] | YES[7] |
| ARIZONA | YES[8] | YES[8] | YES[8] | YES[8] |
| ARKANSAS | YES[9] (MUTUAL AGREEMENT) | YES[9] (MUTUAL AGREEMENT) | YES[9] | YES[9] (SUBJECT MATTER) |
| CALIFORNIA | YES[11] | YES[11] | YES[11] | YES[10] |
| COLORADO | YES[13] | YES[13] | YES[14] | YES[12] |
| CONNECTICUT | YES[15] | YES[15] | YES[16] | YES[15] |
| DELAWARE | YES[18] | YES[18] | YES[18] | YES[17] |
| DISTRICT OF COLUMBIA | YES[20] | YES[20] | YES[20] | YES[19] |
| FLORIDA | YES[23] | YES[23] | YES[24] | YES[22] |
| GEORGIA | YES[25] | YES[25] | YES[25] | YES[26] |
| HAWAII | YES[100] | YES[100] | YES[100] | YES[101] |
| IDAHO | YES[27] | YES[27] | YES[29] | YES[28] |
| ILLINOIS | YES[31] | YES[31] | YES[31] | YES[30] |
| INDIANA | YES[32] | YES[32] | YES[32] | YES[33] |
| IOWA | YES[1] | YES[1] | YES[2] | YES[3] |
| KANSAS | YES[34] | YES[34] | YES[35] | YES[36] |
| KENTUCKY | YES[37] | YES[37] | YES[38] | YES[39] |
| LOUISIANA | YES[40] | YES[40] | YES[41] | YES[42] |
| MAINE | YES[102] | YES[102] | YES[103] | YES[104] |
| MARYLAND | YES[43] | YES[43] | YES[44] | YES[45] |

1

BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)

| | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
| MASSACHUSETTS | YES[46] | YES[46] | YES[46] | YES[47] |
| MICHIGAN | YES[48] | YES[48] | YES[48] | YES[49] |
| MINNESOTA | YES[50] | YES[50] | YES[52] | YES[51] |
| MISSISSIPPI | YES[53] | YES[53] | YES[53] | YES[54] |
| MISSOURI | YES[55] | YES[55] | YES[56] | YES[55] |
| MONTANA | YES[58] (CONSENT) [57] | YES[58] (CONSENT) [57] | YES[57,58] | YES[59] |
| NEBRASKA | YES[60] | YES[60] | YES[60] | YES[61] |
| NEVADA | YES[62] | YES[62] | YES[63] | YES[64] |
| NEW HAMPSHIRE | YES[105] | YES[105] | YES[105] | YES[106] |
| NEW JERSEY | YES[65] | YES[65] | YES[66] | YES[65] |
| NEW MEXICO | YES[67] | YES[67] | YES[67] | YES[68] |
| NEW YORK | YES[107] | YES[107] | YES[108] | YES[107] |
| NORTH CAROLINA | YES[69] | YES[69] | YES[70] | YES[69] |
| NORTH DAKOTA | YES[71] | YES[71] | YES[71] | YES[71] |
| OHIO | YES[72] | YES[72] | YES[72] | YES[72,73] (SUBJECT MATTER) |
| OKLAHOMA | YES[74] | YES[74] | YES[74] | YES[75] |
| OREGON | YES[76] | YES[76] | YES[77] | YES[76] |
| PENNSYLVANIA | YES[78] | YES[78] | YES[78] | YES[79] |
| RHODE ISLAND | YES[109] | YES[109] | YES[110] | YES[110] (SUBJECT MATTER) |
| SOUTH CAROLINA | YES[80] | YES[80] | YES[80] | YES[81] |

2

**BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)**

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
| SOUTH DAKOTA | YES[82] (CONSENT) | YES[82] (CONSENT) | YES[82] | YES[83] |
| TENNESSEE | YES[85] | YES[85] | YES[84,85] | YES[84] |
| TEXAS | YES[86] | YES[86] | YES[86] | YES[87] |
| UTAH | YES[88] | YES[88] | YES[88] | YES[89] |
| VERMONT | YES[111] | YES[111] | YES[112] | YES[113] |
| VIRGINIA | YES[90] | YES[90] | YES[90] | YES[91] |
| WASHINGTON | YES[92] | YES[92] | YES[92] | YES[93] |
| WEST VIRGINIA | YES[94] | YES[94] | YES[94,95] | YES[95] |
| WISCONSIN | YES[96] | YES[96] | YES[96] | YES[97] |
| WYOMING | YES[98] | YES[98] | YES[98] | YES[99] |

[1] Phone Connection, Inc. v. Harbst, 494 N.W.2d 445, 448 (Iowa Ct. App. 1992) (to be bound by contract, creating parties must manifest mutual assent in terms of contract, which is usually given through offer and acceptance)

[2] Des Moines Blue Ribbon Distrib., Inc. v. Drewrys Ltd., U.S.A., Inc., 129 N.W.2d 731, 736 (Iowa 1964) (consideration is essential to validity of contract)

[3] Gildea v. Kapenis, 402 N.W.2d 457, 459 (Iowa Ct. App. 1987) (in order to be binding, agreement must be definite and certain as to its terms)

[4] Pinyan v. Community Bank, 644 So. 2d 919, 922 (Ala. 1994) (basic elements of a contract are an offer and acceptance, consideration, and a mutual assent to the essential terms of the agreement)

BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|

[5] Smith v. Chickamanga Cedar Co., 82 So. 2d 200, 203 (Ala. 1955) (offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain)

[6] Hall v. Add-Ventures, Ltd. 695 P.2d 1081, 1087 n.9 (Alaska 1985) (formation of a contract requires offer, encompassing all essential terms, unequivocal acceptance by offeree of all terms of offer, consideration, and intent to be bound by offer)

[7] Alaska Creamery Products, Inc. v. Wells, 373 P.2d 505, 510 (Alaska 1962) (any contract to be enforceable must be reasonably definite and certain as to its terms)

[8] Rogus v. Lords, 804 P.2d 133, 135 (Ariz. Ct. App. 1991) (elements of enforceable contract are offer, acceptance, consideration and sufficient specification of terms so that the obligations can be ascertained)

[9] Moss v. Allstate Ins. Co., 776 S.W.2d 831, 833 (Ark. Ct. App. 1989) (essential elements of contract are: competent parties, subject matter, legal consideration, mutual agreement and mutual obligations)

[10] Ersa Grae Corp. v. Fluor Corp., 2 Cal. Rptr. 2d 288, 294 (Cal. Ct. App. 1991) (under California law, contract will be enforced if it is sufficiently definite for court to ascertain parties' obligations and to determine whether those obligations have been performed or breached)

[11] Division of Labor Law Enforcement v. Transpacific Transp. Co., 137 Cal. Rptr. 855, 859 (Cal. Ct. App. 1977) (vital elements of cause of action based on contract are mutual assent, usually accomplished through medium of offer, and acceptance, and consideration)

[12] Winston Fin. Group, Inc. v. Fults Management, Inc., 872 P.2d 1356, 1358 (Colo. Ct. App. 1994) (if parties fail to agree to sufficiently definite terms, there is no meeting of the minds and no valid contract exists)

[13] Linder v. Midland Oil Refining Co., 40 P.2d 253, 254 (Colo. 1935) (an offer and an assent thereto manifested by act or conduct constitute a "contract")

[14] City of Arvada v. Concrete Contractors, Inc., 628 P.2d 170, 172 (Colo. Ct. App. 1981) (an agreement not supported by consideration is invalid and unenforceable)

[15] Steinberg v. Reding, 587 A.2d 170, 172 (Conn. App. Ct. 1991) (in order to form a binding and enforceable contract, contract must be definite and certain as to its terms and requirements...there must exist offer and acceptance based on mutual understanding by parties)

[16] First New Haven Nat'l Bank v. Statewide Motors, Inc., 363 A.2d 751, 752 (Conn. Super. Ct. 1976) (the doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration, an executory promise is unenforceable)

4

**BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)**

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|--|-------|------------|---------------|----------------|
|  |       |            |               |                |

[17] Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Del., Inc. v. Hiram Grand Lodge Masonic Temple, Inc., 80 A.2d 294, 295 (Del. Ch. 1951) (an agreement must be reasonably definite and certain in its terms before it is legally binding on the parties thereto)

[18] In re Enstar Corp., No. 7802, 1989 Del. Ch. WL 11139, at 11 (Jan. 31, 1989) (a contract requires among other things, parties who have the capacity and authority to agree, a definitive offer and acceptance, and consideration)

[19] Rosenthal v. National Produce Co., 573 A.2d 365, 370 (D.C. 1990) (contract must be sufficiently definite as to material terms, e.g. subject matter, price, payment terms, quantity, quality, and duration, so that promises and performance to be rendered by each party are reasonably certain)

[20] Rommel v. West Am. Ins. Co., 158 A.2d 683, 685 (D.C. 1960) (for a contract to be valid and binding there must be an offer and an acceptance and consideration to support the agreement)

[22] Suggs v. Defranco's, Inc., 626 So. 2d 1100, 1100-1101 (Fla. Dist. Ct. App. 1993) (to be enforceable, an agreement must be sufficiently specific, and reflect assent by parties to all essential terms)

[23] Blumberg v. Pinellas County, 836 F. Supp. 839, 845 (M.D. Fla. 1993) (under basic Florida contract law, there can be no contract without offer and acceptance)

[24] Alpha Elec. Supply, Inc. v. Drake Contracting, Inc., 407 So. 2d 363, 365 (Fla. Dist. Ct. App. 1981) (a contract must be supported by consideration)

[25] Guthrie v. Dalton City Sch. Dist., 446 S.E.2d 526, 529 (Ga. Ct. App. 1994) (offer, acceptance and consideration result in a binding contract)

[26] Touche Ross & Co. v. DASD Corp., 292 S.E.2d 84, 85 (Ga. Ct. App. 1982) (test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon)

[27] Gyurkey v. Babler, 651 P.2d 928, 931 (Idaho 1982) (it is a basic principle of contract law that, in order to create a contract, an acceptance must be unconditional, identical to the offer, and must not modify, delete or introduce any new terms into the offer)

[28] Lawrence v. Jones, 864 P.2d 194, 197 (Idaho 1993) (to enforce contract, it must be definite and certain in its terms and requirements so that court can determine what acts are to be performed)

[29] Bear Island Water Ass'n, Inc. v. Brown, 874 P.2d 528, 533 (Idaho 1994) (the material terms which must be identified in a contract to convey land include the parties to the contract, the subject matter of the contract, the price or consideration, and a description of the property)

5

| | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|

[30] Bransky v. Schmidt Motor Sales, Inc., 584 N.E.2d 892, 895 (Ill. App. Ct. 1991) (for valid contract to be formed, terms of agreement must be definite and certain, and there must be mutual assent to those terms)

[31] Faulkner v. Gilmore, 621 N.E.2d 908, 912 (Ill. App. Ct. 1993) (to establish valid contract, there must be offer, strictly conforming acceptance of offer, and supporting consideration)

[32] Straub v. B.M.T. by Todd, 645 N.E.2d 597, 598 (Ind. 1994) (rudimentary elements of contract are offer, acceptance of the offer and consideration)

[33] Kokomo Veterans, Inc. v. Schick, 439 N.E.2d 639, 644 (Ind. Ct. App. 1982) (in order to be enforceable a contract must be reasonably definite in its material terms so that the intention of the parties may be ascertained and must also embody the legal essence known as mutuality)

[34] Sutter Bros. Constr. Co. v. City of Leavenworth, 708 P.2d 190, 196 (Kan. 1985) (a bid in response to a solicitation constitutes no more than an offer and until its acceptance, a contract doesn't exist)

[35] Belt v. Shepard, 808 P.2d 907, 911 (Kan. Ct. App. 1991) (every contract requires consideration to be legally enforceable)

[36] Lessley v. Hardage, 727 P.2d 440, 446 (Kan. 1986) (the general rule is that in order for an agreement to be binding it must be sufficiently definite as to its terms and requirements to enable a court to determine what acts are to be performed and when performance is complete, and the court must be able to fix definitely the legal liability of the parties)

[37] Cali-Ken Petroleum Co., Inc. v. Miller, 815 F. Supp. 216, 217 (W.D. Ky. 1993) (under Kentucky law, an enforceable contract exists when parties exchange a valid offer and acceptance)

[38] Cuppy v. General Accident Fire & Life Assurance Corp., 378 S.W.2d 629, 632 (Ky. 1964) (every contract requires mutual assent and consideration)

[39] Mitts & Pettit, Inc. v. Burger Brewing Co., 317 S.W.2d 865, 866 (Ky. 1958) (terms of contract must be complete and sufficiently definite to enable court to determine measure of damages in event of breach)

[40] La. Civ. Code Ann. Art. 1927 (West 1987) (a contract is formed by the consent of the parties established through offer and acceptance)

[41] Eustis v. Moons, 367 So. 2d 1343, 1346-1347 (La. Ct. App. 1970), writ denied, 370 So. 2d 577 (La. 1979) (court could not find required consideration to support a binding contract)

[42] Villars v. Edwards, 412 So. 2d 122, 124 (La. Ct. App.), writ denied, 415 So. 2d 945 (La. 1982) (it is essential to formation of a contract that nature and extent of the obligations therein be certain)

6

**BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)**

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
|  |  |  |  |  |

[43] Lemlich v. Board of Trustees of Hartford Community College, 385 A.2d 1185, 1189 (Md. 1978) (there must be an offer by one party and unconditional acceptance of that precise offer by other, prior to withdrawal by offeror, before a binding agreement is born)

[44] Beall v. Beall, 434 A.2d 1015, 1018 (Md. 1981) (in order for a contract to be binding, it must be supported by consideration)

[45] Robinson v. Gardiner, 76 A.2d 354, 356 (Md. 1950) (no action will lie upon a contract whether written or verbal, where such contract is vague or uncertain in its essential terms)

[46] Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d 283, 286 n.4 (Mass. 1991) (contract requires offer, acceptance and consideration)

[47] Cygan v. Megathlin, 96 N.E.2d 702, 703 (Mass. 1951) (all essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined)

[48] Kirchoff v. Morris, 275 N.W. 778, 780 (Mich. 1937) (an offer and acceptance as well as a consideration are necessary in order to make a contract)

[49] Siporin v. Adler, 111 N.W.2d 848, 850 (Mich. 1961) (the interpretation of written contracts is a matter for the court to determine when the parties have assented to definite terms and incorporated them in formal documents)

[50] St. Paul Fire & Marine Ins. Co. v. Bierwerth, 175 N.W.2d 136, 141 (Minn. 1969) (in order to complete a contract, there must be an offer by one party and unconditional acceptance by the other)

[51] King v. Dalton Motors, Inc., 109 N.W.2d 51, 52 (Minn. 1961) (it is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place, meaning and intent of parties in realm of speculation is void and unenforceable)

[52] Baehr v. Penn-O-Tex Oil Corp., 104 N.W.2d 661, 665 (Minn. 1960) (only a promise supported by consideration constitutes a contract; and consideration requires voluntary assumption of obligation by one party upon condition of fact or forbearance by the other)

[53] Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1177 (Miss. 1990) (elements of a contract are offer, acceptance and consideration)

[54] Hicks v. Bridges, 580 So. 2d 743, 746 (Miss. 1991) (determination that agreement is sufficiently definite to constitute valid contract is favored so as to carry out reasonable intention of parties)

7

# BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
|  |  |  |  |  |

[55] Hyken v. Travelers Ins. Co., 678 S.W.2d 454, 458 (Mo. Ct. App. 1984) (a contract requires a definite offer and an unequivocal acceptance and may be enforced only if the offer and acceptance are sufficiently specific in terms to manifest the parties' assent to those terms)

[56] Earl v. St. Louis Univ., 875 S.W.2d 234, 236 (Mo. Ct. App. 1994) (consideration is a necessary element for establishing the existence of a valid contract)

[57] Klawitter v. Dettman, 886 P.2d 416, 419 (Mont. 1994) (Section 28-2-102, MCA, sets forth the essential elements of a contract: (1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration)

[58] R.H. Grover, Inc. v. Flynn Ins. Co., 777 P.2d 338, 341 (Mont. 1989) (the critical elements of a contract are an offer and acceptance, as well as exchange of consideration)

[59] Majers v. Shining Mountains, 750 P.2d 449, 452 (Mont. 1988) (a contract will not be specifically enforced unless the terms of the contract are sufficiently definite)

[60] Kraski v. Phillips, No. A-93-230, 199 Neb. App. WL 454726, at 5 (Aug. 23, 1994) (the essential elements of a contact are: offer, acceptance, and consideration)

[61] Sayer v. Bowley, 503 N.W.2d 166, 171 (Neb. 1993) (A court of equity will not enforce a contract unless it is complete and certain in all its essential elements)

[62] Gulf Oil Corp. v. Clark County, 575 P.2d 1332, 1333 (Nev. 1978) (a bid in response to a solicitation constitutes no more than an offer and until its acceptance, a contract does not exist)

[63] American Fence, Inc. v. Wham, 603 P.2d 274, 277 (Nev. 1979) (an option could not be a separate contract when the element of consideration was lacking)

[64] Chung v. Atwell, 745 P.2d 370, 371 (Nev. 1987) (a contract to be enforceable must be sufficiently definite)

[65] Weichert Co. Realtors v. Ryan, 608 A.2d 280, 284 (N.J. 1992) (contract arises from offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty)

[66] Continental Bank of Pa. v. Barclay Riding Academy, Inc., 459 A.2d 1163, 1171 (N.J.), cert. denied, 464 U.S. 994 (1983) (no contract is enforceable without consideration)

[67] Hartbarger v. Frank Paxton Co., 857 P.2d 776, 780 (N.M. 1993), cert. denied, 510 U.S. 1118 (1994) (ordinarily, to be legally enforceable, contract must be factually supported by offer, acceptance, consideration, and mutual assent)

8

**BREACH OF CONTRACT IN 50 STATES (PLUS  D.C.)**

|  | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
|  |  |  |  |  |

[68] Sanchez v. The New Mexican, 738 P.2d 1321, 1324 (N.M. 1987) (language of a nonpromisory nature and merely a declaration of employer's general approach lacks specific contractual terms which might evidence intent to form a contract)

[69] Seawell v. Continental Casualty Co., 352 S.E.2d 263, 264 (N.C. Ct. App. 1987) (offer and acceptance are essential elements in formation of a contract, and an offer must be definite and complete to constitute the agreement of the parties)

[70] Labarre v. Duke Univ., 393 S.E.2d 321, 323 (N.C. Ct. App.), rev. denied, 399 S.E.2d 122 (N.C. 1990) (promise must be supported by consideration for it to be enforceable)

[71] In re Estate of Hill, 492 N.W.2d 288, 293 (N.D. 1992) (a contract requires an offer, and acceptance of that offer, consideration,and mutual acceptance and understanding of the offeror and offeree as to the terms of the legally enforceable obligation thus incurred.  Implicit in these requirements is the notion that to be a valid and enforceable contract, the parties must be capable of contracting and the contract must be reasonably definite and certain in its terms so that a court may require it to be performed)

[72] City of Ravenna v. Fouts, 1994 WL 88980, at 3 (Ohio Ct. App. Feb. 4, 1994) (the four basic requirements to form a contract are an offer, acceptance, consideration, and a legal subject matter), dismissed by 638 N.E.2d 1043 (1994)

[73] Ford v. Tandy Transp., Inc., 620 N.E.2d 996, 1006 (Ohio Ct. App. 1993) (in order to declare existence of contract, parties to contract must consent to its terms, there must be meeting of minds of both parties and contract must be definite and certain)

[74] Horton Ins. Agency, Inc. v. Robinson, 824 P.2d 397, 400 (Okla. Ct. App. 1991) (a valid and enforceable contract requires offer, acceptance and consideration)

[75] Sticelber v. Iglehart, 37 P.2d 638, 639 (Okla. 1934) (agreement which does not contain language sufficiently definite to enable court to ascertain parties' intention to reasonable certainty does not constitute enforceable contract)

[76] Klimek v. Perisich, 371 P.2d 956, 960 (Or. 1962) (to constitute a contract there must be an offer and an acceptance and an offer must be certain so that upon an unqualified acceptance the nature and extent of the obligations of each party are fixed and may be determined with reasonable certainty)

[77] McGrath v. Electrical Constr. Co., 364 P.2d 604, 609 (Or. 1961) (a promise not supported by consideration is not enforceable)

[78] Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993) (elemental aspects necessary to give rise to an enforceable contract are offer, acceptance, consideration, and mutual meeting of minds)

9

| | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
| | | | | |

[79] Linnet v. Hitchcock, 471 A.2d 537, 540 (Pa. Super. Ct. 1984) (an agreement is an enforceable contract wherein the parties intended to conclude a binding agreement and the essential terms of that agreement are certain enough to provide the basis for providing an appropriate remedy)

[80] Carolina Amusement Co., Inc. v. Connecticut Nat'l Life Ins. Co., 437 S.E.2d 122, 125 (S.C. Ct. App. 1993) ("contract" requires offer and acceptance accompanied by valuable consideration)

[81] Aperm of S.C. v. Roof, 351 S.E.2d 171, 173 (S.C. Ct. App. 1986) (for contract to be binding, material terms cannot be left for future settlement, but only reasonable certainty is required)

[82] Johnson v. Rapid City Softball Ass'n, 514 N.W.2d 693, 697 (S.D. 1994) (the essential elements to a contract are: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration)

[83] High Plains Genetics Research, Inc. v. J.K. Mill-Iron Ranch, 535 N.W.2d 839, 846 (S.D. 1995) (to be enforceable, an oral agreement must be clear and definite in its terms.  When terms are vague, there is no contract)

[84] People's Bank of Elk Valley v. ConAgra Poultry Co., 832 S.W. 2d 550, 553 (Tenn. Ct. App. 1991) (in order for a contract to be enforceable, contract must result from meeting of the minds, must be based upon sufficient consideration, and must be sufficiently definite to be enforced)

[85] Mitchell v. Mitchell, No. 01-A-01-9206-CV-00244, 1993 Tenn.  App. LEXIS 107, at 5 (Feb. 10, 1993) (contracts require an offer, an effective acceptance of the offer, and adequate consideration)

[86] Smith v. Renz, 840 S.W.2d 702, 704 (Tex. Ct. App. 1992) (binding contract must have offer and acceptance and offer must be accepted in strict compliance with its terms.  Consideration is a fundamental element of every valid contract and may consist of benefit to promisor or loss or detriment to promisee)

[87]T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992) (in order to be legally binding, contract must be sufficiently definite in its terms so that court can understand what the promisor undertook)

[88] Golden Key Realty, Inc. v. Mantas, 699 P.2d 730, 732 (Utah 1985) (elements essential to a contract are offer and acceptance, competent parties and consideration)

[89] Pitcher v. Lauritzen, 423 P.2d 491, 493 (Utah 1967) (a contract must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties)

[90] Snyder-Falkinham v. Stockburger, 457 S.E.2d 36, 39 (Va. 1995) (essential elements of a valid contract include acceptance of an offer and valuable consideration)

10

## BREACH OF CONTRACT IN 50 STATES (PLUS D.C.)

| | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|
| | | | | |

[91] Allen v. Aetna Casualty & Sur. Co., 281 S.E.2d 818, 819 (Va. 1981) (reasonable certainty as to contractual obligations is all that is required in order for the contract not to be too vague and indefinite to be enforceable)

[92] Swanson v. Liquid Air Corp., 826 P.2d 664, 670 (Wash. 1992) (the requisites of contract formation are offer, acceptance and consideration)

[93] Johnson v. Star Iron & Steel Co., 511 P.2d 1370, 1373-1374 (Wash. Ct. App. 1973) (before a proposal can ripen into a contract it must be definite enough so that when it is coupled with the acceptance it can be determined, with at least a reasonable degree of certainty, what the nature and extent of the obligation is which the proposer has assumed)

[94] McCormick v. Hamilton Business Sys. Inc., 332 S.E.2d 234, 236 n.1 (W. Va. 1985) (the elements of a contract are an offer and an acceptance supported by consideration)

[95] Harris v. Harris, 43 S.E.2d 225, 227 (W. Va. 1947) (a contract to make a will property is controlled by the same rules and principles as any other valid contract, and when certain and definite in its terms, and upon sufficient consideration, if equitable, it is valid and enforceable)

[96] Goossen v. Estate of Standaert, 525 N.W.2d 314, 318 (Wis. Ct. App. 1994) (offer, acceptance and consideration are the elements of an enforceable contract)

[97] Goebel v. National Exchangors, Inc., 277 N.W.2d 755, 765 (Wis. 1979) (an offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain)

[98] Prudential Preferred Properties v. J & J Ventures, Inc., 859 P.2d 1267, 1272 (Wyo. 1993) (basic elements of contract require offer, acceptance, and consideration)

[99] Action Ads, Inc. v. Judes, 671 P.2d 309, 310-311 (Wyo. 1983) (where the terms of contract are not sufficiently definite to permit determination of the promissor's contractual duties, court lacks information necessary to rule on the isssues of breach of contract, damages, or duty to mitigate damages)

[100] Dowsett v. Cushman, 625 P.2d 1064, 1068 (Haw. Ct. App. 1981) (contracts require an offer, acceptance, consideration and parties who have the capacity and authority to agree as they do)

[101] Boteilho v. Boteilho, 564 P.2d 144, 146 (Haw. 1977) (to be enforceable, a contract must be certain and definite as to its essential terms)

[102] Zamore v. Whitten, 395 A.2d 435, 439-40 (Me. 1978), overruled on other grounds by Bahre v. Pearl, 595 A.2d 1027 (Me. 1991) (binding contract requires offer, acceptance and mutual assent of the parties to its terms)

11

| | OFFER | ACCEPTANCE | CONSIDERATION | DEFINITE TERMS |
|---|---|---|---|---|

[103] Whitten v. Greeley-Shaw, 520 A.2d 1307, 1309 (Me. 1987) (every contract requires "consideration" to support it)

[104] Bragdon v. Shapiro, 77 A.2d 598, 601 (Me. 1951) (offer and acceptance must be so definite in their terms that promises and performances to be rendered by each party are reasonably certain)

[105] Tsiatsios v. Tsiatsios, 663 A.2d 1335, 1339 (N.H. 1995) (offer, acceptance, and consideration are essential to contract formation, and parties must assent to the same terms, i.e. have a "meeting of the minds")

[106] Riley v. Springfield Sav. Bank, 168 A. 721, 722 (N.H. 1933) (where language of contracting parties is ambiguous and reasonably capable of different interpretations, no contract results)

[107] Valashinas v. Koniuto, 125 N.Y.S.2d 554, 558 (N.Y. App. Div. 1953), order aff'd, 124 N.E.2d 300 (N.Y. 1954) (binding contract requires an offer and acceptance, the terms of which must be definite)

[108] Topken, Loring & Schwarz v. Schwartz, 163 N.E. 735, 736 (N.Y. 1928) (contract cannot be enforced without consideration)

[109] Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989) (an offer and acceptance are indispensable to contract formation)

[110] Lamoureux v. Burrillville Racing Ass'n, 161 A.2d 213, 215 (R.I. 1960) (the essential elements of a contract are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation)

[111] Evans v. Forte, 376 A. 2d 766, 768 (Vt. 1977) (offer and acceptance must be concurrent and there must be mutual manifestation of assent or "meeting of the minds")

[112] In re Spring Brook Farm Found., Inc., 671 A.2d 315, 319 (Vt. 1995) (law of contract formation requires some sort of consideration)

[113] State v. Delaney, 598 A.2d 138, 142 (Vt. 1991) (an offer is an expression of assent to certain definite terms, provided other party will express his assent to identically same terms)

Exhibit 10

1997 U.S. Dist. LEXIS 15481 printed in FULL format.

GLENN GILMAN and DAVID WHITE, on behalf of themselves and others similarly situated, Plaintiffs, v. INDEPENDENCE BLUE CROSS and MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA d/b/a/ PENNSYLVANIA BLUE SHIELD, Defendants.
IVIL ACTION NO. 96-1601
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1997 U.S. Dist. LEXIS 15481

October 6, 1997, Decided

CORE TERMS: settlement, deductible, settlement fund, notice, class action, lodestar, reimbursement, proposed settlement, class member, subscriber, medical coverage, proposed class, health care, calculated, discovery, twenty-five, class representative, common fund, negotiations, reimburse, calculate, successors, opt-out, settlement agreement, certification, coverage, exposure, jointly, mailed, Federal Rules of Civil Procedure

COUNSEL: [*1]

For GLENN GILMAN, DAVID WHITE, PLAINTIFFS: MARK S. GOLDMAN, WEINSTEIN KITCHENOFF SCARLATO & GOLDMAN LTD., PHILADELPHIA, PA USA.

For INDEPENDENCE BLUE CROSS, DEFENDANT: LAWRENCE G. MC MICHAEL, THOMAS S. BIEMER, DILWORTH, PAXSON, KALISH & KAUFFMAN LLP, PHILA, PA USA.

For MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA, DEFENDANT: JAMES A. YOUNG, MARY ELLEN NEPPS, CHRISTIE, PABARUE, MORTENSEN AND YOUNG, PHILA, PA USA.

JUDGES: RAYMOND J. BRODERICK, J.

OPINIONBY: RAYMOND J. BRODERICK

OPINION:
MEMORANDUM

Broderick, J.

October 6, 1997

The plaintiffs in this class action, alleging violations of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA") and state law, have petitioned the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for approval of a final settlement reached between class counsel, on behalf of the class, and defendants. Under the terms of the settlement, defendants will pay approximately $ 1.6 million into a settlement fund to be distributed to class members after deduction of attorneys fees, costs and incentive awards. More importantly, defendants have agreed to take steps to insure that the practices which led to this litigation will not recur in the future. Class counsel has also petitioned the Court for attorneys fees of 30 percent of the settlement fund, for reimbursement of expenses advanced by both plaintiffs and defendants, and for two $ 2,500 incentive awards to the named representatives of the class.

Defendants Independence Blue Cross ("IBC") and Pennsylvania Blue Shield ("PBS") sell and administer various types of health[*2] insurance programs, including H.M.O., P.P.O. and traditional major medical coverage. The plaintiff class is composed of persons who received traditional major medical coverage from defendants which contained a family deductible clause and were allegedly assessed individual deductibles even after the family deductible had been satisfied.

On November 26, 1996, this Court entered an Order preliminarily approving the proposed settlement and certifying a settlement class as follows:

All PBS and IBC members (subscribers and covered dependents) (I) who were covered by contracts which were jointly underwritten by PBS and IBC; (ii) who were subscribers and/or covered dependents of groups covered by ERISA, groups not covered by ERISA, or direct pay customers; (iii) who incurred a claim for covered medical expenses on or after January 1, 1990; (iv) who had a Family Deductible clause in their contract or plan that required a certain number of individual members to satisfy an individual deductible in a benefit year; (v) who had the required number of individual family members meet the individual deductibles in a benefit year; and

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 135 of 260 PageID #: 360

Page 61

1997 U.S. Dist. LEXIS 15481, *2                                    LEXSEE

(vi) who had other family members who were also assessed[*3] a deductible in that benefit year.

The Court directed that notice of the proposed settlement be mailed to members of the class by first class mail and published in The Philadelphia Inquirer. The Court also directed that it would hold a hearing on April 9, 1997 to consider whether the settlement was fair, reasonable, and adequate and to consider plaintiffs' counsel's request for attorneys' fees, costs, and incentive awards.

The Court held a hearing on April 9, 1997 in connection with plaintiffs' petition for approval of the settlement and award of attorneys' fees and costs. For the reasons set forth below, the Court will approve the settlement as fair, reasonable and adequate, and will award attorneys' fees and costs as well as two incentive awards to the named class representatives.

I. BACKGROUND

The original complaint was filed on February 29, 1996. On December 11, 1996, plaintiffs filed an amended complaint asserting claims for recovery of benefits and equitable relief under Section 502 of ERISA, 29 U.S.C. § 1132, as well as state common law claims for breach of contract, bad faith breach of contract, and breach of fiduciary duty.

Plaintiffs alleged that[*4] defendants wrongfully assessed each class member an individual deductible for health care coverage even though the class member's family had already satisfied a family deductible. Under traditional major medical coverage plans like those at issue in this litigation, insurance companies reimburse their insureds only for covered expenses less a deductible. The health care policies at issue, however, contain an additional provision which caps the deductibles that individual family members must pay in a given calendar year. Under class representative Glenn Gilman's policy, for example, there is an individual deductible of $ 100 per family member. However, his plan states that "each enrolled person (you or eligible dependent) must satisfy his own deductible, except that . . . the deductible will not be applied more than three times with respect to covered expenses incurred by you and all enrolled dependents in any calendar year." Defendants applied the individual deductible to each family member until the required number of family members had completely satisfied their individual deductible requirement.

According to plaintiffs, defendants routinely, knowingly, and willfully violated the[*5] family deductible provision set forth above by wrongfully assessing an individual deductible once the family had met its family deductible. Plaintiffs contend that once three members of the family have exhausted their individual deductibles, other family members should be reimbursed for all of their medical expenses regardless of the sequence in which those expenses were incurred. Plaintiffs further allege that defendants would only cease applying the individual deductible and/or reimburse class members for amounts paid toward the individual deductible in excess of the family maximum upon being notified by the affected persons, and that defendants failed to take corrective action in connection with all other class members.

In May, 1996, defendants moved to dismiss plaintiffs' state law claims and plaintiffs' claim for recovery of benefits under ERISA. Defendants did not move to dismiss plaintiffs' claim for equitable relief under ERISA. While the motions were pending, the parties commenced serious settlement negotiations. Initially, defendants took the position that plaintiffs' reading of the family deductible provision was incorrect. Defendants contended that the language was intended [*6]to mean that the family cap did not apply until a third family member (in Gilman's case) was assessed his or her full deductible, and not before then.

Although continuing to pursue settlement, plaintiffs engaged in extensive discovery. Plaintiffs requested, and defendants agreed, to identify all of their health care plans containing a family deductible provision, and to design a computer program capable of identifying all of the members of the proposed class. During the summer of 1996, the parties identified groups and individuals who qualified as class members and calculated defendants' potential liability to each class member. Plaintiffs' counsel randomly selected class members' health care plans to verify the accuracy of the loss calculated by the software program. The total aggregated loss to the identified class members was calculated to be approximately $ 2.8 million, although this amount did not reflect a true damage figure since each class member had a "co-pay" provision as part of his or her coverage. The co-pay provision required insureds to pay 20 percent of most health care expenses and 50 percent of mental health expenses even after the deductible had been reached; thus, [*7] in the event they were found liable, defendants would only be required to reimburse class members for 80 percent of their health care expenses and 50 percent of their mental health expenses paid in excess of their deductibles.

The parties' settlement negotiations were hard fought and conducted in good faith and at arms length. After

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 136 of 260 PageID #: 361

Page 62
1997 U.S. Dist. LEXIS 15481, *7
LEXSEE

several continuances by the Court to allow the parties to reach agreement, the parties signed a settlement agreement on November 1, 1996 which this Court provisionally approved on November 26, 1996 and is currently before the Court for final approval. The settlement calls for creation of a settlement fund of approximately $ 1.6 million. This fund will be automatically disbursed to class members, after deduction for attorneys fees and costs, without need for class members to submit claims for reimbursement. Counsel for plaintiffs pursued this automatic procedure after recognizing that many class members may not have kept their medical records or would not take the effort to file a claim. More significantly, the settlement provides substantial prospective relief. Effective January 1, 1997, defendants altered the methodology they use to calculate the family[*8] deductible provision to reflect the plaintiffs' interpretation. Defendants effectuated this change by reconfiguring their billing software and by modifying the terms of each contract for major medical coverage which contains a family deductible provision. This new contract provision, renamed the "aggregate family deductible" provides:

Family Deductible amount is equal to [2,3] times the individual Deductible amount. In each Benefit Period, it will be applied for all family members covered under a Family Coverage. A Deductible will not be applied to any covered individual family members once that covered individual has satisfied the individual deductible, or the family deductible has been satisfied for all covered family members combined.

Furthermore, defendants had this new language approved by the Pennsylvania Insurance Department.

Plaintiffs filed an amended class action complaint on December 9, 1996 to add an additional class representative, David White. White is a Pennsylvania resident who purchased major medical coverage from defendants during the class period. Plaintiffs added White to counter defendants' arguments in the motions to dismiss that Glenn Gilman[*9] lacked standing to represent the entire class, since not every class member received health insurance from their employer as Gilman did. White purchased coverage independently.

On January 31, 1997, plaintiffs' counsel caused 20,476 notices to be mailed to potential class members as identified from defendants' records. Of the 20,476 notices which were mailed, 743 were returned by the postal service. A skip tracing service was employed to obtain new and current addresses for class members which could not be located by the postal service, so that

all but approximately 150 of the 20,476 class members were notified directly by mail. The notices informed potential class members that this Court would hold a hearing on April 9, 1997 to determine whether the proposed settlement was fair, reasonable, and adequate. The notices further informed potential class members that any member wishing to be excluded from the class, or wishing to object to the proposed settlement or to plaintiffs' counsel's application for attorneys fees, must do so in writing on or before March 28, 1997.

A summary notice was also published in The Philadelphia Inquirer on February 8, 1997. The summary notice provided[*10] a telephone number for potential class members to call with questions about the settlement. This phone bank was staffed from the time the notices were sent and will continue to be staffed for thirty days after settlement awards are mailed. Plaintiffs' counsel has submitted an affidavit attesting to the mailing of the notices and the publication of the summary notice.

Plaintiffs' counsel has represented that only eight members of the settlement class have opted to be excluded from the settlement. These persons are: Richard Miller, Bernadette J. Brennan, Joan E. Letham, Anne M. Boyle, Susan M. Fowler, William H. Kelly, Peter D. Pizzutillo, M.D., and Diana Anderson. No class members have objected to the terms of the settlement, although one person filed a written objection to plaintiffs' counsel's application for attorneys fees.

On April 9, 1997, this Court held a hearing on the proposed settlement and the application of plaintiffs' counsel for attorneys fees, costs, and incentive awards. No settlement class member appeared at the hearing to object to the proposed settlement or to plaintiffs' counsel's application for attorneys fees, costs, and incentive awards.

II. CERTIFICATION[*11] OF THE SETTLEMENT CLASS

Because the parties reached a settlement agreement prior to certification of a class, the Court must certify a class for this action. Having provisionally certified a settlement class on November 26, 1996, the Court now finds, in accordance with In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 794-97 (3d Cir. 1995) (hereinafter "GM Trucks "), that the instant action meets all of the requirements for class certification as set forth in Fed. R. Civ. P. 23. Accordingly, the Court will approve final certification of the class as:

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 137 of 260 PageID #: 362

Page 63
1997 U.S. Dist. LEXIS 15481, *11                                    LEXSEE

All PBS and IBC members (subscribers and covered dependents) (I) who were covered by contracts which were jointly underwritten by PBS and IBC; (ii) who were subscribers and/or covered dependents of groups covered by ERISA, groups not covered by ERISA, or direct pay customers; (iii) who incurred a claim for covered medical expenses on or after January 1, 1990; (iv) who had a Family Deductible clause in their contract or plan that required a certain number of individual members to satisfy an individual deductible in a benefit year; (v) who had the required number of individual[*12] family members meet the individual deductibles in a benefit year; and (vi) who had other family members who were also assessed a deductible in that benefit year.

Rule 23 of the Federal Rules of Civil Procedure sets forth certain requirements for certification of a class action. Fed. R. Civ. P. 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The class in the instant case satisfies the four requirements set forth above of numerosity, commonality, typicality, and adequacy of representation. First, a class consisting of more than 20,000 identified members, as here, is clearly so numerous that joinder of all members is impracticable. Second, there are numerous questions of law and fact common to the class, such as (1) whether defendants wrongfully applied deductibles against[*13] covered expenses incurred by class members or their eligible dependents; (2) whether defendants improperly failed to reimburse class members for covered expenses; (3) whether defendants violated the terms of the health insurance plans; and (4) whether defendants violated ERISA and/or state law. Third, the representative plaintiffs' claims are typical of the claims of the members of the class. The class representatives, Gilman and White, complain that defendants improperly applied the deductible requirements of their health insurance plans, and that defendants employed this practice on a class-wide basis. As this Court found in the context of another ERISA class action, the class representatives' claims "arise[] from the same uniformly applied practice of Pennsylvania Blue Shield [and Independence Blue Cross] that gives rise to the claims of the other class members, and [are] based on the same course of conduct

and legal theory." Sutton v. Medical Service Ass'n of Penna. d/b/a/ Pennsylvania Blue Shield et al., 1993 U.S. Dist. LEXIS 3049, Civ. A. No. 92-4787, 1993 WL 64565, *9 (E.D. Pa. March 5, 1993) (Broderick, J.) (citing Hoxworth v. Blinder, Robinson Co., Inc., 980 F.2d 912, 923 (3d Cir. 1992)).[*14] Gilman's claim is typical of those class members who acquired health care coverage through an employer-sponsored plan, while White's claim is typical of those class members who independently purchased coverage directly from defendants. Finally, the class representatives will fairly and adequately protect the interests of the class, since the representatives' interests are not antagonistic to other class members and since plaintiffs' counsel has submitted a firm biography showing that the firm would be qualified, experienced and generally able to conduct this litigation absent a settlement. Id. at *10. See also GM Trucks, 55 F.3d at 800 (instructing courts to consider whether the class representatives' interests are sufficiently aligned with other members of the class and the qualifications of class counsel). Accordingly, for these reasons, the Court finds that the proposed class meets the four requirements of Fed. R. Civ. P. 23(a).

In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must also show that the action is maintainable under one of the three subsections of Rule 23(b). Amchem Products, Inc. v. Windsor, 138 L. Ed. 2d 689, 117 S. Ct. 2231, 2245[*15] (1997). Plaintiffs proceed under Rule 23(b)(3), which provides in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication or the controversy.

Plaintiffs have met these two additional requirements of Rule 23(b)(3). First, the legal and factual questions that qualify each class member's case as a genuine controversy are all common to the entire class and predominate over individual issues. Amchem, 117 S. Ct. at 2249. Each class member seeks relief under the same law: ERISA and/or Pennsylvania common law. Id. Furthermore, if plaintiffs brought individual actions, each class member would allege, and defendants would deny, that defendants miscalculated the family deductible provision. Once common questions of liability are resolved, all that remains in this case is the mechanical act of computing the amount of restitution owed each

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 138 of 260 PageID #: 363

Page 64
1997 U.S. Dist. LEXIS 15481, *15                                            LEXSEE

[*16] class member. Given the predominance of common legal and factual issues over individual issues, the proposed class is sufficiently cohesive to warrant adjudication by representation. Id. Finally, the numerosity of class members and the commonality of issues of fact and law also support a finding that a class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs' claims would most likely be too small to support individual actions, and absent class certification, many potential claimants might not become aware that they were entitled to seek reimbursement for expenses paid in excess of their family deductible. Sutton, 1993 U.S. Dist. LEXIS 3049, 1993 WL 64565, at *10.

The instant class action also complies with Fed. R. Civ. P. 23(c)(2), requiring the court in class actions brought under Rule 23(b)(3) to "direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The Court is satisfied that the notice provided to class members in this case meets the requirements of Rule 23(c)(2) and due process. See Phillips Petroleum [*17] Co. v. Shutts, 472 U.S. 797, 811-12, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974). As heretofore discussed, the notice advised class members of the nature of the action and their rights to opt-out or object to the settlement. Moreover, this notice was individually mailed to the 20,476 identified class members, except for approximately 150 members who could not be located, and a summary notice was published in The Philadelphia Inquirer on February 8, 1997. These procedures clearly satisfy Rule 23(c)(2).

For the foregoing reasons, the Court has determined that the proposed class meets all of the requirements of Fed. R. Civ. P. 23, and will therefore approve final certification of the class of persons set forth above.

## III. JUDICIAL APPROVAL OF THE SETTLEMENT

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." GM Trucks, 55 F.3d at 784. However, because the potential exists for the representative plaintiffs and class counsel to arrive at a quick settlement with defendants on damages and attorneys fees which may be contrary to the[*18] interests of absent class members, the Court must carefully scrutinize each class action settlement. Rule 23(e) of the Federal Rules of Civil Procedure requires that:

[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal shall be given to all members of the class in such manner as the court directs.

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of absent class members. . . . The Court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." GM Trucks, 55 F.3d at 785 (citation omitted).

In its Order of November 26, 1996, the Court preliminarily approved the settlement agreement. "This preliminary determination establishes an initial presumption of fairness when the court concludes that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected. Id. Both the plaintiffs and defendants are represented by law firms with extensive experience in the area of class[*19] action litigation. The settlement negotiations, as discussed above, were protracted, conducted in good faith and at arms-length, and concluded after ample discovery. Moreover, counsel for both parties consider the settlement to be fair and reasonable. In light of their experience, the Court accords their assessment considerable weight. Finally, only eight people of 20,476 have opted out of the class, and no one has opposed the settlement.

The Third Circuit has provided district courts with nine factors to consider when determining whether a proposed class action settlement is fair, reasonable, and adequate as required by Rule 23(e). Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975). These factors are:

(1) the complexity and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages and other relief;

(6) the risks of maintaining the class action through trial;

(7) the defendants' ability to withstand a greater judgment;

(8) the range of reasonableness of the settlement[*20] fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. at 157.

Applying these nine Girsh factors to the present case, this Court concludes that the proposed class action settlement is fair, reasonable and adequate, and should therefore be approved for the following reasons:

First, the claims asserted in this litigation involve complex issues under ERISA and Pennsylvania common law. There is no doubt that continued litigation would be costly, would result in protracted litigation, and would pose risks for all of those involved. Without settlement, the parties would actively litigate the issues raised in the defendants' motions to dismiss. Moreover, there would likely be additional discovery and motions practice and time spent for trial preparation and the trial itself. These proceedings, as well as the likely appeals that would follow, could only further delay any potential recovery for class members. Thus, a guaranteed recovery at this stage of litigation is in the best interests of the settlement class.

Second, the reaction of class[*21] members to the settlement strongly supports final approval. As discussed above, plaintiffs' counsel sent notices of the settlement by first class mail to almost the entire 20,476 member class, with the exception of approximately 150 members who could not be located. Plaintiffs' counsel also published a summary notice of the settlement in The Philadelphia Inquirer. Out of the thousands of class members who received notice, only eight persons opted to be excluded from the settlement, and no one filed written objections or appeared at the Court's April 9, 1997 hearing to oppose the settlement. The small number of opt-outs and the absence of any opposition to the settlement strongly weigh in favor of approval.

Third, the stage of the proceedings and the amount of discovery completed favors approval of the settlement. Prior to commencing settlement discussions, the parties had engaged in substantial discovery in this case. For example, the parties agreed to identify all of the members of the proposed class, and designed a computer program to do so. Contrary to defendants' initial contentions, plaintiffs' counsel discovered that many more people than initially believed had paid deductibles[*22] in excess of the family deductible provision as inter-

preted by plaintiffs. The parties also agreed to calculate the defendants' aggregate potential liability. Plaintiffs' counsel did not simply accept defendants' calculations, but randomly selected various plans to check the accuracy of defendants' determinations. In short, there is no question that plaintiffs' counsel was in an excellent position to appreciate both the value and merits of the case and make an informed and reasoned judgment concerning possible settlement.

The Court has considered the fourth, fifth, and sixth factors set forth in Girsh and has determined that the settlement's benefits outweigh the risks of establishing liability, damages, and maintaining the class action through judgment. Plaintiffs and defendants each have seemingly credible interpretations of the family deductible provision. The family deductible provision in Glenn Gilman's policy states: "Each enrolled person (you or eligible dependent) must satisfy his own deductible, except that . . . the deductible will not be applied more than three times with respect to Covered Expenses incurred by you and all enrolled dependents in any calendar year." [*23] In order to establish liability, plaintiffs would have had to persuade the trier of fact that this family deductible provision limited the Gilman family's obligation to pay deductibles in a given year to $ 300, no matter how many members of the family actually paid a deductible and regardless of the order in which the deductibles were paid. Defendants, on the other hand, interpret the provision as meaning that deductibles are assessed until the third family member pays his or her deductible in full.

Even assuming that plaintiffs could establish liability, the amount of damages would be both difficult and cumbersome to prove. The amount of potential exposure which the parties have calculated is not a true damage number, since each subscriber has a co-pay provision in his or her plan which requires the subscriber to pay a certain percentage of all bills even after the deductible is satisfied. Finally, there is little risk that the plaintiffs could maintain the class action through trial, particularly with the addition of David White to represent non-ERISA members of the class and Glen Gilman continuing to represent class members with ERISA claims.

As the foregoing discussion demonstrates, [*24] the benefits of the settlement clearly outweigh the risks of establishing liability and damages. The settlement provides a certain recovery for plaintiffs without the need to prove liability, establish damages, or submit individual claims forms. It also requires defendants to change the language of the family deductible provision to meet plaintiffs' interpretation.

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 140 of 260 PageID #: 365

Page 66
1997 U.S. Dist. LEXIS 15481, *24                                    LEXSEE

Turning to the seventh Girsh factor, the Court has determined that defendants could likely withstand a greater judgment. However, this factor alone does not militate against the settlement, since the most significant aspect of the settlement is the prospective, not the monetary, relief. As heretofore stated, defendants have agreed to change the way they calculate the family deductible to meet plaintiffs' demands, and have had new language inserted in their health care plans and approved by the Pennsylvania Insurance Department to effectuate this change.

Finally, in light of the strongly contested and uncertain questions of law and fact in this litigation, especially concerning damages, the settlement falls well within the range of reasonableness. After designing a computer program to analyze each class member's potential[*25] recovery, the parties calculated defendants' exposure to be $ 2.8 million. However, this figure fails to include a twenty to fifty percent reduction to account for each class member's co-pay provision. For purposes of settlement, the parties agreed to a twenty-two percent reduction across the board, reducing the $ 2.8 million exposure to $ 2.184 real exposure. The settlement fund is approximately seventy percent of this real exposure, or $ 1.6 million. More importantly, however, the settlement also offers non-monetary relief in that defendants have agreed to alter the way they calculate the family deductible in the future. This aspect of the settlement provides benefits to current class members and all future families who subscribe to major medical coverage from Independence Blue Cross and Pennsylvania Blue Shield. The possibility of trial producing a recovery that is substantially more favorable than the proposed settlement is tenuous at best, given the complex legal and factual difficulties, the severe obstacles associated with establishing liability and damages, and the inherent unpredictability of trial.

In summary, the Court believes the proposed settlement is favorable to the [*26]settlement class. The settlement resulted from good faith, arms-length bargaining among experienced counsel possessing all relevant information. The Court believes that the proposed settlement is fair, reasonable, and adequate as required by Fed. R. Civ. P. 23(e). Accordingly, the Court will approve the settlement and will dismiss all claims by the class in the instant action against the defendants on the merits, with prejudice, and without costs.

## IV. ATTORNEYS' FEES AND COSTS

Plaintiffs' counsel requests a fee of thirty percent of the settlement fund. The settlement agreement signed by the parties calls for a settlement fund of $ 1.5 million. However, defendants have also agreed to supplement the fund to compensate an additional 1,800 class members with approximately $ 200,000 in losses who were identified between November 1, 1996, when the settlement was reached, and January 1, 1997, when the defendants changed their billing practices in accordance with the settlement agreement. The defendants will increase the settlement fund so that the subsequently identified class members will be reimbursed at the same percentage as the rest of the class. Because this amount can only be[*27] determined after fees, costs, and incentive awards are deducted, class counsel has estimated that the final settlement fund will be approximately $ 1.6 million. The Court will therefore use $ 1.6 million, rather than $ 1.5 million, as the size of the common fund for the purpose of awarding attorneys' fees.

Plaintiffs' counsel also requests reimbursement from the settlement fund in the amount of $ 1,205.89 to cover expenses and costs incurred by class counsel on behalf of the class and $ 20,317.53 to be repaid to defendants to cover costs advanced by the defendants for administering the fund and for mailing and publishing class notice. Finally, class counsel seeks two incentive awards of $ 2,500 to be paid to each class representative from the settlement fund.

"A thorough judicial review of fee applications is required in all class action settlements." GM Trucks, 55 F.3d at 819. For the reasons set forth below, the Court will award class counsel $ 400,000 in fees, which amounts to twenty-five percent of the $ 1.6 million settlement fund. The Court will also allow reimbursement for all claimed expenses, and will grant each named class representative the requested $ 2,500 incentive[*28] award.

The notice disseminated to potential class members advised them that plaintiffs' counsel intended to apply for an award of attorneys' fees from the settlement fund. The notice stated that the fee request would not exceed one-third of the fund. One class member objected in writing to plaintiffs' counsel's request for fees, but neither he nor anyone else appeared at the Court's hearing on April 9, 1997 to oppose the fee application.

The Supreme Court has recognized that a "litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980). This common

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 141 of 260 PageID #: 366

Page 67
1997 U.S. Dist. LEXIS 15481, *28                    LEXSEE

fund doctrine rests on the assumption that individuals who profit from a lawsuit "without contributing to its costs are unjustly enriched at the successful litigant's expense." Id.

The Third Circuit has recently held that fee awards in common fund cases such as this one may be calculated by using the percentage of recovery method. GM Trucks, 55 F.3d at 821-22. Under the percentage of recovery method, the court awards a fee which is a fixed and reasonable percentage[*29] of the settlement fund. This approach differs from the lodestar method used in many statutory fee cases, where the fee award is based on the Court's determination of the reasonable number of hours billed by counsel multiplied by a reasonable hourly rate. Even when using the percentage of recovery method, however, the court should double check the resulting fee against the lodestar method "to assure that the precise percentage awarded does not create an unreasonable hourly fee." Id. at 822.

There is no established percentage of recovery which courts have found to be reasonable in common fund cases. Fee awards have ranged from nineteen percent to forty-five percent, although the normal range is from twenty to thirty percent. Gomberg v. Western Union Corp., 1997 U.S. Dist. LEXIS 8700, 1997 WL 338938 (E.D. Pa. June 16, 1997)(citing In re Smithkline Beckman Corp. Securities Litig., 751 F. Supp. 525 (E.D. Pa. 1990); 3 H. Newberg, Newberg on Class Actions, at 190 (2d ed. 1985)). In Gomberg, which involved a settlement fund similar in size to the instant case ($ 1.7 million), the court awarded class counsel twenty-five percent of the net settlement fund (the settlement fund minus expenses).

After[*30] reviewing both the fee petition submitted by class counsel and the record in this litigation, the Court has determined that a fee award of $ 400,000, or twenty-five percent of the settlement fund, is reasonable. Plaintiffs' counsel's request for thirty percent of the fund, or $ 480,000, is unreasonable under the circumstances, especially when checked against the lodestar fee.

The class has been well served by highly qualified counsel, who has obtained a settlement of approximately $ 1.6 million. More importantly, the settlement will benefit not only members of the class, who will be reimbursed for a percentage of their losses, but also each family which subscribes to major medical coverage from defendants in the future. Beginning January 1, 1997, defendants altered the way they calculate the family deductible to meet plaintiffs' interpretation. Nevertheless,

in checking the percentage of recovery awarded against the lodestar fee, the Court finds that a $ 400,000 award is reasonable. Class counsel has submitted an affidavit setting forth a lodestar value of $ 167,413 for 573.65 hours billed by the firm, yielding an average billable rate of $ 291.84 per hour for the firm. Counsel's[*31] request for thirty percent of the settlement fund, or $ 480,000, is 2.87 times the lodestar, whereas the Court's award is roughly 2.39 times the lodestar. If the Court were to grant counsel's request for thirty percent of the fund, then the firm would be compensated at an average billable rate of $ 836.75 per hour, which this Court finds unreasonable.

A review of other common fund class action cases in this district in 1997 reveals that fee awards have ranged from twenty-five to thirty-five percent of the common fund, yet those awards were only 0.29 to 1.6 times the lodestar fee. See Gomberg, 1997 U.S. Dist. LEXIS 8700, 1997 WL 338938, *16 (25% net award = 1.56 times lodestar); LaChance v. Harrington, 965 F. Supp. 630, 649-50 (E.D. Pa. 1997) (Yohn, J.) (30% net award = 0.88 times lodestar); In re Valuevision Int'l Inc. Securities Litig., 957 F. Supp. 699, 700 (E.D. Pa. 1997) (Pollak, J.) (34.27% net award = 0.54 times lodestar); Seidman v. American Mobile Sys., 965 F. Supp. 612, 623-24 (E.D. Pa. 1997) (Robreno, J.) (25% award = 0.29 times lodestar); Hanrahan v. Britt, 1997 U.S. Dist. LEXIS 1541, 1997 WL 67765, *12 (E.D. Pa. Feb. 11, 1997) (Dubois, J.) (est. 25% award = 0.54 times lodestar); Pozzi v. Smith, 952[*32] F. Supp. 218, 226 (E.D. Pa. 1997) (Robreno, J.) (25% award = 1.26 times lodestar).

The Court's award of $ 400,000 represents twenty-five percent of the gross settlement fund and 2.39 times the lodestar fee, yielding an average billable rate of approximately $ 697 per hour for the firm. This fee rewards class counsel not only for obtaining a $ 1.6 million settlement, but also for obtaining what the Court considers to be the most important aspect of the settlement: in less than one year after filing the lawsuit, plaintiffs' counsel negotiated a settlement which requires defendants to alter the way they calculate the family deductible to meet plaintiffs' interpretation. Class counsel has quickly and efficiently obtained monetary relief for the class and prospective relief for all families who subscribe to major medical coverage from defendants.

In reducing class counsel's requested fee by five percent, the Court has also considered the amount of the settlement fund that will remain for distribution to the class. Class counsel has calculated that the class has been exposed to approximately $ 2.38 million in losses

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 142 of 260 PageID #: 367

Page 68
1997 U.S. Dist. LEXIS 15481, *32                                    LEXSEE

($ 2.18 million plus $ 200,000 for the subsequently identified class members). [*33] After deducting counsel's fees and expenses and incentive awards, which the Court will award as set forth below, roughly $ 1.17 million will remain in the $ 1.6 million fund for disbursement to the class. This will allow each class member to recover approximately fifty percent of his or her losses. Given these figures, the Court's award of $ 400,000 is reasonable. The fee award balances the recovery obtained for the class with a fee that adequately compensates plaintiffs' counsel for the risk involved in taking on this litigation and rewards counsel for achieving an excellent result without expending wasteful billable hours.

Class counsel requests reimbursement from the settlement fund of $ 1,205.89 in expenses incurred in prosecuting this litigation. This amount reflects copying, computer research, and communications charges. The Court has determined that class counsel's expenditure of $ 1,205.89 in costs is adequately documented, proper, and reasonable, and will permit reimbursement of these expenses from the settlement fund. Class counsel also requests reimbursement of $ 20,317.54 advanced by the defendants for providing notice to the class and administering the settlement fund. [*34] The Court has determined that these expenses are also adequately documented, proper, and reasonable, and will permit reimbursement from the settlement fund.

Finally, class counsel seeks two $ 2,500 disbursements from the settlement fund as incentive awards to the named class representatives in this action. Counsel contends that these two individuals provided valuable assistance during this action. The Court has determined that an award of $ 2,500 to each named class representative is appropriate and reasonable, and will permit deduction of these amounts from the settlement fund. See LaChance, 965 F. Supp. at 652.

V. CONCLUSION

In summary, the Court finds that the proposed settlement is fair, adequate, and reasonable and it will be approved. The Court has also determined that the proposed class meets all of the requirements of Fed. R. Civ. P. 23, and the class will be certified as requested. The Court will award class counsel a fee of $ 400,000, which is twenty-five percent of the $ 1.6 million settlement fund and 2.39 times the lodestar fee. The Court will also reimburse class counsel for its reasonable expenses of $ 1,205.89 incurred in prosecuting this litigation, and[*35] will reimburse defendants for their reasonable expenses of $ 20,317.54 incurred in providing class notice and administering the fund. Finally, the Court will

grant each named class representative an incentive award of $ 2,500. These attorneys fees, plaintiffs' expenses, defendants' expenses, and incentive awards shall be deducted from the settlement fund.

An appropriate Order follows.
FINAL JUDGMENT AND ORDER OF DISMISSAL

AND NOW, this 6th day of October, 1997; Plaintiffs Glenn Gilman and David White, individually and as representatives of the class in the above-captioned action, and defendants Independence Blue Cross ("IBC") and Medical Service Association of Pennsylvania, d/b/a/ Pennsylvania Blue Shield ("PBS"), having executed a Stipulation of Settlement on November 1, 1996 (the "Stipulation"); Highmark Inc. ("Highmark") being the successor-in-interest to defendant PBS as a result of a consolidation effected on December 6, 1996; and this Court having determined pursuant to Fed. R. Civ. P. 23, for the reasons set forth in the Court's Memorandum of this date and after a hearing on April 9, 1997, that the proposed settlement between the plaintiff class and defendants[*36] is fair, adequate and reasonable;

IT IS ORDERED:

1. This Court has jurisdiction over the subject matter of the action and over all parties to the action, including all class members.

2. All of the requirements of Rule 23 of the Federal Rules of Civil Procedure are satisfied. This action is certified as a class action on behalf of a plaintiff class defined as follows:

All PBS and IBC members (subscribers and covered dependents) (I) who were covered by contracts which were jointly underwritten by PBS and IBC; (ii) who were subscribers and/or covered dependents of groups covered by ERISA, groups not covered by ERISA, or direct pay customers; (iii) who incurred a claim for covered medical expenses on or after January 1, 1990; (iv) who had a Family Deductible clause in their contract or plan that required a certain number of individual members to satisfy an individual deductible in a benefit year; (v) who had the required number of individual family members meet the individual deductibles in a benefit year; and (vi) who had other family members who were also assessed a deductible in that benefit year.

3. Only eight class members have filed timely and valid requests for exclusion[*37] from the class, for themselves and their families. Those persons are: Richard Miller, Bernadette J. Brennan, Joan E. Letham,

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 143 of 260 PageID #: 368

Page 69
1997 U.S. Dist. LEXIS 15481, *37                              LEXSEE

Anne M. Boyle, Susan M. Fowler, William H. Kelly, Peter D. Pizzutillo, M.D., and Diana Anderson (referred to collectively as the "opt-outs"). Other than the opt-outs, all other PBS and IBC members (subscribers and covered dependents), who were covered by contracts which were jointly underwritten by PBS and IBC, who were subscribers and/or covered dependents of groups covered by ERISA, groups not covered by ERISA or direct pay customers, who incurred a claim for covered medical expenses during the period of January 1, 1990 through December 31, 1996, inclusive, who had a family deductible clause in their contract or plan that required a certain number of individual members to satisfy an individual deductible in a benefit year, who had the required number of individual family members meet the individual deductibles in a benefit year, and who had other family members who were also assessed a deductible in that benefit year, are bound by this Judgment and by the Stipulation, including releases provided for in this Judgment.

4.  The Stipulation and terms of the settlement[*38] set forth therein are fair, reasonable, and adequate as to the class for purposes of Federal Rule of Civil Procedure 23 and in the best interests of the class; and the Stipulation and settlement are hereby finally APPROVED in all respects, and the parties to the Stipulation are hereby directed to consummate and perform its terms.

5.  Neither this Judgment nor the Stipulation, nor the fact of its execution, nor any of the negotiations or proceedings related thereto, nor any provision(s) of this Judgment or the Stipulation, nor any exhibits or documents referred to therein, nor any action taken to carry out or enforce this Judgment or the Stipulation, shall be construed as, or be deemed to be evidence of, an admission or concession, either (a) on the part of plaintiffs of the lack of merit of the action or the lack of recoverable damages; or (b) on the part of IBC or PBS, of any fault, liability or wrongdoing whatsoever, or of any damages having been incurred by plaintiffs or the class or of the validity of any particular method of measuring such damages. IBC and PBS deny each and all of the claims and allegations asserted by plaintiffs in the Amended Complaint, and expressly deny [*39]any liability, fault or wrongdoing arising out of or relating to any of the conduct alleged in the Amended Complaint.

6.  Neither this Judgment nor the Stipulation, nor the fact of its execution, nor any of the negotiations or proceeding related thereto, nor any provision(s) of this Judgment or the Stipulation, nor any exhibit or document referred to therein, nor any action taken to carry out or enforce this Judgment or the Stipulation shall be

offered or received in evidence in any action or proceeding of any nature whether before a court, administrative agency, or other tribunal, for any purpose whatsoever except (1) to enforce any provision(s) of this Judgment or the Stipulation or the exhibits thereto; (2) to enforce any provision(s) of any related agreement or release; or (3) in the case of any subsequent action against IBC, PBS or their successors in interest, on any or all of the release claims as defined below, in order to support by IBC, PBS, or their successors in interest as defined below, a defense of res judicata, collateral estoppel, accord and satisfaction, release, or other theory of claim or issue preclusion or similar defense.

7.  All claims in this action against[*40] IBC and PBS and their successors in interest are DISMISSED on the merits with prejudice and without costs.

8.  Plaintiffs, all class members other than the opt-outs, and their respective past, present or future heirs, executors, administrators, partners, directors, officers, shareholders, employees, representatives, agents, beneficiaries, attorneys, insurers, successors and assigns of plaintiffs and all class members, irrevocably, unconditionally, conclusively, and jointly and severally, in both their individual and fiduciary capacity, if any, shall be deemed to have released and discharged, absolutely and forever, IBC and PBS and their plans and/or consumer groups and their respective predecessors, successors, subsidiaries, divisions, affiliates, and past and present directors, officers, agents, fiduciaries and employees, from any and all matters of the Released Claims (as defined below), or any other matter that has been released, barred, or enjoined pursuant to the terms of the Stipulation.

9.  For purposes of this Judgment, IBC means Independence Blue Cross, and PBS means Pennsylvania Blue Shield and Highmark Inc., as and limited to its status as the successor-in-interest to[*41] Medical Services Association of Pennsylvania d/b/a Pennsylvania Blue Shield, and any and all of their predecessors, successors, former and present subsidiaries and affiliates, any entity now or in the past controlling or controlled by it, and any and all of their former and present principals, officers, directors, employees, agents, legal representatives, attorneys, insurers, investment bankers, advisors, affiliates, associates, assigns, representatives, heirs, executors, trustees or administrators.

10.  "Released Claims" shall mean, as set forth in section II.5 of the Stipulation of Settlement, all claims, rights, demands, causes of action and liabilities of whatever nature, which were asserted in this action or which

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 144 of 260 PageID #: 369

Page 70
1997 U.S. Dist. LEXIS 15481, *41                                   LEXSEE

arise from the facts and circumstances pleaded in the Amended Complaint.

11. Jurisdiction is hereby retained as to all matters relating to administration, consummation, enforcement and interpretation of the Stipulation hereby approved and this Judgment, including without limitation the processing and allowance of claims, distribution to class members, and interpretation of the new "aggregate family deductible" provision required by the Stipulation.

13. Plaintiff's[*42] counsel's application for fees, reimbursement of expenses, and incentive awards is GRANTED as follows:

a. Class counsel is awarded reasonable attorneys' fees in the amount of $ 400,000.

b. Class counsel is awarded reimbursement of expenses in the amount of $ 1,205.89. Defendants are awarded reimbursement of $ 20,317.54 for the costs of notice and administration advanced on behalf of the class.

c. Plaintiffs Glenn Gilman and David White are awarded $ 2,500 each for their efforts on behalf of the class.

d. The fees, costs, and incentive awards set forth above shall be paid from the settlement fund thirty-one (31) days following entry of this Order.

14. This Order shall be ENTERED as of this date, the Court finding that there is no just reason for delay.

RAYMOND J. BRODERICK, J.

Exhibit 11

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 145 of 260 PageID #: 370

1993 U.S. Dist. LEXIS 3049 printed in FULL format.

THOMAS D. SUTTON, on hehalf of himself and all others similarly situated, plaintiffs, v. MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA, d/b/a PENNSYLVANIA BLUE SHIELD, CAPITAL BLUE CROSS and INDEPENDENCE BLUE CROSS, defendants.
CIVIL ACTION NO. 92-4787
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1993 U.S. Dist. LEXIS 3049; 16 E.B.C. 2528

March 5, 1993, Decided
March 5, 1993, Filed

CORE TERMS: coverage, subscriber, duty, class action, jointly, coverage provided, class certification, severally liable, breached, inform, Employee Retirement Income Security Act, et seq, common questions of law, medical insurance, injunctive relief, questions of law, prerequisites, commonwealth-wide, intelligibly, declaration, numerousity, predominate, summarized, satisfying, certifying, uniformly, claimant, altered, certify, doctor

COUNSEL: [*1] For THOMAS D. SUTTON, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF: DAVID A. KAHNE, RICHARD FEDER, FINE, KAPLAN & BLACK, 1845 WALNUT STREET, STE. 2300, PHILA, PA 19103, USA.

For MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA d/b/a PENNSYLVANIA BLUE SHIELD, DEFENDANT: JAMES A. YOUNG, CHRISTIE, PABARUE, MORTENSEN AND YOUNG, 1880 J.F.K. BLVD., STE. 1000, PHILA, PA 19103, USA. For CAPITAL BLUE CROSS, DEFENDANT: DANIEL B. HUYETT, STEVENS & LEE, 607 WASHINGTON STREET, P.O. BOX 679, READING, PA 19603, USA. For INDEPENDENCE BLUE CROSS, DEFENDANT: J. GORDON COONEY, JR., ERIC KRAEUTLER, MORGAN, LEWIS & BOCKIUS, 2000 ONE LOGAN SQUARE, PHILA, PA 19103-6993, USA.

JUDGES: BRODERICK

OPINIONBY: RAYMOND J. BRODERICK

OPINION: MEMORANDUM

BRODERICK, J.

MARCH 5, 1993

Plaintiff Thomas D. Sutton has filed a motion for class certification pursuant to Fed.R.Civ.P. 23. Defendants Medical Service Association ("Pennsylvania Blue Shield"), Capital Blue Cross ("Capital") and Independence Blue Cross ("Independence") oppose plaintiff's motion.

At a conference before this Court, the parties were asked to make an effort to agree on a class to be certified. They have informed the Court that they have been unable[*2] to do so. For the reasons set forth below, this Court has determined that the following class will be certified in this matter:

All persons

(1) who had Major Medical coverage provided by Pennsylvania Blue Shield together with Capital Blue Cross and/or Independence Blue Cross, which coverage is protected by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.; and

(2) who submitted a claim to Pennsylvania Blue Shield for payment for services covered by the person's Major Medical coverage, which claim was not paid to the full extent of the person's Major Medical coverage, based in whole or in part on the person's having filed such claim without using a Major Medical form, or based in whole or in part on such claim having been sent to a Pennsylvania Blue Shield address other than a Blue Cross/Blue Shield Major Medical address; and

(3) whose claims were submitted on or after August 17, 1986.

(4) Pursuant to Fed.R.Civ.P. 23, this Court may alter or amend the above definition of the class at any time before a decision on the merits is entered.

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 147 of 260 PageID #: 372

Page 4
1993 U.S. Dist. LEXIS 3049, *2; 16 E.B.C. 2528    LEXSEE

This action was instituted as a class action by[*3] plaintiff Thomas Sutton on August 17, 1992, on behalf of himself and all others similarly situated, against defendants Pennsylvania Blue Shield, Capital Blue Cross and Independence Blue Cross. At all times relevant to this action, plaintiff has had medical insurance through his employment as part of a group plan, which coverage is protected by ERISA. This medical insurance includes Major Medical coverage which is jointly underwritten by Pennsylvania Blue Shield and Capital Blue Cross, and for which claims are processed by Independence Blue Cross.

In his Complaint, plaintiff Sutton asserts that on or before November 10, 1990, a claim was submitted to Pennsylvania Blue Shield on his behalf for payment of $ 440.00 for certain medical services. This claim was submitted to Pennsylvania Blue Shield on a Blue Shield form. On November 19, 1990, Pennsylvania Blue Shield made a partial payment of $ 175.00 on the claim and, on the front of its explanation of benefits form, it explained its denial of the remaining amount with the following computer-printed declaration: "The Pennsylvania Blue Shield allowance is accepted by participating doctors as payment in full. Your doctor is non-participating." [*4]

On the reverse side of the explanation of benefits form were 53 lines of print, of which the last three lines stated:

MAJOR MEDICAL COVERAGE: Services that are disallowed may be considered for payment under Major Medical or Federal Employee Supplemental coverage, if applicable. Refer to the subscriber's Major Medical Agreement or employee benefit booklet. Major Medical claims are to be submitted by the subscriber to his Major Medical insurer.

Plaintiff asserts that as a result of the manner in which Pennsylvania Blue Shield denied payment of balance of his claim, he did not understand, nor would a reasonable claimant have understood, that additional health coverage was available by resubmitting his claim on a Major Medical form to a Major Medical address. He asserts that as a result of the form of the denial of most of his claim, he was misled into believing that he did not have additional coverage. Further, plaintiff asserts that, as a result of the form of denial, he did not discover how to obtain full benefits, and did not receive the benefits to which he was entitled.

On behalf of himself and the class, plaintiff Sutton asserts that Pennsylvania Blue Shield has engaged[*5]

in a practice of issuing explanation of benefits forms with misleading computer declarations combined with inadequate printed information, and that this practice is employed on a commonwealth-wide basis. On behalf of himself and the class, plaintiff Sutton has brought four counts against Pennsylvania Blue Shield which, summarized, are:

Count I: Pennsylvania Blue Shield has breached its duty under ERISA either to pay covered Major Medical claims or to forward such covered claims for processing and payment.

Count II: Pennsylvania Blue Shield has breached its duty under Erisa to clearly and intelligibly inform subscribers of their coverage rights and of the process for obtaining these rights.

Count III: Pennsylvania Blue Shield has breached its affirmative duty as stated in 29 U.S.C. § 1133 of ERISA:

[to] provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant. . . .

Count IV: Pennsylvania Blue Shield has breached its duty as fiduciary and/or co-fiduciary[*6] under ERISA, 29 U.S.C. § 1104(a)(1), to act solely in the interest of its insureds.

In addition, plaintiff asserts on behalf of himself and the class that Capital Blue Cross and Independence Blue Cross as providers with Pennsylvania Blue Shield of plaintiff's Major Medical coverage are jointly and severally liable with Pennsylvania Blue Shield. Specifically, plaintiff on behalf of himself and the class has brought four counts against Capital Blue Cross and Independence Blue Cross which, summarized, are:

Count V: Capital Blue Cross and Independence Blue Cross are jointly and severally liable with Pennsylvania Blue Shield for breach of the duty under ERISA to pay or to forward for payment the covered claims of plaintiff and the class members.

Count VI: Capital Blue Cross and Independence Blue Cross are jointly and severally liable with Pennsylvania Blue Shield for breach of the duty under ERISA to inform plaintiff and the class members of their rights and coverages.

Count VII: Capital Blue Cross and Independence Blue

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 148 of 260 PageID #: 373

Page 5
1993 U.S. Dist. LEXIS 3049, *6; 16 E.B.C. 2528    LEXSEE

Cross are jointly and severally liable with Pennsylvania Blue Shield for breach of statutory duties under ERISA, 29 U.S.C. § 1133.[*7]

Count VIII: Capital Blue Cross and Independence Blue Cross are jointly and severally liable with Pennsylvania Blue Shield for breach of fiduciary duties under ERISA caused, inter alia, by Pennsylvania Blue Shield's refusal to pay or to forward for payment claims covered by Major Medical, by its failure to intelligibly inform the class of additional benefits, and by its failure to advise the class to re-submit their claims on another form and/or to another address to obtain their Major Medical benefits.

Plaintiff Sutton has requested that this Court certify a commonwealth-wide class of all subscribers who, during the period pertinent to this action, have had Major Medical coverage provided by Pennsylvania Blue Shield in conjunction with any of the Pennsylvania-based Blue Cross organizations, which coverage was obtained through employment as part of a group plan protected by ERISA. This Court has determined that the class should be limited to those subscribers who, during the period pertinent to this action, have had Major Medical coverage provided by Pennsylvania Blue Shield together with Capital Blue Cross and/or Independence Blue Cross. This determination is based on the fact[*8] that Capital and Independence are the two Blue Crosses which are before the Court as defendants. To delay this action for the purpose of adding additional Pennsylvania-based Blue Cross organizations would appear not to be in the interest of justice, particularly in view of the fact that determination of the issues in this matter will in no way jeopardize the rights of non-class subscribers. Furthermore, endeavoring to bring in the remaining Pennsylvania-based Blue Crosses may well raise questions of venue and jurisdiction, since it appears that they do not operate in the Eastern District of Pennsylvania.

Plaintiff Sutton seeks class certification pursuant to Fed.R.Civ.P. 23, and asserts that the class which he has submitted for certification fulfills the requirements of Rule 23(a), (b)(2) and (b)(3). The Court determines that the class as set forth above meets all of these requirements.

F.R.C.P. 23 provides in pertinent part:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common[*9] to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

* * *

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . .

Rule 23(a), (b)(2) and (b)(3).

Plaintiff bears the burden of proving that the class should be certified. Davis v. Romney, 490 F.2d 1360, 1366 (3d Cir. 1974). To succeed on his motion for class certification, plaintiff must meet all four requirements[*10] of Rule 23(a), and the requirements of either Rule 23(b)(1), (b)(2) or (b)(3). Bogus v. American Speech & Hearing Ass'n, 582 F.2d 277, 289 (3d Cir. 1978). In determining whether a class should be certified, a court may not consider the merits of the case. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S. Ct. 2140 (1974).

The class meets the numerousity requirement of Rule 23(a)(1). As stated heretofore, this Court will certify a class composed of subscribers who have Major Major Medical coverage provided through their employment, which Major Medical coverage is provided by Pennsylvania Blue Shield together with Capital Blue Cross and/or Independence Blue Cross. The number of subscribers who will come within the definition of this class is not currently known. This Court notes, however, that although the three defendants have argued for a much circumscribed class, none of them has disputed that even the class they propose would meet the numerousity requirement. In any event, certifying this matter as a class action should eliminate the necessity of multi-

Case 9:99-cv-07725-ADS-ARL   Document 178   Filed 06/05/02   Page 149 of 260 PageID #: 374

Page 6
1993 U.S. Dist. LEXIS 3049, *10; 16 E.B.C. 2528   LEXSEE

ple lawsuits within the class.

The requirements [*11] of Rule 23(a)(2) have also been met. All claims of the members of the class arise from a practice which Pennsylvania Blue Shield has admittedly applied uniformly. Further, the law governing the determination of the claims of the plaintiff class will be ERISA. There will be, therefore, common questions of law and fact.

The requirements of Rule 23(a)(3) are met. Plaintiff's claim necessarily has the required typicality, since it arises from the same uniformly applied practice of Pennsylvania Blue Shield that gives rise to the claims of the other class members, and is based on the same course of conduct and legal theory. Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 923 (3rd Cir. 1992).

Last, the requirements of Rule 23(a)(4) have been met. Plaintiff Sutton appears not to have interests antagonistic to those of the class. Further, plaintiff's counsel has submitted affidavits attesting that counsel is qualified, experienced and generally able to conduct the proposed litigation. It may be anticipated, therefore, that plaintiff Sutton will prosecute the matter vigorously and represent the class fairly and adequately.

In addition to satisfying the[*12] requirements of Rule 23(a), plaintiff must also satisfy one of the three requirements under Rule 23(b). Although 23(b)(2) and 23(b)(3) are alternatives, this Court determines that plaintiff satisfies both. Rule 23(b)(2) is satisfied, in that final injunctive relief will be appropriate if Pennsylvania Blue Shield's practice of denying claims is proven to be a violation of duties under ERISA. Rule 23(b)(3), further, is satisfied, in that the claims of all members of the class will have arisen from the same practice of Pennsylvania Blue Shield and, if proven, will be established by proof of the same breach of its duties under ERISA. Thus, common questions of law and fact will predominate over any questions affecting individual members. Further, under the circumstances of this case, a class action is superior to other available methods of adjudication. These claims typically will be too small to anticipate individual action and, as plaintiff asserts, many potential claimants are not aware and may not become aware absent class certification that they are entitled to coverage because of the form of rejection that has been used by Pennsylvania Blue Shield.

For the foregoing reasons, this[*13] Court determines that plaintiff has met his burden in satisfying the requirements of Rule 23(a), (b)(2) and (b)(3). This Court will therefore issue an Order certifying a class as delineated heretofore. Pursuant to Fed.R.Civ.P. 23, however, the definition of the class may be altered or amended by further Order of this Court at any time before a decision on the merits is entered.

ORDER- March 8, 1993, Entered

AND NOW, this 5th day of March, 1993, plaintiff Thomas D. Sutton having filed a motion for class certification in this action under Fed.R.Civ.P. 23(a), (b)(2) and (b)(3); for the reasons set forth in this Court's Memorandum of March 5, 1993;

IT IS ORDERED: this action will proceed as a class action, with the class defined as:

All persons:

(1) who had Major Medical coverage provided by Pennsylvania Blue Shield together with Capital Blue Cross and/or Independence Blue Cross, which coverage is protected by Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.; and

(2) who submitted a claim to Pennsylvania Blue Shield for payment for services covered by the person's Major Medical coverage, which claim was not paid to the [*14]full extent of the person's Major Medical coverage, based in whole or in part on the person's having filed such claim without using a Major Medical form, or based in whole or in part on such claim having been sent to a Pennsylvania Blue Shield address other than a Blue Cross/Blue Shield Major Medical address; and

(3) whose claims were submitted on or after August 17, 1986.

(4) Pursuant to Fed.R.Civ.P. 23, the above definition of the class may be altered or amended by further Order of this Court at any time before a decision on the merits is entered.

RAYMOND J. BRODERICK, J.

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 150 of 260 PageID #: 375

# Exhibit 12

02/25/   LIEFF CABRASER    ☑002

ช15

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL CIRCUIT
WILLIAMSON COUNTY, ILLINOIS

TAMMY SNIDER and MICHAEL     )     No. 97-L-114
AVERY, On Behalf of Themselves and     )
All Others Similarly Situated,     )     CLASS ACTION
     )
        Plaintiffs,     )
     )
     )
vs     )
     )
STATE FARM MUTUAL     )
AUTOMOBILE INSURANCE     )
COMPANY,     )
     )
        Defendant.     )
     )

**FILED**

.1.

DEC 05 1997

*Marie Basler*
Clerk of Circuit Court

ORDER AND FINDINGS THAT ACTION MAY BE MAINTAINED
AS A CLASS ACTION FOR BREACH OF CONTRACT,
CONSUMER FRAUD AND EQUITABLE RELIEF CLAIMS

I.    SUMMARY OF THE CASE

The representative plaintiffs ("Plaintiffs") in this class action allege that defendant

State Farm Mutual Automobile Insurance Company ("State Farm") has breached its contract with

its auto insurance policyholders, and violated the provisions of Illinois' Consumer Fraud and

Deceptive Business Practices Act (the "CFA"), 815 ILCS 505/1 *et seq.*  Plaintiffs seek

certification of a class (the "Class") composed of:

> All persons in the United States, except those residing in Arkansas
> and Tennessee, who (1) were insured by a vehicle casualty
> insurance policy issued by Defendant State Farm and (2) made a
> claim for vehicle repairs pursuant to their policy and had imitation
> that is, non-factory-authorized and/or non-OEM parts installed on
> their vehicles or else received monetary compensation determined
> in relation to the cost of imitation parts. Excluded from the class
> are employees of Defendant State Farm, its officers, its directors, its
> subsidiaries, or its affiliates.

-1-

In addition, the following persons are excluded from the class: (1) persons who resided in Illinois and whose policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.

Plaintiffs' claims concern contractual language in standard form State Farm automobile insurance policies issued nationwide. This language either obligates State Farm to restore a policyholder's vehicle to "its pre-loss condition" after an accident, or for State Farm to "pay to repair or replace the property or part with like kind and quality." While State Farm has designed form policies specific to each state, the contractual obligations at issue in this case are stated in substantially identical form in State Farm policies issued nationwide.

Notwithstanding this language, State Farm's uniform policy specifies the use of certain non-original equipment manufacture (non-OEM) replacement parts (referred to as "quality replacement parts" by State Farm and "imitation parts" by Plaintiffs) when these parts are priced lower than original equipment manufacturer's (OEM) parts. Whether this policy violates the above-referenced provisions of State Farm's insurance contracts with its policyholders is the central issue of this litigation.[1]

In their Second Amended Class Action Complaint (A) (the "Complaint"), their submissions, and their arguments before the Court, Plaintiffs contend that non-OEM parts are neither of "like kind and quality," nor are they sufficient to restore a policyholder's vehicle to its "pre-loss condition." For this reason, Plaintiffs contend that State Farm has breached its contract with its policyholders. Plaintiffs seek damages for breach of contract and for State Farm's alleged

---

[1] Throughout the hearing there was much discussion as to what parts may or may not be "crash parts." Throughout this order the Court has used the term "non-OEM parts" without specifying "crash parts" so as to mirror the Class definition.

-2-

violation of CFA. Plaintiffs also seek equitable relief against State Farm as set forth in Plaintiffs' Complaint.

State Farm contends that non-OEM parts (particularly those certified by the Certified Auto Parts Association ("CAPA")) are of "like kind and quality" to OEM parts, and that they fully restore a policyholder's vehicle to its "pre-loss condition." State Farm also contends that its policyholders are informed whenever non-OEM parts are used, and that its use of the term "quality replacement parts" is not misleading.

## II. GOVERNING LEGAL STANDARD

Certification of a class action in the State of Illinois is governed by 735 ILCS 5/2-801, which provides as follows:

> An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:
>
> (1) The class is so numerous that joinder of all members is impracticable.
>
> (2) There are questions of fact or law common to the class. which common questions predominate over any questions affecting only individual members.
>
> (3) The representative parties will fairly and adequately protect the interests of the class.
>
> (4) The class action is an appropriate method for the fair and efficient adjudication of the controversy.

Plaintiffs request class certification under 5/2-801. The Court has carefully considered the testimony adduced over the course of the evidentiary hearing on class certification completed in November, 1997, the affidavits filed by Plaintiffs and State Farm, the pleadings and briefs submitted to the Court, the voluminous exhibits introduced at the certification hearing, and the arguments by counsel. *See Gordon v. Boden*, 224 Ill. App. 3d 195, 199, 586 N.E.2d 461, 464

-3-

(1991). In considering class certification the Court has assigned to Plaintiffs the burden of satisfying the four requirements of 5/2-801. *Wheatley v. Board of Ed. of District 205*, 99 Ill. 2d 481, 486, 459 N.E.2d 1364, 1367 (1984). The Court has not considered the possibility of success on the underlying merits, but only whether the statutory requisites for class certification are satisfied at this time. *See Purcell & Wardrope Chartered v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1075, 530 N.E. 2d 994, 998 (1988)("hypothetical problems that may arise in the future***[are] not a sufficient basis to refuse to certify an otherwise properly pleaded class action.") Applying this standard, the Court makes the following findings of fact, and the following conclusions, with respect to each of the four statutory requirements for certification of a class action in Illinois.

## III.    CERTIFICATION ISSUES

### A.    Numerosity and Impracticality of Joinder

735 ILCS 5/2-801(1) requires not only that the number of plaintiffs be numerous, but also that joinder of plaintiffs in one individual action be impractical. "In general the question of numerosity depends on the particular facts of each case and no arbitrary rules regarding the size of class have been established by the courts." *In re Application of Edward J. Rosewell*, 236 Ill. App.3d 165, 174, 603 N.E. 2d 681, 686 (1992). Where there are a number of potential claimants, and the individual amount of each claim is small, making redress on an individual level difficult, if not impossible, Illinois courts have been particularly receptive to proceeding on a class action basis. *Miner v. Gillette Co.*, 87 Ill. 2d 7, 428 N.E. 2d 478 (1981), *cert. dismissed*, 459 U.S. 86 (1982).

Testimony at the certification hearing indicates that State Farm's practice of using non-OEM parts affects a large number of policyholders. State Farm is the largest auto insurer in the United States, with over 34 million auto policies in effect nationwide. Affidavit of

-4-

Kathleen M. Pechan, Defen. ..t's Exhibit 8, p. 3. State Farm paid app. ..ximately 5.1 million separate collision and comprehensive claims in 1996. Affidavit of David W. Gibson, Jr., Defendant's Exhibit 5, p. 3. In 1993, 49.4% of State Farm's repair estimates nationwide included CAPA certified non-OEM parts. Plaintiffs' Exhibit 177. It is clear from the exhibits introduced by both Plaintiffs and State Farm that millions of people are affected by State Farm's current claims settlement practices. The Court therefore finds the potential class members are sufficiently numerous.

In reaching its determination that joinder is impracticable the Court is guided by the number of potential class members. The Court finds that, first, the potential class members are widely distributed. Second, the class is large and its members cannot be easily identified, located and informed of the pendency of this action for purposes of formal joinder. Third, the potential class members are average consumers, not "sophisticated" entities. Fourth, the individual damages alleged in this action are, for the most part, small. They involve accelerated vehicle deterioration after repair, inferior fit and finish of repaired areas, and loss of value at resale. The dollar value of individual claims, although not nominal, is not large. *See, e.g.,* Plaintiffs' Exhibit 94 ($1,670 diminution in value upon resale when non-OEM parts used). Finally, it should be noted that this is the type of consumer class action on behalf of smaller claimants to which Illinois courts have been particularly receptive. *Gordon,* 224 Ill. App. 3d at 204, 586 N.E.2d at 467.

The Court finds that more localized litigation, either on an individual or localized class basis, would be a waste of scarce judicial resources both in this and other states. Addressing the common issues in one litigation would aid judicial administration. Therefore, the Court finds that requirements for certification of a class action under 5/2-801(1) are satisfied.

-5-

B.     Common Questions of Fact or Law

735 ILCS 5/2-801(2) requires that there be "questions of fact or law common to the class." However, "[c]ertification require[s] only that there be either a predominating common issue of law or fact, not both." *Martin v. Heinold Commodities. Inc.*, 117 Ill. 2d 67, 81, 510 N.E. 2d. 840, 846 (1987). While Plaintiffs must demonstrate that the common questions predominate over individual issues,

> "the hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issues is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action."

*Harrison Sheet Steel Co. v. Lyons*, 15 Ill. 2d 532, 538, 155 N.E. 2d 595, 598 (1959). Common questions arising from the interpretation of standard contract provisions or other uniform documents may be found to predominate; accordingly, the inability of some members of the class to obtain relief due to particular factors unique to them, is to be resolved at trial and does not impair certification of the class. *Steinberg*, 69 Ill. 2d at 338, 371 N.E. 2d at 643; *Rosen v. Village of Downer's Grove*, 19 Ill. 2d 448, 456, 167 N.E. 2d. 230, 235 (1960).

Testimony at the class certification hearing highlighted the common factual pattern in this case. James Ford, employed by State Farm as a divisional claims superintendent, testified that State Farm's claims policies are communicated through a series of "general claims memos" issued from State Farm's headquarters in Bloomington, Illinois, which governs claims policy nationwide. Certification Hearing at 0120-0124. General Claims Memo #430, introduced at the hearing as Defendant's Exhibit 23, governs the use of non-OEM parts.

In resolving customer claims, an estimate is prepared at a local State Farm claims office. When a particular part is needed to complete a repair, the part number is input into a

computer program. This program contains a database maintained by, respectively, Mitchell, C.C.C. or A.D.P, *Id.* at 0142, which contains information on the availability of, and price for, various parts from suppliers State Farm has approved. *Id.* at 0144. The computer's software then automatically searches what was referred to as "the matrix," and locates the cheapest available part. *Id.* at 0143-44. This part, whether it is an OEM or non-OEM part, is then automatically specified on the repair estimate. *Id.* at 0143-44. The State Farm adjuster has no authority to override the computer's choice of the cheapest part. *Id.* at 0153-54. It appears that this practice is uniform throughout the United States wherever non-OEM parts are used. *Id.* at 0155. Defendant's Exhibit 23. The policyholder is neither informed, nor consulted when a non-OEM part is specified. Certification Hearing at 0132. If the policy holder does not want non-OEM parts placed on their car, they must convince a body shop to absorb the price difference, or pay for the difference in price themselves. *Id.* at 0151.

As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm's methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant's Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant's Exhibit 27. State Farm has also promoted the use of the term "quality replacement parts" nationwide in an effort to promote its substitution of non-OEM for OEM parts. Plaintiffs' Exhibits 115, 116.

The Court finds that the evidence introduced at the certification hearing demonstrate "a series of essentially identical transactions," *Miner*, 87 Ill. 2d at 19, 428 N.E. 2d at

-7-

.484, between State Farm and its insureds, which transactions routinely result in the use of non-OEM parts.

In reaching its conclusion that the class claims are essentially factually identical, the Court acknowledges the significant evidence presented at the hearing regarding the varying availability and use of non-OEM parts in each of State Farm's regional offices. Affidavit of David A. Gibson, Jr., Defendant's Exhibit 5; Certification Hearing at 0121, 0124. The Court notes that varying availability of non-OEM parts affects how many policyholders did or did not receive non-OEM parts, but it does not affect the common pattern with respect to class members, who always received such parts if they were available. Any person whose car was repaired only with OEM parts is not part of the class for which certification is sought. Therefore, any variations in OEM part use is irrelevant to certification.

Given State Farm's common and ongoing course of conduct in repairing its insureds' vehicles with cheaper non-OEM parts whenever these parts were available, potential class members have a common interest in determining State Farm's obligations under its contractual provisions. "A class action can properly be prosecuted where a defendant is alleged to have acted wrongfully in the same basic manner as to an entire class. In such circumstances, the common class questions still dominate the case." *Brooks v. Midas-International Corp.*, 47 Ill. App. 3d 266, 273, 361 N.E. 2d 815, 820 (1977). Here the class members have a common interest in determining if State Farm's policy violates its contractual obligations, and this issue of contractual interpretation predominates over other issues. *See, e.g., Carrao v. Healthcare Service Corp.*, 118 Ill. App. 3d 417, 428, 454 N.E. 2d 781, 790 (1983). Similarly, the question of whether State Farm's practice of using non-OEM parts constitutes a violation of the CFA is a

-8-

common issue appropriate for resolution. *See, e.g., Brooks,* 47 Ill. App. 3d at 272, 361 N.E. 2d at 820.

In determining if this common question predominates, the Court has carefully considered State Farm's contention that it has no standard form auto insurance policy, as each individual state's policy is tailored to comply with the requirements of that state. *See* Affidavit of Everett J. Truttmann, Defendant's Exhibit 9. Therefore, State Farm contends there is no common question to be interpreted. The Court finds, however, that the policies specific form is immaterial, provided that the operative contractual language contained in each policy is susceptible to uniform interpretation. Whether particular language in its policies authorizes State Farm's use of non-OEM parts or is in conflict with the "like kind and quality" or "pre-loss condition" language of the policies is not a question to be resolved during class certification. It is a question for resolution on the merits.

State Farm has placed particular emphasis on its practice of using CAPA-certified non-OEM parts. Under this practice, State Farm will specify only a CAPA-certified part in place of an OEM part when that type of part was subject to CAPA certification. Affidavit of David A. Gibson, Jr., Defendant's Exhibit 5, p. 8. Although considerable testimony was received as to the difference between CAPA-certified non-OEM parts, non-CAPA-certified non-OEM parts, and OEM parts, this testimony all addresses the merits of whether non-OEM parts satisfy State Farm's contractual obligations. This ultimate issue is irrelevant to class certification, where the common treatment of the class members in having received non-OEM parts is the central question.

The Court heard substantial testimony as to the number of different non-OEM parts. Since the Court finds that a common question concerning the use of non-OEM parts has been established, the number of different parts and their relative quality is a question that goes to

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 160 of 260 PageID #: 385

the merits of whether non-OEM parts are equal to OEM parts. Plaintiffs submissions that non-OEM parts are categorically inferior in performance and safety, because of inferior design, manufacture and quality control, and evidence that they are commonly perceived by the marketplace as inferior, with a resulting negative effect on policyholders' cars' ultimate resale value are factors in the Court's determination that the requirements of 2-801(2) have been established.

In *Phillips Petroleum Co. v. Shutts,* the United States Supreme Court discussed the constitutional limitations on the application of a particular state's substantive law to the claims of out-of-state plaintiffs, finding that a state may apply its substantive law beyond its borders where it has "'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating, state interests'*** insur[ing] that the choice of [law] is not arbitrary or unfair." 472 U.S. 797, 821-22, 105 S. Ct. 2965, 2979 (1985) (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-12, 101 S. Ct. 633, 640 (1981). Illinois courts have approved the application of the CFA, § 815 ILCA 505/1 *et seq.,* to the claims of out-of-state plaintiffs. *See, e.g., Gordon,* 224 Ill. App. 3d at 202-03, 586 N.E. 2d at 466; *Martin* 117 Ill. 2d 67, 510 N.E.2d. 840. In *Martin,* a class composed of in state and out-of-state plaintiffs sued an Illinois corporation for fraud and for violations of the Illinois CFA. Relying upon *Phillips,* the Illinois Supreme Court noted that defendant's principal place of business was Illinois and stated:

> "Applying the Phillips Petroleum standard to the instant case, it is apparent that Illinois substantive law cant be applied to resolve the underlying common factual dispute. Here each member of the plaintiff class asserts the same breach of defendant's fiduciary duty with regard to the same nondisclosure of the same fact. This common allegation implicates the legitimate interests of the State of Illinois in insuring that persons and entities within its jurisdiction, insofar as they undertake to act as agents, do so in accordance with its law." 117 Ill. 2d at 82, 510 N.E.2d at 847.

-10-

02/23/00   FAX 415 956      LIEFF CABRASER                    ☑012

DEC 05 '97 11:35 TO 312 6211750        FROM ROSE LAW FIRM              T-090 P. 12

The Illinois Supreme Court concluded that "there can be no doubt that the claim of each member of the plaintiff class implicates the legitimate interests of Illinois in applying its law to adjudicate a dispute involving a business principally situated in its jurisdiction and which, by its own efforts, insistently has sought to avail itself of both the courts and the laws of the forum State." 117 Ill. 2d at 83, 510 N.E.2d at 847. Under *Phillips* and *Martin*, given the fact that State Farm is situated and headquartered in Illinois and affirmatively uses Illinois courts and law, this Court could apply Illinois substantive laws, including the CFA to the entire class.

While it is not necessary for the Court at this time to decide upon choice of law as to the breach of contract claim, it does note that the eventual decision as to choice of law will not prevent the certification of the Class in this case. *Gordon*, 224 Ill. App. 3d at 202, 586 N.E. 2d at 466. The Court retains the right to divide the litigation into a manageable number of sub-classes under 2-802(b) should differences in law present themselves. The Court finds that the requirements of Section 2-801(2) are met as "common issues of fact or law predominate."

C.      The Representative Plaintiffs Fairly and Adequately Protect the Interest of the Class

735 ILCS 5/2-801(3) conditions class certification upon a finding that "[t]he representative parties will fairly and adequately protect the interest of the class." "The purpose ...of the adequate representation requirement is merely to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Gordon*, 224 Ill. App. at 203, 586 N.E. 2d at 466. Judicial evaluation of the quality of the representation, as well as class certification in general, rests within the sound discretion of the trial court. *McCabe v. Burgess*, 75 Ill. 2d 457, 464, 389 N.E. 2d 565, 568 (1979).

Adequate representation assures compliance with due process requirements. "The test applied to determine the adequacy of representation is whether the interests of those who are

parties are the same as those who are not joined and whether the litigating parties fairly represent those not joined." *Miner*, 87 Ill. 2d at 14, 428 N.E.2d at 482. Essentially, the determination focuses on whether the absentee members are so represented by the persons before the court "that their interests will receive actual and efficient protection." *Brooks*, 47 Ill. App. 3d at 274, 361 N.E. 2d at 820, quoting *State Life Insurance Co. v. Board of Education*, 394 Ill. 301, 308, 68 N.E.2d 525, 529 (1946). Finally, unlike Federal Rule Of Civil Procedure 23, there is no "typicality" requirement in 5/2-801(3). The Illinois rule is more liberal than the federal rule in this regard and "...a class representative may not be disqualified merely because his claim is not exactly the same as the claims of other potential class members." *Carrao*, 118 Ill. App. 3d at 428, 454 N.E.2d at 790. The Court finds that the requirement of adequate representation under 735 ILCS 5/2-801(3) has been satisfied.

After a rigorous analysis of Plaintiffs' Complaint, Plaintiffs' affidavits and Plaintiffs' counsels' affidavits or résumés, the Court concludes that Plaintiffs have zealously pursued their claims since learning of State Farm's alleged wrongful conduct and that Plaintiffs have sufficient financial resources to absorb the expenses involved in being the named representatives. The Court further finds that no conflicting interests exist between Plaintiffs and the Plaintiff Class as it is clear from the Court's review of the material submitted in support of class certification that the representatives herein and Class members share common objectives and legal and factual positions. Other than the dates and specific amounts concerning Plaintiffs' repairs and Class members' repairs, the proof, objectives, legal and factual positions will be essentially identical from plaintiff to plaintiff and class member to class member.

In determining the adequacy of representation, the Court may also consider the quality and experience of the attorneys for the Class. The Court finds, after a rigorous analysis and review of the pleadings and résumés submitted by Plaintiffs' counsel and having observed their conduct in open Court, that they are able advocates for the Class. Counsel for Plaintiffs have regularly engaged in major complex consumer litigation of size, scope and complexity similar to this case. Counsel have successfully prosecuted many and varied class actions or other complex litigation. They have the experience and sophistication that the Plaintiffs and Class members lack. The Court finds that counsel for Plaintiffs are well suited for this case and that Plaintiffs will fairly and adequately protect the interest of the Class in compliance with the mandate of 735 ILCS 5/2-801(3).

**D.    The Class Action Is an Appropriate Method to Resolve the Class Issues**

735 ILCS 5/2-801(4) conditions class certification on a finding that "[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." In applying the fourth prerequisite, the Court has considered whether a class action can best secure economies of time, effort, and expense and promote uniformity of decision or accomplish other ends of equity and justice. *Gordon*, 224 Ill. App. 3d at 203, 586 N.E.2d at 467. While Federal Rule Of Civil Procedure 23(b)(3) requires that a class action be *superior* to other available methods of adjudication, the Illinois statute requires that the trial court find that the class action is an *appropriate* method of litigating the controversy. Section 5/2-801(4). This standard allows the trial court a more flexible measure of discretion in determining whether to permit the class action to proceed. A significant factor in the case at bar is that a class action is the only practical means for State Farm policyholders to present their claims and for State Farm to achieve finality as to their claims.

Illinois courts have historically recognized that class actions are an appropriate method of fairly and efficiently adjudicating controversies involving numerous small claims. In *Wood River Area Development Corporation v. Germania Federal Savings and Loan*, 198 Ill. App. 3d 445, 452; 555 N.E.2d 1150, 1154 (1990), the Court stated "[t]he class action is particularly appropriate where those who have allegedly been injured 'are in poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive.' ...Its 'historic mission' has been to take care of the smaller guy." The *Wood River* court concluded,

> "No matter how refined, how revised, or how evolved" [the class action becomes], "...the goal of the class action remains the same — justice for the lowly, the tenants, the parishioners, the multitudes." 198 Ill. App. 3d at 448, 555 N.E.2d at 1152.

The United States Supreme Court recently acknowledged not only the appropriateness, but the necessity, of class treatment of small consumer claims in *AmChem Prods. Inc. v. Windsor*, ___ U.S. ___, 117 S. Ct. 2231, 2250 (1997), stating,

> ("Predominance is a test readily me: in certain cases alleging consumer or securities fraud or violations of the antitrust laws." )

With respect to "small claims" class actions in gen ral, the Court stated:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." 117 S. Ct. at 2246, quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

The evidence presented to the Court supports the conclusion that, not only is a class action an appropriate method for the fair adjudication of the disputes between Defendant

State Farm and its millions of automobile insurance policyholders, but also that it may be the only means by which these disputes may be efficiently resolved.

Defendant State Farm provides automobile insurance coverage to one out of every five insured drivers in the United States, making it the nation's number one auto insurer. Plaintiffs' Exhibit 102. The evidence submitted by Plaintiffs indicates that State Farm achieved a savings of 532 million in 1994 from the use of non-OEM parts. Plaintiffs' Exhibit 92. Accordingly, this action qualifies for class resolution both in terms of the dollar amount in controversy and the number of claims involved.

State Farm has previously settled two lawsuits challenging its non-OEM parts practices — the Illinois case entitled *Krusinski v. State Farm*, No. 87 CH 10253, in the Circuit Court of Cook County ("*Krusinski*"), and the California case entitled *Krinsk v. State Farm Mutual Automobile Insurance Company*, No. 626412, in San Diego County Superior Court ("*Krinsk*"). Defendant's Exhibit 1. State Farm has settled both the *Krusinski* and *Krinsk* actions but has continued its practice of utilizing non-OEM parts in its repairs of policyholders' vehicles. In addition to other relief, Plaintiffs at bar seek an injunction prohibiting State Farm from continuing its practice of settling policyholders' repair claims based upon the use and cost of non-OEM parts.

Proof of Plaintiffs' claims against Defendant State Farm may be made on a class-wide basis. After a rigorous review of the pleadings, exhibits and affidavits submitted by Plaintiffs, the only proof that might differ from Plaintiff to Plaintiff and class member to class member would appear to be the amount of damages suffered by each class member. It is well settled, in Illinois and elsewhere, that differences in the amount of damages suffered by individual class members will not defeat class certification. *Gordon*, 224 Ill. App. 3d at 202, 586 N.E.2d at 465-66. Individual lawsuits for small amounts would be too expensive, and absent a class action, individual lawsuits

run a substantial likelihood of inconsistent adjudications. Upon consideration of the pleadings, exhibits and affidavits submitted by Plaintiffs, the Court concludes that the proposed Class is manageable. The Court concludes, pursuant to 735 ILCS 5/2-801(4), that a class action is an appropriate method for the fair and efficient adjudication of this controversy.

## IV.    CONCLUSION

Pursuant to 735 ILCS 5/2-801, this Court concludes that Plaintiffs have adequately satisfied the four requirements for class certification of this action under Illinois law. Plaintiffs will now have the opportunity to try and prove the merits of their claims, which is an entirely different matter from establishing the requirements for class certification. The Court notes that class certification will allow all State Farm policyholders to seek redress for their claims and will also provide State Farm with finality as to the claims. State Farm has, for years, had class actions filed against it concerning the matters involved in this litigation and has been forced to defend itself in numerous jurisdictions. Since this case has been filed, the parties have made the Court aware of several cases which have recently been filed, including the *Dorries* action in Champaign County, Illinois (No. 97-L-188), which has now been terminated by Judge Green's November 10, 1997 order in "*Krusinski*". The Court has learned that the attorneys prosecuting the *Dorries* case in Illinois had also filed an identical class action case in Alabama. Such a multiplicity of suits is an inefficient use of judicial resources and places State Farm in the unenviable position of trying to defend itself on multiple fronts.

The Court believes that Illinois is the one State where a national class can be maintained and where all issues between State Farm and State Farm's policyholders concerning the use of non-OEM parts can finally be resolved. The Court is unaware of any other class action cases pending in Illinois concerning the issues involved in this litigation and is unaware of any other class

DEC 05 '97 11:38 TO 312 6211750          FROM ROSE LAW FIRM          T-090 P.18

action case in any other State which has certified a national class after a full evidentiary hearing on

class certification.

The following described Plaintiff Class is hereby ordered certified for purposes of litigation

and trial:

> All persons in the United States, except those residing in Arkansas
> and Tennessee, who (1) were insured by a vehicle casualty insurance
> policy issued by Defendant State Farm and (2) made a claim for
> vehicle repairs pursuant to their policy and had imitation that is, non-
> factory-authorized and/or non-OEM parts installed on their vehicles
> or else received monetary compensation determined in relation to
> the cost of imitation parts. Excluded from the class are employees
> of Defendant State Farm, its officers, its directors, its subsidiaries, or
> its affiliates.
>
> In addition, the following persons are excluded from the class:
> (1) persons who resided in Illinois and whose policies were
> issued/executed prior to April 16, 1994, and (2) persons who resided
> in California and whose policies were issued/executed prior to
> September 26, 1996.

ENTERED: December 5, 1997

JOHN SPERONI
ASSOCIATE CIRCUIT JUDGE

-17-

Exhibit 13

Case 9:99-cv-07725-ADS-ARL    Document 178    Filed 06/05/02    Page 168 of 260 PageID #: 393

RECYCLED

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT

WILLIAMSON COUNTY, ILLINOIS

MICHAEL E. AVERY, et al, On Behalf of
Themselves and All Others Similarly
Situated,

    Plaintiffs,

vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 97-L-114

**FILED**

OCT 0 8 1999

*Marie Bacler*
CLERK OF THE CIRCUIT COURT

## JUDGMENT

## COUNTS II AND III

Counts II and III of plaintiffs' Third Amended Class Action Complaint

("Complaint") assert claims under the Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505/1, *et seq.* (hereinafter, "Consumer Fraud Act" or "Act")

against defendant State Farm Mutual Automobile Insurance Company ("State Farm").

Under Illinois law, these claims must be decided by the court, not the jury. The bench

trial on Counts II and III was conducted separately, but simultaneously, with the jury

trial on Count I.

The Act declares unfair methods of competition and unfair or deceptive

acts or practices in any trade or commerce to be unlawful. These include any fraud,

misrepresentation or the concealment, suppression or omission of any material fact,

with the intent that others rely on the concealment, suppression or omission of such

material fact, as well the use or employment of any practice described in Section 2 of

the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2. Such methods, acts or practices are unlawful whether any person has in fact been misled, deceived or damaged.

Where private individual plaintiffs bring suit under the Act, they must prove, by a preponderance of the evidence, (1) a deceptive act or practice by the defendant; and (2) defendant's intent that the plaintiffs' rely on the deception ( actual reliance on the part of the plaintiffs is not required); and (3)the occurrence of the deception in the course of conduct involving trade or commerce; and (4) damage to the plaintiffs as a result of defendant's violation of the act. *Cripe v. Leiter*, 184 Ill.2d 185 (1998); *Malooley v. Alice*, 251 Ill. App. 3d 51 (3rd Dist. 1993); 850 ILCS 505/10a(a). If a violation of the Act is proven, the court may award actual economic damages and "any other relief which it deems proper". 850 ILCS 505/10a(a) and (c). In order to recover, plaintiffs must show that the violation of the Act directly and proximately caused their injury. *Martin v. Heinold*, 163 Ill.2d 33,68 (1994).

Pursuant to 735 ILCS 5/2-805, this Judgment, with respect to Counts II and III, shall be binding on all class members, as certified by the court pursuant to 735 ILCS 5/2-801 *et seq.*, on December 5, 1997, and Amendment To Order on February 11, 1998, (except those persons listed on Exhibit "A" hereto, who have been properly excluded from the class under 735 ILCS 5/2-804(b)), and who come within the following definition for the purposes of the Consumer Fraud Act claims:

> All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1994, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs

pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) "crash parts" installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

In addition, the following persons are excluded from the class: (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.

On October 4, 1999, the jury found that State Farm was liable to the plaintiffs on Count I of plaintiffs' Third Amended Class Action Complaint for breach of contract and returned a verdict in favor of Plaintiffs in the amount of $243,740,000.00 for class-wide Specification/Direct Damages and $212,440,000.00 for class-wide Installation Damages. The court, prior to the commencement of the jury trial on Count I, made the following determinations (which are also applicable to the court's consideration of Counts II and III):

1. That the contractual obligation of State Farm under its insurance policies is exactly the same whether State Farm promised to pay for "crash parts" of "like kind and quality" or promised to pay for "crash parts" which restore a vehicle to its "pre-loss condition";

2. That the State Farm insurance policies allow State Farm to specify and pay for "crash parts" made by the vehicle's manufacturer (Original Equipment Manufacturer, abbreviated OEM) or "crash parts" from other sources (non-Original Equipment Manufacturer, abbreviated non-OEM) so long as the "crash parts"

are of "like kind and quality" which restore the damaged vehicle to its "pre-loss condition";

3. That "crash parts" are of "like kind and quality" only if they restore a vehicle to its "pre-loss condition"; and

4. That "pre-loss condition" means the condition of the vehicle immediately before the time it is damaged.

This court has presided over this action since its inception and is familiar with the issues of fact and law it presents. This court has independently heard, read, and considered all of the admitted evidence and testimony pertinent to the Consumer Fraud Act claims, including the evidence and testimony presented to the jury on the breach of contract claim, to the extent relevant, and the evidence and testimony pertaining solely to the Consumer Fraud Act claims, that was presented to the court outside the jury's presence. This court has had the opportunity to consider the documents and materials admitted into evidence and to observe the demeanor, evaluate the credibility, and weigh the testimony of the parties' fact and opinion witnesses and the arguments of counsel.

The court, after considering all the evidence, finds, as did the jury, that State Farm did breach its contract with the plaintiffs, that the non-OEM "crash parts" specified and used by State Farm were not of "like kind and quality" and did not restore plaintiffs' vehicles to their pre-loss condition as required by the insurance contract between State Farm and the plaintiffs. These findings do not on their own establish a violation of the Act. The court must now consider whether the evidence also

establishes the elements, set forth above, which are required to prove a violation of the Consumer Fraud Act.

The plaintiffs allege, under Count II and Count III of the Third Amended Class Action Complaint, that State Farm violated the Consumer Fraud Act. The Plaintiffs allegations include, without limitation, that State Farm installed inferior non-OEM "crash parts" on the plaintiffs' vehicles when it was obligated under its insurance policies with the plaintiffs to use "crash parts" of "like kind and quality" which would restore plaintiffs' vehicles to their "pre-loss condition" and that State Farm failed to disclose to plaintiffs that it was using and paying for cheaper, inferior non-OEM "crash parts" to repair plaintiffs' vehicles.

After considering all the testimony and evidence admitted at trial, the court finds that the plaintiffs have proven that State Farm violated the Consumer Fraud Act and that none of the defenses asserted by State Farm bar plaintiffs' right to recover under the Act or reduce the amount of plaintiffs' recovery.

State Farm, prior to and during the class period for Consumer Fraud Act plaintiffs, knew that the non-OEM "crash parts" it was specifying on its policyholders' repair estimates were not of "like kind and quality" and would not restore their policyholders' vehicles to "pre-loss condition." State Farm's knowledge of the inferiority of the non-OEM "crash parts" is clearly shown the testimony of witnesses, State Farm's own internal documents, CAPA documents (State Farm was instrumental in the creation of CAPA. CAPA's stated purpose was to certify quality non-OEM "crash parts" and State Farm officers and management served on CAPA's board prior

to and during the class period for Consumer Fraud Act plaintiffs) of which State Farm had knowledge, and other documents, all of which were admitted into evidence and appear in the trial court record. Rather than telling its policyholders of the known problems with the non-OEM "crash parts," including possible safety concerns, State Farm chose to adopt and use on its estimates the misleading term "Quality Replacement Parts," and to tell its policyholders, in various written documents which were admitted into evidence, that the parts were as good, or better than, OEM parts. Further, the written disclosures stamped on or attached to the repair estimates or which were delivered with the repair estimates, did nothing to advise the State Farm policyholder of the inferiority of the parts. Finally, State Farm's "Guarantee" improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm.

State Farm is a mutual insurance company which operates for the benefit of its policyholders. State Farm occupies a position of trust with its policyholders, who pay the required premiums and are entitled to receive all the benefits State Farm promises to provide in its insurance contract with them. State Farm violated this trust. The court finds that State Farm, in light of its knowledge of the inferiority of non-OEM "crash parts," misrepresented, concealed, suppressed or omitted material facts concerning the non-OEM "crash parts," with the intent that its policyholders rely upon on these deceptions, in violation of the Consumer Fraud Act. The court further finds that as a direct and proximate result of State Farm's violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages; namely the

specification/direct damages and installation damages which occurred during the class period for Consumer Fraud Act plaintiffs.

The jury awarded $243,740,000.00 in "Specification/Direct Damages" and $212,440,000.00 in "Installation Damages" for the entire plaintiff class (including the Consumer Fraud Act plaintiffs) under Count I, which awards include the amounts of specification/direct damages and installation damages sustained by the Consumer Fraud Act plaintiffs. The Consumer Fraud Act plaintiffs cannot recover these damages twice and the court therefore does not award these actual damages for State Farm's violation of the Consumer Fraud Act.

Having found that the plaintiffs sustained "actual damages," the Consumer Fraud Act allows the court, in its discretion, "to award actual economic damages or any other relief which the court deems proper," 815 ILCS 505/10(a), which includes equitable relief, injunctive relief, punitive damages, reasonable attorney fees and court costs. The evidence established that during the Consumer Fraud Act class period, State Farm realized direct savings from its non-OEM practice in the amount of $130,000,000.00. The court finds that the equitable relief of imposition of a constructive trust for the benefit of the Consumer Fraud Act plaintiffs on the $130,000,000.00 State Farm directly saved from its non-OEM practice is an appropriate remedy for State Farm's violation of the Act. The $130,000,000.00 in this constructive trust will be disgorged and distributed for the benefit of the Consumer Fraud Act plaintiffs.

The court has also considered whether punitive damages should be awarded for State Farm's violation of the Consumer Fraud Act. Punitive damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when a defendant acts wilfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172,186 (1978); *Martin,* 163 Ill.2d at 80-81. The court finds that State Farm's conduct and willful violations of the Consumer Fraud Act satisfy the legal requirements for the imposition of punitive damages and that punitive damages are justified and should be awarded in this case.

Punitive damages, when awarded, are in the nature of punishment and as a warning and example to deter the defendant and others from similar wrongful conduct in the future. *Kelsay,* 74 Ill.2d at 186. A court, in determining the amount of a punitive damage award, should consider the nature and enormity of the wrong, the defendant's financial status and the defendant's potential liability in other cases. *Heldenbrand v. Roadmaster Corp,* 277 Ill.App.3d 664, 674 (5th Dist 1996). The court has considered these factors and determines that an award of $600,000,000.00 in punitive damages is appropriate.

It is clear to the court, given State Farm's strong financial condition, that State Farm can pay the substantial punitive damages awarded without affecting its ability to pay claims under any conceivable or foreseeable combination of catastrophes and disasters for which it currently provides coverage, without affecting the contractual rights and expectations of any of State Farm's millions of policyholders and without

canceling any of the insurance policies of current policyholders.

The court, under 815 ILCS 505/10a(a), also finds that declaratory relief, specifically stating the current contractual obligation of State Farm under its insurance policies is appropriate. The court hereby finds that the contractual obligation of State Farm under its insurance policies is exactly the same whether State Farm promises to pay for "crash parts" of "like kind and quality" or promises to pay for "crash parts" which restore a vehicle to its "pre-loss condition", that the State Farm insurance policies allow State Farm to specify and pay for "crash parts" made by the vehicle's manufacturer (Original Equipment Manufacturer, abbreviated OEM) or "crash parts" from other sources (non-Original Equipment Manufacturer, abbreviated non-OEM) so long as the "crash parts" are of "like kind and quality" which restore the damaged vehicle to its "pre-loss condition", that "crash parts" are of "like kind and quality" only if they restore a vehicle to its "pre-loss condition" and that "pre-loss condition" means the condition of the vehicle immediately before the time it is damaged.

The last matter which the court must consider is whether any injunctive relief, pursuant to 815 ILCS 505/10a(c), is appropriate. The requirements for injunctive relief are (1) ascertainable rights in need of protection, (2) no adequate remedy at law and (3) irreparable harm absent an injunction. *Witter v. Buchanan*, 132 Ill. App.3d 273 (1st Dist 1985). The court, after much thought, has decided that injunctive relief is not appropriate. In this case, State Farm has been ordered to pay money damages for breaching its insurance contracts and violating the Consumer Fraud Act. Accordingly, it is clear that an adequate remedy at law is available if State Farm again breaches its

insurance contracts or violates the Consumer Fraud Act or other law. Injunctive relief cannot be awarded if there is an adequate remedy at law.

Accordingly, Judgment shall be and is hereby entered in favor of the plaintiff class and against State Farm Mutual Automobile Insurance Company on Counts II and III of plaintiffs' Third Amended Class Action Complaint as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That a constructive trust is imposed for the benefit of the Consumer Fraud Act plaintiffs on the $130,000,000.00 in direct savings realized by State Farm from its non-OEM practice during the Consumer Fraud Act class period, which will be disgorged and distributed for the benefit of the Consumer Fraud Act plaintiffs.

2. That the Consumer Fraud Act plaintiffs shall recover from defendant State Farm the further sum of $600,000,000.00 as punitive damages.

3. That the current contractual obligation of State Farm under its insurance policies is exactly the same whether State Farm promises to pay for "crash parts" of "like kind and quality" or promises to pay for "crash parts" which restore a vehicle to its "pre-loss condition", that the State Farm insurance policies allow State Farm to specify and pay for "crash parts" made by the vehicle's manufacturer (Original Equipment Manufacturer, abbreviated OEM) or "crash parts" from other sources (non-Original Equipment Manufacturer, abbreviated non-OEM) so long as the "crash parts" are of "like kind and quality" which restore the damaged vehicle to its "pre-loss condition", that "crash parts" are of "like kind and quality" only if they restore a vehicle to its "pre-loss condition" and that "pre-loss condition" means the condition of

the vehicle immediately before the time it is damaged.

4. That the court reserves continuing jurisdiction over the Consumer Fraud Act plaintiffs and State Farm to enforce all provisions of this Judgment and to administer and distribute the common fund resulting from this Judgment among Consumer Fraud Act class members, based upon appropriate proof of class membership and claims, to be obtained insofar as is practicable from the records of State Farm, and augmented, if and as necessary, by documents and information from class members and their vehicles.

5. That this court reserves continuing jurisdiction over the common fund resulting from this Judgment to consider and award attorneys' fees and costs to class counsel utilizing the fee award criteria and methodology authorized for class actions by the Illinois Supreme Court in *Brundidge v. Glendale Federal Bank, F.S.B.* 168 Ill.2d 235 (1995). This determination shall be made at such time as the full extent of class counsels' efforts in creating, preserving and making the common fund available for distribution to the Consumer Fraud Act plaintiff class has been determined.

Entered this 8th day of October, 1999.

_John Speroni_
Associate Circuit Judge

# Exhibit 14

**NOTICE**

The text of this opinion may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

NO. 5-99-0830

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

**FILED**

APR 05 2001

LOUIS E. COSTA
CLERK, APPELLATE COURT, 5th DIST.

| | | |
|---|---|---|
| MICHAEL E. AVERY *et al.*, on behalf of themselves and all others similarly situated, | ) ) ) | Appeal from the Circuit Court of Williamson County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) | No. 97-L-114 |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | ) ) ) | Honorable |
| Defendant-Appellant. | ) ) | John Speroni, Judge. presiding. |

JUSTICE MAAG delivered the opinion of the court:

State Farm Mutual Automobile Insurance Company (State Farm) appeals from a $1.18 billion judgment entered against it in a nationwide class action lawsuit tried in the circuit court of Williamson County, Illinois. The three-count complaint, filed on behalf of a class of State Farm automobile insurance policyholders (plaintiffs), alleged breach of contract, consumer fraud, and claims seeking equitable relief. On appeal State Farm seeks the decertification of the class and a reversal of the judgment below or, alternatively, a new trial. State Farm also seeks to have the punitive damages award vacated or reduced.

**[The following text is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).]**

The tone of this appeal was set in the statement of facts. The parties seem to agree on little beyond the fact that the members of the class all purchased State Farm automobile insurance policies. The class consisted of more than four million State Farm automobile insurance policyholders nationwide whose vehicles sustained damage as a result of accidents and required repairs that included the replacement of one or more designated "crash parts". "Crash parts" were described as vehicle components typically repaired or replaced as a result of crash damage rather than normal use. They are primarily sheet metal and plastic parts attached to the outer shell of the vehicle. The types of "crash

1

parts" at issue included fenders, hoods, doors, quarter panels, tailgates, grills, headlight and taillight mounting panels, brackets, moldings, and bumpers. There were 25 types of "crash parts" at issue in this case.

**[The preceding text is nonpublishable under Supreme Court Rule 23.]**

In count I of the complaint, plaintiffs alleged that State Farm issued form contracts containing an identical promise to its policyholders nationwide. Plaintiffs contended that in exchange for payment of the insurance premium, State Farm had promised to pay for replacement parts of "like kind and quality" that would restore the vehicle to its "pre-loss condition" and that it breached this promise by uniformly specifying inferior non-original equipment manufacturer (non-OEM) parts when they were available and cheaper than original equipment parts made by the automobile manufacturer (OEM). Counts II and III alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (CFA) (815 ILCS 505/1 *et seq.* (West 1998)). In those counts, plaintiffs claimed that State Farm had a nationwide claims practice of uniformly specifying cheaper non-OEM crash parts on damage estimates issued to its policyholders despite the fact that it knew that those parts were inferior in quality and condition and would not return the damaged vehicle to its preloss condition. Plaintiffs claimed that by adopting and employing this claims practice, State Farm deceived its policyholders in that it failed to inform them of the inferior quality of specified replacement parts. It was alleged that State Farm was able to succeed in this deception by representing that the inferior parts met high performance criteria and by offering a bogus guarantee to replace unsatisfactory non-OEM parts at no cost to the policyholder.

State Farm objected to the certification of the class, on the grounds that the individual questions of fact and law overwhelmingly dominated any purported common questions in the contract and consumer-fraud claims. State Farm also denied the allegations of the complaint.

The trial court conducted a pretrial evidentiary hearing on the class-certification issue. After considering documents and the testimony of several witnesses, the court certified the class as follows:

"All persons in the United States, except those residing in Arkansas and Tennessee, who (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had imitation[,] that is, non-factory-authorized and/or non-OEM parts installed

2

on their vehicles or else received monetary compensation determined in relation to the cost of imitation parts. Excluded from the class are employees of Defendant State Farm. its officers, its directors. its subsidiaries. or its affiliates.

In addition, the following persons are excluded from the class: (1) persons who resided in Illinois and whose policies were issued/executed prior to April 16. 1994. and (2) persons who resided in California and whose policies were issued/executed prior to September 26. 1996."

The trial court also reviewed State Farm auto policies that were issued to class members who resided in states other than Illinois. The court found that there were some variations in the form of the policy from state to state. but it concluded that these variations were immaterial because the operative policy language in each policy was susceptible to uniform interpretation. The court determined that in each policy State Farm made the identical promise to pay for parts "of like kind and quality" that would restore the vehicle to its "original pre-loss condition".

**[The following text is nonpublishable under Supreme Court Rule 23.]**

The trial lasted almost 30 days. The parties presented testimony from dozens of witnesses and introduced hundreds of exhibits. Summarizing all of the evidence would be neither manageable nor beneficial. Exhibits and testimony will be referenced as required to dispose of the issues raised in this appeal. The positions of the parties at trial were as follows:

**[The preceding text is nonpublishable under Supreme Court Rule 23.]**

### I. Plaintiffs' Contentions At Trial

#### A. Breach of Contract

In the breach-of-contract claim, plaintiffs alleged that State Farm's practice of specifying non-OEM parts constituted a breach of its contractual obligation to pay for parts "of like kind and quality" to restore the vehicles to "pre-loss condition". This class-wide claim was based on plaintiffs' theory that the non-OEM parts specified in the damage estimates were categorically inferior. Plaintiffs presented evidence to demonstrate that State Farm had a uniform, corporate-wide claims adjustment manual that dictated the policy for the settlement of property-damage claims with its insureds and that this policy and practice was devised, implemented, dictated, and monitored from its

3

home office in Bloomington, Illinois.

[The following text is nonpublishable under Supreme Court Rule 23.]

During the applicable class period, a nationwide directive was in effect that required the specification of non-OEM parts in the settlement of its policyholders' damage claims if the non-OEM parts were cheaper. State Farm claims estimators were required to utilize a computer system programmed to select the cheapest available non-OEM part certified by the Certified Automotive Parts Association (CAPA), an association formed and largely funded by the insurance industry to regulate and certify aftermarket parts. The estimators had no authority to substitute OEM parts in damage estimates when non-OEM parts were cheaper and available. In the event the damaged part was not one that was subject to CAPA certification, the computer selected and the estimator routinely specified a noncertified, non-OEM part.

The computer program contained a matrix of all parts that were available and the suppliers who carried those parts. State Farm selected the suppliers and approved the parts that were listed in the computer software. In order to prepare a damage estimate, the claims estimator would enter into the computer system the make and model year of the damaged part, and the computer would identify the cheapest part without regard for the preloss condition of the damaged vehicle. That part and its cost would be specified on the damage estimate. The claim was resolved based upon the cost of the non-OEM part. Adjustors and claims estimators were trained in these policies and practices through in-house seminars, which were held at the home office.

Plaintiffs also presented numerous documents and the testimony of expert witnesses to bolster the claim that the non-OEM parts which State Farm specified were categorically inferior in terms of fit, function, performance, durability, corrosion resistance, appearance, and safety. Plaintiffs' experts included both auto body repairmen who had practical, hands-on experience with the non-OEM parts State Farm specified and experts who had advanced education, training, and experience in such fields as industrial engineering, metallurgy, and materials sciences. One of those experts had observed the process used in the manufacture of non-OEM parts at a plant in Taiwan. Another conducted testing on a sample of non-OEM parts. Plaintiffs also presented an expert in market analysis.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

4

*B. The Consumer Fraud Act*

In the consumer-fraud claim, plaintiffs alleged that State Farm knowingly concealed information about the inferior condition of the non-OEM parts it was specifying on damage estimates and misrepresented the quality and condition of those parts to its policyholders. Plaintiffs presented evidence. in the form of State Farm's own documents and testimony from past and current State Farm employees. to show that State Farm knew that the non-OEM parts were inferior in terms of fit, quality, function, performance. corrosion resistance, appearance, and safety. These parts were represented to policyholders as "quality replacement parts". There was also evidence that State Farm's guarantee that it would replace non-OEM parts at no cost to the unsatisfied policyholders upon demand was bogus. If the aftermarket part was warranted by the part manufacturer, the policyholder was required to contact the manufacturer for relief. In most cases, these part manufacturers were located outside the United States in Taiwan or another country. If the policyholder demanded replacement of the non-OEM part. a State Farm adjustor was required to investigate the claim. and if it was approved. an OEM replacement part was installed but the cost was charged to the policyholder as an indemnity payment.

## II. State Farm's Contentions At Trial

State Farm defended by presenting witnesses who testified that the use of non-OEM parts had been approved in all states in which the class members reside, that non-OEM parts were "equivalent" or "functionally equivalent" to OEM parts. that the use of non-OEM parts did not adversely effect occupant safety, and that non-OEM parts did not reduce the value of the vehicle. State Farm also presented evidence to show that it advised its policyholders of its use of non-OEM parts in the policy, in estimates, and in a pamphlet provided with the estimate. There was also evidence that 95% of State Farm's policyholders renewed their policies. This evidence was offered in an attempt to prove that State Farm insureds were satisfied customers. State Farm also presented as experts those who had practical experience and those with credentials similar to plaintiffs' experts, to counter plaintiffs' opinion witnesses. Thus. there was a classic battle of experts, and the fact finders were required to determine the weight and credibility of these witnesses.

## III. The Verdict and Judgment

After many hours of deliberation, the jury returned a verdict on the breach-of-contract claim. The jury found

5

that State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class. Damages to the plaintiff class were fixed at $243,740,000 in direct damages and $212,440,000 in consequential damages.

The consumer-fraud counts of the complaint were resolved in a bench trial. In its written judgment, the trial court found that State Farm misrepresented, concealed, suppressed, or omitted material facts concerning the non-OEM crash parts with the intent that its policyholders rely upon these deceptions in violation of the CFA. The trial court noted that it concurred with the jury's verdict on the breach-of-contract claim. The court found that plaintiffs had incurred actual damages as a result of State Farm's deceptive practices, but the court did not award actual damages, noting that the jury had awarded identical actual damages in the breach-of-contract case and that plaintiffs could not recover these damages twice. The court awarded the sum of $130 million in disgorgement damages (representing the direct savings State Farm realized from use of non-OEM parts) and imposed a constructive trust on that sum. The court also awarded $600 million in punitive damages. The court granted declaratory relief, holding that State Farm was obligated to pay for crash parts of like kind and quality which restored a vehicle to its preloss condition. The court denied the prayer for injunctive relief, finding that there was an adequate remedy at law. Judgment was entered on the verdicts, but the court retained jurisdiction over the parties and the fund to enforce all provisions of the judgment, to administer the damages awarded, and to consider attorney fees. It is from this judgment that State Farm appeals.

### IV. Issues on Appeal

[The following text is nonpublishable under Supreme Court Rule 23.]

As a preliminary matter, we note that the record in this case contains more than 30,000 pages of pleadings and more than 13,000 pages of transcripts of the proceedings. We extended the page limitations of the briefs so that both parties would have an adequate opportunity to address the errors which State Farm identified as prejudicial. We also extended the time for oral argument. Though there may have been other issues that could have been identified, we will address only those issues raised in the appellate briefs.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

There are certain standards that the parties are required to meet when raising any issue on appeal. It is well

established that a court of review is entitled to have briefs submitted that are articulate and organized and present cohesive legal argument in conformity with our Supreme Court rules. *Schwartz v. Great Central Insurance Co.*, 188 Ill. App. 3d 264, 268, 544 N.E.2d 131, 133 (1989). A reviewing court is also entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; arguments inadequately presented on appeal are waived. *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill. 2d 389, 401, 515 N.E.2d 1222, 1227 (1987). Mere contentions without argument or citation of authority do not merit consideration on appeal (*Fuller v. Justice*, 117 Ill. App. 3d 933, 942, 453 N.E.2d 1133, 1139 (1983)), nor do statements unsupported by argument or citation of relevant authority. *Hutchings v. Bauer*, 212 Ill. App. 3d 172, 183, 571 N.E.2d 169, 176 (1991), *rev'd on other grounds*, 149 Ill. 2d 568, 599 N.E.2d 934 (1992). Contentions supported by some argument but by absolutely no authority do not meet the requirements of Supreme Court Rule 341(e)(7) (155 Ill. 2d R. 341(e)(7)). *In re Marriage of Drummond*, 156 Ill. App. 3d 672, 684, 509 N.E.2d 707, 716 (1987). We point out these requirements because in the argument portion of the briefs, nearly every issue argued contains multiple subissues consisting of a single sentence or paragraph. These subissues appear as naked assertions that are rarely clothed with citation to the record or to pertinent authority. Often these miniclaims also lack a developed argument. They appear from nowhere and then vanish in a twinkling, never to be heard of again. We will give these matters all the attention they deserve. None!

These rules have not changed in almost a century. "If the questions involved in a case are of sufficient importance to justify asking this court to decide them, they are worthy of careful consideration of counsel presenting them. If the case is not properly presented and the court is not given the benefit of precedents, there is a danger of a decision being rendered that will not be in harmony with the weight of authority. It is the duty of attorneys practicing in this court to present to the court the authorities supporting their views[] and to assist the court in reaching a correct conclusion." *Kelley v. Kelley*, 317 Ill. 104, 107, 147 N.E. 659 (1925). "Reviewing courts are entitled to have issues clearly defined [and] to be cited pertinent authorities and are not a depository in which an appellant is to dump the entire matter of pleadings, court action, argument[,] and research as it were, upon the court." *In re Estate of Kunz*, 7 Ill. App. 3d 760, 763, 288 N.E.2d 520, 523 (1972).

[The following text is nonpublishable under Supreme Court Rule 23.]

7

An objection to evidence must be timely made and must specify the reasons for the objection. *People v. Trefonas*, 9 Ill. 2d 92, 98, 136 N.E.2d 817, 820 (1956). In order to be timely, the objection must be made at the time the evidence is admitted. *Trefonas*, 9 Ill. 2d at 98, 136 N.E.2d at 820; *Johnson v. Hoover Water Well Service, Inc.*, 108 Ill. App. 3d 994, 1006, 439 N.E.2d 1284, 1293 (1982). It must designate the particular testimony considered objectionable and point out the objectionable features. *Trefonas*, 9 Ill. 2d at 98, 136 N.E.2d at 820. An objection to evidence on a specific ground is a waiver of objection on all grounds not specified. *Johnson*, 108 Ill. App. 3d at 1006, 439 N.E.2d at 1293. "The function of the objection is, first, to signify there is an issue of law, and, secondly, to give notice of the terms of the issue." *Trefonas*, 9 Ill. 2d at 98, 136 N.E.2d at 820. In addition, the theory upon which a case is tried in the lower court cannot be changed on review, and an issue not presented to or considered by a trial court cannot be raised for the first time on review. *Woman's Athletic Club of Chicago v. Hulman*, 31 Ill. 2d 449, 202 N.E.2d 528, 530 (1964).

The reasons behind the rules requiring timely and specific objections to be raised during the trial and in the posttrial motion are simple. See *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 349-50, 415 N.E.2d 337, 339 (1980). These rules allow the decision maker who is most familiar with the events of the trial, the trial judge, to review his decisions without the pressure of an ongoing trial and to grant a new trial if, on reconsideration, he concludes that his earlier decision was incorrect. *Brown*, 83 Ill. 2d at 349-50, 415 N.E.2d at 339. The rule requiring the statement of the specific grounds urged as support for the claim of error allows a reviewing court to ascertain from the record whether the trial court has been afforded an adequate opportunity to reassess the allegedly erroneous rulings, and it prevents the litigant from stating mere general objections and subsequently raising on appeal arguments that the trial judge was never given the opportunity to consider. *Brown*, 83 Ill. 2d at 349-50, 415 N.E.2d at 339. It promotes the accuracy of decision making and eliminates unnecessary appeals.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

During the trial and on appeal, the parties argued at length about whether the evidence at trial established that non-OEM parts were inferior to OEM parts, whether non-OEM parts were categorically inferior, and what other conclusions should be drawn from the evidence presented. It is not our function as a reviewing court to reweigh the

8

evidence. The rule we must apply in considering the evidence is as follows:

> "An initial step in analyzing the issue before us is to determine the authority of the jury, trial court, and appellate court[] and their relationship to one another. Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony. [Citation.] A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions[] or because the court feels that other results are more reasonable. [Citation.] Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 511-12 (1992).

We are compelled to view all the evidence and inferences therefrom in the light most favorable to the verdict winner. *Quality Granite Construction Co. v. Hurst-Rosche Engineers, Inc.*, 261 Ill. App. 3d 21, 632 N.E.2d 1139 (1994). Accordingly, that is the view we adopt in considering the questions of fact raised herein.

While State Farm has not properly preserved for review a number of the issues it has raised in its brief, we must remind the parties that the doctrine of waiver is an admonition upon the parties, not a restriction upon the jurisdiction of a reviewing court. *Hux v. Raben*, 38 Ill. 2d 223, 224, 230 N.E.2d 831, 832 (1967). A reviewing court, in its discretion, may consider issues not properly preserved by the parties, in the exercise of its responsibility to reach a just result and to maintain a sound body of precedent. *Hux*, 38 Ill. 2d at 225, 230 N.E.2d at 832; *Wagner v. City of Chicago*, 166 Ill. 2d 144, 148, 651 N.E.2d 1120, 1122 (1995). In this decision, we have pointed out a number of instances where an issue raised on appeal has, in fact, been waived, and then we have proceeded to address many of those issues on the merits. We did so in the interest of thoroughly considering the issues raised in this appeal. Our consideration of the merits did not change the outcome.

### A. The Class Certification

**[The following text is nonpublishable under Supreme Court Rule 23.]**

The class action lawsuit is a litigation tool that allows a representative party to pursue like claims of a large

9

number of people in one action where individual actions may be impracticable. *Brooks v. Midas-International Corp.*, 47 Ill. App. 3d 266, 271, 361 N.E.2d 815, 818 (1977). The class action mechanism is predicated on the inability of the court to entertain the actual appearance of all members of the class and the impracticality of having each class member prosecute his individual claim. *Miner v. Gillette Co.*, 87 Ill. 2d 7, 14, 428 N.E.2d 478, 482 (1981).

**[The preceding text is nonpublishable under Supreme Court Rule 23.]**

The policy objective behind the class action is to encourage individuals, who may otherwise lack incentive to file individual actions because their damages are limited, to join with others to vindicate their rights in a single action. *Hansberry v. Lee*, 311 U.S. 32, 41, 85 L. Ed. 22, 27, 61 S. Ct. 115, 118 (1940). In *Hoover v. May Department Stores Co.*, this court noted that class actions are particularly attractive in consumer-protection cases because individual suits are often not economically feasible. *Hoover v. May Department Stores Co.*, 62 Ill. App. 3d 106, 112, 378 N.E.2d 762, 768 (1978), *rev'd on other grounds*, 77 Ill. 2d 93, 395 N.E.2d 541 (1979). The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in recovery that is worthy of an attorney's time and costs of litigation and that provides some measure of restitution to the injured party and deterrence to the wrongdoer. See *Hoover*, 62 Ill. App. 3d at 112, 378 N.E.2d at 768; *Gordon v. Boden*, 224 Ill. App. 3d 195, 204, 586 N.E.2d 461, 467 (1991).

In order to maintain a class action in Illinois, the court must find that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of fact or law common to the class, (3) the representative parties will fairly and adequately protect the interests of the class, and (4) the class action is an appropriate method for the fair and efficient adjudication of the controversy. 735 ILCS 5/2-801 (West 1998).

The certification of a class is within the sound discretion of the trial court and will be disturbed only upon a clear abuse of discretion or application of impermissible legal criteria. *Slimack v. Country Life Insurance Co.*, 227 Ill. App. 3d 287, 292, 591 N.E.2d 70, 74 (1992). The scope of appellate review is limited to an assessment of the trial court's exercise of discretion and does not extend to an independent, *de novo* evaluation of the facts alleged to justify litigation of the case as a class action. *Carrao v. Health Care Service Corp.*, 118 Ill. App. 3d 417, 427, 454 N.E.2d 781, 789 (1983).

On appeal, State Farm claims that the trial court abused its discretion by certifying and thereafter failing to

decertify the class of millions of policyholders, because all prerequisites of the class action statute were not met.

State Farm does not actively dispute the trial court's finding that the class is so numerous that joinder of all members would be impractical. There is no question that litigating individual lawsuits would be a waste of judicial resources and that addressing common issues in one action would aid judicial administration. The fact that there may be many individual issues is relevant to the ultimate decision whether to certify the case as a class action. It is irrelevant to the numerosity and joinder element. Therefore, the first prerequisite of section 2-801 of the Code of Civil Procedure (Code) (735 ILCS 5/2-801 (West 1998)) is established. See *Gordon*, 224 Ill. App. 3d at 200, 586 N.E.2d at 464.

Turning to the second prerequisite, State Farm contends that class certification was improper because common questions of fact or law did not predominate over questions affecting only individual class members. State Farm argues that in order to determine whether each class member has a right to an award of damages under the breach-of-contract claim, there must be evidence concerning each member's repairs, including identification and evaluation of the damaged part and the specified replacement part, evidence of the vehicle's preloss condition, any affirmative defenses such as waiver or consent, and whether and the extent to which each member was damaged by the alleged breach.

As long as there are questions of fact or law common to the class and these predominate over questions affecting only individual members of the class, the provisions of subsection 2-801(2) (735 ILCS 5/2-801(2) (West 1992)) have been met. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 338, 371 N.E.2d 634, 643 (1977). A common question may be shown when the claims of the individual class members are based upon the common application of a statute or when the members are aggrieved by the same or similar conduct (*Miner*, 87 Ill. 2d at 19, 428 N.E.2d at 484-85) or a pattern of conduct (*Slimack*, 227 Ill. App. 3d at 299, 591 N.E.2d at 78; *Purcell & Wardrope Chartered v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1077, 530 N.E.2d 994, 1000 (1988)). Satisfaction of the prerequisite pertaining to predominating common questions of fact or law necessitates a showing that successful adjudication of the purported class representatives' individual claims will establish a right of recovery or resolve a central issue on behalf of the class members. *Society of St. Francis v. Dulman*, 98 Ill. App. 3d 16, 18, 424 N.E.2d 59, 61 (1981). The fact that the class members' recoveries may be in varying amounts which must be determined separately does not

11

necessarily mean that there is no predominate common question. *Society of St. Francis*, 98 Ill. App. 3d at 18, 424 N.E.2d at 61; *McCarthy v. LaSalle National Bank & Trust Co.*, 230 Ill. App. 3d 628, 634, 595 N.E.2d 149, 153 (1992).

The record demonstrates that plaintiffs presented evidence to show that State Farm made the same promise (*i.e.*, to pay for parts "of like kind and quality" to restore "pre-loss condition") to its policyholders throughout the country. State Farm's own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders. This promise was to specify parts of like kind and quality to OEM parts so as to restore preloss condition. State Farm devised a nationwide policy mandating the use of non-OEM parts in its insureds' property-damage claims if those parts were cheaper and available. It also established uniform procedures to implement that policy, while simultaneously denying its claims estimators any discretion to substitute OEM parts for non-OEM parts. Each class member had received an estimate from State Farm specifying non-OEM replacement parts. Plaintiffs claimed that the non-OEM parts specified by State Farm were categorically inferior and failed to restore the vehicles to their "pre-loss condition". The claim was supported with expert testimony, from which it could be reasonably inferred, if accepted as true, that the lot of non-OEM parts specified by State Farm was inferior in terms of appearance, fit, quality, function, durability, and performance.

In regard to the consumer-fraud claim, the record contained evidence that State Farm engaged in an ongoing course of conduct nationwide, in which it specified inferior non-OEM parts whenever those parts were cheaper and available, that State Farm knew those parts were inferior, that State Farm did not inform its policyholders of the problems with those parts, and that State Farm affirmatively misrepresented the condition of those parts by assuring policyholders—on the damage estimates and in brochures—that it specified only "quality replacement parts" and that it guaranteed the parts at no additional cost.

In the certification order, the trial court found that there were factual and legal issues regarding the breach-of-contract and consumer-fraud claims common to all class members, which predominated over other issues. There was ample support for the court's finding that there were questions of fact regarding the breach-of-contract and deceptive claims practices common to the class. See *Miner*, 87 Ill. 2d at 19, 428 N.E.2d at 484-85; *Gordon*, 224 Ill. App. 3d at 200-02, 586 N.E.2d at 465. The fact that a different conclusion might be arguable does not diminish the deference we

12

must give to decision of the trial court.

State Farm next asserts that it was error to certify a nationwide consumer-fraud class because the claims of non-Illinois class members are governed by varying consumer-fraud laws in 48 states. We reject this argument for several reasons. First, the question of whether laws of different states apply to specific transactions alleged in a class action does not ordinarily prevent certification of the class. *Gordon*, 224 Ill. App. 3d at 202, 586 N.E.2d at 466; *Purcell*, 175 Ill. App. 3d at 1075, 530 N.E.2d at 998. Illinois courts have found class actions maintainable in situations where the class includes the residents of other states. See *Landesman v. General Motors Corp.*, 42 Ill. App. 3d 363, 356 N.E.2d 105 (1976), *vacated & rem'd on other grounds*, 72 Ill. 2d 44, 377 N.E.2d 813 (1978); *Hoover*, 62 Ill. App. 3d at 112, 378 N.E.2d at 768. The CFA does not limit its application to resident consumers. To deny an out-of-state plaintiff a remedy against a resident of Illinois would violate the legislative directive that the CFA be liberally construed to achieve its remedial purposes. Non-Illinois consumers have been permitted to pursue an action under the CFA against a resident defendant where the deceptive acts and practices were perpetrated in Illinois. See *Martin v. Heinold Commodities, Inc.*, 117 Ill. 2d 67, 83, 510 N.E.2d 840, 847 (1987).

Second, the circuit court found that there were no true conflicts between the substantive laws of Illinois and those of the other states whose residents were part of the class. After reviewing those portions of the insurance statutes pertaining to the use of non-OEM parts and the consumer-protection statutes contained in this record, we have concluded that State Farm's deceptive practices were neither specifically authorized nor in compliance with the laws in any of the 48 states. In addition, the public policy espoused in the laws of our sister states does not conflict with the public policy of Illinois. Former and current representatives of state insurance commissioners testified that the laws in many of our sister states permit and in some cases encourage the use of non-OEM parts as an effort to encourage competitive price control. But each witness admitted unequivocally that his respective state would not sanction the use of *inferior* aftermarket replacement parts.

· State Farm has not identified any state that authorizes an insurer to specify inferior replacement parts. State Farm has not demonstrated that its conduct is authorized by any other state's laws nor that compliance with the substantive laws of Illinois would lead it to violate a law or regulation imposed by any other state. We also reject State

13

Farm's argument that the application of the CFA to "transactions occurring in other states" violates interstate commerce and the sovereignty of those states. The resolution of this case under Illinois law does not violate another state's sovereignty, nor is interstate commerce adversely impacted. The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states. There is no showing that a conflict exists between the laws of Illinois and our sister states regarding the use of inferior aftermarket parts.

Third, Illinois has significant contacts to the claims asserted by each class member. See *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22, 86 L. Ed. 2d 628, 648, 105 S. Ct. 2965, 2980 (1985). Plaintiffs' complaint was predicated on identical promises made in standard-form insurance contracts issued to policyholders throughout the country and upon a claims practice that was uniform nationally. This action was filed against a company chartered and headquartered in Illinois. There is substantial evidence the deceptive claims practices were designed, established, and initiated from State Farm's corporate headquarters in Bloomington, Illinois, and dictated and disseminated to State Farm employees nationwide. Illinois has a legitimate interest in applying its law to adjudicate this dispute and to insure that its residents comply with its consumer-protection laws while serving Illinois and out-of-state consumers. See *Martin*, 117 Ill. 2d at 82, 510 N.E.2d at 846-47. State Farm has not demonstrated that Illinois courts would lack jurisdiction to adjudicate or would decline to apply the substantive law of Illinois to a consumer-fraud or contract action filed by an individual out-of-state policyholder on these facts. In our view, Illinois has sufficient contacts so that the application of its consumer-fraud laws to all class claimants is neither unfair nor a violation of due process. See *Martin*, 117 Ill. 2d at 82, 510 N.E.2d at 846-47; *Gordon*, 224 Ill. App. 3d at 202, 586 N.E.2d at 466.

State Farm also contends that individualized proofs were necessary to determine which class members had non-OEM parts installed on their vehicles, to determine the quality of the non-OEM parts specified and the preloss condition of class members vehicles, to assert affirmative defenses, and to establish the nature and extent of the damages on each insured vehicle and that these questions predominate over questions common to class members.

In Illinois, a class action is appropriate if common questions predominate over individual questions. *Steinberg*, 69 Ill. 2d at 338, 371 N.E.2d at 643. Once this determination has been made, the hypothetical existence

14

of individual defenses and the need for individual proofs on subsidiary questions will not overcome the predominate common question and defeat the class. *Harrison Sheet Steel Co. v. Lyons*, 15 Ill. 2d 532, 538, 155 N.E.2d 595, 598 (1959). We are not convinced that individual questions regarding affirmative defenses identified by State Farm amount to anything more than hypothetical questions. Moreover, a number of these individual questions have been satisfactorily addressed by the trial court or lack evidentiary support in the record.

According to the record, State Farm maintains a central database from which past and present policyholders can be identified and a claims history can be established. Thus, through its own records State Farm is capable of identifying class members who have had non-OEM parts installed on their vehicles. The fact that individual determinations as to damages will be necessitated (because some class members may be awarded both specification damages and installation damages while others may be awarded only specification damages) will not defeat the class. Common issues of State Farm's contractual and statutory violations predominate. See *Gordon*, 224 Ill. App. 3d at 202-03, 586 N.E.2d at 466.

The condition of non-OEM parts specified by State Farm was subject to class-wide proofs. According to plaintiffs' theory, these non-OEM parts were categorically inferior. Plaintiffs also presented evidence to show that State Farm did not factor a vehicle's preloss condition into the damage assessment process and into the selection and specification of replacement parts. State Farm notes that it presented evidence of the preloss condition of some of the class representatives' vehicles. However, State Farm does not point to any evidence in the record to show that the preloss condition was a factor in the damage estimates. It has not claimed that in specifying repair parts, it sought to duplicate any preloss damage to that vehicle. State Farm does not contend, for example, that if a fender had a dent prior to an accident, its practice was to require the body shop to dent the replacement part or to specify a dented replacement fender on the estimate. To the contrary, the unequivocal and singular conclusion that could be drawn from the evidence is that when a property damage claim was made, State Farm did not concern itself with trying to duplicate preloss injury or damage. Preloss condition played no part in specification of replacement parts on class members vehicles. Given this policy of State Farm's indifference to preloss condition when it specified replacement parts, requiring plaintiffs to present proof of preloss condition would have been pointless. State Farm did not consider this

15

in its claim practice. The evidence would have been irrelevant. Only relevant evidence is admissible. "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." *Marut v. Costello*, 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769 (1965).

State Farm has not identified in this record any offer of proof to show that it could establish individual affirmative defenses. We note that State Farm argued that statutes in a few states required the policyholder to consent to the use of non-OEM parts. State Farm failed to produce evidence that any policyholder from any of those states had in fact consented to the use of inferior non-OEM parts. State Farm points out that one of its claims agents testified that one policyholder requested less expensive non-OEM parts. It failed, however, to present evidence showing that the policyholder had in fact consented with knowledge that the parts were inferior in quality and condition.

Where a complaint is made that the trial court's ruling precluded the presentation of evidence to support a claim or defense, the nature and context of the evidence must be disclosed. This disclosure through an offer of proof allows the trial and appellate courts to evaluate the proposed evidence and consider its relevance to the matters at issue. *Holder v. Caselton*, 275 Ill. App. 3d 950, 657 N.E.2d 680 (1995). Unless the offer of proof is excused because it is apparent from the context, the failure to make an offer of proof precludes raising the issue on appeal. *Tarshes v. Lake Shore Harley Davidson*, 171 Ill. App. 3d 143, 524 N.E.2d 1136 (1988). Merely alluding to what might be divulged does not preserve error for appeal. *People v. Brown*, 104 Ill. App. 3d 1110, 433 N.E.2d 1081 (1982). The issue is waived. Nevertheless, to the extent possible based on the record, we have considered the issue.

On this record, there is not sufficient evidence to support the affirmative defenses alleged. The need for individual proofs on subsidiary issues did not predominate over questions common to the class. See *Harrison Sheet Steel Co.*, 15 Ill. 2d at 538, 155 N.E.2d at 598. In addition, State Farm has not shown that its opportunity to defend any individual issues was impaired or that it suffered great inconvenience by litigating those issues in a single action instead of in separate actions. *Harrison Sheet Steel Co.*, 15 Ill. 2d at 538, 155 N.E.2d at 598. Stated simply, the proof at trial did not support State Farm's claim. The second prerequisite has been met.

Turning to the third prerequisite, State Farm contends the class representatives do not fairly and adequately protect the interests of the class. State Farm argues that because it is a mutual fund, there is a conflict between class

16

members, in that current policyholders have an interest in keeping damage awards low and in continuing the use of non-OEM parts in order to keep premium costs down, while former policyholders have no such interest.

The purpose of the adequate-representation requirement is to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim. *Gordon*, 224 Ill. App. 3d at 203, 586 N.E.2d at 466. The record does not support State Farm's claim that the interests of some class members are antithetical to the interests of others. State Farm's actuary testified that any damages awarded would be paid from the company's reserves and would not affect premiums and that the amount awarded would not affect the company's financial viability or its ability to pay dividends or future claims. Further, there is no evidence that any of the policyholders, past, present, or future, would approve of or encourage State Farm to continue to specify inferior crash parts on repairs of their own cars. The party representatives and the absent class members share a common interest in establishing the essential elements sought to be litigated on behalf of the class. On this record, the trial court properly concluded that there was no conflict among class members. See *Slimack*, 227 Ill. App. 3d at 299-300, 591 N.E.2d at 78.

There is no doubt that the attorneys representing the plaintiff class are qualified and experienced. From our review of the record, class counsel appeared to be prepared and well-versed in the facts and the applicable law. Accordingly, we cannot say that the trial court abused its discretion in finding that the class representatives would adequately protect the interests of the class.

As to the final requirement, State Farm alleges that the trial court erred by focusing on the statutory requirement of efficiency and ignoring the requirement that a class action must be a fair way to adjudicate the controversy. We disagree with the claim that the trial court ignored this requirement. The trial court carefully considered whether each party would be able to fairly present its case and whether a class action best served the economies of time, effort, and expense, while promoting uniformity of decision in contract interpretation. It concluded that these requirements could be and were met. See *Steinberg*, 69 Ill. 2d at 339, 371 N.E.2d at 644; *Gordon*, 224 Ill. App. 3d at 203, 586 N.E.2d at 466. We find no abuse of discretion.

Based upon even a cursory review of this record, there is little doubt that any individual cases would be

17

defended as vigorously as the case at bar. The costs of pursing the case on an individual basis would greatly exceed any recovery. See *Gordon*, 224 Ill. App. 3d at 203-04. 586 N.E.2d at 467. Accordingly, we find that the prerequisites of the class action statute have been met and that the circuit court did not abuse its discretion in certifying and in refusing to decertify the class.

## B. The Notice

### [The following text is nonpublishable under Supreme Court Rule 23.]

State Farm contends that the trial court failed to provide proper notice to the class. State Farm argues that the court's refusal to order plaintiffs to mail individual notices to the 1.8 million class members whose names and addresses could be identified requires the reversal of the judgment.

Section 2-803 of the Code gives the trial court discretion to order such notice as it deems necessary to protect the interests of the class and the parties. 735 ILCS 5/2-803 (West 1998). The question of what notice must be given to absent class members to satisfy due process depends upon the circumstances of the individual action. *Miner*, 87 Ill. 2d at 15, 428 N.E.2d at 482. Neither due process nor the Illinois class action statute requires individual notice to all members of the class in all circumstances. *Carrao*, 118 Ill. App. 3d at 429-30, 454 N.E.2d at 791.

In this case, the trial court reviewed proposals and considered the expert-opinion evidence offered by each party. The court determined that plaintiffs' proposed notice plan provided the best practicable notice. The court rejected State Farm's proposal calling for individual notices because State Farm did not show that it could generate a reasonably accurate list of the names and addresses of potential class members within a reasonable time period. State Farm represented that it could provide either a markedly underinclusive list of policyholders who qualified as class members or an overinclusive list of policyholders who may fit within the class definition. Given this fact, along with the absence of any evidence of antagonism between the interests of the class members and the representative parties, we cannot say that the trial court abused its discretion in opting for the publication notice suggested by plaintiffs. See *Carrao*, 118 Ill. App. 3d at 429-30, 454 N.E.2d at 791.

### [The preceding text is nonpublishable under Supreme Court Rule 23.]

## C. Damages

*1. Direct and Consequential Damages*

In its next point, State Farm claims that the trial court erred in accepting improper damages theories, in accepting or rejecting jury instructions regarding plaintiffs' burden of proof, and in admitting baseless opinion testimony. State Farm alleges that the trial court permitted the plaintiffs to take "short cuts to paper over their inability to present any real class-wide proof" and claims that it committed these errors because of its "desire to preserve the case as a class action". We will address each point in turn. Before addressing these issues, we feel obligated to caution counsel that an appeal is not a license to vilify the trial court. Several comments in this portion of State Farm's brief approach criticism that is inappropriate. Counsel should be mindful of the obligation to temper advocacy with civility. See *Ambrosius v. Katz*, 2 Ill. 2d 173, 179-80, 117 N.E.2d 69, 73 (1954). We believe that these brief remarks are sufficient. We will now move on.

State Farm contends that the specification-damages model is legally flawed because OEM replacement parts were installed in the vehicles of many State Farm policyholders despite the fact that the damage estimates specified non-OEM parts. State Farm contends that these class members have incurred no actual damages because the body shop installed OEM parts at no additional charge. State Farm also alleges that class members who sold their vehicles for fair market value subsequent to the installation of non-OEM parts suffered no actual damages.

Under Illinois law, a contracting party has the right to receive the value of the benefit of his bargain, *i.e.*, the amount that will compensate him for the loss which a fulfillment of the contract would have prevented or the loss which the breach of contract has entailed. See *Lanterman v. Edwards*, 294 Ill. App. 3d 351, 354, 689 N.E.2d 1221, 1224 (1998); *Illiana Machine & Manufacturing Corp. v. Duro-Chrome Corp.*, 152 Ill. App. 3d 764, 768, 504 N.E.2d 974, 976-77 (1987). In cases where the breach involved defective performance in the furnishing of goods or services, the measure of damages is the cost of remedying the deficiencies. *Kalal v. Goldblatt Brothers. Inc.*, 53 Ill. App. 3d 109, 112, 368 N.E.2d 671, 674 (1977).

In this case, plaintiffs theorized that as a result of the contract breach State Farm policyholders had suffered direct damages ("specification damages"), consequential damages ("installation damages"), or both. Specification damages were intended to compensate those policyholders who received estimates specifying non-OEM replacement

19

parts. Specification damages were calculated as the cost difference between the OEM part and the non-OEM part.

There is no question that a class member is entitled to specification damages if an inferior non-OEM part was specified and a class member paid out-of-pocket for an OEM part. A class member is also entitled to specification damages if an inferior non-OEM part was specified and the body shop provided an OEM part at no additional cost to the class member. Why? Because the class member has not received the benefit of his bargain. The benefits received from a source wholly independent of and collateral to the breaching party do not diminish damages otherwise recoverable. See *American Fidelity Fire Insurance Co. v. General Ry. Signal Co.*, 184 Ill. App. 3d 601, 617, 540 N.E.2d 557, 568 (1989). The collateral-source rule has been applied in contract law in Illinois in cases where there has been an element of fraud, tort, or wilfulness in breaching the contract. See *American Fidelity Fire Insurance Co.*, 184 Ill. App. 3d at 617, 540 N.E.2d at 568; *GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill. App. 3d 966, 977, 420 N.E.2d 659, 668 (1981).

In this case there is evidence the breaching party wilfully engaged in deceptive practices that deprived the policyholder of the benefit of his bargain. State Farm cannot be relieved of its duty to pay damages for breach of contract based upon the gratuitous action of a third party that may have mitigated the damages. Allowing State Farm to avoid paying damages because an individual body shop installed a quality part rather than the inferior non-OEM part State Farm specified would contravene the collateral-source rule. It must be remembered that plaintiffs claimed that all non-OEM parts were categorically inferior. State Farm denied this claim. Plaintiffs won. We are compelled to view the evidence in the light most favorable to the verdict winner. *Quality Granite Construction Co.*, 261 Ill. App. 3d 21, 632 N.E.2d 1139. Therefore, this group is entitled to specification damages.

The next question is whether class members who received non-OEM parts but subsequently sold their vehicles for fair market value are entitled to specification damages. Again the answer is yes. According to plaintiffs' proofs, the damages were not of an ongoing nature; thus, the time to evaluate damages was at the time of the breach. See generally *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Ass'n*, 97 Ill. App. 3d 22, 31-32, 421 N.E.2d 1375, 1382 (1981). State Farm's promise to pay for parts "of like kind and quality" to restore the vehicle to its "pre-loss condition" was breached when it specified and paid for inferior non-OEM parts. This point is reinforced by the

20

repeated refrain of State Farm's counsel that State Farm "does not fix cars", it merely specifies replacement parts and pays for car repairs. The fact that a class member sold his vehicle at or below the fair market value months or years later does not negate the fact that he was damaged.

[The following text is nonpublishable under Supreme Court Rule 23.]

Each policyholder paid a premium for an insurance policy. In each policy, State Farm made certain promises to each insured. Did the policyholder get his or her money's worth? The jury decided that the answer was no. The verdict is an unequivocal statement that the parts were not of like kind and quality and did not restore preloss condition. Installation of these categorically inferior parts deprived each insured of the benefit of the bargain.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

State Farm next contends that the award of installation damages was wholly speculative. State Farm argues that a class member is eligible to receive installation damages only if a non-OEM part was installed in his vehicle and he still has the vehicle. State Farm argues that in the absence of individual proofs there is no competent evidence to show which class members are eligible for installation damages. It claims that the damage calculations prepared and testified to by plaintiffs' expert were baseless in fact and speculative.

The amount of damages is ordinarily left to the jury, and its judgment should not be upset unless it appears motivated by passion or prejudice. *Cannell v. State Farm Fire & Casualty Co.*, 25 Ill. App. 3d 907, 914, 323 N.E.2d 418, 423 (1975). Damages sought to be recovered must be shown with reasonable certainty as to their nature and extent, but the amount awarded does not have to be proved with mathematical certainty. *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 541, 623 N.E.2d 981, 1001 (1993). The law does not require better evidence than can be reasonably obtained (*Cannell*, 25 Ill. App. 3d at 914, 323 N.E.2d at 423), but the party seeking to recover bears the burden of establishing a reasonable basis for the computation of damages. *E.J. McKernan Co.*, 252 Ill. App. 3d at 541, 623 N.E.2d at 1001.

Class-wide consequential damages, referenced as installation damages, were intended to compensate class members for the labor costs to remove a non-OEM part and to replace it with an OEM part and for a two-day rental car fee for loss of use of the vehicle during the repair process. Plaintiffs' expert, Dr. Mathur, testified that he used

21

hours-per-job and the labor rates reflected in State Farm's own records and principles of economics to calculate the installation damages that each eligible class member sustained. In his opinion, each eligible class member sustained approximately $276 in damages as a result of labor costs and loss of use. Dr. Mathur also testified that he estimated the number of class members eligible for installation damages based, in part, on State Farm's repair records and reinspection studies that it had done. Dr. Mathur estimated that between 50% and 92% of the damaged vehicles were repaired with non-OEM parts. He calculated a damages range based upon his estimate of the number of class members who actually received non-OEM parts. Dr. Mathur testified to aggregate installation damages of $1.2 billion based on 92% eligibility and $658 million based upon a 50% eligibility. During cross-examination, Dr. Mathur admitted that his high estimate could be off by as much as a billion dollars. Apparently, State Farm's cross-examination and argument were not lost on the jury. It awarded $212 million in installation damages, approximately one billion less than the expert's estimate.

In this issue, State Farm is questioning the validity of the concept of aggregate damages in class action litigation. State Farm suggests that extrapolation from a representative sample of class members leads to a speculative reflection of total damages. However, sampling techniques have been found to be an appropriate method for class-wide proof of damages. See 2 Newberg, Class Actions 350-51 (1985) (citing cases). In appropriate circumstances, it is considered feasible and reasonable to prove aggregate monetary relief for the class based upon (1) an examination of defendant's records, (2) the use of a common formula or measure of damages multiplied by the number of transactions. units. or class members involved, or (3) a reasonable approximation with proper adherence to recognized evidentiary standards. See 2 Newberg, Class Actions 348 (1985); *Long v. Trans World Airlines. Inc.*, 761 F. Supp. 1320, 1324 (N.D. Ill. 1991), *aff'd on other grounds*, 913 F.2d 1262 (7th Cir. 1990). When determining which method to use. courts must be careful to balance the opposing interests of the parties, and a defendant must be given fair opportunity to contest the validity of individual claims. See 2 Newberg, Class Actions 348 (1985).

· Dr. Mathur's estimate of the number of class members eligible for installation damages was extrapolated from data found in State Farm's own records. Class-wide awards based upon estimates of the number of affected class members have been approved in the past, and mathematical precision has not been required. See, *e.g.*, *Thomas v. City*

*of Evanston*, 610 F. Supp. 422, 435-36 (N.D. Ill. 1985). In this case, the trial court has reserved jurisdiction to administer and distribute damages. Class members entitled to installation damages can be identified through State Farm's data, class response forms, and other methods. Damages can then be distributed accordingly. See *Gordon*, 224 Ill. App. 3d at 204-05, 586 N.E.2d at 467-68. We trust that the trial court, in consultation with the parties, can devise an acceptable method to manage and distribute the class-wide damages. Given the amount of the jury's award and the fact that eligible class members can be identified, we see little danger that ineligible class members will receive a share of this award.

Dr. Mathur's calculations of labor costs and rental fees were based upon economic principles and data accepted in the field. Though his calculations contain some uncertainty, we do not think that his opinions constitute sheer speculation. *E.J. McKernan Co.*, 252 Ill. App. 3d at 540-41, 623 N.E.2d at 1001; *Oakleaf of Illinois v. Oakleaf & Associates, Inc.*, 173 Ill. App. 3d 637, 649, 527 N.E.2d 926, 934 (1988). The jury considered the conflicting expert opinions and the evidence and awarded a sum well below plaintiffs' expert's minimum figure. There is no evidence that the award was motivated by passion or prejudice. We do not find the award to be against the manifest weight of the evidence.

[The following text is nonpublishable under Supreme Court Rule 23.]

### 2. Instructional Errors

State Farm next contends that the burden-of-proof instruction and verdict forms were misleading or confusing. It claims that the verdict forms were improper because they permitted the jury to render a verdict for the class as a whole, rather than to render a separate verdict as to each class member. State Farm also claims that the burden-of-proof instruction was improper because it did not inform the jury that in order for the jury to find for plaintiff on the contract claim, the plaintiffs had to prove that each individual non-OEM part specified was of inferior quality.

The parties have the right to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict. *Magna Trust Co. v. Illinois Central R. Co.*, 313 Ill. App. 3d 375, 388, 728 N.E.2d 797, 808 (2000). Whether to give or deny an instruction is within the trial court's sound discretion. *Magna Trust Co.*, 313 Ill. App. 3d at 388, 728 N.E.2d at 808. The standard for determining an

23  \

abuse-of-discretion issue is whether, taken as a whole, the jury instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law. *Magna Trust Co.*, 313 Ill. App. 3d at 388, 728 N.E.2d at 808.

The burden-of-proof instruction that was given is taken directly from the Illinois pattern jury instructions. Illinois Pattern Jury Instructions, Civil, No. 700.19 (1995 ed.). The rejected burden-of-proof instruction tendered by State Farm required the jury to consider affirmative defense theories based upon consent, waiver, and satisfaction even though there was no evidence to support those theories. It is error to give an instruction not based on the evidence. *Bielicke v. Terminal R.R. Ass'n*, 291 Ill. App. 3d 690. 693, 684 N.E.2d 160, 162 (1997). Not only was there no evidence to support the instruction, but there was not even a suggestion through an offer of proof of what evidence might be available. The issue is waived. See *Tarshes v. Lake Shore Harley Davidson*, 171 Ill. App. 3d 143. 524 N.E.2d 1136 (1988). More significant is that the fact that the defenses identified are not true affirmative defenses. given the posture taken by State Farm in this case. While there is no question that in a proper case waiver, consent. and satisfaction may constitute affirmative defenses. such was not the case here.

Plaintiffs claimed that the specified non-OEM parts were categorically inferior. State Farm denied this at trial and continues to deny this aspect of the case. It is appropriate to consider one of our prior decisions dealing with this type of situation.

"Additionally, we are of the opinion that defendants' 'affirmative defenses' were not true affirmative defenses. A defense is of an affirmative nature if. by the raising of it, a defendant gives color to his opponent's claim and then asserts new matter by which the apparent right is defeated. (*Horst v. Morand Brothers Beverage Co.* (1968). 96 Ill. App. 2d 68, 80, 237 N.E.2d 732, 738.) The instant 'affirmative defenses' were merely specific reasons to support defendants' denials of liability. These 'affirmative defenses' neither admitted any part of plaintiff's case nor introduced any new matter which would have defeated plaintiff's. contentions. *Zieger v. Manhattan Coffee Co.*, 112 Ill. App. 3d 518, 533, 445 N.E.2d 844, 855 (1983).

State Farm is not entitled to claim that the parts are not inferior and at the same time claim that the policyholder waived any objection to the use of inferior parts. Had State Farm acknowledged either unequivocally or. in the alternative. conditionally that non-OEM parts were categorically inferior and then presented evidence that a State

24

Farm policyholder with knowledge of the inferior condition had agreed to the use of the inferior non-OEM parts, then there would have been record support factually and legally for the instruction. This was not the case and therefore State Farm's burden-of-proof instruction was properly refused.

To preserve its objection to plaintiffs' burden-of-proof instruction, State Farm was required to clearly and specifically state the grounds for its objection and to tender a *proper* alternative instruction. See *Deal v. Byford*, 127 Ill. 2d 192, 202, 537 N.E.2d 267, 271 (1989). State Farm has waived this issue because it did not tender a correct burden-of-proof instruction.

Thus, this claim of instructional error was waived on multiple grounds. After giving due consideration to the facts and the law, the trial court gave the pattern instructions as required by Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a)). Plaintiffs' theory of the breach was based upon the categorical inferiority of the non-OEM crash parts that State Farm specified on the repair estimates. Plaintiffs presented evidence that the non-OEM parts specified did not comport with the design and materials specifications used in manufacturing original equipment parts and the preassembly treatment of materials used in non-OEM parts was deficient, leading to problems of fit, durability, quality, and appearance in aftermarket crash parts. There was sufficient evidence to support plaintiffs' theory of categorical inferiority of non-OEM parts. Accordingly the trial court's decision to give the pattern burden-of-proof instruction was not an abuse of discretion.

State Farm argues that the jury should have been required to render a separate verdict as to each class representative's claim. The form of the verdicts is a matter within the sound discretion of the trial court, and its determination thereon will not be disturbed in the absence of an abuse of that discretion. *Kennedy v. Commercial Carriers, Inc.*, 294 Ill. App. 3d 34, 39, 689 N.E.2d 293, 296 (1997). In *Kennedy*, our colleagues in the first district determined that separate verdict forms were not required in a class action based upon a claim that the defendant had breached its equipment leases with each plaintiff and class member. *Kennedy*, 294 Ill. App. 3d at 40, 689 N.E.2d at 297. In that case, the plaintiffs claimed a common breach and submitted damages on a class-wide basis. Separate verdict forms were not required because there were not separate causes of action based upon separate transactions, involving subclasses. *Kennedy*, 294 Ill. App. 3d at 40, 689 N.E.2d at 297.

25

The record shows that this case was tried on behalf of a single class, without subclasses, on a single theory of liability in a breach-of-contract action. The case was tried on an issue common to all class members. The common issue was whether State Farm breached its contract by specifying inferior non-OEM parts. This was not a case where the plaintiffs' representatives sought to recover damages based upon distinct demands in the same complaint. Considering the record before us and keeping in mind the objective of the class action lawsuit, we do not believe that separate verdicts as to each individual class representative were appropriate. The trial court did not abuse its discretion in giving class-wide verdict forms.

State Farm also contends that the trial court erred in failing to give a series of non-IPI instructions. The contested instructions are not Illinois pattern instructions. It is improper to give a non-IPI instruction when a pattern instruction on the same subject is available. Where a unique factual situation or point of law is presented, a nonpattern instruction may be given if it is accurate and will not have an improper effect on the jury. See *Magna Trust Co.*, 313 Ill. App. 3d at 388, 728 N.E.2d at 808. A trial court may also give supplementary instructions to the jury to prevent confusion or to clarify an issue. *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 489, 473 N.E.2d 1322, 1344 (1985).

Proposed Instruction No. 30 states that the jury must determine the preloss condition of the vehicle in order to determine whether a non-OEM part restored that vehicle to its preloss condition. An instruction may be given when evidence exists to support the theory of the instruction, but it is error to given an instruction not based on the evidence. *Bielicke*, 291 Ill. App. 3d at 693, 684 N.E.2d at 162. In this case, plaintiffs' evidence showed that State Farm did not use the preloss condition as a factor in adjusting a claim and in determining what replacement part to specify. State Farm presented no evidence to suggest that preloss condition was a factor in the specification of replacement parts. As stated earlier, because State Farm did not consider preloss condition in specifying the replacement part, the entire argument concerns an irrelevant matter. See *Marut v. Costello*, 34 Ill. 2d 125, 128, 214 N.E. 2d 768, 769 (1965). Since there was no evidence to support the theory of the instruction, the trial court properly refused it.

· State Farm's proposed Instruction No. 26 states that the verdict must be for State Farm and against all class members if plaintiffs failed to prove that State Farm breached its contracts with each and every member of the class. Instruction Nos. 28, 28A, and 28B state that the verdict must be for State Farm if plaintiffs failed to prove that each

26

abuse-of-discretion issue is whether, taken as a whole, the jury instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law. *Magna Trust Co.*, 313 Ill. App. 3d at 388, 728 N.E.2d at 808.

The burden-of-proof instruction that was given is taken directly from the Illinois pattern jury instructions. Illinois Pattern Jury Instructions, Civil, No. 700.19 (1995 ed.). The rejected burden-of-proof instruction tendered by State Farm required the jury to consider affirmative defense theories based upon consent, waiver, and satisfaction even though there was no evidence to support those theories. It is error to give an instruction not based on the evidence. *Bielicke v. Terminal R.R. Ass'n*, 291 Ill. App. 3d 690, 693, 684 N.E.2d 160, 162 (1997). Not only was there no evidence to support the instruction, but there was not even a suggestion through an offer of proof of what evidence might be available. The issue is waived. See *Tarshes v. Lake Shore Harley Davidson*, 171 Ill. App. 3d 143, 524 N.E.2d 1136 (1988). More significant is that the fact that the defenses identified are not true affirmative defenses, given the posture taken by State Farm in this case. While there is no question that in a proper case waiver, consent, and satisfaction may constitute affirmative defenses, such was not the case here.

Plaintiffs claimed that the specified non-OEM parts were categorically inferior. State Farm denied this at trial and continues to deny this aspect of the case. It is appropriate to consider one of our prior decisions dealing with this type of situation.

"Additionally, we are of the opinion that defendants' 'affirmative defenses' were not true affirmative defenses. A defense is of an affirmative nature if, by the raising of it, a defendant gives color to his opponent's claim and then asserts new matter by which the apparent right is defeated. (*Horst v. Morand Brothers Beverage Co.* (1968), 96 Ill. App. 2d 68, 80, 237 N.E.2d 732, 738.) The instant 'affirmative defenses' were merely specific reasons to support defendants' denials of liability. These 'affirmative defenses' neither admitted any part of plaintiff's case nor introduced any new matter which would have defeated plaintiff's contentions. *Zieger v. Manhattan Coffee Co.*, 112 Ill. App. 3d 518, 533, 445 N.E.2d 844, 855 (1983).

State Farm is not entitled to claim that the parts are not inferior and at the same time claim that the policyholder waived any objection to the use of inferior parts. Had State Farm acknowledged either unequivocally or, in the alternative, conditionally that non-OEM parts were categorically inferior and then presented evidence that a State

24

Farm policyholder with knowledge of the inferior condition had agreed to the use of the inferior non-OEM parts, then there would have been record support factually and legally for the instruction. This was not the case and therefore State Farm's burden-of-proof instruction was properly refused.

To preserve its objection to plaintiffs' burden-of-proof instruction, State Farm was required to clearly and specifically state the grounds for its objection and to tender a *proper* alternative instruction. See *Deal v. Byford*, 127 Ill. 2d 192, 202, 537 N.E.2d 267, 271 (1989). State Farm has waived this issue because it did not tender a correct burden-of-proof instruction.

Thus, this claim of instructional error was waived on multiple grounds. After giving due consideration to the facts and the law, the trial court gave the pattern instructions as required by Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a)). Plaintiffs' theory of the breach was based upon the categorical inferiority of the non-OEM crash parts that State Farm specified on the repair estimates. Plaintiffs presented evidence that the non-OEM parts specified did not comport with the design and materials specifications used in manufacturing original equipment parts and the preassembly treatment of materials used in non-OEM parts was deficient, leading to problems of fit, durability, quality, and appearance in aftermarket crash parts. There was sufficient evidence to support plaintiffs' theory of categorical inferiority of non-OEM parts. Accordingly the trial court's decision to give the pattern burden-of-proof instruction was not an abuse of discretion.

State Farm argues that the jury should have been required to render a separate verdict as to each class representative's claim. The form of the verdicts is a matter within the sound discretion of the trial court, and its determination thereon will not be disturbed in the absence of an abuse of that discretion. *Kennedy v. Commercial Carriers, Inc.*, 294 Ill. App. 3d 34, 39, 689 N.E.2d 293, 296 (1997). In *Kennedy*, our colleagues in the first district determined that separate verdict forms were not required in a class action based upon a claim that the defendant had breached its equipment leases with each plaintiff and class member. *Kennedy*, 294 Ill. App. 3d at 40, 689 N.E.2d at 297. In that case, the plaintiffs claimed a common breach and submitted damages on a class-wide basis. Separate verdict forms were not required because there were not separate causes of action based upon separate transactions, involving subclasses. *Kennedy*, 294 Ill. App. 3d at 40, 689 N.E.2d at 297.

25    \

The record shows that this case was tried on behalf of a single class. without subclasses, on a single theory of liability in a breach-of-contract action. The case was tried on an issue common to all class members. The common issue was whether State Farm breached its contract by specifying inferior non-OEM parts. This was not a case where the plaintiffs' representatives sought to recover damages based upon distinct demands in the same complaint. Considering the record before us and keeping in mind the objective of the class action lawsuit, we do not believe that separate verdicts as to each individual class representative were appropriate. The trial court did not abuse its discretion in giving class-wide verdict forms.

State Farm also contends that the trial court erred in failing to give a series of non-IPI instructions. The contested instructions are not Illinois pattern instructions. It is improper to give a non-IPI instruction when a pattern instruction on the same subject is available. Where a unique factual situation or point of law is presented. a nonpattern instruction may be given if it is accurate and will not have an improper effect on the jury. See *Magna Trust Co.*. 313 Ill. App. 3d at 388. 728 N.E.2d at 808. A trial court may also give supplementary instructions to the jury to prevent confusion or to clarify an issue. *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 489, 473 N.E.2d 1322, 1344 (1985).

Proposed Instruction No. 30 states that the jury must determine the preloss condition of the vehicle in order to determine whether a non-OEM part restored that vehicle to its preloss condition. An instruction may be given when evidence exists to support the theory of the instruction, but it is error to given an instruction not based on the evidence. *Bielicke*. 291 Ill. App. 3d at 693, 684 N.E.2d at 162. In this case. plaintiffs' evidence showed that State Farm did not use the preloss condition as a factor in adjusting a claim and in determining what replacement part to specify. State Farm presented no evidence to suggest that preloss condition was a factor in the specification of replacement parts. As stated earlier, because State Farm did not consider preloss condition in specifying the replacement part, the entire argument concerns an irrelevant matter. See *Marut v. Costello*. 34 Ill. 2d 125, 128, 214 N.E. 2d 768. 769 (1965). Since there was no evidence to support the theory of the instruction. the trial court properly refused it.

· State Farm's proposed Instruction No. 26 states that the verdict must be for State Farm and against all class members if plaintiffs failed to prove that State Farm breached its contracts with each and every member of the class. Instruction Nos. 28, 28A, and 28B state that the verdict must be for State Farm if plaintiffs failed to prove that each

26

non-OEM part was inferior to the part it replaced. Instruction Nos. 26, 28, 28A, and 28B are not neutral statements of the law. On the contrary, they are argumentative. It is not error for the court to refuse an instruction that is not a neutral statement of the law. *Gordon v. Chicago Transit Authority*, 128 Ill. App. 3d 493, 501, 470 N.E.2d 1163, 1169 (1984). "Illinois courts follow a rule which requires jury instructions to be 'simple, brief, impartial, and free from argument' [Citation.] Argumentative instructions depart from the approved, fair[,] and impartial statement of the law in understandable language. Rather, argumentative instructions are adversarial statements highlighting favorable and unfavorable evidence with partisan overtones." *Lay v. Knapp*, 93 Ill. App. 3d 855, 858-59, 417 N.E.2d 1099, 1101-02 (1981).

If given, these instructions would have been equivalent to directing a verdict for State Farm. Such instructions are improper. *Zieger v. Manhattan Coffee Co.*, 112 Ill. App. 3d 518, 533, 445 N.E.2d 844, 855 (1983). The subject matter of these instructions was fully covered by other instructions. It is improper to give an instruction if the proposition contained therein is fully covered in other instructions. *National Surety Corp. v. Fast Motor Service, Inc.*, 213 Ill. App. 3d 500, 509, 572 N.E.2d 1083, 1089 (1991).

These instructions were improper in both form and content. In our view, the instructions given, when taken as a whole, adequately advised the jury of the law on the issues that were to be decided and were not misleading. The trial court correctly instructed the jury on the applicable law and the issues raised by the evidence. It was not an abuse of discretion to refuse State Farm's non-IPI Instruction Nos. 26, 28, 28A, and 28B.

State Farm also contends that the trial court erred in refusing to instruct the jury that the mere fact that a non-OEM part was specified in a repair estimate was not sufficient to establish State Farm's liability (State Farm's Instruction Nos. 31 and 31A), that State Farm cannot be held liable if a class member sold his car for fair market value after it was repaired with non-OEM parts (State Farm's Instruction No. 35), and that State Farm cannot be held liable if a class member had non-OEM parts specified but received OEM parts at no additional cost (State Farm's Instruction No. 33A). In our view, these are not accurate statements of the law, they are argumentative, and the trial court properly refused them. (See discussion in part IV(C)(1) of this opinion and our discussion above concerning alleged instructional error.)

27

[The preceding text is nonpublishable under Supreme Court Rule 23.]

### 3. Disgorgement Damages

The trial court awarded and imposed a constructive trust on $130 million in disgorgement damages on the consumer-fraud claims. State Farm claims that the court was not authorized to impose a constructive trust, an equitable remedy, because plaintiffs had an adequate remedy at law. State Farm also argues that the disgorgement damages were duplicative of the specification damages awarded by the jury and must be vacated.

[The following text is nonpublishable under Supreme Court Rule 23.]

Generally, the imposition of a constructive trust is erroneous when a plaintiff's legal remedy is adequate. *Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 1082. 571 N.E.2d 1085, 1095 (1991). However, courts have properly imposed constructive trusts or other equitable relief along with an award of damages where the court has determined the damage award to be inadequate and when such awards would have enabled the breaching party to profit from his conduct. *Hill*, 212 Ill. App. 3d at 1083, 571 N.E.2d at 1096. The right to recover is triggered by the gain to the agent rather than the loss to the principal. *Hill*, 212 Ill. App. 3d at 1083, 571 N.E.2d at 1096.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

The trial court found that State Farm realized direct savings of $130 million from the specification of inferior crash parts, and the court ordered that sum to be placed in the constructive trust to disgorge State Farm's unjust profits. According to the evidence, the direct-savings calculation was based upon the difference between the costs of OEM parts and non-OEM parts. Thus, the disgorgement damages award is duplicative of the specification damages award. The unjust gain was entirely disgorged through an award in the action at law. Plaintiffs are entitled to be fully compensated, but there can only be one recovery. To allow disgorgement damages would amount to double recovery. See *Stevens v. B & L Package Liquors. Inc.*, 66 Ill. App. 3d 120, 383 N.E.2d 676 (1978); *Abbinante v. O'Connell*, 277 Ill. App. 3d 1046, 662 N.E.2d 126 (1996). We find that the trial court erred in awarding an additional sum of $130 million, and we reverse that portion of the judgment.

[The following text is nonpublishable under Supreme Court Rule 23.]

### 4. Punitive Damages

28

State Farm next claims that it is unconstitutional to impose punitive damages when the activities complained of occurred in other states, that Illinois and federal due process preclude imposing punitive damages on a defendant who lacked fair notice that its conduct was punishable, that there is no evidence in the record to prove that State Farm had the evil motive necessary to justify the imposition of punitive damages under Illinois law, and that the award is grossly excessive.

Many of these points have been addressed elsewhere herein and can be disposed of summarily. There is substantial evidence that the deceptive practices were devised, implemented, and carried out from State Farm's home office in Bloomington, Illinois. We do not find any due process violations. State Farm had notice that it might be subject to punitive damages under the CFA because State Farm is a resident of Illinois and has done business in Illinois for many years, the CFA was in effect for several years prior to the deceptive activities complained of, there were published decisions demonstrating that the CFA was available to nonresident consumers, and the evidence in this record clearly demonstrated that none of the states in which class members resided permit insurers to specify inferior non-OEM replacement parts and to conceal the inferior quality of those parts. State Farm is presumed to know the law and will not be heard to plead ignorance concerning those matters of law that are commonly known. See *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 679 N.E.2d 774 (1997). The statutory and decisional law of Illinois was no secret.

Punitive damages are intended to punish the wrongdoer and to deter that party, and others, from participating in similar future acts. *Deal*, 127 Ill. 2d at 203, 537 N.E.2d at 272. The question of whether the facts of a particular case justify the imposition of punitive damages is a question of law. *Kelsay v. Motorola, Inc*, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978).

In its judgment the trial court found that State Farm's wilful violations of the consumer-fraud act justified an award of punitive damages. The trial court found that State Farm knew that it was specifying inferior non-OEM crash parts while representing that those parts were "quality replacement parts" and were as good as or better than OEM parts. The court also found that State Farm offered an illusory guarantee. The court noted that as a mutual insurance company, State Farm occupied a position of trust with its policyholders and that it violated that trust. Punitive damages are permissible where a duty based upon a relationship of trust is wilfully violated. *Martin v. Heinold Commodities,*

29   \

*Inc.*, 163 Ill. 2d 33, 81, 643 N.E.2d 734, 757 (1994). In our view, the facts of this case justify an award of punitive damages.

A reviewing court will not disturb an award of punitive damages on grounds that the amount is excessive unless it is apparent that the award is the result of passion, partiality, or corruption. *Deal*, 127 Ill. 2d at 204, 537 N.E.2d at 272. In constructing the punitive damages award, the trial court properly and carefully assessed the specific conduct involved, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. See *Deal*, 127 Ill. 2d at 204, 537 N.E.2d at 272. The court considered the testimony of State Farm's actuary, who provided evidence of the company's financial resources and its foreseeable obligations to current policyholders in the event of any conceivable disasters and explained that any award of damages would be paid from company reserves and would not affect its financial viability and ability to pay future claims. The award is less than two times the compensatory damages. We do not find that the award was so high as to indicate passion, partiality, or corruption. Therefore, the award of punitive damages is affirmed.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

### D. The Illinois Consumer Fraud Act Judgment

State Farm attacks the consumer-fraud judgment and claims that it should be reversed on the merits. State Farm contends that the trial court erroneously applied a preponderance-of-the-evidence standard when the correct standard is clear and convincing evidence.

Both parties correctly note that no standard of proof is set forth in the CFA and that the Illinois Supreme Court has not yet considered this issue. However, our colleagues in the first and third districts have reviewed this issue. *Cuculich v. Thomson Consumer Electronics, Inc.*, 317 Ill. App. 3d 709, 717-18, 739 N.E.2d 934, 939-40 (2000); *Malooley v. Alice*, 251 Ill. App. 3d 51, 56, 621 N.E.2d 265, 268-69 (1993). They have concluded that the appropriate standard of proof is a preponderance-of-the-evidence standard. The legislature has directed that the CFA be construed liberally to effect its remedial purposes. *Cuculich*, 317 Ill. App. 3d at 717-18, 739 N.E.2d at 939-40; *Malooley*, 251 Ill. App. 3d at 56, 621 N.E.2d at 268-69. The CFA was intended to afford a broader range of protection than the common law (*Martin*, 163 Ill. 2d at 68, 643 N.E.2d at 751) and to curb fraudulent abuses, while eradicating deceptive

30

and unfair business practices. *Malooley*, 251 Ill. App. 3d at 56, 621 N.E.2d at 268. The elements necessary to establish fraud under the CFA are less stringent than elements necessary to establish common law fraud. *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill. App. 3d 995, 1001-02, 574 N.E.2d 760, 764 (1991). The liberal construction accorded the CFA, coupled with the absence of a statutorily imposed clear-and-convincing-evidence standard, persuades us that the preponderance-of-the-evidence standard is appropriate. We, therefore, join our colleagues in so holding.

### [The following text is nonpublishable under Supreme Court Rule 23.]

State Farm claims that the CFA judgment should be reversed because the evidence was not sufficient to establish that the representations and omissions identified by the circuit court proximately caused injury to any of the class members. It also claims that the trial court's finding of liability under the CFA was against the manifest weight of the evidence because the claim was nothing more than a breach of contract.

An omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud. *Perona v. Volkswagen of America, Inc.*, 292 Ill. App. 3d 59, 67, 684 N.E.2d 859, 865 (1997). Plaintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, that State Farm specified non-OEM parts that it knew to be inferior, that State Farm did not inform its policyholders that the non-OEM parts it specified were inferior, and that State Farm knowingly represented on its estimates, in its "Quality Replacement Part" brochures, and through its estimators that these non-OEM parts were of equal quality or better than OEM parts. There is evidence that State Farm's material misrepresentations led numerous class members to blindly accept the non-OEM parts specified (*i.e.*, without knowledge of the inferior condition of those parts). See *Perona*, 292 Ill. App. 3d at 68-69, 684 N.E.2d at 866-67; *Johnston v. Anchor Organization for Health Maintenance*, 250 Ill. App. 3d 393, 397, 621 N.E.2d 137, 140-41 (1993). There is overwhelming evidence of State Farm's calculated deception of its policyholders in a deliberate disregard of its express written promises contained in the policies issued. The deceit was deliberate and universally employed for the purpose of obtaining unearned, illegitimate monetary gain. This was an ill-gotten gain, acquired at the expense of persons that trusted and relied upon State Farm for honest, fair treatment.

There is an abundance of evidence to support the trial court's finding that the class members' injuries were proximately caused by State Farm's deceptive conduct.

State Farm claims that it should not have been held liable under the CFA because its representations were nothing more than statements of opinion or puffery. In our view, these representations assigned "virtues" to non-OEM parts that they did not possess. See *Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 905, 602 N.E.2d 1374, 1383 (1992); *Rumford v. Countrywide Funding Corp.*, 287 Ill. App. 3d 330, 336, 678 N.E.2d 369, 373 (1997). They are representations that a reasonable policyholder would have interpreted as fact. The evidence of State Farm's deceptive claims practices moves this case beyond a mere contract breach. In our view, the trial court's determination that State Farm's deceptive practices violated the CFA is completely supported by the evidence in the record and is not against the manifest weight of the evidence.

### E. Evidentiary & Trial Errors

State Farm first contends that the trial court committed reversible error by admitting baseless opinion testimony purporting to show the universal inferiority of non-OEM parts. State Farm contends that the court abused its discretion in permitting body shop witnesses who had no expertise in metallurgy, design, or engineering to render opinions that non-OEM replacement parts were categorically inferior to OEM replacement parts.

We have reviewed the excerpts that State Farm identified in its brief, and State Farm did not object to the testimony about which it now complains. Thus, the point is waived. See *Brown*, 83 Ill. 2d at 349, 415 N.E.2d at 339. As explained earlier, it is not our role to comb the record to uncover possible errors. Nevertheless, given the nature of this case, we have considered the issue and find no reversible error.

Whether a witness qualifies as an expert is a question left to the sound discretion of the trial court, and the court's determination will not be disturbed absent an abuse of discretion. *National Surety Corp.*, 213 Ill. App. 3d at 508, 572 N.E.2d at 1088. A witness may be qualified as an expert based upon his knowledge, skill, experience, training, or education. *National Surety Corp.*, 213 Ill. App. 3d at 508, 572 N.E.2d at 1088. A witness whose knowledge is based on practical experience is no less an expert than one who possesses particular academic or scientific knowledge, and each may be qualified as an expert once it is shown that he possesses specialized knowledge beyond

32

that of the average person and that his testimony will assist the jury in deciding fact issues in the case. *Cannell*, 25 Ill. App. 3d at 913, 323 N.E.2d at 423.

Each of the body shop witnesses had worked in the auto repair industry for a number of years. Each had worked with the non-OEM crash parts that State Farm specified. Over the course of those years, each had formed opinions about the quality, fit, corrosion resistence, strength, and stability of those parts based upon his hands-on experience with those parts. These witnesses were not experts in the field of metallurgy or engineering, nor did they hold themselves out as such. Each demonstrated specialized knowledge about a factual issue in the case based upon years of observations and experience in the auto repair trade. The fact that these witnesses may not be able to explain scientifically why these parts are inferior does not preclude them from rendering opinions based upon their practical experiences installing non-OEM parts. In our view, a proper foundation was laid for each of the body shop witnesses to offer an opinion about the quality and fit of non-OEM parts. State Farm had an adequate opportunity to and did vigorously cross-examine these witnesses about their qualifications and biases. It was up to the jury to determine the credibility of the witnesses and what weight, if any, to give their opinions. *Falkenbury v. Elder Cadillac, Inc.*, 109 Ill. App. 3d 11, 18, 440 N.E.2d 180, 186 (1982).

State Farm next contends that the trial court erred in permitting one of the body shop witnesses to rely upon automotive manufacturer publications, a Consumer Reports publication, and a videotape documenting a bumper-impact test discussed in the Consumer Reports publication because they are not the types of materials reasonably relied on by experts in the auto body repair industry. The trial court has discretion to determine whether the underlying facts or data on which an expert bases an opinion are of a type reasonably relied upon by experts in that field. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186, 554 N.E.2d 1381, 1389 (1990); *Yates v. Chicago National League Ball Club, Inc.*, 230 Ill. App. 3d 472, 485, 595 N.E.2d 570 (1992). It is common practice and completely proper to allow experts to rely upon a trade journal or a publication as the basis for an opinion. See *Rivera v. Rockford Machine & Tool Co.*, 1 Ill. App. 3d 641, 274 N.E.2d 828 (1971). An expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion. *People v. Nieves*, 193 Ill. 2d 513, 739 N.E.2d 1277 (2000). The publications discussed and critically analyzed the use, quality, and condition of aftermarket replacement parts. The

33

trial court reviewed the material and determined that these publications were of a type used by persons in the auto body repair trade and were reasonably reliable. Given this record. we cannot say that the court's decision was an abuse of discretion.

State Farm claims that the trial court erred in permitting one of plaintiff's experts to play a section of a videotape demonstrating a bumper-impact test that was discussed in the Consumer Reports article and to use the Consumer Reports information during the cross-examination of one of its expert witnesses. The record reveals that the videotape was played after one of plaintiffs' auto body mechanic witnesses testified that his opinions about the inferiority of non-OEM parts were based on his first-hand experience working with non-OEM parts and his review of the Consumer Reports article, the videotape, and other trade publications.

An expert may disclose the underlying facts and conclusions for the purpose of explaining the basis for his opinion and conclusion. *Nieves.* 193 Ill. 2d 527-28. 739 N.E.2d at 1284. Absent a full explanation of the expert's reasons. including the underlying facts and opinions, the jury has no way to evaluate the testimony. *People v. Anderson.* 113 Ill. 2d 1, 11, 495 N.E.2d 485. 488-89 (1986). In *Kochan v. Owens-Corning Fiberglass Corp.*, we held that the trial court properly permitted a physician to summarize and quote from medical and industrial articles upon which he based his opinion. *Kochan v. Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 804-05, 610 N.E.2d 683. 689 (1993). However, we noted that the information was not admitted as substantive evidence and the expert was not using the information to bolster his opinion by showing that other experts agreed with him. *Kochan*, 242 Ill. App. 3d at 804, 610 N.E.2d at 689.

In our view, this witness used the Consumer Reports material as a basis for his opinion. There is no evidence that he was using the material to bolster his opinion. The trial court gave a limiting instruction advising the jury to consider the information not for the truth of the matters asserted but to evaluate the expert's opinion. The court need not permit the expert to recite this underlying information when its probative value pales beside its likely prejudicial impact or its tendency to create confusion. *Anderson,* 113 Ill. 2d at 12, 495 N.E.2d at 490. The trial court had a chance to review the videotape before the witness testified, and the court determined that its probative value in explaining the expert's opinion outweighed its prejudicial impact. See *Anderson,* 113 Ill. 2d at 12, 495 N.E.2d at 490.

34    \

While it may appear that permitting the use of the videotape takes us a step beyond permitting an expert to give a detailed summary of medical and industry reports which formed the basis of his opinions, we do not find that to be the case on these particular facts. In this case, the videotape was brief. It depicted the results of a bumper-impact test upon which plaintiffs' expert relied. Given the fact that this witness lacked extensive formal education and was not a professional witness, the trial court may have determined that playing the video would have been less prejudicial than permitting the witness to attempt to summarize the content of the video in his own words. On the basis of this record, we cannot say that the trial court abused its discretion in permitting the videotape to be played for the exclusive purpose of establishing the basis for the expert's opinion.

State Farm next claims that the trial court abused its discretion in allowing plaintiffs' engineering experts to "offer a variety of overblown generalizations" about non-OEM parts.

Plaintiffs presented an expert in industrial engineering and an expert in metallurgy and materials sciences. Each of the experts was properly qualified. Each discussed the methodology utilized to reach his respective opinions and conclusions. One expert conducted testing on a sample of the non-OEM parts. The other had observed the manufacturing process used in making non-OEM parts at a plant in Taiwan. The experts reviewed State Farm and CAPA data and documents referencing problems encountered during the process of the manufacturing of non-OEM parts, quality-control issues, and the overall quality of the non-OEM parts being produced. Each expert rendered opinions about the flaws in the design and the manufacturing process of the non-OEM parts at issue in this case and concluded that these parts were categorically inferior. State Farm has not shown that the experts were unqualified or that the methodology was not accepted in the relevant scientific community. The validity of their opinions and conclusions are matters of weight, not admissibility. See *Temesvary v. Houdek*, 301 Ill. App. 3d 560, 568, 703 N.E.2d 613, 618 (1998). Allowing the testimony was within the court's discretion, and we find no abuse of that discretion.

State Farm also challenges, as inadmissible hearsay, the admissibility of a statistical marketing survey. A survey that adheres to generally accepted survey principles and statistical principles is generally deemed admissible, and any technical inadequacies go to its evidentiary value. See *Antry v. Illinois Educational Labor Relations Board*, 195 Ill. App. 3d 221, 265, 552 N.E.2d 313, 340 (1990). State Farm did not challenge the statistical validity of the

35

results or the manner of the survey. Therefore, we cannot say that the trial court abused its discretion in admitting the survey evidence.

State Farm next claims that it was not permitted to call insurance regulators of various states to testify about the quality of non-OEM parts. In its brief, State Farm does not refer us to any place in the record demonstrating that it made an offer of proof regarding the qualifications of these witnesses and the evidence each would provide. Therefore, we must conclude that no such offer was made. In the absence of some record outlining the testimony these witnesses were expected to provide, we have no way to determine whether the exclusion of the evidence was prejudicial. *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211, 238, 606 N.E.2d 400, 417 (1992). The issue is waived.

State Farm also claims that the trial court erred in permitting plaintiffs to introduce "perception" evidence. This argument is not supported by any authority and does not meet the requirements of Supreme Court Rule 341(e)(7) (155 Ill. 2d R. 341(e)(7)). See *In re Marriage of Drummond*, 156 Ill. App. 3d 672, 684, 509 N.E.2d 707, 716 (1987). Nevertheless, we have reviewed the argument and find no prejudicial error. The record reveals that plaintiffs offered several opinion witnesses, including a professional market researcher, a professional auto sales manager with experience appraising used cars, and a professor of marketing and consumer information from Duke University, who testified that items perceived to be of inferior quality will be worth less in the marketplace. State Farm presented a number of opinion witnesses, including a professor from the Virginia Commonwealth University and a number of professional auto auctioneers, to counter plaintiffs' evidence.

Evidence should be admitted if it is material or relevant. *Kirkham v. Will*, 311 Ill. App. 3d 787, 795, 724 N.E.2d 1062, 1068 (2000). The trial court determined that the evidence was probative of whether plaintiffs were damaged as a result of the installation of inferior parts. The determination of what is relevant is a matter within the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. *Kirkham*, 311 Ill. App. 3d at 795, 724 N.E.2d at 1068. State Farm has failed to demonstrate that the admission of this evidence was an abuse of discretion and has failed to demonstrate how it was prejudiced by the admission of such evidence.

State Farm asserts that the trial court erred in admitting the testimony of two former insurance regulators, Timothy Ryles and Robert Hunter. State Farm contends that the trial court permitted the witnesses to testify about the

36

inferior quality of non-OEM parts, matters it claims were outside the area of their expertise.

Whether a witness qualifies as an expert is a question left to the sound discretion of the trial court, and the court's determination will not be disturbed absent an abuse of discretion. *National Surety Corp.*, 213 Ill. App. 3d at 508, 572 N.E.2d at 1088. The record reveals that Mr. Ryles testified that his area of expertise is insurance industry custom and practice and includes the interpretation and implementation of contracts. He reviewed a number of documents, including State Farm's own documents referencing its practice of using non-OEM parts and its knowledge of the quality of those parts. Relying upon those documents and his knowledge and experience in the operations of insurance industry, he critiqued State Farm's policy and claims practices regarding the specification of non-OEM parts in light of its insurance contract, its guarantee, and the general practice in the insurance industry. Mr. Hunter testified that his area of expertise is in casualty actuarial issues and public policy matters dealing with consumers and insurance claims issues. Relying upon a review of State Farm documents and his knowledge and experience in insurance claims practices, he critiqued State Farm's policy and claims practices of specifying "quality replacement parts" it knew to be inferior. Any conclusions regarding the quality of non-OEM parts was expressed by these experts in the context of a discussion of claims practices in the insurance industry. Considering the background and experience of each of these witnesses, we cannot say that either was unqualified to render the opinions offered.

State Farm also claims that it was improper to permit these witnesses to merely "interpret" its documents when those documents were neither technical nor complex. It is not improper for an expert to explain a term or a practice when such subjects are beyond the knowledge and the experience of the average juror. See *American College of Surgeons v. Lumbermens Mutual Casualty Co.*, 142 Ill. App. 3d 680, 701, 491 N.E.2d 1179, 1194 (1986). Here, Mr. Ryles and Mr. Hunter identified documents upon which they relied to form opinions in this case. In so doing, they explained the significance or meaning of a particular document or practice as it related to the opinions being offered. An expert may disclose the underlying facts and conclusions for the purpose of explaining the basis for his opinion and conclusion. *Nieves*, 193 Ill. 2d at 527-28, 739 N.E.2d at 1284. Absent a full explanation of the expert's reasons, including the underlying facts and opinions, the jury has no way to evaluate the testimony. *People v. Anderson*, 113 Ill. 2d 1, 11, 495 N.E.2d 485, 488-89 (1986). The trial court did not abuse its discretion in allowing each expert to

37    \

identify those documents that formed the basis for his opinions and to explain their significance to the jury.

State Farm contends that the trial court erred in allowing plaintiffs to show a videotape depicting the comparative results of a salt-spray corrosion test on an non-OEM fender and a fender manufactured by the Ford Motor Company. State Farm contends that the video was irrelevant to any issue because there was no evidence to show that this type of non-OEM fender had been installed on a policyholder's car during the class period and no evidence to show that the testing had been fairly conducted.

The videotape was presented during the evidence deposition of John Reinholz, an employee of the Ford Motor Company. Mr. Reinholz performed this test and explained how the test was performed. He testified that the test was performed in 1986 or 1987, and he authenticated the content of the videotape. Another Ford employee, Gary Balint, also testified by evidence deposition. He stated that he had asked Ford Central Laboratories to conduct a corrosion test of Ford sheet metal parts and non-OEM sheet metal parts. He explained how the testing was performed. He testified that he inspected the parts before the test began to ensure that there was no preexisting damage. He monitored the testing procedure and inspected both parts after the test was completed. Mr. Balint stated that the test was conducted in 1987 and that the non-OEM parts used were made for a 1986 vehicle. He authenticated the contents of the videotape and explained how the video was made.

According to the record, the videotape was used as a piece of demonstrative circumstantial evidence. Videotapes may be admitted into evidence when properly authenticated and relevant either to illustrate or corroborate the testimony of a witness or to act as probative evidence of what the videotape depicts. *People v. Smith*, 152 Ill. 2d 229, 604 N.E.2d 858 (1992); *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 755, 631 N.E.2d 1186, 1204 (1994). The decision on whether to admit or exclude this evidence is reserved to the sound discretion of the trial court, and a court's ruling will not be reversed in absence of a clear showing of abuse. *Montag v. Board of Education, School District No. 40, Rock Island County*, 112 Ill. App. 3d 1039, 1047, 446 N.E.2d 299, 304 (1983). In this case, two witnesses who had participated in the testing stated that the videotape fairly and accurately depicted the test and result. Mr. Balint explained how the test was performed. He also explained how the photography and videotaping was done to ensure a fair and accurate representation. A proper foundation was established. See *Missouri Portland Cement Co.*

38

*v. United Cement, Lime, Gypsum & Allied Workers International Union*, 145 Ill. App. 3d 1023, 1029, 496 N.E.2d 489, 492 (1986).

We also find that the content of the videotape was demonstrative of the corrosion-testing process and the type of damage that can result when a part is not galvanized. The jurors heard extensive testimony about corrosion testing, galvanization, and the use of testing standards to assess the quality of OEM and non-OEM parts. This video provided the jurors a chance to see how corrosion testing is performed. During the cross-examination of Mr. Balint, the jury was informed that this testing was a demonstrative exhibit for litigation purposes. The testing was conducted in 1987 during the designated class period and thus was not too remote in time. See *Glassman*, 259 Ill. App. 3d at 755, 631 N.E.2d at 1204; *Montag*, 112 Ill. App. 3d at 1047, 446 N.E.2d at 304. State Farm did not object to the testimony or the video on the basis that the date of manufacture of the aftermarket part had not been established at the time these depositions were taken. Had the objection been made at the time of the depositions, the ground for objection may have been corrected. Where the basis of an objection is curable if presented during the deposition, the failure to object at that time waives the objection. 134 Ill. 2d R. 211(c)(1); *Lundell v. Citrano*, 129 Ill. App. 3d 390, 397-98, 472 N.E.2d 541, 546-47 (1984). State Farm waived this objection. We find no clear abuse of discretion in permitting the jurors to view this videotape.

State Farm also claims that plaintiffs were permitted to offer evidence and to argue that State Farm had a policy of discriminating against members of the lower class and minorities, thereby impugning State Farm's character. After reviewing the excerpts complained of, we find that State Farm has overstated the case. The trial testimony indicated that the practice of specifying non-OEM parts did not apply to State Farm employees, "special customers", and associates of State Farm executives. Considering this evidence, along with the other evidence in the case, it is reasonable to infer that this exemption was provided to "friends of State Farm" because it knew non-OEM parts were of inferior quality. The court gave a limiting instruction in which it informed the jury that this evidence could create an inference, if they chose to draw it, that non-OEM parts were inferior. The court felt that the jury was intelligent and was capable of following its instructions.

State Farm has also directed us to comments made by plaintiffs' counsel during closing argument that it claims

39

were prejudicial and improper. Upon a review of the record, we note that State Farm did not object to those statements. Thus, it has waived those objections. See *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 619 N.E.2d 892 (1993). Nevertheless, our review of the statements shows them to be within the court's limiting instruction. The trial court is in a superior position to observe the impact of alleged misconduct on the jury, and it is within the sound discretion of the trial court to determine whether the remarks and conduct of counsel interfered with the right to a fair trial. *Fultz v. Peart*, 144 Ill. App. 3d 364, 380, 494 N.E.2d 212, 224 (1986); *Reynolds v. Alton & Southern Ry. Co.*, 115 Ill. App. 3d 88, 99, 450 N.E.2d 402, 411 (1983). On this record, we find no abuse of discretion.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

Accordingly, the award of disgorgement damages is reversed. In all other respects, the judgment of the circuit court is affirmed, and the cause is remanded for further proceedings.


Affirmed in part and reversed in part; cause remanded.


WELCH, THOMAS M., and WELCH, ROBERT L.[1], JJ., concur.

---

[1]Chief Judge of the Seventh Judicial Circuit, sitting by assignment.

**Exhibit 15**

IN THE CIRCUIT COURT
FOR THE TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

FILED
ST. CLAIR COUNTY

DEC 2 1 2000

19 C. Daugherty CIRCUIT CLERK

STEVEN PETERSON,                          )
GENYNE GREENE,                            )
and ALLISON ANDERSON,                     )
On Behalf of Themselves                   )
and All Others Similarly Situated,        )
                                          )
                                          )    CLASS ACTION
        Plaintiffs,                       )
                                          )
vs.                                       )    No. 99-L-394A
                                          )
STATE FARM MUTUAL AUTOMOBILE              )
INSURANCE COMPANY,                        )
                                          )

## ORDER AND FINDINGS RELATED TO
## CLASS CERTIFICATION

After consideration of the testimony adduced at the class certification hearing on July 12-14[th],

2000, and having further considered the pleadings, depositions, briefs, exhibits and case authority

submitted by both parties, and all other matters properly before the Court, and having considered the

arguments of counsel, **the Court hereby finds as follows:**

### I.    SUMMARY OF THE CASE

The representative plaintiffs ("Plaintiffs") in this class action allege that defendant, State

Farm Mutual Automobile Insurance Company ("State Farm"), breached provisions of its automobile

insurance contracts with first-party policyholders (Count II of Plaintiffs' Third Amended Complaint).

Plaintiffs further argue that they, on behalf of themselves and all others similarly situated, are entitled

to Declaratory Judgment and certain equitable remedies (Count I of Plaintiffs' Third Amended

Complaint).[1]

Plaintiffs have requested that this Court certify a Class which corresponds to each cause of action in their Third Amended Complaint. The Declaratory Judgment Class (Count I) requested by Plaintiffs would be comprised of all first-party policyholders who made property damage claims, but were not informed about coverage for "inherent diminished value" during the claims process. Plaintiffs seek to compel State Farm to recognize "inherent diminished value" as a covered "Loss" in first-party situations. As part of the equitable remedies prayed for, Plaintiffs also seek to change State Farm's claims practices so that policyholders are notified of their right to recover for "inherent diminished value" as a loss. Plaintiffs believe that once State Farm recognizes this obligation, then State Farm should be required to inspect and evaluate for "inherent diminished value" whenever a physical damage claim is made.

Plaintiffs have also requested that this Court certify a Breach of Contract Class (Count II). This Class would be comprised of smaller groups of these same individuals, who, according to Plaintiffs, should have received compensation for "inherent diminished value" because of the nature of damage to their vehicles. It is alleged that State Farm's failure to pay constitutes a breach of the insurance contract, and the Class seeks compensatory damages resulting from any such breach.

Plaintiffs' claims focus upon certain language in State Farm's automobile insurance policies issued nationwide. This language obligates State Farm to pay for *"Loss"* incurred by the policyholder under the terms of the comprehensive or collision coverages of the policies. State Farm contends that its obligation to pay *"Loss"* is circumscribed by those provisions limiting its liability

---

[1] Count III of Plaintiffs' Third Amended Complaint is premised on the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et. seq.* ). The Plaintiffs have not requested that the Court certify a class in conjunction with ICFA at this time.

2

to the "cost of repair" in each policy. State Farm further claims that its obligation to pay is subject to any applicable "appraisal clause" provisions. Although State Farm has issued policies specific to each state, the Court notes that the contractual language at issue in this case is substantially the same in all of its policies nationwide.

Plaintiffs contend that "inherent diminished value" is well-recognized within the automotive industry, that State Farm acknowledges this concept, and that State Farm (in certain states) compensates its policyholders for "inherent diminished value." For example, State Farm offers employee training to handle diminished value claims in Texas (Gilmore Depo. I, Ex. 71), and it routinely hires independent appraisers to evaluate such losses in that State (Gilmore Depo. II, at 92-93, 112-113). Furthermore, State Farm pays (or has paid) "inherent diminished value" in Texas and Georgia, provided that a claim is made and proven to State Farm's satisfaction. (Tr. 7/12/00, at 181-182; Gilmore Depo. II, at 80-81; Mathews Depo., at 82.)

Nevertheless, State Farm denies that its insurance policies include any obligation to pay "inherent diminished value" as a part of the *"Loss"* suffered by the insured. In support thereof, State Farm directs this Court's attention to its limitation of liability provisions. State Farm claims that the terms of its policies clearly and unambiguously limit State Farm's obligation to the "cost of repair," which does not include "loss in value." However, this Court previously considered such language in the defendant's Illinois and Delaware policies, and found it to be ambiguous. (Court's Order, filed February 4, 2000.)

3

## II.    GOVERNING LEGAL STANDARD

Certification of a class action in the State of Illinois is governed by 735 ILCS 5/2-801, which

provides as follows:

> An action may be maintained as a class action in any court of this
> State and a party may sue or be sued as a representative party of the
> class only if the court finds:
>
> (1)    The class is so numerous that joinder of all members
>        is impracticable.
>
> (2)    There are questions of fact or law common to the
>        class which common questions predominate over any
>        questions affecting only individual members.
>
> (3)    The representative parties will fairly and adequately
>        protect the interests of the class.
>
> (4)    The class action is an appropriate method for the fair
>        and efficient adjudication of the controversy.

In considering class certification, the Court has assigned to Plaintiffs the burden of satisfying

the four requirements of Section 2-801. *Wheatley v. Board of Ed. Of District 205*, 99 Ill. 2d 481,

486, 459 N.E.2d 1364, 1367 (1984). The Court has not considered the possibility of success on the

underlying merits, but only whether the statutory requisites for class certification are satisfied at this

time. *See Purcell & Wardrope Chartered v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1075, 530 N.E.2d

994, 998 (1ª Dist.1988) ("hypothetical problems that may arise in the future***[are] not a sufficient

basis to refuse to certify an otherwise properly pleaded class action"). Applying this standard, the

Court makes the following findings with respect to each of the four statutory requirements for

certification of a class action in Illinois.

4

## III.  CERTIFICATION ISSUES

### A.  Numerosity And Impracticality Of Joinder

735 ILCS 5/2-801(1) requires not only that the number of claimants be numerous, but also that joinder of those claimants in a single suit be impractical. Where there are a number of potential class members and the individual amount of each claim is small, making redress on an individual level difficult, if not impossible, Illinois courts have been particularly receptive to proceeding as a class action. *Miner v. Gillette Co.*, 87 Ill. 2d 7, 428 N.E.2d 478 (1981), *cert. denied.*

State Farm is the largest auto insurer in the United States. Based upon exhibits introduced by Plaintiffs and State Farm, it is obvious that millions of people are affected by State Farm's current claims practices. It is also clear from the record that this lawsuit encompasses millions of potential claimants who are widely dispersed throughout a number of states. In such circumstances, "any attempt to join such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill.App.3d 195, 586 N.E.2d 461, 464 (1st Dist. 1991), *appeal denied* and *certiorari denied.*

The Court therefore finds that the first prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

### B.  Predominate Questions Of Fact Or Law

735 ILCS 5/2-801(2) requires that there be "questions of fact or law common to the class which...predominate over any questions affecting only individual members." As our Supreme Court recognized, however, Section 2-801(2) simply necessitates a showing of "*either* a predominating common issue of law *or* fact, not both." *Martin v. Heinhold Commodities, Inc.*, 117 Ill. 2d 67, 81,

5

510 N.E.2d. 840, 846 (1987) (*Emphasis added.*) While the Plaintiffs must demonstrate that common questions predominate over individual issues,

> "the hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action."

*Harrison Sheet Steel Co. v. Lyons*, 15 Ill. 2d 532, 538, 155 N.E.2d 595, 598 (1959).

It should also be recognized that "...a separate determination of damages, multiple theories of recovery, or even the inability of some class members to obtain relief because of a particular individual factor will not, standing alone, defeat a class certification if the common questions of fact or law are otherwise predominant." *Purcell*, 530 N.E.2d at 998, citing *Miner v. Gillette Co.*, 87 Ill.2d 7, 428 N.E.2d 478 (1981).

### (i)    Common questions of law predominate

In determining whether there are common questions of law which predominate, the Court has carefully considered State Farm's contention that it has no standard auto insurance policy, since each state's policy is tailored to comply with individual state requirements. The Court finds, however, that the operative contractual language contained in each policy is substantially the same. Whether State Farm's "limitation of liability" provision or "appraisal clause" qualifies the "Loss" language is not a question to be resolved during class certification. It is a question for resolution on the merits.

Although the Plaintiffs claim that there are numerous questions of law which predominate, the Court is satisfied that the common issue of contract interpretation, by itself, is dominant and pervasive. *See, e.g., Van Vactor v. Blue Cross Association*, 50 Ill.App.3d 709, 365 N.E.2d 638, 647

(1st Dist.1977).[2] Here the class members have a common interest in determining whether State Farm is obligated to compensate its policyholders for "inherent diminished value," and this issue of contract interpretation predominates over other issues. *See, e.g., Carraro v. Healthcare Service Corp.*, 118 Ill.App.3d 417, 428, 454 N.E.2d781, 790 (1st Dist.1983); *Purcell*, 530 N.E.2d at 998.

While it is not necessary to make a choice-of-law determination at this time, the Court does note that contract law is essentially uniform throughout the country. (Plaintiffs' Class Certification Exs. 36-37.) Moreover, our Supreme Court previously certified a nationwide class action, finding that it does not violate due process to apply Illinois substantive law to nonresident class members where the dispute involves an Illinois corporation, like State Farm, and otherwise implicates legitimate State interests. *Martin*, 510 N.E.2d at 847. *Accord Gordon*, 586 N.E.2d at 466.

Similarly, the vast majority of states either permit recovery for inherent diminished value or have not spoken on the issue. However, because some states are presently considering the issue in related litigation, the Court has considered this fact and divided the potential claimants into separate

---

[2]Among others, the Plaintiffs claim that the following questions of fact and law predominate:

(1)     Whether State Farm's standard auto policy provides coverage for the "loss" (*i.e.*, inherent diminished value)?

(2)     Whether payment for repairs alone can restore vehicles (which sustain certain types of damage) to their pre-loss condition?

(3)     Whether State Farm breached its obligations to policyholders by systematically failing and/or refusing to compensate class members for diminution in value?

(4)     Whether class members are entitled to damages for this breach?

(5)     Whether State Farm satisfied all conditions precedent necessary to invoke the "appraisal clause" in is standard auto policy?

(6)     Whether State Farm– through a common and systematic course of conduct and business practice – processed first-party physical damage claims so as to avoid paying diminution in value?

(7)     Whether the court should declare such business practices in breach of State Farm's contractual obligations and, on the basis thereof, enjoin State Farm from proceeding in that wrongful manner?

(8)     Whether State Farm should be required to implement reasonable procedures to inform and notify policyholders of their right to payment for diminution in value, to ascertain the amount of such diminution during the appraisal and repair process, and to pay such amount?

7

classes. Plaintiff Class I includes policyholders from those states where recovery for diminished value is either expressly permitted or, at least, not prohibited. Plaintiff Class II includes policyholders from those states where the law on diminished value is "in flux" because of ongoing litigation, yet not "clearly contradictory" to forum law at this time.

The Court retains the right to establish manageable sub-classes pursuant to Section 2-802(b) should it become necessary. *Purcell*, 530 N.E.2d at 998; *Gordon*, 586 N.E.2d at 466.

### (ii)    Common questions of fact predominate

The Court finds that there are common questions of fact which also predominate over issues affecting only individual Class Members. For example, Plaintiffs argue that vehicles which sustain certain types of physical damage cannot be restored to pre-loss condition through the repair process. (Batton Depo., at 320-325.) State Farm disputes this contention. (Tr. 10/23/00, at 66-68.) Similarly, Plaintiffs contend that "inherent diminished value" is well-recognized in the automotive industry, yet State Farm "[does] not agree that 'inherent diminished value' is a valid or viable concept, or that it even exists." (See State Farm's Combined Motion to Dismiss, at 2). Therefore, the existence and proof of "inherent diminished value" is a class-wide issue.

The Court further notes that a common factual pattern can be found in State Farm's consistent practice of not informing its policyholders about coverage for "inherent diminished value" during the claims process. (Tr. 07/12/00, at 189-190.) This is significant since a class action "can properly be prosecuted where a defendant is alleged to have acted wrongfully in the same basic manner as to an entire class." *Brooks v. Midas-International Corp.*, 47 Ill.App.3d 266, 361 N.E.2d 81, 820 (1977). It is also reminiscent of evidence adduced during *Avery v. State Farm*, wherein it was noted that "State Farm's claims policies are communicated through a series of 'general claims

**8**

\

memos' issued from State Farm's headquarters in Bloomington, Illinois, which governs claims policy nationwide." (Plaintiffs' Memorandum in Support of Class Certification, Ex. 5, at 6.) Therefore, State Farm's claims' practices have class-wide implications.

While the Court is mindful of State Farm's concerns about the need for individual proofs and the fact that damages may be in varying amounts, it does not believe that such issues predominate over the common questions of fact and law noted above. Furthermore, such considerations traditionally have not foreclosed certification in this State. *See, e.g., Slimack v. Country Life Ins. Co.*, 227 Ill.App.3d 287, 591 N.E.2d 70, 74 (5th Dist. 1992) ("The requirement of individual proofs should not be a bar to a class action."), *appeal denied*; *Barliant v. Follett Corp.*, 74 Ill.2d 226, 384 N.E.2d 316 (1978) (same); *Kennedy v. Commercial Carriers*, 294 Ill.App.3d 34, 689 N.E.2d 293, 297 (1st Dist. 1997) ("...[I]f certain individual questions exist that may require individual determinations, these individual questions may be handled within sub-classes, as long as the common issues predominate."); and *McCarthy v. LaSalle Nat. Bank & Trust*, 230 Ill.App.3d 628, 595 N.E.2d 149, 153 (1st Dist. 1992) ("...[T]he fact that the class members' recovery may be in varying amounts which must be determined separately does not necessarily mean that there is no predominate question.").

The Court expresses no opinion on the ultimate resolution of these disputed issues, and does not know whether Plaintiffs will ultimately prove successful with their claims. However, it does believe that the common questions predominate in light of the respective positions taken by the parties to this litigation. The Court therefore finds that the second prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

9

**C.    Adequacy Of Representation**

735 ILCS 5/2-801(3) conditions class certification upon a finding that "the representative parties will fairly and adequately protect the interest of the class." The purpose of the "adequate representation" requirement is to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim. *Gordon*, 586 N.E.2d at 466. It is therefore necessary that "the class representative[s] not seek relief antagonistic to the interests of other potential class members." *Purcell*, 530 N.E.2d at 1000. *Accord Slimack v. Country Life Insurance Company*, 227 Ill.App.3d 287, 591 N.E.2d 70 (5th Dist. 1992).

The Court further notes that, unlike F.R.C.P. 23, there is no "typicality" requirement in Section 2-801(3). The Illinois statute is more liberal than the Federal Rule in this regard, and "...a class representative may not be disqualified merely because his claim is not exactly the same as the claims of other potential class members." *Carraro*, 454, N.E.2d at 790.

Based upon the record, the Court concludes that Plaintiffs have zealously pursued their claims since learning of State Farm's alleged wrongful conduct and that Plaintiffs have sufficient financial resources to absorb the expenses involved in being the named representatives. The Court further finds that there are no conflicts between Plaintiffs and the Class, since it is clear from the Court's review of the materials submitted that Steven Peterson, Genyne Greene, Allison Anderson and the Class Members share common objectives and legal and factual positions.

In determining the adequacy of representation, the Court also considers the quality and experience of the attorneys for the Class. In that regard, the Court is aware that counsel for Plaintiffs regularly engage in major consumer litigation of the size, scope and complexity as this case. Moreover, the Court has had the opportunity to observe Plaintiffs' counsel in the past and during the

**10**

\

proceedings herein.

Judicial evaluation of the quality of representation, as well as class certification in general, rests within the sound discretion of the trial court. *McCabe v. Burgess*, 75 Ill. 2d 457, 464, 389 N.E.2d 565, 568 (1979). Based upon the foregoing, the Court finds that the third prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

**D.      An Appropriate Method For The Fair And Efficient Adjudication of the Controversy**

735 ILCS 5/2-801(4) requires a finding that "the class action is an appropriate method for the fair and efficient adjudication of the controversy." Although F.R.C.P. 23(b)(3) requires that a class action be *superior* to other available methods of adjudication, the Illinois statute merely requires that a class action be an *appropriate* method of litigating the controversy. In applying the fourth prerequisite, the Court considers whether a class action can best secure economies of time, effort, and expense and promote uniformity of decision or accomplish other ends of equity and justice. *Gordon*, 586 N.E.2d at 467.

A significant factor in the case at bar is that a class action is the only practical means for policyholders to present their claims and for State Farm to achieve some finality to this matter. Further, Illinois courts have historically recognized that class actions are an appropriate method for adjudicating controversies involving numerous small claims. In *Wood River Area Development Corporation v. Germain Federal Savings and Loan*, 198 Ill App. 3d 445, 452, 555 N.E.2d 1150, 1154 (5th Dist. 1990), the Fifth District noted that a class action "is particularly appropriate where those who have allegedly been injured 'are in poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive.'" *Wood River*, 555

11

N.E.2d at 1152.

The evidence presented supports the conclusion that, not only is a class action an appropriate method for the fair adjudication of the disputes between State Farm and its millions of policyholders, but also that it may be the only means by which these disputes may be efficiently resolved. First, the potential claimants are widely distributed. Second, the potential claimants are average consumers, not "sophisticated" entities. Third, the individual damages alleged in this action are, for the most part, small and often involve a percentage of the vehicle's actual cash value. This is the very type of consumer class action on behalf of smaller claimants to which Illinois courts have been particularly receptive. *Gordon*, 586 N.E.2d at 467.

In addition, State Farm has made the Court aware of piecemeal litigation taking place in a number of states against the same defendant involving the same issues. Therefore, addressing the common issues in one lawsuit would avoid varying or inconsistent adjudications, and further aid judicial administration by preserving scarce judicial resources.

The Court therefore finds that the fourth prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1. With regard to Count I of Plaintiffs' Third Amended Complaint (Declaratory Judgment), the Court hereby reserves all rulings with respect to this claim and takes the matter under advisement.

2. With regard to Count II of Plaintiffs' Third Amended Complaint (Breach of Contract), the Court finds that Plaintiffs have satisfied their burden of proof regarding the four requirements for certification of this class action under 735 ILCS 5/2-801.

12

3.     The Court has previously considered Plaintiffs' submissions with regard to those states which either permit recovery for diminished value or have not yet spoken on the issue, and the following described Plaintiff Class I is hereby ordered certified for purposes of Count II (Breach of Contract) of Plaintiffs' Third Amended Complaint:

> Those persons in the United States: 1) who were insured under a State Farm motor vehicle insurance policy that provided comprehensive or collision (first-party) coverage; 2) who submitted a claim for property damage to an insured automobile under their collision or comprehensive coverages since January 1, 1996; 3) who, during the class period, were residents of Colorado, Delaware, Georgia, Illinois, Iowa, Kansas, Mississippi, New York, North Carolina, Oregon, South Carolina, Tennessee, Alaska, Connecticut, District of Columbia, Hawaii, Idaho, Maine, Maryland, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Utah, Vermont, West Virginia, Wisconsin or Wyoming; and 4) where:
>
> a.     the repair estimate, including supplements, totaled at least $1,000.00; and,
>
> b.     the claim involved at least one of the following types of vehicle damage:
>
>   1).     Structural and/or Frame Damage; or
>   2).     Deformed Sheet Metal; and,
>
> c.     the vehicle was no more than six years old (model year plus five years) and had less than 90,000 miles on it at the time of the accident.
>
> Excluded from the Class are: 1) individuals who made a claim and received compensation for "inherent diminished value" or "loss in value"; 2) individuals whose policies expressly exclude coverage for "inherent diminished value" or "loss in value"; 3) individuals insured through the involuntary market; 4) insured lease vehicles; 5) employees of State Farm, including its officers and directors; 6) Plaintiffs' counsel; and 7) the Judge of the Court to which this case is assigned.

13

4.    The Court further notes that there are certain states whose law on diminished value is presently "in flux." However, pursuant to the Illinois Class Action Statute, the Court finds that with regard to those states, there still exist common questions of fact or law which predominate, and the following described Plaintiff Class II is hereby ordered certified for purposes of Count II (Breach of Contract) of Plaintiffs' Third Amended Complaint:

> Those persons in the United States: 1) who were insured under a State Farm motor vehicle insurance policy that provided comprehensive or collision (first-party) coverage; 2) who submitted a claim for property damage to an insured automobile under their collision or comprehensive coverages since January 1, 1996; 3) who, during the class period, were residents of Alabama, Arkansas, Florida, Indiana, Louisiana, Michigan, Missouri, Nebraska, Rhode Island, South Dakota, Texas, Washington; and 4) where:
>
> 1.    the repair estimate, including supplements, totaled at least $1,000.00; and,
>
> 2.    the claim involved at least one of the following types of vehicle damage:
>
>   1).    Structural and/or Frame Damage;
>   2).    Deformed Sheet Metal; and,
>
> c.    the vehicle was no more than six years old (model year plus five years) and had less than 90,000 miles on it at the time of the accident.
>
> Excluded from the Class are: 1) individuals who made a claim and received compensation for "inherent diminished value" or "loss in value"; 2) individuals whose policies expressly exclude coverage for "inherent diminished value" or "loss in value"; 3) individuals insured through the involuntary market; 4) insured lease vehicles; 5) employees of State Farm, including its officers and directors; 6) Plaintiffs' counsel; and 7) the Judge of the Court to which this case is assigned.

5.    Steven Peterson, Genyne Greene and Allison Anderson are hereby appointed representatives of Plaintiff Class I and Plaintiff Class II certified herein. Furthermore, Attorneys

14

Judy L. Cates, John Hoffman, Troy Doles, and the firm of Carr, Korein, Tillery, Kunin, Montroy, Cates, Katz & Glass, LLC, and Attorney Debra Hayes are hereby appointed counsel on behalf of the Classes certified herein.

6.    It is further ordered that a status conference is set for January _____, 2001, at 9:00 a.m. At that time , the parties shall appear to discuss formulation of a plan for giving notice to the Class Members.

_____
HONORABLE LLOYD CUETO
CIRCUIT JUDGE

ENTERED: __12-21__, 2000

15

Exhibit 16

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

FILED

APR 2 0 2001

CLERK OF CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| TIMOTHY N. KAISER, M.D. and SUZANNE LeBEL CORRIGAN, M.D., | ) ) ) | |
| Plaintiffs, | ) ) | CLASS ACTION |
| vs. | ) ) | CASE NO: 00-L-480 |
| CIGNA CORPORATION; CIGNA HEALTHCARE OF ST. LOUIS, INC; and CIGNA HEALTHCARE OF TEXAS, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## AMENDED ORDER OF CLASS CERTIFICATION

Case called for hearing on March 29, 2001 pursuant to Plaintiffs' Amended Motion For Class Certification and Plaintiffs' Memorandum In Support Of Class Certification;

Hearing held; arguments heard; exhibits received.

The Court hereby finds that Plaintiffs have sustained their burden of proof pursuant to 735 ILCS 5/2-801. In support thereof, the Court further finds that:

1.) The Class is so numerous that joinder of all members is impracticable and,

2.) That there are questions of fact and law common to the Class and that said common questions predominate over any questions affecting only individual members, and,

3.) The representative Plaintiffs, Timothy N. Kaiser, M.D. and Suzanne LeBel Corrigan, M.D., have no apparent conflicts with, or interests antagonistic to, the other members of the Class. Class Counsel have no apparent conflicts with, or interests antagonistic to, the members of the Class.

Said representative Plaintiffs and Class Counsel will fairly and adequately represent and protect the interests of the Class; and,

4.)     That the certification of a nationwide class as requested by plaintiffs and their counsel is an appropriate method for the fair and efficient adjudication of the controversy.

5.)     The Court further finds that its Order entered March 29, 2001 should be amended to provide for the appointment of additional Class Counsel. Further, an Amended Order is necessary to conform the Class definition to the evidence contained in the record and adduced during the Class certification hearing. The substance of the Class definition is unchanged from the Court's original ruling on March 29, 2001.

### IT IS HEREBY ORDERED:

A.)     The Court hereby certifies the following nationwide Class:

> All physicians or health care *Providers* who, from May 26, 1990, to the present (1) executed a Preferred Provider Organization (PPO) fee-for-service agreement with CIGNA; (2) submitted claims for covered services and/or supplies pursuant to said agreement; and, (3) whose claims were audited by CIGNA's ClaimCheck computer software program prior to any payment.
>
> Excluded from the Class are employees of CIGNA including its officers and directors, plaintiffs' counsel, and the Judge of the Court to which the case is assigned.

B.)     The Court finds and hereby Orders that the term *"Providers"* as used in the Class definition shall be defined as follows: Provider[s] means a physician, hospital, or any other health care practitioner or entity (including such ancillary facilities as clinical laboratories) that has a direct PPO fee-for-service agreement with CIGNA to provide covered services.

C.)   When the term "CIGNA" is used herein, it shall mean CIGNA Corporation, its divisions including CIGNA HealthCare, and the direct and indirect subsidiaries, and affiliates of CIGNA Corporation, including, but not limited to, CIGNA HealthCare of St. Louis, Inc. and CIGNA HealthCare of Texas, Inc.

D.)   The Court hereby designates attorneys Judy L. Cates and Troy A. Doles of Carr Korein, Tillery, Kunin, Montroy, Cates, Katz and Glass as class counsel. Counsel for Dr. Corrigan - Michael C. Dodge and David W. Dodge of the firm of Dodge, Fazio, Anderson & Jones, PC - are appointed class counsel. The Court also appoints Debra Brewer Hayes and Dennis Reich of Reich and Binstock as class counsel.

ENTERED THIS _20_ DAY OF APRIL, 2001.

_____
A. A. Matoesian, Circuit Judge

Exhibit 17

IN THE CIRCUIT COURT
TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

```
FILED
ST. CLAIR COUNTY

DEC 2 1 2000

19 ............. CIRCUIT CLERK
```

MICHAEL SIMS and TIFFANY SIMS,          )
on Behalf of Themselves                 )
and All Others Similarly Situated,      )
                                        )       CLASS ACTION
        Plaintiffs,                     )
                                        )       No. 99-L-393A
vs.                                     )
                                        )
ALLSTATE INSURANCE COMPANY,             )
                                        )
        Defendant.                      )

### ORDER AND FINDINGS RELATED TO CLASS CERTIFICATION

After consideration of the testimony adduced at the class certification hearing on October 24-27, 2000, and having further considered the pleadings, depositions, briefs, exhibits and case authority submitted by both parties, and all other matters properly before the Court, and having considered the arguments of counsel, **the Court hereby finds as follows:**

## I.    SUMMARY OF THE CASE

The representative plaintiffs ("Plaintiffs") in this class action allege that defendant, Allstate Insurance Company ("Allstate"), breached provisions of its automobile insurance contracts with first-party policyholders (Count II of Plaintiffs' Second Amended Complaint). Plaintiffs further argue that they, on behalf of themselves and all others similarly situated, are entitled to Declaratory Judgment and certain equitable remedies (Count I of Plaintiffs' Second Amended Complaint).[1]

---

[1]Count III of Plaintiffs' Second Amended Complaint is premised on the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et seq.* ). The Plaintiffs have not requested that the Court certify a class in conjunction with ICFA at this time.

Plaintiffs have requested that this Court certify a Class which corresponds to each cause of action in their Second Amended Complaint. The Declaratory Judgment Class (Count I) requested by Plaintiffs would be comprised of all first-party policyholders who made property damage claims, but were not informed about coverage for "inherent diminished value" during the claims process. Plaintiffs seek to compel Allstate to recognize "inherent diminished value" as a covered "Loss" in first-party situations. As part of the equitable remedies prayed for, Plaintiffs also seek to change Allstate's claims practices so that policyholders are notified of their right to recover for "inherent diminished value" as a loss. Plaintiffs believe that once Allstate recognizes this obligation, then Allstate should be required to inspect and evaluate for "inherent diminished value" whenever a physical damage claim is made.

Plaintiffs have also requested that this Court certify a Breach of Contract Class (Count II). This Class would be comprised of smaller groups of the same individuals, who, according to Plaintiffs, should have received compensation for "inherent diminished value" because of the nature of damage to their vehicles. It is alleged that Allstate's failure to pay constitutes a breach of the insurance contract, and the Class seeks compensatory damages resulting from any such breach.

Plaintiffs' claims focus upon certain language in Allstate's automobile insurance policies issued nationwide. This language obligates Allstate to pay for *"Loss"* incurred by the policyholder under the terms of the comprehensive or collision coverages of the policies. Allstate contends that its obligation to pay *"Loss"* is circumscribed by those provisions limiting its liability to the "cost of repair" in each policy. Allstate further claims that its obligation to pay is subject to any applicable "appraisal clause" provisions. Although Allstate has issued policies specific to each state, the Court

2

notes that the contractual language at issue in this case is substantially the same in all of its policies nationwide.

Plaintiffs contend that "inherent diminished value" is well-recognized within the automotive industry, that Allstate acknowledges this concept, and that Allstate (in certain states) compensates its insureds for "inherent diminished value." In August of 1997, for example, Allstate conducted a nationwide telephone conference with its Auto Claims Process Specialists to introduce and discuss "Diminished Value Claim Handling." During that telephone conference, Allstate informed its adjusters as follows: "[S]tates currently recognizing loss of value claims on a 1st party basis: Arkansas, Delaware, Florida, Georgia, Iowa, Kansas, Louisiana, Mississippi, Oregon, South Carolina, Tennessee and Texas." (*See* Depo. of Robert Howell, Ex. 12.) Thereafter, Allstate's nationwide handling of diminished value claims was reduced to writing in a manual known as "Diminished Value Best Practices." (*See* Defendant's Pre-Hearing Memorandum, pp. 16-17.)

The record further reveals that Allstate pays (or has paid) "inherent diminished value" in Georgia, Oregon, Texas and parts of Florida, provided that a claim is made and proven to Allstate's satisfaction. (Tr. 10/27/00, Vol. 1, at 57-58.)[3] However, Allstate does not inform its policyholders of their right to make such a claim or to receive compensation for "inherent diminished value." (Tr. 10/25/00, Vol. 1, at 65-66 and Tr. 10/26/00, Vol. III, at 58.) The Plaintiffs characterize Allstate's practice as the "Don't Ask, Don't Tell" policy.

Allstate denies that its insurance policies include any obligation to pay "inherent diminished value" as a part of the *"Loss"* suffered by the insured. In support thereof, Allstate directs this Court's attention to its limitation of liability provisions. Allstate claims that the terms of its policies

---

[3]All citations to the class certification hearing are from the unofficial transcript.

3

\

clearly and unambiguously limit Allstate's obligation to the "cost of repair," which does not include "loss in value." However, this Court previously considered such language in the defendant's Illinois and Washington policies, and found it to be ambiguous. (Order, dated February 4, 2000.) Furthermore, the record reflects that Allstate recently inserted exclusionary language in some of its policies which purports to clarify its liability for "loss in value." (*See* Defendant's Pre-Hearing Memorandum, note 5 and Exhibit "A.")

## II.    GOVERNING LEGAL STANDARD

Certification of a class action in the State of Illinois is governed by 735 ILCS 5/2-801, which provides as follows:

> An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:
>
> (1)    The class is so numerous that joinder of all members its impracticable.
>
> (2)    There are questions of fact or law common to the class which common questions predominate over any questions affecting only individual members.
>
> (3)    The representative parties will fairly and adequately protect the interests of the class.
>
> (4)    The class action is an appropriate method for the fair and efficient adjudication of the controversy.

In considering class certification, the Court has assigned to Plaintiffs the burden of satisfying the four requirements of Section 2-801. *Wheatley v. Board of Ed. Of District 205*, 99 Ill. 2d 481, 459 N.E.2d 1364, 1367 (1984). The Court has not considered the possibility of success on the underlying merits, but only whether the statutory requisites for class certification are satisfied at this

4

time. *See Purcell & Wardrope Chartered v. Hertz Corp.*, 175 Ill. App. 3d 1069, 530 N.E.2d 994, 998 (1st Dist.1988)("hypothetical problems that may arise in the future***[are] not a sufficient basis to refuse to certify an otherwise properly pleaded class action.") Applying this standard, the Court makes the following findings with respect to each of the four statutory requirements for certification of a class action in Illinois.

## III.    CERTIFICATION ISSUES

### A.    Numerosity And Impracticality Of Joinder

735 ILCS 5/2-801(1) requires not only that the number of claimants be numerous, but also that joinder of those claimants in a single suit be impractical. Where there are a number of potential class members and the individual amount of each claim is small, making redress on an individual level difficult, if not impossible, Illinois courts have been particularly receptive to proceeding as a class action. *Miner v. Gillette Co.*, 87 Ill. 2d 7, 428 N.E.2d 478 (1981), *cert. denied*.

It is clear from the record that this lawsuit encompasses millions of potential claimants who are widely dispersed throughout a number of states. In such circumstances, "any attempt to join such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill.App.3d 195, 586 N.E.2d 461, 464 (1st Dist. 1991), *appeal denied* and *certiorari denied*. Furthermore, Allstate does not contest numerosity.

The Court therefore finds that the first prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

5

**B.** Predominate Questions Of Fact Or Law

735 ILCS 5/2-801(2) requires that there be "questions of fact or law common to the class which . . . predominate over any questions affecting only individual members." As our Supreme Court recognized, however, Section 2-801(2) simply necessitates a showing of "*either* a predominating common issue of law *or* fact, not both." *Martin v. Heinhold Commodities, Inc.*, 117 Ill. 2d 67, 510 N.E.2d. 840, 846 (1987) (*Emphasis added.*) While the Plaintiffs must demonstrate that common questions predominate over individual issues,

> [t]he hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action.

*Harrison Sheet Steel Co. v. Lyons*, 15 Ill. 2d 532, 155 N.E.2d 595, 598 (1959).

It should also be recognized that "a separate determination of damages, multiple theories of recovery, or even the inability of some class members to obtain relief because of a particular individual factor will not, standing alone, defeat a class certification if the common questions of fact or law are otherwise predominant." *Purcell*, 530 N.E.2d at 998, citing *Miner v. Gillette Co.*, 87 Ill.2d 7, 428 N.E.2d 478 (1981).

**(i)    Common questions of law predominate**

In determining whether there are common questions which predominate, the Court has carefully considered Allstate's contention that it has no standard auto insurance policy, since each state's policy is tailored to comply with individual state requirements. The Court finds, however, that the operative contractual language contained in each policy is substantially the same. Whether

6

\

Allstate's "limitation of liability" provision or "appraisal clause" qualifies the "Loss" language is not a question to be resolved during class certification. It is a question for resolution on the merits.

Although the Plaintiffs claim that there are numerous questions of law which predominate, the Court is satisfied that the common issue of contract interpretation, by itself, is dominant and pervasive. *See, e.g., Van Vactor v. Blue Cross Association*, 50 Ill.App.3d 709, 365 N.E.2d 638, 647 (1ˢᵗ Dist.1977).[4] Here the Class Members have a common interest in determining whether Allstate is obligated to compensate its policyholders for "inherent diminished value," and this issue of contract interpretation predominates over other issues. *See, e.g., Carraro v. Healthcare Service Corp.*, 118 Ill.App.3d 417, 454 N.E.2d781, 790 (1ˢᵗ Dist.1983); *Purcell*, 530 N.E.2d at 998.

While it is not necessary to make a choice-of-law determination at this time, the Court does note that contract law is essentially uniform throughout the country. (*See, e.g.*, Plaintiffs' Reply Brief, Exs. 34-35.) Moreover, our Supreme Court previously certified a nationwide class action, finding that it does not violate due process to apply Illinois substantive law to nonresident class

---

[4]Among others, Plaintiffs claim that the following questions of fact and law predominate:

(1)   Whether Allstate's standard auto policy provides coverage for the "loss" (*i.e.*, inherent diminished value)?

(2)   Whether payment for repairs alone can restore vehicles (which sustain certain types of damage) to their pre-loss condition?

(3)   Whether Allstate breached its obligations to policyholders by systematically failing and/or refusing to compensate Class Members for diminution in value?

(4)   Whether Class Members are entitled to damages for this breach?

(5)   Whether Allstate satisfied all conditions precedent necessary to invoke the "appraisal clause" in is standard auto policy?

(6)   Whether Allstate – through a common and systematic course of conduct and business practice – processed first-party physical damage claims so as to avoid paying diminution in value?

(7)   Whether the court should declare such business practices in breach of Allstate's contractual obligations and, on the basis thereof, enjoin Allstate from proceeding in that wrongful manner?

(8)   Whether Allstate should be required to implement reasonable procedures to inform and notify policyholders of their right to payment for diminution in value, to ascertain the amount of such diminution during the appraisal and repair process, and to pay such amount?

7

members where the dispute involves an Illinois corporation, like Allstate, and otherwise implicates legitimate State interests. *Martin*, 510 N.E.2d at 847. *Accord Gordon*, 586 N.E.2d at 466.

Similarly, the vast majority of states either permit recovery for inherent diminished value or have not spoken on the issue. However, because some states are presently considering the issue in related litigation, the Court has considered this fact and divided the potential claimants into separate classes. Plaintiff Class I includes policyholders from those states where recovery for diminished value is either expressly permitted or, at least, not prohibited. Plaintiff Class II includes policyholders from those states where the law on diminished value law is "in flux" because of ongoing litigation, yet not "clearly contradictory" to forum law at this time.

The Court retains the right to establish manageable sub-classes pursuant to Section 2-802(b) should it become necessary. *Purcell*, 530 N.E.2d at 998; *Gordon*, 586 N.E.2d at 466.

### (ii)   Common questions of fact predominate

As highlighted by the testimony at the class certification hearing, the Court finds that there are common questions of fact which also predominate over issues affecting only individual Class Members. For example, Plaintiffs argue that vehicles which sustain certain types of physical damage cannot be restored to pre-loss condition through the repair process. (*See, e.g.*, Plaintiffs' Reply Memorandum, pp. 10-12.) Allstate disputes this contention. (Tr. 10/26/00, Vol. 2, at 31.) Therefore, the existence and proof of "inherent diminished value" is a class-wide issue.

Similarly, both Tom Dinardo and Bob Khosropur testified that Allstate follows a consistent practice of not informing its policyholders about coverage for "inherent diminished value." (Tr. 10/25/00, Vol. 1, at 65-66 and Tr. 10/26/00, Vol. III, at 58.) The record also reflects that Allstate establishes nationwide claims policies, *e.g.*, "Best Practices," at its corporate headquarters in

8

Northbrook, Illinois.[5] Yet, Allstate disputes that its claims handling practices are systematic and uniform. (*See, e.g.,* Defendant's Pre-Hearing Memorandum, pp. 13-19.) Therefore, the nature of Allstate's claims' practices is a class-wide issue.

While the Court is mindful of Allstate's concerns about the need for individual proofs and the fact that damages may be in varying amounts, it does not believe that such issues predominate over the common questions of fact and law noted above. Furthermore, such considerations traditionally have not foreclosed certification in this State. *See, e.g., Slimack v. Country Life Ins. Co.,* 227 Ill.App.3d 287, 591 N.E.2d 70, 74 (5th Dist. 1992) ("The requirement of individual proofs should not be a bar to a class action."), *appeal denied; Barliant v. Follett Corp.,* 74 Ill.2d 226, 384 N.E.2d 316 (1978) (same); *Kennedy v. Commercial Carriers,* 294 Ill.App.3d 34, 689 N.E.2d 293, 297 (1st Dist. 1997) ("[I]f certain individual questions exist that may require individual determinations, these individual questions may be handled within sub-classes, as long as the common issues predominate."); and *McCarthy v. LaSalle Nat. Bank & Trust,* 230 Ill.App.3d 628, 595 N.E.2d 149, 153 (1st Dist. 1992) ("[T]he fact that the class members' recovery may be in varying amounts which must be determined separately does not necessarily mean that there is no predominate question.")

The Court expresses no opinion on the ultimate resolution of these disputed issues, and does not know whether Plaintiffs will ultimately prove successful with their claims. However, it does believe that these are examples of common questions which predominate in light of the respective

---

[5]Like *Avery v. State Farm,* there is also testimony which suggests that Allstate issues claims bulletins from its headquarters in Northbrook, Illinois, to convey changes in policy nationwide. (*See* Depo. of Tom Dinardo, p. 219.)

positions taken by the parties to this litigation. The Court therefore finds that the second prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

### C.    Adequacy Of Representation

735 ILCS 5/2-801(3) conditions class certification upon a finding that "the representative parties will fairly and adequately protect the interest of the class." The purpose of the "adequate representation" requirement is to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim. *Gordon*, 586 N.E.2d at 466. It is therefore necessary that "the class representative[s] not seek relief antagonistic to the interests of other potential class members." *Purcell*, 530 N.E.2d at 1000. *Accord Slimack v. Country Life Insurance Company*, 227 Ill.App.3d 287, 591 N.E.2d 70 (5th Dist. 1992).

The Court further notes that, unlike F.R.C.P. 23, there is no "typicality" requirement in Section 2-801(3). The Illinois statute is more liberal than the Federal Rule in this regard, and "a class representative may not be disqualified merely because his claim is not exactly the same as the claims of other potential class members." *Carraro*, 454 N.E.2d at 790.

Based upon the record, the Court concludes that Plaintiffs have zealously pursued their claims since learning of Allstate's alleged wrongful conduct and that Plaintiffs have sufficient financial resources to absorb the expenses involved in being the named representatives. The Court further finds that there are no conflicts between Plaintiffs and the Class, since it is clear from the Court's review of the materials submitted that Michael Sims, Tiffany Sims and the Class Members share common objectives and legal and factual positions.

It should be noted that much has been made of the Sims' prior bankruptcy and whether the bankruptcy trustee is the real-party-in-interest to this litigation. Although the Plaintiffs are correct

10

that individual defenses (*e.g.*, estoppel, spoliation, etc.) do not defeat class certification (*Purcell*), the Court agrees with Allstate that Michael and Tiffany Sims must at least "own" their claims to serve as class representatives. Based upon the parties' recent submissions and the arguments of counsel, however, the Court is satisfied that Michael and Tiffany Sims do "own" their claims and that they are the real-parties-in-interest.

Lastly, in determining the adequacy of representation, the Court also considers the quality and experience of the attorneys for the Class. In that regard, the Court is aware that counsel for Plaintiffs regularly engage in major consumer litigation of the size, scope and complexity as this case. Moreover, the Court has had the opportunity to observe Plaintiffs' counsel in the past and during the proceedings herein.

Judicial evaluation of the quality of representation, as well as class certification in general, rests within the sound discretion of the trial court. *McCabe v. Burgess*, 75 Ill. 2d 457, 389 N.E.2d 565, 568 (1979). Based upon the foregoing, the Court finds that the third prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.

D.     **Appropriate Method For The Fair And Efficient Adjudication Of The Controversy.**

735 ILCS 5/2-801(4) requires a finding that "the class action is an appropriate method for the fair and efficient adjudication of the controversy." Although F.R.C.P. 23(b)(3) requires that a class action be *superior* to other available methods of adjudication, the Illinois statute merely requires that a class action be an *appropriate* method of litigating the controversy. In applying the fourth prerequisite, the Court considers whether a class action can best secure economies of time,

11

effort, and expense and promote uniformity of decision or accomplish other ends of equity and justice. *Gordon*, 586 N.E.2d at 467.

A significant factor in the case at bar is that a class action is the only practical means for policyholders to present their claims and for Allstate to achieve some finality to this matter. Further, Illinois courts have historically recognized that class actions are an appropriate method for adjudicating controversies involving numerous small claims. In *Wood River Area Development Corporation v. Germain Federal Savings and Loan*, 198 Ill App. 3d 445, 555 N.E.2d 1150, 1154 (5th Dist. 1990), the Fifth District noted that a class action "is particularly appropriate where those who have allegedly been injured 'are in poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive.'" *Wood River*, 555 N.E.2d at 1152.

The evidence presented supports the conclusion that, not only is a class action an appropriate method for the fair adjudication of the disputes between Allstate and its millions of policyholders, but also that it may be the only means by which these disputes may be efficiently resolved. First, the potential claimants are widely distributed. Second, the potential claimants are average consumers, not "sophisticated" entities. Third, the individual damages alleged in this action are, for the most part, small and often involve a percentage of the vehicle's actual cash value or damage repair estimate. (*See, e.g.*, Defendant's Pre-Hearing Memorandum, Vol. 10, Ex. 16.) This is the very type of consumer class action on behalf of smaller claimants to which Illinois courts have been particularly receptive. *Gordon*, 586 N.E.2d at 467.

In addition, Allstate has made the Court aware of piecemeal litigation taking place in a number of states against the same defendant involving the same issues. Therefore, addressing the

12

common issues in one lawsuit would avoid varying or inconsistent adjudications, and further aid judicial administration by preserving scarce judicial resources.

The Court therefore finds that the fourth prerequisite for class certification under Section 2-801 of the Illinois Class Action Statute is satisfied.   —

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      With regard to Count I of Plaintiffs' Second Amended Complaint (Declaratory Judgment), the Court hereby reserves all rulings with respect to this claim and takes the matter under advisement.

2.      With regard to Count II of Plaintiffs' Second Amended Complaint (Breach of Contract), the Court finds that Plaintiffs have satisfied their burden of proof regarding the four requirements for certification of this class action under 735 ILCS 5/2-801.

3.      The Court has previously considered Plaintiffs' submissions with regard to those states which either permit recovery for diminished value or have not yet spoken on the issue, and the following described Plaintiff Class I is hereby ordered certified for purposes of Count II (Breach of Contract) of Plaintiffs' Second Amended Complaint:

> Those persons in the United States: 1) who were insured under an Allstate motor vehicle insurance policy that provided comprehensive or collision (first-party) coverage; 2) who submitted a claim for property damage to an insured automobile under their collision or comprehensive coverages since January 1, 1996; 3) who, during the class period, were residents of Colorado, Delaware, Georgia, Illinois, Iowa, Kansas, Mississippi, New York, North Carolina, Oregon, South Carolina, Tennessee, Alaska, Connecticut, District of Columbia, Hawaii, Idaho, Maine, Maryland, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Utah, Vermont, West Virginia, Wisconsin or Wyoming; and 4) where:

13

a. the repair estimate, including supplements, totaled at least $1,000.00; and,

b. the claim involved at least one of the following types of vehicle damage:

  1) Structural and/or Frame Damage; or,   —
  2) Deformed Sheet Metal; and,

c. the vehicle was no more than six years old (model year plus five years) and had less than 90,000 miles on it at the time of the accident.

Excluded from the Class are: 1) individuals who made a claim and received compensation for "inherent diminished value" or "loss in value"; 2) individuals whose policies expressly exclude coverage for "inherent diminished value" or "loss in value"; 3) individuals insured through the involuntary market; 4) insured lease vehicles; 5) employees of Allstate, including its officers and directors; 6) Plaintiffs' counsel; and 7) the Judge of the Court to which this case is assigned.

4. The Court further notes that there are certain states whose law on diminished value is presently "in flux." However, pursuant to the Illinois Class Action Statute, the Court finds that with regard to those states, there still exist common questions of fact or law which predominate, and the following described Plaintiff Class II is hereby ordered certified for purposes of Count II (Breach of Contract) of Plaintiffs' Second Amended Complaint:

Those persons in the United States: 1) who were insured under an Allstate motor vehicle insurance policy that provided comprehensive or collision (first-party) coverage; 2) who submitted a claim for property damage to an insured automobile under their collision or comprehensive coverages since January 1, 1996; 3) who, during the class period, were residents of Alabama, Arkansas, Florida, Indiana, Louisiana, Michigan, Missouri, Nebraska, Rhode Island, South Dakota, Texas, Washington, and 4) where:

a. the repair estimate, including supplements, totaled at least $1,000.00; and,

14

b. the claim involved at least one of the following types of vehicle damage:

  1) Structural and/or Frame Damage; or,
  2) Deformed Sheet Metal; and,

c. the vehicle was no more than six years old (model year plus five years) and had less than 90,000 miles on it at the time of the accident.

Excluded from the Class are: 1) individuals who made a claim and received compensation for "inherent diminished value" or "loss in value"; 2) individuals whose policies expressly exclude coverage for "inherent diminished value" or "loss in value"; 3) individuals insured through the involuntary market; 4) insured lease vehicles; 5) employees of Allstate, including its officers and directors; 6) Plaintiffs' counsel; and 7) the Judge of the Court to which this case is assigned.

5. Michael Sims and Tiffany Sims are hereby appointed representatives of Plaintiff Class I and Plaintiff Class II certified herein. Furthermore, Attorneys Judy L. Cates, John Hoffman, Troy Doles, and the firm of Carr, Korein, Tillery, Kunin, Montroy, Cates, Katz & Glass, LLC, and Attorney Ron Parry of Arnzen, Parry and Wentz, P.S.C. are hereby appointed counsel on behalf of the Classes certified herein.

6. It is further ordered that a status conference is set for January _____, 2001, at 9:00 a.m. At that time, the parties shall appear to discuss formulation of a plan for giving notice to the Class Members.

_____
HONORABLE LLOYD CUETO
CIRCUIT JUDGE


ENTERED: __/2 - 2/__, 2000


15