**Pomerantz Haudek Block Grossman & Gross LLP**
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
100 Park Avenue
New York, New York 10017
212-661-1100

Counsel for Plaintiff and the Putative Class

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN R. STEINBERG, on his own behalf and on behalf of all others similarly situated,<br><br>                                   Plaintiff,<br><br>                    v.<br><br>NATIONWIDE   MUTUAL   INSURANCE COMPANY,<br><br>                                   Defendant. | 99-CV-7725 (*ADS*)<br><br>**REPLY AFFIDAVIT OF D. BRIAN HUFFORD IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**FILED**<br>IN CLERK'S OFFICE<br>U.S. DISTRICT COURT E.D.N.Y<br><br>★   JUN 2 1 2002   ★<br>*9-25-02 ʰᵃᵒ*<br>LONG ISLAND OFFICE |

STATE OF NEW YORK      )
                                        )      ss.:
COUNTY OF NEW YORK   )

D. BRIAN HUFFORD, being duly sworn, deposes and says:

1.        I am an attorney admitted to practice in the State of New York and am a member of the firm of Pomerantz Haudek Block Grossman & Gross LLP, counsel for plaintiff Stephen R. Steinberg in the above-captioned litigation.  I submit this reply affidavit in support of Plaintiff's Motion for Class Certification.  Through this affidavit, I will respond to some of the issues raised in the declarations submitted by defendant Nationwide Mutual Insurance Company ("Nationwide") in opposition to the class motion.

205

2.      As detailed in Plaintiff's opening papers, and in the accompanying Reply Memorandum in Support of Plaintiff's Motion for Class Certification, Plaintiff's motion for class certification should be granted.  Plaintiff has alleged the common issue of whether Nationwide has breached its standard form automobile insurance contract by taking betterment deductions from reimbursements for automobile repairs, which clearly predominates over individual questions. Moreover, addressing this issue through a class action is far superior to relying on the possibility of numerous individual disputes asserting the same grievance.

### Natiowide's Standard Form Automobile Insurance Policies

3.      In opposing Plaintiffs' class motion, Nationwide filed a memorandum of law as well as several declarations which purportedly support its claim that certification of the class is improper.  Initially, Nationwide asserts that it does not use a standard form automobile insurance policy, such that common issues do not predominate, relying on a declaration of Michael R. Nelson, one of the attorneys for Nationwide's in this action.  Declaration of Michael R. Nelson ("Nelson Decl.").  In this Declaration, Mr. Nelson claims that there are "significant material differences in policy language from state to state, and over time within individual states." *Id.*, ¶ 5.  To support this contention, Mr. Nelson makes the following assertions: (1) "certain states require mandatory language in policies on issues such as limits of liability for loss, actual cash value, and others," citing the Declaration of Robert W. Basehore, Jr., dated October 17, 2001 ("Basehore Decl."), ¶ 6, and the Third Declaration of Robert W. Basehore, Jr., dated May 1, 2002 ("3rd Basehore Decl."), ¶ 3; (2) "in nearly every state, Nationwide (like other insurers) 'is required to file its policy and endorsement forms with insurance regulators in those states and obtain from them prior approval for its forms,'" citing Basehore Decl., ¶ 8; and (3) "State insurance departments also perform audits of individual

2

claim files to monitor for compliance with state insurance regulations, and those auditors are provided with the relevant policies and endorsements," citing *id.*, ¶ 9. Significantly, *none of these "facts" demonstrates that there are material variations of the contractual language at issue in this litigation.*

4.      With respect to the mandatory state definitions, Nationwide actually cites only three states in which it currently provides automobile insurance – North Carolina, Texas and Virginia – as having mandatory language, and one additional state, Massachusetts, in which it has not provided insurance since 1994. 3rd Basehore Decl., ¶ 3. Thus, this is not even an issue for the vast majority of the 45 states in which Nationwide provides insurance. Moreover, Nationwide doesn't even attempt to explain why this mandatory language is materially different from that used in the other 41 states as it relates to the use of betterment deductions. In any event, assuming Nationwide could ultimately demonstrate that the mandatory language is materially different from the other states, the Court could always revise the class definition to exclude subscribers in those states.

5.      As for the involvement of state insurance regulators, Nationwide merely asserts that they are "informed" of the language it uses in its form contracts. It never explains why this has any relevance whatsoever in the question of contract interpretation before this Court. Nationwide has entered into private standard form contracts with its insureds and it is obligated to comply with its agreements. The fact that regulators may oversee its operations in general, or even provide some form of approval for the forms, says nothing about whether Nationwide has breached its private insurance contracts by imposing a betterment deduction. Nor is it relevant to the question of whether Nationwide uses standard from contracts in the first instance.

3

6.    To further support its claim that it does not rely on similar form contracts, Nationwide also attaches to the Nelson Declaration several charts which purportedly point out "the many differences in policy language from state to state." Nelson Decl., ¶¶ 30-32 (attaching Exhibits N-P). Nationwide neglects to even discuss any of these supposed "differences," however, apparently hoping the Court will merely accept its conclusory characterizations. Nevertheless, a review of the Exhibits disputes Nationwide's conclusions

7.    As Exhibit N to the Nelson Declaration, Nationwide attaches a chart which lists the minor variations among Nationwide's policies concerning the process by which an appraisal may be undertaken to resolves disputes over how much Nationwide should reimburse a claimant under his or her automobile policy. Ironically, this chart demonstrates that language among the state contracts are very similar, with virtually all of the states establishing a procedure where each party will identify a "competent and disinterested appraiser," which together "will select an umpire to differences," *see* Nelson Decl., ¶ 6 (one state, Delaware, permits arbitration instead). Plaintiff is hard pressed to find *any* material differences in the contracts, and invites the Court to try as well. The only variation identified by Nationwide is that the umpire's decision is expressly binding in some states, while in others it can be appealed to a court, Nelson Decl., ¶ 6, a distinction which is not relevant to the issue before the Court. Regardless of what steps an insured may take to resolve coverage disputes, that says nothing about whether the underlying automobile insurance contract permits Nationwide to take a betterment deduction. That is a contract issue based on the language in the contract itself; a decision by appraisers over individual disputes will not resolve that legal question.

4

8.      As Exhibit O to the Nelson Declaration, Nationwide attaches a second chart, entitled "Actual Cash Value Language Contained in Nationwide Mutual's Auto Physical Damage Insurance Policies and Amendatory Endorsements," which purports to summarize the "actual cash value" language used in its various form policies.  This is Nationwide's version of the chart attached as Exhibit 5 to the original Affidavit of D. Brian Hufford in Support of Plaintiff's Motion for Class Certification ("Hufford Aff.").  What both this charts demonstrate is how similar the language is in all of Nationwide's policies.  Nearly all of the policies, for example, use the identical language for defining "cash value," by stating that, to determine this value, Nationwide will consider "fair market value; age; and condition of the property."  Some of the policies list this factors numerically, while others include the same substance in a paragraph form.  But they *all* have the same basic language. Nelson Decl., Exh. O; Hufford Aff., Exh. 5.

9.      There is also a remarkable similarity state to state in the way in which they describe how Nationwide will pay its insured for their losses, as reflected in Exhibit P to the Nelson Declaration.  This third chart, entitled "Loss Language Contained in Nationwide Mutual's Physical Damage Insurance Policies and Amendatory Endorsements," summarizes the "Loss Language" contained in its form policies.  Virtually every version contains the same basic language in which Nationwide represents that it will pay the insured "directly for a loss" or will pay "to repair or replace your auto or its damaged parts," and will "return stolen property at our expense and pay for any damage." *Id.*  Aside from a change in format (with some versions listing the statements in paragraph form, while others numbering them), the only other change is that some of the versions specify that repairs may be made "by original equipment manufacturers or non-original equipment manufacturers," while others do not.  But whether or not original equipment manufacturer ("OEM")

5

parts are used *is not at issue in Plaintiff's class motion.* Significantly, as Plaintiffs' own chart demonstrates, Hufford Aff., Exh. 5, none of the Nationwide policies expressly authorize it to take a betterment deduction. Instead, Nationwide relies on standard language used in all of its contracts to justify its entitlement to do so. Nationwide fails to demonstrate in any fashion how the minor differences in the contracts have any material impact in our the contracts are interpreted. Indeed, Nationwide has adopted national betterment guidelines which apply equally to all of the policies, without changing due to any such variations. By interpreting the contracts uniformly, Nationwide establishes that, for all intents and purposes, the contracts *are identical.*

10.    As Exhibit Q to the Nelson Declaration, Nationwide attaches a fourth chart, entitled "Specific Language Regarding Losses From Non-Physical Causes Contained in Certain of Nationwide Mutual's Auto Physical Damage Policies," which merely points out that in California, Delaware, Indiana, Mississippi, Oregon and Rhode Island the following exclusionary language is included: "'Loss' means accidental loss or damage to your auto, including its equipment, which is both direct and physical. Loss does not include reduction in value from non-physical causes." Again, Nationwide does not explain how this language has relevance to Plaintiff's allegations. The fact that these six states have this language, does not have an impact on the common question of whether Nationwide may impose betterment deductions on its insureds. Moreover, even if there was some significance to this language, it would be a simple matter to create a subclass to address the issue on behalf of residents in those states.

11.    Finally, as Exhibit R to the Nelson Declaration, Nationwide attaches a fifth chart, entitled "Statutes of Limitations - Breach of Contract," which purports to list the various statute of limitations applicable to a breach of contract. However, the law is clear that variations in

6

the statute of limitations in various states does not bar class certification. As held in *Morris v. Transmouth Financial Corp.*, 1997 U.S. Dist. LEXIS 18502, *17 (M.D. Ala. Nov. 14, 1997), "[t]o the extent there may be varying statute of limitations, the application of those statutes appears to the court to be a mechanical process which will not undercut the benefits of class treatment." The same conclusion has been reached by numerous other courts. *See e.g., Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) ("The existence of a statute of limitations issues does not compel a finding that individual issues predominate over common ones."); *Williams v. Sinclair*, 529 F. Supp. 1383, 1388 (9th Cir. 1975) (same); *Hoxworth v. Blinder Robinson & Co., Inc.*, 980 F.2d 912, 924 (3d Cir. 1992) (variations among statute of limitations do not defeat class certification); *In re Energy Sys. Equip. Leasing Secs. Litig.*, 642 F. Supp. 718, 752-53 (E.D.N.Y. 1986); *Chevalier v. Baird Sav. Assn.*, 72 F.R.D. 140, (E.D. Pa. 1976); *Broin v. Philip Morris Companies, Inc.*, 641 So. 2d 888, 891 (Fla. Ct. App. 1994) ("it is of no moment . . . that different statutes of limitations may apply . . . . Differences among the class members as to applicable statutes of limitations do not require dismissal of a class action.); *Lamb v. United Security Life*, 59 F.R.D. 25, 34 (S.D. Iowa 1972) (statute of limitations affirmative defense does not preclude certification); *Zeigler v. Gibralter Life Ins. Co. of America*, 43 F.R.D. 169, 173 (D.S.D. 1967) (same); *Gunter v. Ridgewood Energy Corp.*, 154 F.R.D. 391, 399 (D.N.J. 1996) ("even if the statute of limitations defense does later reveal itself to be an individual issue, this Court does not foresee that it will be a *predominating* issue worth derailing certification"). Thus, accounting for any variations in the statute of limitations for contract disputes is a mere mechanical task that can be performed by the claims administrator and does not warrant denial of class certification. In any event, the Court has the authority to apply the New York statute of limitations, rather than to resort to applying the statutes of other states. In *Sun Oil Co. v.*

7

*Wortman*, 486 U.S. 717 (1988), the Supreme Court noted that it "has long and repeatedly held that the Constitution does not bar application of the forum State's statute of limitations to claims that in their substance are and must be governed by the law of a different State." *Id.* at 722. Accordingly, variations in statutes of limitations poses no problem.

12.     Nationwide cannot legitimately dispute the conclusion that it uses a standard form contract with virtually identical language throughout the United States. Any minor variations in language are not relevant to the class issue, since a common question of whether the contracts permit a betterment deduction to be taken applies to all of them. The holding in *Collins v. International Dairy Queen, Inc.*, 168 F.R.D. 668, 676 (N.D. Ill. 1996), is particularly relevant, because it certified a class of franchisees where there were *more than 500 different types of franchise agreements*, with the court concluding that "the lack of identical language in every franchise agreement does not preclude class certification with respect to the issues presented [for] violation of the franchise agreement," given that "[n]o difference[s] in the substantive meaning of the various contracts has yet been established, and plaintiffs are seeking to have the issues adjudicated under general contract law." *See* cases cited in Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pl. Mem."), at 17-18, including *Snider v. State Farm Mutual Automobile Insurance Co.*, No. 97-L-114, *slip op.*, at 9 (Ill. Cir. Ct. Dec. 5, 1997) (in certifying a nationwide class of all State Farm customers who had received repairs to their vehicles pursuant to automobile insurance contracts, State Farm's claim that it does not use standard form contracts was not dispositive, because "the policies' specific form is immaterial, provided that the operative contractual language contained in each policy *is susceptible to uniform interpretation*") (emphasis added). The same is true here, where, although there may be certain differences among some provisions in

8

Nationwide's form contracts, they are virtually *identical* with respect to the coverage provisions at issue and are subject to a "uniform interpretation" as it relates to the propriety of taking betterment deductions.

### Nationwide's Uniform Interpretation of its Standard Form Policies

13.    Nationwide also contests Plaintiff's allegation that it relies on a uniform interpretation of its standard form contracts to permit betterment deductions, with Mr. Nelson stating that "Nationwide's witnesses and its interrogatory responses have uniformly stated that the requirements of state law, individual judgment of appraisers, and the particular circumstances govern decisions on betterment." Nelson Decl., ¶ 7. Mr. Nelson then describes how regulations influence such issues as "the parts on which betterment may be taken," *id.*, ¶ 8, and how "betterment decisions are highly specific," *id.,* ¶ 9, with "the decision to reduce for depreciation [being] based on the assessor's individual judgment of the condition of the vehicle." *Id.*, ¶ 10. These arguments, however, are besides the point. Regardless of whether the *amount* of a betterment deduction may depend on individualized assessments, or whether the process by which a betterment deduction is made may be impacted by state regulations, that does not alter the undisputed fact that Nationwide has adopted a uniform interpretation of its policies whereby betterment deductions are *permissible* – an interpretation which Plaintiff directly challenges in this litigation.

14    Nationwide clearly applies a uniform policy pursuant to which it permits a betterment deduction to be taken under *all* of its contracts nationwide – with the only exception being Texas, where the regulators have ordered them to stop. *See* Pl. Mem. at 6-7 (quoting deposition testimony of Terry Fortner, a Material Damage Claims Technical Officer for Nationwide, confirming that Nationwide applies betterment to all of its automobile insurance policies except for

9

those issued in Texas); Hufford Aff., Exh. 7 (Dec. 14, 1998 memorandum entitled "Auto Material Damage Depreciation/Betterment Guidelines," summarized in Plt. Mem. at 7-8) ("Betterment Guidelines").

15.    The Betterment Guidelines, in particular, provide compelling evidence in favor of class certification. The cover memorandum, for example, which was written by Mr. Fortner, states that the Betterment Guidelines were prepared "[i]n an effort to create uniformity and consistency . . . for all material damage claims." Hufford Aff., Exh. 7 (at 00472). During his deposition, Mr. Forkner also testified that "[t]he purpose" of this document "was to create uniformity and consistency with all of Nationwide claims handling." Hufford Aff., Exh. 6 (Forkner Deposition Transcript dated August 17, 2001) ("Forkner Dep."), at 91). Although the Betterment Guidelines stated that they will be superceded by any regulations or statutes, Nelson Decl., ¶ 7, that does not indicate that they have, in fact, been superceded, nor does it alter the fact that the Guidelines demonstrate conclusively that Nationwide has adopted a policy whereby betterment deductions are permissible under their standard form automobile insurance contracts.

16    If any state regulations do, in fact, preclude the use of betterment deductions, such that Nationwide does not take such deductions in certain states, then residents from those states (if any) would not be members of the class – it is defined as including only those who have had betterment deductibles applied. Although the Texas regulators apparently will not permit Nationwide to continue making betterment deductions, for example, there is no indication that Nationwide has been required to make reimbursements to Texas residents for past deductions. Thus, even Texas residents remain viable members of the proposed class. To the extent the regulators, or the discretion of individual appraisers, affect the *amount* of betterment deductions, or how they may

10

be calculated, that is not relevant to the issue of *whether* betterment can be deducted in the first instance. Nationwide cannot deny that it permits betterments to be taken under *all* of its standard automobile insurance policies. The common – and predominant – issue, then, is whether that is proper under the terms of the contract.

## Similarities Among State Laws Concerning Contract Interpretation

### The *Contra Proferentem* Doctrine

17. Nationwide further asserts that there are numerous variations among the states with regard to breach of contract issues, which preclude class certification. First, it claims many conflicting interpretations of the *contra proferentem* doctrine, attaching Exhibit S to the Nelson Declaration, entitled "Application of Contra Proferentem Doctrine," purportedly to show such variations. A careful review of that chart, however, favors Plaintiff's interpretation of the law. As it reveals, 40 states have adopted a straightforward interpretation of the *contra proferentem* doctrine, pursuant to which an ambiguous insurance contracts -- where the contract was drafted by the insurance company and the disputed provision could reasonable be interpreted either against or in support of coverage -- should be interpreted *in favor of the insured*: Alabama, Alaska, Arkansas, California, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming. Nelson Decl., Exh. S.

18 Nationwide highlights certain statements with regard to some of the states to suggest variations, but they are not relevant here. For example, courts in California, Louisiana,

11

Massachusetts, New Jersey and North Carolina have held that there is no need to apply the doctrine where both parties to a contract were sophisticated entities which jointly negotiated the language. Nelson Decl., Exh. S. But that exception, to the extent it exists, is irrelevant to this case, where the Court is being asked to interpret standard form automobile insurance contracts which were drafted solely by Nationwide and there is no evidence they were *ever* subject to negotiation by the parties. Indeed, Nationwide's claim that the form contracts have to be submitted to regulators for review or approval demonstrate that such individual negotiation simply does not happen with these types of policies.

19.     While some states, such as Hawaii, Iowa, Oklahoma, specify that "limitations" or "exclusions" in insurance contracts are subject to the doctrine, Nelson Decl., Exh. S, that again does not alter the Court's consideration here, because that is precisely what is at issue – Nationwide's effort to exclude coverage of the difference between the value new and used parts in automobile repairs. Thus, the extent to which some states apply the doctrine primarily to "limitations" or "exclusions" does not impact on this case.

20.     In Exhibit S, Nationwide also distorts the decisions in certain states to create the impression that they vary from the majority view, when such is not the case. For New York, Nationwide simply misquotes the relevant authority to suggest a result which is the exact opposite of what the court held. In particular, Nationwide quotes *Mossa v. Provident Life & Cas. Ins. Co.*, 36 F. Supp.2d 524, 526 (E.D.N.Y. 1999), as stating that New York courts will "interpret language of policy in favor of *insured* only 'where it is the sole construction which can be failure placed upon the words employed.'" Thus suggests that the insured must have the only reasonable construction of the contract in dispute for it to be interpreted in its favor. But what the court in *Mosso* actually

12

says is that "[a] construction favorable to the *insurer* will only be sustained where it is the sole construction which can fairly be placed upon the words employed." *Id.* (emphasis added). This conclusion is reached after the court explains the *contra proferentem* doctrine as "the well-accepted maxim that any ambiguity must be resolved against the drafter" which is applied in New York to insurance contracts. Thus, contrary to Nationwide's assertion, New York has adopted the *contra proferentem* doctrine, just as virtually every other state has.

21.     Nationwide similarly distorts the law in both Kentucky and Utah. With regard to Kentucky, Nationwide cites a case that apparently does not even discuss *contra proferentem*, but merely holds that "exceptions and exclusions are required to be strictly construed to make insurance effective." Nelson Decl., Exh. S (citing *Aetna Cas. & Surety v. Nuclear Eng. Co.*, No. 2000-CA-000114-MR (Ky. App. March 8, 2002)). But it ignores existing Kentucky precedent that clearly adopts the *contra proferentem* doctrine. *See, e.g., Simpsonville Wrecker Service,Inc. v. Empire Fire and Marine Ins. Co.,* 793 S.W.2d 825, 829 (Ky. App. 1989) (citing to "the mandate of *Wolford v. Wolford, Ky.,* 663 S.W.2d 835, 838 (1984), requiring that if a contract is capable of two constructions or if its language is ambiguous then it must be liberally construed in order to resolve any doubts in favor of the insured").

22.     Nationwide also misstates the law in Utah, by summarizing it as being that the court should "*liberally interpret contract language* 'so as to promote and not defeat the purposes of the insurance,*" suggesting some variation from the *contra proferentem* doctrine. Nelson Decl., Exh. S (emphases added by Nationwide) (quoting *Am. Concepts Ins. Co. v. Jones*, 935 F. Supp. 1220, 1225 (D. Utah 1996)). In doing so, it omits the line preceding the quote which states that the contract language is to be strictly construed "in favor of the insured," with the court adding that "if

13

a policy contains ambiguous language that is 'fairly susceptible to different interpretations,' the policy must be construed in favor of coverage." *Id.* Thus, Kentucky and Utah, just as is true for New York, have adopted the same interpretation of *contra proferentem*, bringing to 43 the number which apply the identical interpretation of the doctrine.

23.     Notwithstanding Nationwide's recitation of decisions from every state in an effort to imply material variations among them, there are, in fact, only two basic approaches to the *contra proferentem* doctrine. The first one, summarized above, is the standard interpretation which holds that, when a form contract is involved which has been drafted by the insurer and is not negotiated, any ambiguous provisions should be interpreted in favor of coverage for the insured. The second approach, adopted by Connecticut, the District of Columbia, Maine, Missouri, New Mexico and North Dakota, applies the doctrine, but will interpret the ambiguous provisions in favor of the insured only after the court first examines any available extrinsic evidence to see if the parties' intent can be determined. Nelson Decl., Exh. S. The same law also applies in Maryland, where – notwithstanding Nationwide's assertion that "there is *no rule in Maryland* that insurance policies are to be strongly construed against insurer; instead, ordinary standards of contract construction govern," Nelson Decl., Exh. S – the courts "apply the majority rule" of *contra proferentem*, but only after they "first ascertain the intent of the parties from the policy as a whole, considering extrinsic and parol evidence to construe any ambiguity." *Empire Fire and Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 98 and n.10 (1997). Similarly, Arizona has adopted the same basic approach, stating in *State Farm Mut. Auto Ins. Co. v. Wilson*, 162 Ariz. 251, 257 (1989), that "before construing ambiguous terms of insurance policy against insurer, [courts] must examine the disputed language, public policy considerations, and the purposes of the transaction as a whole," therefore indicating

14

that the doctrine may be applied, but only after first determining if there is any other basis for interpreting the ambiguous contract in a particular way.

24.     For the large majority of states (43), the *contra proferentem* doctrine can be applied in the same fashion as do the courts in New York, such that there is no problem with conflicts of law. For the other states, the Court merely must follow a second approach – not multiple approaches, as Nationwide would suggest – by first examining any relevant extrinsic evidence which might influence the interpretation of the ambiguous provision. Because the standard form policies at issue were drafted by Nationwide, and were not negotiated, it is very unlikely that there will be such evidence of any magnitude, or which raises individualized concerns. Thus, any evidence which is produced can be examined without difficulty on a class-wide basis. To the extent there is no such evidence, or it can easily be considered by the Court and it rejects its impact on the contract interpretation issue, then the Court can apply the doctrine in a uniform way, applicable to residents from all states in which Nationwide conducts business.

## The "Reasonable Expectations" Doctrine

25.     As a second area of purported conflict, Nationwide cites the "reasonable expectation" doctrine, attached a summary of state law as Exhibit T to the Nelson Declaration, entitled "Reasonable Expectations Doctrine." Again, however, the differences are far less significant than Nationwide would have the Court believe. Initially, Nationwide lists 12 states as either rejecting or not addressing the doctrine: Arkansas, Florida, Idaho, Maryland, Mississippi, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah and Washington. For class members residing in these states, there will be no problem for the Court, since -- if the issue goes before a jury -- it can simply structure a jury instruction that does not apply the doctrine to those class members.

15

26.     The remaining 39 states (for ease of reference, I will refer to the District of Columbia as one of the states, rather than treating it separately) recognize the "reasonable expectation" doctrine.  Of those, 24 have adopted the doctrine, which specifies that, in interpreting a contract -- including whether the contract should be deemed to be ambiguous, and thus interpreted in favor of the insured -- the Court should consider what are the "reasonable expectations" of a reasonably prudent insured.  These include Alabama, Alaska, Arizona, California, Colorado, Delaware, District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Massachusetts, Minnesota, Montana,  New Hampshire, New York, North Carolina, Oregon, Pennsylvania, Tennessee and Vermont. Nelson Exh. T.  Nationwide fails to explain how any slight variations in how the doctrine is described change, in any material way, how it must be applied.

27.     The remaining 15 states have also adopted the "reasonable expectations" doctrine, with one limitation – they only apply it *if* the contract has already been deemed to be ambiguous:  Connecticut, Hawaii, Louisiana, Michigan, Missouri, Nebraska, Nevada, New Jersey, New Mexico, Oklahoma, Rhode Island, Virginia, West Virginia, Wisconsin and Wyoming.

28.     Thus, the Court need only consider three approaches with respect to the "reasonable expectation" doctrine.  It is irrelevant to the 12 states which have not adopted it.  For the 24 states which permit its application prior to a determination of ambiguity, including New York, the Court can consider, in determining whether the contract is ambiguous, whether the "reasonable expectation" of a prudent insured would have been that he or she would be covered for the full repair costs, less  deductible, without an additional betterment deduction.  Finally, for the remaining 15 states which apply it after a finding of ambiguity, the Court can apply the doctrine at that time.  In practice, there also is little if any difference between the application of the "reasonable expectations"

16

doctrine to an ambiguous contract and the *contra proferentem* doctrine. As a result, the apparent reliance on two rules of construction really mean one in that circumstance -- an ambiguous contract is interpreted in favor of the insured. But again, only three approaches are required at most, not the multiple, conflicting approaches that Nationwide suggests. Significantly, whether or not the contract is ambiguous is a question of law. As a result, there is no concern here over how the issue might be handled at trial, since that will have been resolved before trial in any event.

**The Use of Extrinsic Evidence**

29. As the third purported area of dispute among the states, Nationwide attaches yet another chart to the Nelson Declaration, entitled "Extrinsic Evidence to Interpret Policy Terms." A review of this summary also reveals substantial similarity between the states, with only two basic approaches followed. Thirty-eight states follow what is known as the "four corners" rule, whereby the Court must determine whether the contract is unambiguous based on the "four corners" of the contract, and if it is, then the language of the contract should be applied as written, as the best representation of the parties' intent. Nelson Decl., Exh. U. *See* Calamari and Perillo, *The Law of Contracts* (3d ed 1987) ("The Plain Meaning Rule states that if a writing, or the term in question, appears to be plain and unambiguous on its face, is meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature."); Samuel Williston, 4 *A Treatise on the Law of Contracts* § 611 (3d ed. 1961), at 554 ("The object of construction is to ascertain the intention which the parties have expressed in the language of their contracts, and where there is no ambiguity in the terms used, the instrument itself is the only criterion of the intention of the parties."). These include Alabama, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kentucky, Maine, Massachusetts, Maryland, Michigan,

17

Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia and Wyoming.

30. Although Nationwide represents that Louisiana does not address this issue, that is not true. It has adopted the majority "four corners" approach. *See, e.g., Corbello v. Iowa Production*, 806 So.2d 32, 41 (La. App. 2001) ("The meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the contract."). Thus, for these 39 states (including Louisiana), of which New York is one, the Court must evaluate the "four corners" of Nationwide's standard form automobile insurance contracts to determine whether the propriety of betterment deductions can be elicited from the "plain meaning" of the contract.

31. In contrast, 12 states, Alaska, Arizona, Arkansas, California, Colorado, Illinois, Kansas, New Mexico, Rhode Island, Vermont, Washington and Wisconsin, allow certain extrinsic evidence to assist the interpretation of a contract even before a finding that it is ambiguous, particularly if such evidence is needed to determine whether or not the contract is, in fact, ambiguous. Nelson Decl., Exh. U.

32. Nationwide tries to heighten the apparent variations by citing to purport variations in the laws of several states, but the differences do not exist. For example, Nationwide cites *Rummel v. St. Paul Surplus Lines Ins. Co.*, 945 P.2d 985, 988 (N.M. 1997), for the proposition

that New Mexico courts "allow extensive evidence to be considered to determine the existence of any ambiguity," Def. Mem. at 12, and then cites *Kipp v. Estate of Chips*, 732 A.2d 127, 131 (Vt. 1999), for the proposition that "some states disallow extrinsic evidence where policy language is unambiguous, but allow a court to consider it in deciding whether there is an ambiguity." Def. Mem. at 12. While these cases are portrayed as differences, in fact they are the same – both allow extrinsic evidence (if any is available) to demonstrate whether the language in the contract should be deemed to be ambiguous.

33.    The final issue identified by Nationwide as involving disparate state laws is the existence of ambiguity, and how the Court should determine it. Other than whether extrinsic evidence should be considered, discussed above, all of the states follow the same law. As explained in Plaintiffs' Reply Memorandum, the differences Nationwide asserts in its opposition are illusory.

### The Manageability of a Multistate Class

34.    As is evident from an examination of the laws of the various states, there are few true variations among the states with regard to rules of construction applicable to the pending case. As a result, applying the proper standards will not be difficult or unmanageable. This contrasts sharply with non-contract disputes, where there may be numerous conflicts among the states or individual issues that have to be resolved, making class certification improper. Nearly all of the cases Nationwide relied upon to support its claim that multistate classes should be denied involve these types of circumstances *which do not involve the breach of a standard form contract, where the laws of the various states are uniform.* Attached hereto as Exhibit A is a chart listing the cases cited by Nationwide, demonstrating the nature of the issues they raise and their inapplicability to the pending case.

35.     With these rules of construction for contract interpretation evaluated for all of the relevant states, it is now relatively easy – and certainly "manageable" – for the Court to adjudicate this class action. First, the Court must determine whether Nationwide's standard form automobile insurance policies are unambiguous. For 39 states (listed in paragraph 28 and 29 above), including New York, the Court must simply look at the "four corners" of the form contract to see if a conclusion can be reached as to whether a betterment deduction is permissible under its clear and unambiguous terms. Of those states, 17 also permit the Court to consider the "reasonable expectations" of a prudent insured in interpreting the contract and determining whether it is ambiguous or unambiguous (listed in paragraph 26 above). The remainder of those states either do not recognize the "reasonable expectations" doctrine (Florida, Idaho, Maryland, Mississippi, North Dakota, Ohio, South Carolina, South Dakota, Texas and Utah, *see* paragraph 25 above), or only apply it *after* the contract has been deemed to be ambiguous (Connecticut, Hawaii, Louisiana, Michigan, Missouri, Nebraska, Nevada, New Jersey, Oklahoma, Virginia, West Virginia and Wyoming, *see* paragraph 27 above).

36.     For the remaining 12 states which do not follow the "four corners" approach to unambiguous contracts (listed in paragraph 31 above), the Court may also consider extrinsic evidence to determine whether the contract is ambiguous. Of those, five either do not recognize the "reasonable expectations" doctrine (Arkansas and Washington) or don't recognize it prior to a finding that the contract is ambiguous (New Mexico, Rhode Island and Wisconsin), while the remaining seven permit the Court to apply it while also considering any extrinsic evidence.

37.     While Nationwide will undoubtedly argue that even this structured analysis of the state law variations is too complicated for the Court, it is important to recognize that, because

so many of the laws are identical, the states can be placed in four groups for this initial analysis: (1) the four corners, plus reasonable expectation; (2) the four corners, without reasonable expectation; (3) the extrinsic evidence, with reasonable expectation; and (4) the extrinsic evidence, without reasonable expectation. Even these four groups may merge, since the Court may well conclude that there is no extrinsic evidence which supports a particular interpretation of the contract, in which case all it has to go on to determine whether the contract is unambiguous is the four corners of the policies, plus the reasonable expectation of a prudent insured for those states which recognize it. Plaintiffs believe it very likely that under *any* of these scenarios, the Court will deem the contracts to be ambiguous, making the variations meaningless in any event.

38.     If the Court deems the contract unambiguous, it simply interprets it to see if a betterment deduction is consistent with the clear and unambiguous terms. If, on the other hand, the Court deems the contract ambiguous, it must apply proper rules of construction to construe the policy. Here again the states can be broken down into only a few subgroups.

39.     As summarized above, 43 states have adopted a straight-forward interpretation of the *contra proferentem* doctrine, pursuant to which an ambiguous provision in a form contract drafted by the insurer is construed in favor of the insured (*see* the list of those states at paragraphs 17, 22 above). Because the "reasonable expectations" doctrine is merely another way of applying *contra proferentem*, it is not particularly significant which of those states may or may not recognize the "reasonable expectations" doctrine, but, in any event, only 10 of the 43 have not recognized the doctrine. The remaining 33 states – including New York – permit the "reasonable expectations" doctrine to be used in conjunction with *contra proferentem*.

40.     For the remaining 8 states (listed in paragraph 23 above), the Court should first consider any extrinsic evidence which may assist it in construing the ambiguous contract prior to applying *contra proferentem*.  All but two of those states (Maryland and North Dakota) also permit the "reasonable expectations" doctrine to be considered.

41.     Although there is no reason the Court cannot manage this class action by grouping the states as summarized herein, even if the Court did not wish to do so, at a minimum it should certify a class of all states which have adopted the same rules of construction as New York, the forum state. This would mean that the class could be defined to include residents in all states which apply the four corners doctrine to determine whether the contract is ambiguous, as does New York (thereby avoiding any potential problem with considering extrinsic evidence), and then, upon a finding of ambiguity, it would apply the *contra proferentem* doctrine, again without having to first consider all extrinsic evidence.  The majority of states follow the same law as New York, such that, under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985), application of New York law to the nationwide class is entirely appropriate as there is no conflict of laws at issue.

### Adequacy of Class Representative and Class Counsel

42.     Nationwide's challenge to Mr. Steinberg as an adequate representative is completely unsupported.  Mr. Steinberg has shown his substantial commitment to this case by the amount of time and effort he has put into the litigation, and the mere fact that the parties have had disagreements over discovery matters is irrelevant to his adequacy.  Although Mr. Steinberg hopes that the Court will, in its discretion, approve an award of fees for his time and expenses in prosecuting this case on behalf of the Class up until the Pomerantz firm assumed the role of class counsel, he will not seek any attorneys' fees for any time after he has retained class counsel.

Moreover, Mr. Steingberg has no interest in -- and will not be seeking any portion of -- the attorneys' fees that the Pomerantz firm may obtain in this matter. As a result, his entire effort upon being appointed class representative will be solely in that capacity, not as class counsel.

43.     In attacking Mr. Steinberg directly, Nationwide also makes much of the fact that the original *pro se* complaint he filed included an additional claim that is not part of the pending class motion – namely, that his vehicle had been repaired with a remanufactured engine, rather than a new one, without his knowledge or consent. Nelson Decl., ¶¶ 14-16. Thus, Mr. Nelson charges that Plaintiff's new claims "are fundamentally different from those he made in his first amended complaint. *Id.*, ¶ 18. But so what? The mere fact that Mr. Steinberg had originally pursued a different claim says nothing about the validity of the current claim, or the propriety of certifying that claim on a nationwide basis. Indeed, much of the support for the pending class motion has developed through discovery which has proven Nationwide's betterment policies. Mr. Steinberg should be applauded, not denigrated, for dropping claims that he learns may not be as strong as he had originally thought for class purposes, rather than wasting the Court's time by continuing to pursue all of his original allegations merely because they had been included in his first filed complaint.

44.     Nationwide also asserts that Mr. Steinberg knew of the betterment charge at the time of his repair, and thus is subject to an individual claim of waiver and estoppel. Nelson Decl. ¶ 15. The fact that Mr. Steinberg had been informed that Nationwide was taking a betterment chage, however, is irrelevant to the issue of whether that represented a breach of contract. Mr. Steinberg certainly did not know of Nationwide's policy *before he entered into the contract*, which is the only knowledge that might have some relevance to the issue. In any event, this type of claim does not

detract from class certification. As a leading commentator writes, "[c]hallenges based on the statute of limitations, fraudulent concealment, releases, causation or reliance usually have been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying issues of defendant's liability." H. Newberg & A. Conte, 1 *Newberg on Class Actions* § 4.46 at 4-104. *See also Purcell v. Hertz Corp*, 175 Ill. App. 3d 1069, 1074, 530 N.E.2d 994 (1988) (in certifying national class of lessees of Hertz car rentals to recover security deposits and accrued interests, court acknowledged, "individual defenses," such as reliance, satisfaction, waiver and consideration did not constitute "overriding individual questions or issues").

45.    The challenge by Nationwide to the adequacy of the Pomerantz firm as class counsel is similarly without basis. The Pomerantz firm has a long-history of successful consumer, securities and antitrust class actions, and its only involvement in this case – the pending class motion – certainly does nothing to raise doubts about its adequacy to represent the class in this matter. Indeed, the Pomerantz firm has frequently been appointed class counsel in complicated matters, and has successfully prosecuted numerous litigations throughout the country. *See* Hufford Aff., Exh. 8 (firm resume).

For the reasons summarized herein, and in Plaintiff's moving and reply papers, I believe that certification of the proposed class is entirely appropriate under Rule 23 and I respectfully urge the Court to grant Plaintiff's motion.

Dated: New York, New York
        June 20, 2002

_____
        D. Brian Hufford

Sworn to before me this
20th day of June, 2002

_____
        Notary Public

**VINCENT K. ENG**
**Notary Public, State of New York**
No. 01EN4686221
**Qualified in Queens County**
Commission Expires December 31, 20___

Exhibit A

**NATIONWIDE MUTUAL INSURANCE COMPANY**
**Summary of Defendant's Cases in Opposition to Multistate Classes**
**(in order in which they are cited in Defendant's opposition brief)**

*In re Rhone Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995)
> Nationwide class action brought on behalf of hemophiliacs infected by the AIDS virus as a consequence of using the products manufactured by drug companies that manufacture blood solids. Cases seek to impose tort liability on the defendants for the transmission of HIV to hemophiliacs in blood solids manufactured by the defendants.

*In re American Medical Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)
> Products liability suit involving penile prostheses. Causes of action include fraudulent and negligent misrepresentation, failure to warn, negligence, strict liability and breach of warranty, both express and implied.

*Georgine v. Amchem Products Inc.*, 83 F.3d 610 (3d Cir. 1996), *aff'd* sub nom. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)
> Class action that seeks to settle the claims of between 250,000 and 2,000,000 individuals who have been exposed to asbestos products. Legal theories include negligent failure to warn, strict liability, breach of express and implied warranty, negligent infliction of emotional distress, enhanced risk of disease, medical monitoring and civil conspiracy. (Mass tort).

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)
> Class action complaint filed against defendant tobacco companies and the Tobacco Institute, Inc. seeking compensation for the injury of nicotine addiction. Causes of action include fraud and deceit, negligent misrepresentation, intentional infliction of emotional distress, negligence and negligent infliction of emotional distress, violation of state consumer protection statutes, breach of express warranty, breach of implied warranty, strict product liability, and redhibition pursuant to the Louisiana Civil Code. (Mass tort).

*Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014 (11th Cir. 1996)
> Class action alleging that AT&T, Sprint, West-Interactive, and others knowingly participated in an enterprise operated in interstate commerce by which people dialing applicable 900-numbers place a bet or wager in the hope of winning a cash prize or some other award of great value. Complaint alleges that this gambling activity is illegal under the laws of all fifty states and constitutes racketeering activity in violation of RICO, the Communications Act of 1934, and the "federal common law" of communications law. Complaint also alleges the defendants committed mail and wire fraud in furtherance of their RICO enterprise.

*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180 (9th Cir. 2001)
> Product liability action involving pacemakers containing the allegedly defective ENCOR Bipolar Passive Fixation Pacing Lead Model 330-854. Class action complaint alleging negligence, products liability, negligent misrepresentation, fraud and deceit, breach of

express warranty, breach of implied warranty, and infliction of emotional distress.

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332 (D.N.J. 1997)
Products liability case. Cause of action stem from an allegedly defective ignition switch found in approximately 23 million vehicles that were manufactured and distributed by defendant Ford Motor Company between the model years 1984 to 1993.

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998)
Class action complaint based on an alleged defect in the anti-lock braking system ("ABS") in certain vehicles that were manufactured and distributed by defendant Chrysler Corporation between the model years 1989 and 1993. Complaint alleges Chrysler sold automobiles with "dangerously defective ABS systems" in violation of the Magnuson-Moss Act and the applicable common law governing fraud and breach of express and implied warranties.

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986)
Class action complaint on behalf of owners of Ford automobiles to pursue breach of warranty claims. Suit arises under the Magnuson-Moss Act. Complaint alleges certain Ford models suffer from a transmission defect that causes the automobiles to slip out of the "park" position and into "reverse."

*Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613 (S.D. Ohio 1996)
Class action products liability case concerning Harvestore silos. Causes of action for strict product liability, negligent design and breach of implied warranty.

*In re Stucco Litigation*, 175 F.R.D. 210 (E.D.N.C. 1997)
Class action (tort). Claims for fraud and suppression; intentional, reckless or negligent misrepresentation; violation of consumer protection statutes; breach of express warranty; breach of implied warranty; strict liability; and negligence.

*In re LifeUSA Holding Inc.*, 242 F.3d 136 (3rd Cir. 2001)
Class action complaint filed by purchasers of LifeUSA "Accumulator" annuity policies. Claims of fraudulent nondisclosures and misrepresentations, negligent misrepresentation breach of duty of good faith and fair dealing, negligence, unjust enrichment, and injunctive relief. No breach of contract claim in complaint.

*Spence v. Glock*, 227 F3d 308 (5th Cir. 2000)
Class action complaint alleging a design defect in Glock handguns. Theories of liability include design defect; failure to warn; fraud, deceit and material misrepresentations of fact; negligence; breach of express and implied warranties; and negligent misrepresentation. (Note in opinion that Georgia law not controlling on tort issues, and that contract claims for breach of express and implied warranty not covered by choice of law provision in the instruction manual.)

2

*In re Ford Motor Co., Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360 (E.D. La. 1997)

> Class action complaint alleging design defect in the Ford Bronco II that renders the Bronco II unreasonably prone to roll over in normal driving conditions. Complaint alleges claims for common law fraud, misrepresentation, breach of express and implied warranty, redhibition, breach of contract and violation of the Magnuson-Moss Warrant Act.

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.*, 98 F.R.D. 254 (D. Del. 1983)

> Class action complaint alleging violations of 1921 Consent Decrees and the Bottler's Contracts between the plaintiff (and proposed intervenors) and Coca-Cola. In Count I plaintiff seeks declaratory relief, injunctive relief and monetary damages for defendant's alleged breach of the Consent Decree and the Bottler's Contracts (in the alternative, plaintiff seeks equitable relief in the form of money damages). In Count III plaintiff seeks declaratory relief and monetary damages for Coca-Cola's alleged violation of the pricing term of the 1921 Consent Decree and the Bottler's Contracts (in the alternative, plaintiff seeks equitable relief in the form of money damages). In Count IV plaintiff asserts an unjust enrichment claim against Coca-Cola.

*Rohlfing v. Manor Care, Inc.* 172 F.R.D. 330 (N.D. Ill. 1997)

> Class action complaint to recover excessive pharmaceutical fees. Complaint alleges violations of the Sherman Act; RICO; Illinois Consumer Fraud Act and common law fiduciary duty owed to plaintiff.

*In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214 (E.D. La. 1998)

> Class action complaint seeking to certify a nationwide class based on a mass tort of fraudulent concealment (of a paint defect in certain vehicles manufactured by Ford) under state law.

*Clay v. American Tobacco Co., Inc.*, 188 F.R.D. 483, 495-98 (S.D. Ill. 1999)

> Class action brought on behalf of all persons who, as children, purchased and smoked cigarettes designed, manufacturer, promoted, or sold by the defendants. Allegations of civil conspiracy to effect illegal sales of cigarettes to children; that defendants knew product was unsafe for its intended use in violation of Restatement (Second) of Torts; unjust enrichment; violation of consumer protection statutes of Illinois, Kentucky, North Carolina, New York, the District of Columbia, and Delaware; and strict liability for supplying a defective and unreasonably dangerous product.

*Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 312-313 (S.D.N.Y. 1999)

> Class action brought on behalf of all persons and entities who from June 1994 to present purchased an IBM Aptive, ThinkPad, or PC 700 with an "Mwave" digital signal processor. Claims against IBM for breach of implied and express warranties under the Magnuson-Moss Act and common law; violation of the New York State consumer protection law; fraud; negligent misrepresentation; breach of contract; and specific performance in the form of replacement or repair.

*Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc.*, 181 F.R.D. 331, 337-338 (N.D. Miss. 1998)

> Class action complaint brought by practicing optometrists from the states of Mississippi, Kentucky, Montana, California, Colorado, Arizona, Missouri, New Mexico, Florida, Georgia and Illinois who bring claims for breach of contract, breach of warranty, fraud, and violations of RICO.

*Majeski v. Balcor Entm't Co. Ltd.*, 134 F.R.D. 240, 249 (E.D. Wis. 1991)

> Class action on behalf of all persons who purchased limited partnership interests in Balcor Film Investors during the period January 8, 1985 through December 31, 1985. Allege violations of § 10(b) and Rule 10b-5. (Note: *Majeski* and *Eckstein* plaintiffs' federal security claims certified for class treatment. *Majeski* plaintiffs' state law claim of breach of fiduciary duties certified for class treatment; *Majeski* plaintiffs' state law claims for fraud; negligent misrepresentation; misrepresentation - strict liability; breach of contract and derivative action not certified for class treatment.)

*Bresson v. Thomson McKinnon Sec. Inc.*, 118 F.R.D. 339, 344 (S.D.N.Y. 1988)

> Class action on behalf of all persons who during the period January 1, 1981 through February 6, 1984 purchased interests in certain limited partnerships. Complaint alleges violation of § 10(b) and Rule 10b-5; common law negligence; fraud; and breach of fiduciary duty.